UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EDWARD J. GOODMAN LIFE INCOME TRUST,
on behalf of itself and others similarly situated,

     Plaintiffs,

v.                                                    CASE NO: 8:06-cv-01716-T-23EAJ

JABIL CIRCUIT, INC., et al.,

     Defendants.

_____/

## **ORDER**

The plaintiffs assert claims against Jabil Circuit, Inc., ("Jabil") and sixteen individual defendants (collectively, the "defendants") pursuant to sections 10(b), 14(a), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Rules 10b-5 and 14a-9.  The defendants move (Doc. 75) to dismiss the amended complaint (the "complaint") (Doc. 73) for failure to state a claim pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, and failure to satisfy the pleading requirement of Rule 9(b), Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The plaintiffs respond (Doc. 79) in opposition.

Factual Background

The complaint contains the following factual allegations, assumed true for the sole purpose of deciding a motion under Rule 12(b)(6).

I. The Parties

A. The Plaintiffs

Appointed the lead plaintiffs in a January 18, 2007, order (Doc. 57), Laborers Pension Trust Fund for Northern California ("Laborers") and Pension Trust Fund for Operating Engineers ("Pension") bring this action on behalf of themselves and a putative class of other persons and entities (collectively, the "plaintiffs"), who purchased Jabil publicly traded securities from September 19, 2001, through December 21, 2006, (the "class period").  (Doc. 73, ¶¶ 1, 51)  The plaintiffs allegedly suffered financial loss as a result of the defendants' Exchange Act violations.

B. The Defendants

A Delaware corporation headquartered in St. Petersburg, Florida, Jabil provides "design, production and product management services" to electronics and technology companies.  (Doc. 73, ¶ 3)  Each individual defendant held a directorship or officership at Jabil for all or part of the class period.  (Doc. 73, ¶ 72)  Timothy L. Main ("Main") served as the company's chief executive officer and president and as a director. (Doc. 73, ¶ 55)  Forbes I.J. Alexander ("Alexander") served as treasurer from November, 1996, through August, 2004, and was promoted to chief financial officer in September, 2004.  (Doc. 73, ¶ 64)  Mark T. Mondello ("Mondello") was appointed chief operating officer in 2002.  (Doc. 73, ¶ 56)  Ronald J. Rapp ("Rapp") served as chief operating officer from 2000 through 2002.  (Doc. 73, ¶ 66)  Chris A. Lewis ("Lewis") acted as chief financial officer from August, 1999, through September, 2004.  (Doc. 73, ¶ 65)  Scott D. Brown ("Brown") was appointed executive vice-president in November,

2002.  (Doc. 73, ¶ 57)  Wesley B. Edwards ("Edwards") served as a senior vice-president (Doc. 73, ¶ 67), and Robert L. Paver ("Paver") as general counsel.  (Doc. 73, ¶ 68)  William D. Morean ("Morean") served as chairman of the board of directors.  (Doc. 73, ¶ 53).  The other directors include Laurence S. Grafstein ("Grafstein") (beginning in April, 2002), Mel S. Lavitt ("Lavitt"), Lawrence J. Murphy ("Murphy"), Frank A. Newman ("Newman"), Steven A. Raymund ("Raymund"), Thomas A. Sansone ("Sansone"), and Kathleen A. Walters ("Walters") (beginning in July, 2005).  (Doc. 73 at 33, 36-40)

## II. Stock Option Plan

During the class period and as part of its compensation program, Jabil granted stock options to its directors, officers, and employees.  (Doc. 73, ¶ 80)  Jabil was required to issue the options in accord with the company's 1992 Stock Option Plan and 2002 Stock Incentive Plan (collectively, the "1992 and 2002 Plans").  (Doc. 73, ¶ 80)  A stock option grants the recipient an option to purchase company stock at a specified price, called the "exercise price."  (Doc. 73, ¶ 4)  The 1992 and 2002 Plans require the exercise price "to be at least equal to the fair market value[1] of shares of common stock on the date of the grant."  (Doc. 73, ¶¶ 92, 111)  Thus, when exercising an option, the recipient purchases stock at the market price on the day of the grant, rather than the price on the day of purchase.  (Doc. 73, ¶ 4)

The plaintiffs allege that the defendants violated the 1992 and 2002 Plans by approving "backdated" stock option grants to directors and officers during the class

---

[1] The 2002 Plan defines fair market value as "the closing sales price for such stock (or the closing bid, if no sales were reported)."  (Doc. 73, ¶ 111, n.15)

period.  (Doc. 73, ¶ 5)  "'Backdating' is a practice by which a stock option is reported as being granted on one date, but . . . actually had been backdated weeks or months to a date when the stock was trading at a lower price."  (Doc. 73, ¶ 6)  The exercise price of a backdated option is less than the fair market value of a share of common stock on the day of the grant, resulting in an "instant paper gain."  (Doc. 73, ¶¶ 8, 117)

Although not unlawful per se, backdating requires attention to Generally Accepted Accounting Principles ("GAAP").  Accounting Principles Board Opinion No. 25 ("APB 25"),[2] titled "Accounting for Stock Issued to Employees," requires the recording of the "intrinsic value" of a fixed stock option on its "measurement date."[3]  (Doc. 73, ¶ 211)  A backdated option has intrinsic value on the measurement date and "the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option."  (Doc. 73, ¶ 211)  Because a stock option that is not backdated has no intrinsic value on the measurement date, a company need not record any employee compensation.  (Doc. 73, ¶ 211)  In documents filed during the class period, Jabil reported that "[t]he Company applies APB Opinion No. 25 in accounting for its stock options, and

---

[2] Statement of Financial Accounting Standards No. 123 ("SFAS 123") has superseded APB 25.  (Doc. 73, 141, n.22)  Under SFAS 123, a corporation accounting for a stock option grant is required to use the fair market value method rather than the intrinsic value method.  (Doc. 73, 141, n.22)  The fair market value method requires a corporation to expense an employee stock option when granted.  (Doc. 73, 141, n.22)

[3] "The measurement date for determining compensation cost in stock option, purchase, and award plans, is the first on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase prices, if any.  That date for many or most plans is the date an option or purchase right is granted or stock is awarded to an individual employee."  In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1168 n.7 (S.D. Fla. 2004).

accordingly, no compensation cost has been recognized for its stock options in the consolidated financial statements." (Doc. 73, ¶¶ 107, 112)

### III. Article and Aftermath

On March 18, 2006, The Wall Street Journal published an article, "The Perfect Payday – Some CEOs reap millions by landing stock options when they are most valuable; Luck – or something else?" (Doc. 73, ¶ 143) The article questions the timing of options granted to executives of several technology companies. (Doc. 73, ¶ 143) The article identifies six stock options granted to Jabil's chief executive officer, Main, at "suspicious" times between 1998 and 2001. (Doc. 73, ¶ 144) A statistical analysis performed at the behest of the newspaper calculates the supposed odds of Main's six grants occurring at such auspicious moments as "roughly one million to one." (Doc. 73, ¶ 144) In the days and weeks following publication, Main and other Jabil executives denied that Jabil had engaged in backdating. (Doc. 73, ¶¶ 146-47, 168-69, 180)

Allegedly "diverting investors' focus from backdating allegations," on March 22, 2006, Jabil issued a press release announcing favorable financial results for the second quarter of fiscal year 2006, as well as an improved forecast for the third quarter and entire fiscal year. (Doc. 73, ¶ 15) Main attributed Jabil's success to "burning on fire demand." (Doc. 73, ¶ 151) In response to the positive news, Jabil's stock reached the class period high of $43.31 per share on March 27, 2006. (Doc. 73, ¶ 233) However, as backdating concerns rose, Jabil's stock price "began to decline precipitously" between April 6 and May 1, 2006. (Doc. 73, ¶ 158) Notwithstanding the decline, in April

and early May, 2006, analysts at several prominent institutions expressed their confidence in Jabil and its stock option practice.  (Doc. 73, ¶¶ 159-60)

On May 3, 2006, Jabil disclosed that the Securities and Exchange Commission ("SEC") had initiated an informal inquiry into Jabil's stock option practice.  (Doc. 73, ¶ 163)  Jabil disclosed also that shareholders had initiated a derivative action in state court against Jabil executives and directors who had allegedly breached their fiduciary duty to Jabil in connection with the stock option practice.  (Doc. 73, ¶ 163)  Jabil's board of directors formed the Special Review Committee to review the allegations in the derivative suit and other suits that would follow.  (Doc. 73, ¶¶ 34, 36, 163, 179)  The next day at the company's headquarters, Jabil hosted an analyst day during which Main rejected the backdating allegations and called The Wall Street Journal's article a "witch hunt."  (Doc. 73, ¶¶ 165, 168)  Main's statements failed to forestall the decline of Jabil's stock price.  Between May 3 and 10, 2006, the stock price fell from $40.78 to $38.21 per share.  (Doc. 73, ¶ 164)

On June 12, 2006, Jabil announced a failure to meet the earnings forecast for the third quarter of fiscal year 2006.  (Doc. 73, ¶ 27)  During a conference call with analysts and investors, Main attributed the shortfall to (1) mechanical tooling operation losses, (2) a failure to fulfill contract obligations, and (3) higher costs in the warranty and repair division.  (Doc. 73, ¶ 29)  On June 21, 2006, the United States Attorney for the Southern District of New York issued Jabil a subpoena, requesting material concerning the stock option practice.  (Doc. 73, ¶ 32)

After completion of an internal review, Jabil concluded on November 7, 2006, that its 2005 financial statement and disclosure "should no longer be relied upon" and that it "will need to restate" the information.  (Doc. 73, ¶ 190)  Jabil stated that "[t]he issues under review principally reflect changes in the Company's understanding of the requirements for identifying appropriate measurement dates for option grants as defined in relevant accounting guidance or errors in interpreting such guidance, and administrative and logistical errors made in effecting the options program."  (Doc. 73, ¶ 190)  On December 8, 2006, Jabil announced the Special Review Committee's conclusion that "there is no merit to the allegations in the State Court derivative complaints that Jabil's officers issued themselves backdated stock options or attempted to cause others to issue them."  (Doc. 73, ¶ 193)  On March 21, 2007, Jabil stated that the 2003 financial statement and disclosure "should not be relied upon."  (Doc. 73, ¶ 202)  After the plaintiffs instituted the present action, Jabil announced in a Form 8-K filed on March 28, 2007, that Jabil "will record approximately $54.3 million of aggregate incremental non-cash stock-related compensation charges for the fiscal years 1996 through August 31, 2005."  (Doc. 73, ¶ 41)  Of the $54.3 million expense, Jabil reported incurring approximately $35.0 million in 2005 and $16.2 million in 2003.  (Doc. 73, ¶ 202)

## Motion to Dismiss Standard

For a motion to dismiss, allegations in the complaint are accepted as true and construed favorably to the plaintiff.  Financial Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1282 (11th Cir. 2007).  The allegations "must 'possess enough heft' to set

forth 'a plausible entitlement to relief.'" Financial Sec. Assur., 500 F.3d at 1282 (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1966-67 (2007)).[4]

Discussion

I. Section 10(b) of Securities Exchange Act

The plaintiffs assert in count one that the defendants violated section 10(b) of the Exchange Act and Rule 10b-5.  Alleging expiration of the statute of repose and a failure to satisfy pleading requirements, the defendants move to dismiss the claim.

A. Statute of Limitations

A defendant may raise a statute of limitations defense in a motion to dismiss for failure to state a claim "when the complaint shows on its face that the limitation period has run." Avco Corp. v. Precision Air Parts, Inc., 676 F.2d 494, 495 (11th Cir. 1982). Prior to the enactment of the Sarbanes-Oxley Act of 2002[5] ("Sarbanes-Oxley"), a plaintiff was required to bring a section 10(b) claim "within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S. Ct. 2773, 2782 (1991).  Under Sarbanes-Oxley, a plaintiff must bring a section 10(b) claim within two years after discovery of the facts evidencing securities fraud or within five years after the fraudulent conduct, whichever first occurs.  28 U.S.C. § 1658.  The new, longer

---

[4] The pendency of a securities fraud case permits judicial notice of a required public filing with the SEC, but only to determine the content of the document.  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999).

[5] Public Company Accounting and Investor Protection Act of 2002 ("Sarbanes Oxley Act of 2002"), Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (codified in part at 28 U.S.C. § 1658(b)).

statute of limitations and statute of repose applies to an action commenced on or after July 30, 2002, the effective date of Sarbanes-Oxley.

The defendants argue that the plaintiffs cannot state a claim based on any allegedly false and misleading statement issued more than five years before September 18, 2006, the day the action commenced.  (Doc. 75 at 8)  Under the defendants' argument, the statute of repose bars a claim based on an allegation of a statement issued on or before September 18, 2001.

The complaint includes no allegation suggesting that before July 30, 2002, the plaintiffs knew of any fact sufficient to prompt a reasonable shareholder to investigate possible wrongdoing.  See Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001). The facts alleged and the publicly filed documents submitted by the defendants show that before the February, 2006, publication of The Wall Street Journal's article, a reasonable shareholder had no reason to question the defendants' stock option practice.  Jabil repeatedly assured investors that the company granted stock options at an exercise price equal to 100 percent of the fair market value of common stock on the day of the grant and that the company applied APB 25.  (Doc. 73, ¶¶ 10-11)  A reasonable shareholder had no reason to question the defendants' veracity.

Sarbanes-Oxley requires initiation of the action within the earlier of two years after discovery of a fact evidencing securities fraud or five years after the fraudulent conduct. 28 U.S.C. § 1658.  The two-year limitation poses no problem because the plaintiffs sued the defendants on September 18, 2006, six months after publication of The Wall Street Journal's article.  The five-year repose period prohibits the plaintiffs from basing a claim

on conduct that occurred on or before September 18, 2001.  Although the complaint

contains allegations of false and misleading statements beginning in 1997, any

statement issued on or before September 18, 2001, cannot form the basis of the

plaintiffs' section 10(b) claim.

B. Fraud

To state a claim under section 10(b) or Rule 10b-5, a plaintiff must allege "(1) a

misstatement or omission (2) of a material fact (3) made with scienter (4) upon which

the plaintiff relied (5) that proximately caused the plaintiff's loss."  Theoharous, 256 F.3d

at 1224 (internal quotation marks omitted).  A plaintiff must also satisfy the pleading

requirements of Rule 9(b), Federal Rules of Civil Procedure, and the PSLRA.

To satisfy Rule 9(b)'s particularity requirement for fraud, a plaintiff must set forth

"'(1) precisely what documents or oral representations were made, . . . (2) the time and

place of each such statement and [where possible] the person responsible for making

(or, in the case of omissions, not making) same, . . . (3) the content of such statements

and the manner in which they misled the plaintiff, and (4) what the defendants obtained

as a consequence of the fraud.'"  In re Recoton Corp. Sec. Litig., 358 F. Supp. 2d 1130,

1138 (M.D. Fla. 2005) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th

Cir. 2001)).

To satisfy the PSLRA, a plaintiff must "'specify each statement alleged to have

been misleading [and] the reason or reasons why the statement is misleading.'"

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2508 (2007) (quoting 15

U.S.C. § 78u-4(b)(1)).  "[W]here the false or misleading information is conveyed in

prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1019 (11th Cir. 2004); see also In re AFC Enters., Inc., Sec. Litig., 348 F. Supp. 2d 1363, 1370 (N.D. Ga. 2004). "A sufficient level of factual support for a [10b] claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks omitted). "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Garfield, 466 F.3d at 1262 (quoting 15 U.S.C. § 78u-4(b)(1)).

The complaint alleges that the defendants violated the Exchange Act by knowingly, falsely, and misleadingly stating Jabil's stock option practice, accounting practice, and earnings forecast. (Doc. 73 at 53-139)

### 1. Stock Option Practice

The complaint alleges that during the class period the defendants stated that "[t]he exercise price of all incentive stock options granted under the Plans is to be at least equal to the fair market value of shares of common stock on the date of grant" (the "policy representation"). (Doc. 73, ¶ 10) The plaintiffs allege that the policy representation is false and misleading because the defendants priced stock options lower than the fair market value of common stock on the day of the grant. (Doc. 73,

¶ 117)  The complaint contains the following specific allegations concerning the timing of the representation, the individual defendants who approved the representation, and the reason the representation is false and misleading.

On November 28, 2001, Jabil included the policy representation in the fiscal year 2001 Form 10-K, signed by Lavitt, Lewis, Main, Morean, Murphy, Newman, Raymund, and Sansone.  (Doc. 73, ¶¶ 106-07)  However, Alexander, Brown, Edwards, Lavitt, Lewis, Main, Mondello, Morean, Murphy, Newman, Paver,  Raymund, and Rapp received stock options dated October 12, 2000, at $42.75 per share, "the second lowest trading price of the month."  (Doc. 73, ¶ 100)

On November 25, 2002, Jabil included the policy representation in the fiscal year 2002 Form 10-K, signed by Grafstein, Lavitt, Lewis, Main, Morean, Murphy, Newman, and Raymund.  (Doc. 73, ¶¶ 110-11)  However, Alexander, Murphy, Morean, Sansone, Raymund, Main, Rapp, Brown, Mondello, Lavitt, Newman, Paver, and Lewis received stock options dated September 20, 2001, "the second lowest closing price of the month and the year."  (Doc. 73, ¶ 104)

On November 12, 2003, Jabil included the policy representation in the fiscal year 2003 Form 10-K, signed by Grafstein, Lavitt, Lewis, Main, Morean, Murphy, Newman, Raymund, and Sansone.  (Doc. 73, ¶ 114)  However, Alexander, Brown, Edwards, Grafstein, Lavitt, Lewis, Main,  Mondello, Morean, Murphy, Newman, Paver, Raymund, and Sansone received stock options dated October 17, 2002, at $12.95 per share, "the seventh lowest closing price of the year."  (Doc. 73, ¶ 109)

On November 5, 2004, Jabil included the policy representation in the fiscal year 2004 Form 10-K, signed by Alexander, Grafstein, Lavitt, Main, Morean, Murphy, Newman, Raymund, and Sansone.  (Doc. 73, ¶¶ 125-26)  However, Grafstein, Murphy, Newman, Sansone, Main, Mondello, Lewis, Brown, Alexander, Edwards, Lavitt, Morean, Paver, and Raymund received stock options dated October 2, 2003, at $26.14 per share, "the lowest closing price of the month and the second lowest trading price for the remainder of the calendar year."  (Doc. 73, ¶ 115)  Additionally, Grafstein, Murphy, Newman, Sansone, Main, Mondello, Lewis, Brown, Alexander, Edwards, Lavitt, Morean, Paver and Raymund received stock options dated December 16, 2003, at $26.75 per share, "the sixth lowest trading price of the month."  (Doc. 73, ¶ 115)

On October 28, 2005, Jabil included the policy representation in the fiscal year 2005 Form 10-K, signed by Alexander, Grafstein, Lavitt, Main, Morean, Murphy, Newman, Raymund, Sansone, and Walters.  (Doc. 73, ¶ 138)  The complaint includes no allegation of the specific dates of suspiciously timed stock option grants in 2005.  However, Alexander, Brown, Edwards, Grafstein, Lavitt, Main, Mondello, Morean, Murphy, Newman, Paver, Raymund, and Sansone received stock options dated October 20, 2004, at $24.02 per share.  (Doc. 73, ¶ 127)  Twenty days later, the stock price rose to $25.09 per share.  (Doc. 73, ¶ 127)

The plaintiffs rely on the statement of one confidential witness ("CW"), CW5, to support the claim that Jabil backdated the "suspiciously timed" stock options.  A treasury analyst in the St. Petersburg office from March, 1999, through August, 2005, CW5 "was responsible for the administration of stock options, as well as cash

- 13 -

management."  (Doc. 73, ¶ 48(e))  CW5 "was also responsible for entering details of grant 'letters' that Kathryn Vetter[6] . . . forwarded to CW5 from Jabil's Legal Department regarding the granting and issuance of options into the Equity Edge information system."  (Doc. 73, ¶ 48(e))  "CW5 was also responsible for handling the exercising and cancellation of options on behalf of the options recipients."  (Doc. 73, ¶ 48(e))  In 2001, Jabil officers received stock options.  (Doc. 73, ¶ 105(a))  Following September 11, 2001, the price of Jabil's stock declined below the exercise price of the options. (Doc. 73, ¶ 105(a))  CW5 reports that Jabil issued the officers new stock options "in the same exact amounts as the options they received earlier in the year, but at a new, lower strike price."  (Doc. 73, ¶ 105(b))  CW5 states that Vetter informed CW5 that "these new options were a replacement for the options that the officers received earlier in 2001 because those options were now 'underwater.'"  (Doc. 73, ¶ 105(b))  "[W]hile the grant date of the replacement options was September 21, 2001, documentation for input into 'Equity Edge' was provided to CW5 several months after September 2001 and possibly as late as March 2002."  (Doc. 73, ¶ 105(b))

The PSLRA imposes no requirement that a plaintiff name a confidential witness. Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir. 2000); In re PSS World Med., Inc. Sec. Litig., 250 F. Supp. 2d 1335, 1350 (M.D. Fla. 2002).  However, the PSLRA requires a plaintiff to describe the confidential witness with sufficient particularity to support the probability that the witness is an actual person who possesses information about the

_____

[6] Vetter served as Paver's executive assistant.  (Doc. 73, ¶ 48(e))

alleged violation.  <u>Novak</u>, 216 F.3d at 313-14; <u>In re PSS World Med.</u>, 250 F. Supp. 2d at 1350.

The defendants argue that the plaintiffs (1) fail to allege "that any specific grant of stock to any specific defendant was backdated"; (2) fail to allege "that any grant was backdated from any given actual (or approximate) date of authorization"; (3) fail to allege "the role played by each defendant with respect to each such grant"; (4) fail to allege "the means by which the backdating occurred on each occasion"; and (5) fail to allege "the amount of backdated stock each defendant received and the specific benefit obtained."  (Doc. 75 at 14-15)

Although the complaint specifies the offending statement and identifies when and where the defendants issued the statement, the complaint includes deficient allegations concerning the falsity of the statement.  The plaintiffs purport to allege repeated instances of backdating by stating the dates of "suspiciously timed" option grants and the individual defendants who received the grants.  However, the plaintiffs never allege that any specific grant of stock to any specific defendant was backdated.  The issuance of suspiciously timed options fails to convert the policy representation into a false and misleading statement.

To demonstrate falsity and misrepresentation, the plaintiffs also rely on the statement of CW5, who addresses the options granted in only 2001.  Construing the allegations in the plaintiffs' favor, the complaint alleges sufficient facts to support the probability that CW5 is an actual person who possesses information about possible backdating.  CW5's report concerning the timing of the entry of the replacement options

may provide circumstantial evidence of backdating on a particular occasion.  (Doc. 73, ¶ 105(b))  However, the plaintiffs fail to adequately allege a connection between the replacement options dated September 21, 2001, and the "suspiciously timed" options dated September 20, 2001.  (Doc. 73, ¶¶ 104-05)  The CW5 allegations therefore fail to provide a sufficient basis for inferring that any statement is false and misleading.

## 2. Accounting Practice

During the class period, the defendants allegedly represented in public filings the company's policy of applying APB 25 and the company's compliance with APB 25 ("the APB 25 representation").  The defendants included the APB representation in each Form 10-K for fiscal years 2001 through 2005.  (Doc. 73, ¶¶ 106, 110, 112-14, 125, 128, 137, 139)  The plaintiffs allege the APB 25 representation is false and misleading because the defendants failed to record the appropriate compensation expense for backdated options.  (Doc. 73, ¶¶ 106, 110, 112-13, 125, 137)  The plaintiffs allege the materiality of the failure to record.  (Doc. 73, ¶¶ 214-17)

The plaintiffs allege that throughout the class period the defendants falsely and misleadingly stated in each Form 10-K Jabil's quarterly and annual earnings.  (Doc. 73, ¶¶ 106, 110, 122-25, 131-33, 136-37, 149)  The plaintiffs allege that each financial statement is false and misleading because Jabil "failed to record material amounts of compensation expense in accordance with APB Opinion No. 25."  (Doc. 73, ¶¶ 106, 110, 122-25, 131-33, 136-37, 149)  The plaintiffs allege that the granting of backdated options required Jabil to record a compensation expense.  (Doc. 73, ¶¶ 100, 104, 109, 115, 127)  Each false financial statement allegedly enabled Jabil to meet its projection

forecast and "caused Jabil's stock price to be artificially inflated, allowing the defendants to pocket huge insider trading profits on top of exercising and selling retroactively priced stock options for millions of dollars" and "to reap millions of dollars in incentive based bonuses (¶¶ 53-68) for meeting and exceeding profitability goals."  (Doc. 73, ¶ 120)

The complaint specifies each offending statement and identifies when and where each statement was issued.  The complaint alleges which individual defendant signed each Form 10-K.  The complaint generally alleges that each statement is false and misleading because Jabil failed to record the appropriate compensation expense for the backdated options.  However, the complaint fails to allege an adequate basis for the claim that Jabil was required to record a compensation expense for the options.  APB 25 would require the recording of a compensation expense only if Jabil had issued backdated options.  As previously established, however, the complaint fails to adequately allege backdating.

### 3. Denial of Backdating

The plaintiffs allege that the defendants repeatedly denied that Jabil had granted backdated stock options.  This section groups each statement into one of four categories based on shared characteristics.

In response to The Wall Street Journal's inquiries, "Jabil executives denied that any backdating had taken place, instead falsely stating that '[t]he scheduled meetings of the compensation committee and the Board determined and dictated the date of grants, not the Company's stock price.'"  (Doc. 73, ¶ 146)  In a March 21, 2006, article the St. Petersburg Times "repeated Jabil's denials of wrongdoing made to *The Wall Street*

*Journal* that 'the company did not backdate grants or time them ahead of favorable news, basing them on scheduled meetings of the compensation committee and the board." (Doc. 73, ¶ 147)

"Section 10(b) liability can be predicated on a defendant's false statement to securities analysts or to the financial or news media." In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1339 (S.D. Fla. 1999) (citing Basic v. Levinson, 485 U.S. 224, 228, n.4, 108 S. Ct. 978 (1988)). "A company may be held liable for statements made to analysts that reach the market, where the plaintiff alleges entanglement between the [c]ompany's executives and the analysts." In re Sunbeam, 89 F. Supp. 2d at 1339 (citing Gross v. Medaphis Corp., 977 F. Supp. 1463, 1474 (N.D. Ga. 1997)). "A plaintiff must (1) identify specific forecasts and the company insider who adopted them; (2) point to specific interactions between the insider and the analyst [or journalist] which gave rise to the entanglement; and (3) state the dates when these interactions occurred." Gross, 977 F. Supp. at 1474. In other words, a plaintiff must allege who conveyed what specific information to which analyst or journalist and when this occurred.

The plaintiffs' allegations fail to satisfy the particularity requirement because they fail to identify which defendant conveyed the denial to the news media and when this occurred. The plaintiffs fail to allege how each statement was conveyed, whether in an interview, press release, or some other manner. Absent an allegation sufficient to characterize each statement as "group-published information," it is unreasonable to presume each statement is the result of the defendants' collective conduct. See Phillips, 374 F.3d at 1019; see also In re AFC Enters., 348 F. Supp. 2d at 1370.

According to a MarketWatch article, at a May 4, 2006, analyst event at Jabil's headquarters "Main said that there was 'absolutely no backdating' of stock options that either he, or other Jabil executives, received between 1998 and 2001." (Doc. 73, ¶ 168)  According to a St. Petersburg Times article, Main also stated that the timing of the stock option grants was a matter of chance and that "[t]he math is right" but "[t]he conclusions are wrong." (Doc. 73, ¶ 169)  Although in this instance the plaintiffs identify which defendant conveyed what specific information to which news outlet and when, the plaintiffs fail to adequately allege backdating and, consequently, fail to allege adequately the falsity of the statement.

According to a MarketWatch article, at the May 4, 2006, analyst event, Main stated "that he would be 'shocked into another dimension' if the probe found anything improper" and called The Wall Street Journal's article a "'witch hunt.'" (Doc. 73, ¶ 168-69)  Main allegedly stated, "'I want to give you an appreciation for basically how [pissed] off I am about this whole thing . . . . I guess this is part of being a successful, big company.  People want to take shots at you.'" (Doc. 73, ¶ 169 (alteration in original))  According to an article in The Tampa Tribune, Raymund stated, "We've always done everything exactly according to procedure and with transparency, and there's no reason to change.  I think any aspersions cast in our direction are unfounded and Jabil is being penalized for extraordinary results for their stockholders." (Doc. 73, ¶ 167)  The plaintiffs identify which defendant conveyed what specific information to which news outlet and when.  However, the representations are vague statements of opinion, which present no actionable misrepresentation.  See Communications Workers of Am. Plan

- 19 -

for Employees' Pensions and Death Benefits v. CSK, 525 F. Supp. 2d 1116, 1121

(D. Ariz. 2007); Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998)

("Vague statements of opinion are not actionable under the federal securities laws

because they are considered immaterial and discounted by the market as mere

'puffing.'").  Moreover, the plaintiffs fail to plead exactly why each statement is false and

misleading.

In a June 21, 2006, conference call Jabil executives declined to comment further

on the backdating issue because of the ongoing SEC investigation.  (Doc. 73, ¶ 180)

However, Walters stated, "[Y]ou can assume that everything we said historically still

stands."  (Doc. 73, ¶ 180)  Main stated, "You can go back and look at press releases

and what we said at the analyst day . . . ."  (Doc. 73, ¶ 180)  The plaintiffs fail to explain

exactly why each statement is false and misleading.

### 4. 3Q06 and 2006 Earnings Forecast

The plaintiffs allege that in a March 22, 2006, press release the defendants

projected third quarter revenue "in a range of $2.5 to $2.6 billion and core earnings of

$0.43 per diluted share, depending upon actual levels of production."  (Doc. 73, ¶¶ 150-

51)  The defendants updated their fiscal year 2006 forecast, projecting "revenue of $9.9

billion, $600 million higher than guidance the company provided in December, 2005."

(Doc. 73, ¶ 150)  The defendants expected "to grow full fiscal core earnings per share

33 percent to $1.70 per diluted share."  (Doc. 73, ¶ 150)

The defendants argue that no liability accrues from these "forward-looking

statements," protected under the PSLRA's safe harbor provision.  (Doc. 75 at 34-41)

The PSLRA defines a "forward-looking statement" as (1) "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, . . . or other financial items"; (2) "a statement of the plans and objectives of management for future operations"; (3) "a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations."  15 U.S.C. §§ 77z-2(i)(1), 78u-5(i)(1). A defendant avoids liability for a forward-looking statement if (1) the statement is immaterial or (2) the defendant identifies the statement as forward-looking and accompanies the statement with "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  §§ 77z-2(c)(1)(A), 78u-5(c)(1)(A).  "[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."  Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999).  If a defendant includes meaningful cautionary language, the defendant's state of mind is irrelevant.  Harris, 182 F.3d at 803.

The statement providing guidance for fiscal year 2006 and the third quarter of that year fits the definition of a forward-looking statement.  The statement addresses "financial items," including "statement[s] containing a projection of revenue," "earnings per share," and "[expected] economic performance."  §§ 77z-2(i)(1), 78u-5(i)(1); see also Cutsforth v. Renschler, 235 F. Supp. 2d 1216, 1228 (M.D. Fla. 2002).  In their motion to dismiss, the defendants identify a cautionary statement accompanying the

forward-looking earnings projection.[7]  (Doc. 75 at 38-40)  In the March 22, 2006, press

release, Jabil cautioned that:

> These statements are based on current expectations, forecasts,
> and assumptions involving risks and uncertainties that could cause
> actual outcomes and results to differ materially.  These risks and
> uncertainties include, but are not limited to:  fluctuations in
> operating results; changes in technology; competition; . . .
> managing rapid growth; . . . our dependence on a limited number of
> customers; business and competitive factors generally affecting the
> electronic manufacturing services industry, our customers, and our
> business; other factors that we may not have currently identified or
> quantified . . . .

This cautionary statement warns "of risks of a significance similar to that actually

realized."  Harris, 182 F.3d at 807.  Given the cautionary language, each defendant's

state of mind is irrelevant, and no defendant bears liability for the forward-looking

statement.  See Harris, 182 F.3d at 803.

### 5. Business Condition Omission

According to Business Outlook, on March 22, 2006, Main stated that "[d]emand

for Jabil's outsourcing services continues to be broad-based across numerous markets."

(Doc. 73, ¶ 150)  On the same day, Main and Alexander hosted a conference call in

which they repeated the projection announced in the press release and commented on

Jabil's business condition.  (Doc. 73, ¶ 151)

> Consumer demand's done pretty darn well all year.  And demand feels
> pretty stable.  But for end market contribution overall, again looking at
> the full portfolio of businesses that we're in, I think that a 3 to 5% end
> market growth rate is appropriate.  And again, it is this burning on fire

---

[7] "On any motion to dismiss based upon subsection (c)(1) of this section, the court shall
consider any statement cited in the complaint and any cautionary statement accompanying the
forward-looking statement, which are not subject to material dispute, cited by the defendant."
15 U.S.C. § 78u-5(e).  The plaintiffs raise no objection.

demand for outsourcing services that is driving the growth.  It is just extraordinary right now.

(Doc. 73, ¶ 151)  In response to a question about the strength of demand from large customers, Main stated that "'[i]f you look back at the 10-K, Phillips and Nokia were the two biggest customers, and they were in the low teens.  It would be tough to move the needle a lot if we weren't doing well with the bigger customers.'"  (Doc. 73, ¶ 184)  The defendants further stated during the conference call that "'the instrumentation and medical sector would increase by 10% in the third quarter, reflecting the ongoing growth of assemblies within this sector across multiple customers.'"  (Doc. 73, ¶ 185)  The plaintiffs do not argue that the statements are false.  Instead, the plaintiffs argue that in issuing the statement the defendants "knew, but failed to disclose, that current 'execution' problems occurring throughout the company were compromising Jabil's ability to manufacture, build and ship products in a manner which would enable Jabil to meet its new 3Q06 and fiscal '06 earnings forecast."  (Doc. 73, ¶ 18)

A statement misrepresenting a present or historical fact is not forward-looking and "cannot be cured by cautionary language."  P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96-97 (2d Cir. 2004); see also EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 874 (3d Cir. 2000); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996).  However, a section of a prospectus, conference call, or other disclosure may qualify as a forward-looking statement even though the disclosure includes a statement of current condition.  In Ehlert v. Singer, 245 F.3d 1313, 1317 (11th Cir. 2001), the plaintiffs alleged that a section of a prospectus was misleading absent a particular disclosure.  245 F.3d at 1318.  The plaintiffs did not allege that each statement of

- 23 -

current condition was misleading.  The Eleventh Circuit held that "[b]ecause the

allegation is that this section of the prospectus is misleading, due to material omissions,

we view the section as a whole and determine whether it is forward-looking."  The

section discussed the company's future success and risk factors that might affect that

success.  The Eleventh Circuit concluded that the section qualified as a forward-looking

statement because it was "a statement of future economic performance," as well as "a

statement of the plans and objectives of management for future operations."  245 F.3d

at 1318.

The plaintiffs argue the March 22, 2006, conference call is misleading absent

disclosure of Jabil's operational problems.  The conference call contains statements of

present and historical fact.  (Doc. 73, ¶ 151) ("Consumer demand's done pretty darn

well all year.  And demand feels pretty stable . . . .").  However, because the plaintiffs

allege that a material omission causes the conference call to mislead, <u>Ehlert</u> requires

examination of the conference call to determine whether it is forward-looking.  The

conference call concentrates on Jabil's success in the third and fourth quarters of fiscal

year 2006 and the factors that might affect that success.  The conference call

statements (Doc. 76, Ex. 21 at 2-5) qualify as forward-looking because they discuss

"future economic performance," and "the plans and objectives of management for future

operations."  <u>See</u> 15 U.S.C. §§ 77z-2(i)(1), 78u-5(i)(1); <u>Ehlert</u>, 245 F.3d at 1318.

In their motion to dismiss, the defendants identify a cautionary statement provided

at the beginning of the conference call.

> During the course of this conference call we will be making
> projections and other forward-looking statements regarding future

> events and the future financial performance of the Company.  We
> do caution that these statements are just predictions, and that
> actual events or results may differ materially.  We refer you to the
> documents that we file from time to time with the SEC, including our
> most recent 10-K which was filed on October 28, 2005.  These
> documents contain and identify important factors that could cause
> the actual results to differ materially from those contained in our
> projections or other forward-looking statements.

(Doc. 76, Ex. 21 at 2)  The Form 10-K for fiscal year 2005 includes thirteen pages of risk

factors and includes a list of eleven general factors and a discussion of thirty-seven

specific factors.  (Doc. 76, Ex. 26 at 37-49)  The general factors include an adverse

change in the general economic condition, an adverse change in the use of a

manufacturing facility and the associated fixed cost, and an adverse change in the

efficiency achieved in managing inventory and fixed assets.  (Doc. 76, Ex. 26 at 37)

"Congress was explicit in stating that meaningful cautionary language could

incorporate by reference information contained in documents filed with the SEC."

Harris v. IVAX Corp., 998 F. Supp. 1449, 1454 n.4 (S.D. Fla. 1998) (citing H.R. Conf.

Rep. No. 104-369, at 45 (1995)), aff'd, 182 F.3d 799 (11th Cir. 1999); see also In re

Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 273 n.11 (3d Cir. 2005) (holding that the

cautionary language was sufficient because a press release incorporated by reference

the cautionary statement in the Form 10-K and in the periodic reports).

The cautionary statement in the conference call and Form 10-K warns "of risks of

a significance similar to that actually realized."  See Harris, 182 F.3d at 807.  Given the

cautionary language, each defendant's state of mind is irrelevant, and no defendant

bears liability for the forward-looking statement.  See Harris, 182 F.3d at 803.

C. Scienter

To maintain a section 10(b) claim, a complaint must state with particularity facts creating a strong inference that each defendant acted with scienter in each act or omission alleged.  Tellabs, 127 S. Ct. at 2508 (citing 15 U.S.C. § 78u-4(b)(2)); see also Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1322 (S.D. Fla. 2004).  A complaint satisfies the pleading requirement for scienter by demonstrating "severe recklessness." McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).  The Eleventh Circuit describes severe recklessness as "limited to those highly unreasonable omissions or misrepresentations" that are known to the defendant or so obvious that the defendant must have been aware and "that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers."  McDonald, 863 F.2d at 814. A motive and opportunity to commit fraud provides circumstantial evidence of severe recklessness but cannot alone establish scienter.  Bryant, 187 F.3d at 1285-86.  Tellabs requires consideration of "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  127 S. Ct. at 2510.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, 127 S. Ct. at 2510.  A complaint may aggregate facts to imply scienter as to each defendant but may not rely on group pleading.  Phillips, 374 F.3d at 1017; Primavera Investors v. Liquidmetal Techs., Inc., 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005).

The plaintiffs' scienter allegations relate to the defendants' (1) knowledge of non-public information, (2) financial benefit, (3) committee membership, (4) GAAP violation, and (5) confidential witnesses.  The defendants argue that the allegations, considered alone or together, permit no strong inference of scienter.  (Doc. 75 at 41-57)

### 1. Knowledge of Non-Public Information

The complaint alleges that each individual defendant, by virtue of his position, "knew the adverse non-public information about the business of Jabil, as well as its finances, markets and present and future business prospects."  (Doc. 73, ¶¶ 53-69) The complaint alleges that each individual defendant "knew or should have known" that Jabil had issued backdated stock options and had failed to properly account for the options.  (Doc. 73, ¶¶ 76, 119, 231)  The complaint alleges that in issuing each false statement each individual defendant acted "knowingly" or "knowingly or with severe recklessness."  (Doc, 73, ¶¶ 11, 117-19, 231, 263)

"A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."  Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002).  A conclusory allegation that a defendant "knew," "knew or should have known," or acted "knowingly or with severe recklessness" fails to support an inference of scienter.  See In re Recoton Corp., 358 F. Supp. 2d at 1147 (holding that allegations of "would have known," "knew and ignored," or "recklessly failed to know" fail to satisfy the scienter requirement); In re Sunterra, 199 F. Supp. 2d 1308, 1324 (M.D. Fla. 2002) (holding that an allegation of "must have known" fails to demonstrate scienter).  The complaint's allegations of

knowledge of non-public information fail to raise an inference of scienter with respect to any defendant.

## 2. Financial Benefit and Motivation

The complaint alleges that each individual defendant benefitted financially from the false and misleading statements through one or more of (1) insider trading, (2) the receipt of a backdated stock option, and (3) the receipt of an incentive-based bonus.

The complaint alleges that several individual defendants engaged in insider trading by "selling Jabil stock while in possession of material, adverse non-public information concerning the Company" despite each individual defendant's duty to refrain from such conduct.  (Doc. 73, ¶ 259)  On March 23, 2006, the day after the favorable earnings announcement, Brown, Main, and Sansone sold 244,800 shares of Jabil stock for $8.8 million of profit.  (Doc. 73, ¶ 156)  On March 27, 2006, Alexander and Sansone sold 98,664 shares for $3.9 million of profit.  (Doc. 73, ¶ 156)  On March 30, 2006, Brown sold 58,000 shares for $1.7 million of profit.  (Doc. 73, ¶ 156)  Between March 30 and April 13, 2006, Morean sold 1,017,200 shares for $43.1 million of profit.  (Doc. 73, ¶ 156)

"While a showing of profitable stock trades is not a prerequisite to prove scienter, where it is alleged, plaintiffs 'bear the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing.'"  Druskin, 299 F. Supp. 2d at 1335.  A showing of unusualness requires an allegation of the "amount of trading that the insider conducted before or after the Class Period."  Druskin, 299 F. Supp. 2d at 1335.  "Whether insider trading will support an inference that defendants engaged in securities

fraud 'turns upon (1) the percentage of holdings sold by a defendant, (2) the number of defendants who sold stock, and (3) the difference between stock sales during the relevant time period and prior activity.'" Druskin, 299 F. Supp. 2d at 1335; see also Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d. Cir. 1995) (no inference of scienter where the defendant sold approximately 11 percent of holdings); Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (no inference of scienter where the defendant sold approximately 17 percent of holdings).  "'[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information.*" Ronconi, 253 F.3d at 435 (internal quotation marks omitted, alteration and italics in original).

The complaint alleges the number of shares sold and the amount of profit received by certain individual defendants on certain dates following the issuance of the March 22, 2006, earnings report.  However, the plaintiffs fail to allege the percentage of the defendants' total shares sold after issuance of the report.  The plaintiffs also fail to compare the number of shares sold during the class period with the number of shares sold either before or after the class period.  See Druskin, 299 F. Supp. 2d at 1335.  The complaint's allegations of insider trading fail to support an inference of scienter as to any individual defendant.

The complaint alleges that certain individual defendants benefitted financially from the false and misleading statements because certain individual defendants received backdated stock options on specific occasions between 1997 and 2004.  The complaint characterizes the stock options as "suspiciously timed" because Jabil's committees

priced the options at or near a low point in Jabil's stock price during a particular period. (Doc. 73, ¶¶ 88, 93, 95, 100, 104, 109, 115, 127)

Receipt of a stock option evidences scienter only if the option grant is unusual or suspicious.  See In re Linear Tech. Corp. Derivative Litig., No. C-06-3290, 2006 WL 3533024, at *3 (N.D. Cal. Dec. 7, 2006).  A showing of unusualness or suspiciousness requires an allegation of the amount and timing of the stock options granted during the class period and the options granted before or after the class period.  See In re Linear Tech Corp., 2006 WL 3533024, at *3.  Because the plaintiffs fail to include any such allegation, no unusual or suspicious pattern emerges.  See In re Linear Tech Corp., 2006 WL 3533024, at *3 ("Because plaintiffs provide no facts as to how often and at what times the Committee Defendants have granted stock options in the past, no 'pattern,' let alone a 'striking' one is apparent.")  In fact, the pattern alleged, "a stock grant followed by a price increase," is susceptible of a plausible non-culpable explanation.  (Doc. 75 at 24)  Jabil's committees could have decided "that it made sense to try to anticipate possible stock price increases when timing grants so that lower cash salaries can be paid to management."  (Doc. 75 at 24)  Moreover, as the defendants argue, "in many periods, Jabil's growth prompted its volatile stock price to increase, which would lead to increases after almost any date selected during such periods." (Doc. 75 at 24)  A reasonable person would not necessarily find the inference of scienter cogent and at least as compelling as an opposing inference.  See Tellabs, 127 S. Ct. at 2510.  The plaintiffs' allegations of receipt of stock options fail to support an inference of scienter as to any defendant.

The complaint alleges that each individual defendant benefitted financially from the false and misleading statements because each individual defendant received "incentive-based bonuses . . . which rewarded each executive for achieving earnings and revenue targets." (Doc. 73, ¶ 46)  A report of the compensation committee provides that "[b]onuses are paid on an annual or quarterly basis and are based on qualitative and subjective factors, including the pre-tax profitability of the Company, business development, operational performance, and other measures of efficiency appropriate to the officer compensated."  (Doc. 73, ¶ 80)  The complaint alleges the bonus each individual defendant received each year.  (Doc. 73, ¶¶ 53-68)

Receipt of a standard incentive-based bonus has limited probative value for scienter. Kalnit v. Eichler, 264 F.3d 131, 139-40 (2d Cir. 2001); In re Metris Cos., Inc. Sec. Litig.,, 428 F. Supp. 2d 1004, 1013 (D. Minn. 2006) ("[I]t is well-established that a desire to get greater pay and bonuses attaches to executives in every company.  Such a desire is not probative of the question of the executives' motivation to defraud the market.").  An "extraordinary" incentive package provides circumstantial evidence of scienter.  In re AFC Enters., 348 F. Supp. 2d at 1374.  The complaint fails to allege facts demonstrating that any individual defendant received or had the potential to receive an extraordinary incentive package.  The bonus allegations yield no material inference of scienter as to any defendant.

### 3. Committee Membership

The complaint alleges that between 1996 and 2006, several defendants served on committees "directly responsible for the granting or issuance of stock options and oversight of the Company's publicly issued financial statements and internal controls." (Doc. 73, ¶ 86)  The committees include the non-executive stock option committee, generally empowered stock option committee, audit committee, and compensation committee.

The complaint includes the following specific allegations concerning the committees.  During the class period, the non-executive stock option committee administered the 1992 and 2002 Plans with respect to employees who were neither directors nor officers.  (Doc. 73, ¶ 81)  The non-executive stock option committee allegedly "approved and/or recklessly disregarded the backdating of stock option grants to the Company's employees, causing the Company to materially make false and misleading statements to the public and investors regarding its true financial condition." (Doc. 73, ¶ 84)  From the beginning of the class period through fiscal year 2002, the generally empowered stock option committee administered the 1992 and 2002 Plans with respect to everyone, including directors and officers.  (Doc. 73, ¶¶ 81, 87)  During the class period, the audit committee oversaw Jabil's auditing, accounting, and financial reporting.  (Doc. 73, ¶ 75)  The audit committee allegedly approved or recklessly disregarded "unlawful stock option practices[,] . . . including preparing false reports in the Company's proxy statements, annual reports and interim financial reports that did not disclose the backdating of stock options and failing to properly account for stock

option grants in accordance with APB Opinion No. 25." (Doc. 73, ¶ 76)  During the class period, the compensation committee reviewed and established compensation plans, salaries, bonuses, and other officer benefits. (Doc. 73, ¶¶ 77-78, 129)  After fiscal year 2002, the compensation committee assumed the duties of the generally empowered stock option committee. (Doc. 73, ¶ 85)  The complaint alleges which individual defendant served on which committee and at what time.

Membership in a committee responsible for approving a backdated option or for monitoring the exercise date of an option may contribute to an inference of scienter. See In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007) ("[T]he members of the compensation committee were charged with a specific 'duty to monitor' the exercise dates of the options granted.  Their failure to do so, as demonstrated by the facts alleged in the Complaint, gives rise to an inference of scienter.") (internal citation omitted); Ryan v. Gifford, 918 A.2d 341, 355 n.35 (Del. Ch. 2007) ("[A]ny grant of options had to have been approved by the committee, and that committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant.").

As previously established, the complaint fails to adequately allege backdating, and consequently, membership in a committee responsible for approving a stock option grant, monitoring the exercise date of an option grant, or overseeing accounting or financial reporting fails to raise an inference of scienter.  The complaint's allegations with respect to the generally empowered stock option committee, compensation committee, and audit committee therefore fail to raise an inference of scienter.

Membership in the non-executive stock option committee fails to support an inference of scienter because the complaint fails to include a single specific allegation of an employee receiving a backdated stock option.  (Doc. 73, ¶ 81)

### 4. GAAP Violation

The complaint alleges that the defendants' practice of backdating stock option grants and failing to properly account for the grants materially violates GAAP, particularly APB 25.  (Doc. 73, ¶ 214)  The plaintiffs allege each defendant "systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date."  (Doc. 73, ¶ 210)  The plaintiffs allege that the failure to adhere to APB 25 caused the company to overstate earnings.  (Doc. 73, ¶ 209)  The plaintiffs allege each defendant repeatedly violated Jabil's internal policy, which required the exercise price of stock options "to be at least equal to the fair market value of shares of common stock on the date of the grant" and which required Jabil to follow APB 25.  (Doc. 73, ¶¶ 10, 130)  In a conclusory manner, the plaintiffs allege violations of SEC regulations and Internal Revenue Service ("IRS") rules and regulations.  (Doc. 73 at 145-58)

The complaint alleges that "the fact that Jabil revised and restated downward its net income is an admission that the financial statements originally issued were false when they were reported and that the misstatements were material."  (Doc. 73, ¶ 212)  The complaint alleges a restatement of approximately $54.3 million in aggregate incremental non-cash stock-related compensation charges for fiscal years 1996 through

August 31, 2005.  (Doc. 73, ¶ 41)  Of the $54.3 million expense, Jabil reported that it

incurred approximately $35.0 million in 2005 and $16.2 million in 2003.  (Doc. 73,

¶ 202)  Approximately $48.9 million of the $54.3 million expense relates to options

granted to employees who were neither directors nor officers at the time of the grants.

(Doc. 73, ¶ 41)  Approximately $3.7 million relates to options "granted to a director over

a period of five years for his providing consulting services to the Company."  (Doc. 73,

¶ 41)  Approximately $1.7 million relates to options granted to officers.  (Doc. 73, ¶ 41)

A GAAP violation alone cannot satisfy the PSLRA's scienter requirement.

Ziemba, 256 F.3d at 1208.  However, facts suggesting the "defendants recklessly

disregarded the deviance from GAAP" supports an inference of scienter.  In re

Friedman's, Inc. Sec. Litig., 385 F. Supp. 2d 1345, 1361 (N.D. Ga. 2005) (alteration and

internal quotation marks omitted).  A series of GAAP violations, "coupled with

allegations of ignoring 'red flags,'" contributes to an inference of scienter.  Ziemba, 256

F.3d at 1208; see also In re Smith-Gardner Sec. Litig., 214 F. Supp. 2d 1291, 1302

(S.D. Fla. 2002).  The fact that a company's GAAP errors violate an internal accounting

policy or an obvious and simple accounting principle raises an inference of scienter.

Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996) (allegation that the defendant

violated GAAP and its own revenue recognition policy was sufficient to overcome

summary judgment); In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 21-22 (D.D.C. 2000);

In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("[I]f the

GAAP rules and MicroStrategy accounting policies Defendants are alleged to have

violated are relatively simple, it is more likely that the Defendants were aware of the

violations and consciously or intentionally implemented or supported them, or were reckless in this regard."). Additionally, "significant overstatements of revenue 'tend to support the conclusion that defendants acted with scienter.'"  In re MicroStrategy, 115 F. Supp. 2d at 636.  Thus, "[w]here the number, size, timing, nature, frequency, and context of the GAAP violations or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter." In re AFC Enters., 348 F. Supp. 2d at 1372.

The complaint's allegations of GAAP, SEC, and IRS violations fail to raise an inference of scienter because the complaint fails to adequately allege a basis for the claim of backdating.  The bulk of the restatement expense (approximately $48.9 million of the $54.3 million) relates to options granted to employees who were neither directors nor officers at the time of the grants.  However, the complaint fails to include a single specific allegation of Jabil granting a non-director or non-officer a backdated option. Approximately $3.7 million of the restatement expense relates to options "granted to a director over a period of five years for his providing consulting services to the Company." (Doc. 73, ¶ 41)  The complaint fails to include any allegations concerning this director's receipt of a backdated option.  Finally, approximately $1.7 million of the restatement expense relates to options granted to officers.  (Doc. 73, ¶ 41)  The complaint fails to include sufficient allegations to demonstrate the materiality of the $1.7 million expense.

5. Confidential Witnesses

The complaint relies on information provided by eight confidential witnesses ("CWs"), employed by Jabil during the class period, to raise an inference that the defendants issued the March 22, 2006, earnings forecast with scienter.  (Doc. 73, ¶ 48) However, because the statement issued on March 22, 2006, qualifies for protection under the PSLRA's safe harbor provision, no scienter analysis is needed.

D. Loss Causation

A plaintiff must prove that a defendant's false or misleading statement "caused the loss for which the plaintiff seeks to recover."  Dura Pharms., 544 U.S. at 346 (quoting 15 U.S.C. § 78u-4(b)(4)).  "An 'artificially inflated purchase price' is not itself a relevant economic loss."  Dura Pharms., 544 U.S. at 346.  Rather, a plaintiff must allege that a stock decline occurred "after the truth became known."  Dura Pharms., 544 U.S. at 347.  A plaintiff must also allege a "causal connection" between the false statement and a decline in stock price.  Dura Pharms., 544 U.S. at 346.  "A plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation marks and citation omitted).  "Because market responses, such as stock downturns, are often the result of many different, complex, and often unknowable factors, the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was substantial, i.e., a significant contributing cause."  Robbins

v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (internal quotation marks

omitted).  The PSLRA imposes no heightened pleading requirement for causation or

economic loss.  A plaintiff must comply with Rule 8(a)(2), Federal Rules of Civil

Procedure, which requires a "'short and plain statement of the claim showing that the

pleader is entitled to relief.'"  544 U.S. at 346.

The plaintiffs allege that the defendants' false and misleading statements "caused

Jabil's stock price to trade at artificially inflated prices throughout the Class Period" and

that "[l]ater, when the true state of the Company's financial condition . . . began to be

revealed [in] the market, Jabil's stock price began a continuous and precipitous decline."

(Doc. 73, ¶ 233)  The "initial disclosure[]" concerning Jabil's backdating of stock options

occurred in The Wall Street Journal's March 18, 2006, article.  (Doc. 73, ¶¶ 143, 235)

Subsequent disclosures by Jabil between May, 2006, and November 15, 2006,

publicized, among other events, (1) the initiation of the SEC's informal investigation, (2)

Jabil's failure to meet earnings forecasts for fiscal year 2006 and the third quarter of that

year, (3) Jabil's formation of the Special Review Committee to investigate backdating

allegations, and (4) Jabil's receipt of a Southern District of New York subpoena.  (Doc.

73, ¶¶ 27, 32, 34, 36, 163, 179)  These disclosures "caused the Company's stock price

to drop from an adjusted close of $30.30 on November 14, 2006 to $20.04 on

November 15, 2006 and $28.67 by November 17, 2006."  (Doc. 73, ¶ 239)  Jabil's

December 8, 2006, disclosure of a forthcoming restatement of financial results for fiscal

year 2005, coupled with the prospect that "necessary adjustments could require the

Company to restate it[s] financial results as far back as 1996," caused the stock price to

decline from $28.43 to $27.77.  (Doc. 73, ¶ 240)  Jabil's December 20, 2006, disclosure "that its restructuring would cost hundreds of millions of dollars" and require layoffs caused the stock price to decline from $26.56 on December 20, 2006, to $24.12 on December 21, 2006."  (Doc. 73, ¶ 241)  "The decline in Jabil's stock price as the market began to learn adverse, previously undisclosed information about the true state of Jabil's financial results and operations was related to defendants' prior misrepresentations and fraudulent conduct pursuant to their scheme to misrepresent and conceal Jabil's true financial condition."  (Doc. 73, ¶ 244)  Each remaining disclosure and stock decline occurred after the class period.  (Doc. 73, ¶ 245)

The defendants argue that "plaintiffs make no averments showing that the 'truth' of options backdating at Jabil was <u>ever</u> revealed."  (Doc. 75 at 9)  "To the contrary, plaintiffs contend that the Company's disclosures continued to deny the alleged 'truth' even after this action was commenced."  (Doc. 75 at 9-10)  Additionally, the defendants argue that the plaintiffs fail to allege that the "disclosures" relate to a specific decline in stock price.  (Doc. 75 at 9)

The plaintiffs allege that Jabil's stock declined after the defendants disclosed certain information.  However, the causation element requires an allegation of a causal connection between a false or misleading statement and a decline in stock price. Having failed to adequately allege the falsity of the backdating-related statements, the plaintiffs fail to sufficiently plead loss causation as to those statements.  With regard to the misrepresentation of Jabil's business condition, the plaintiffs allege that Jabil's stock price declined after the June 12 and 22, 2006, disclosures.  (Doc. 73, ¶¶ 32-33)

However, because the PSLRA's safe harbor provision applies, no analysis of loss causation is needed.

## II. Section 14(a) of the Exchange Act

The plaintiffs assert in count two that Grafstein, Lavitt, Lewis, Main, Morean, Newman, Murphy, Sansone, and Walters (the "section 14(a) defendants") violated section 14(a) of the Exchange Act and Rule 14a-9. To state a claim under section 14(a) of the Exchange Act and Rule 14a-9, a plaintiff must allege that the defendant prepared a proxy statement containing a material misstatement or omission that caused the plaintiff's injury. See Shaev v. Saper, 320 F.3d 373, 379 (3d Cir. 2003). The plaintiff must allege that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." See Shaev, 320 F.3d at 379 (internal quotation marks omitted). Although not requiring scienter, a section 14(a) claim requires an allegation that the defendant negligently drafted the proxy statement. Wilson v. Great Am. Inds., 855 F.2d 987, 995 (2d Cir. 1988).

The plaintiffs allege that the section 14(a) defendants prepared proxy statements containing material misstatements or omissions. (Doc. 73, ¶¶ 268, 270) Specifically, the proxy statements "omitted material facts, including the fact that the defendants were causing Jabil to engage in an option backdating scheme." (Doc. 73, ¶ 268) The plaintiffs allege that each proxy statement was "an essential link in the accomplishment of the continuation of defendants' unlawful stock option backdating scheme." (Doc. 73, ¶ 270) Finally, the lead plaintiffs allege that each section 14(a) defendant should have

known that each proxy statement was materially false and misleading.  (Doc. 73, ¶ 269)

As previously established, the plaintiffs fail to adequately allege backdating.  The plaintiffs therefore fail to plead that each proxy statement contained a material misstatement or omission.  The plaintiffs fail to state a claim under section 14(a) of the Exchange Act and Rule 14a-9 against any section 14(a) defendant.

III. Section 20A

The plaintiffs assert in count three that each individual defendant violated section 20A of the Exchange Act.  To claim a violation of section 20A, a plaintiff must plead a predicate violation of the Act or an implementing rule or regulation.  See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir. 1994).  The plaintiff must also allege that the defendant, while in the possession of "material, nonpublic information," purchased or sold a security "contemporaneously" with the plaintiff's purchase or sale of a security.  See 15 U.S.C. § 78t-1(a).  Neither the Act nor the rules or regulations define "contemporaneously."  The strict interpretation of "contemporaneously" includes only trades on the same day.  In re AST Research Sec. Litig., 887 F. Supp. 231, 233-34 (C.D. Cal. 1995).  A more lenient interpretation defines "contemporaneously" to include trades within several days of each other.  In re Oxford Health Plans, Inc., 187 F.R.D. 133, 144 (S.D.N.Y. 1999) (purchase within five days sufficient); In re Cypress Semiconductor Sec. Litig., 836 F. Supp. 711, 714 (N.D. Cal. 1993) (same).  Regardless of the time between trades, a plaintiff's purchase cannot precede the defendant's sale.  In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 663-64 (E.D. Va. 2000); In re Verifone Sec. Litig., 784 F. Supp. 1471, 1489 (N.D. Ca.

1992) ("No liability can attach for trades made by plaintiffs before the insider engages in trading activity.").

Because the complaint asserts a section 20A claim against the "Insider Selling Defendants" but fails to identify each defendant in the group, a reasonable construction of the complaint includes each individual defendant.  The complaint fails to adequately allege a violation of section 10(b) or 14(a) of the Act; therefore the complaint fails to state a section 20A claim against any individual defendant.

The complaint contains other section 20A deficiencies.  The complaint contains few allegations concerning the violation of Brown, Edwards, Grafstein, Lavitt, Mondello, Newman, Paver, Rapp, and Walters.  The plaintiffs allege that Brown, Edwards, Grafstein, Lavitt, Mondello, Newman, Paver, Rapp, and Walters sold shares on unspecified days "while in possession of adverse, material non-public information about Jabil."  (Doc. 73 at 163-65, ¶ 272)  The complaint fails to specifically allege that the plaintiffs traded contemporaneously with Brown, Edwards, Grafstein, Lavitt, Mondello, Newman, Paver, Rapp, or Walters.

The plaintiffs allege that they traded contemporaneously with Alexander, Lewis, Main, Morean, Murphy, Raymund, and Sansone.  (Doc. 73, ¶ 273)  Alexander sold shares on March 27, 2006, and the plaintiffs purchased shares on March 31, 2006 (four days later) and April 25, 2006 (nearly a month later).  (Doc. 73, ¶¶ 156, 273)  Lewis sold shares during the "Relevant Period" (between January 1, 1996, and December 20, 2006), and the plaintiffs purchased shares on July 2, 2004.  (Doc. 73, ¶¶ 4 n.3, 65, 273) Main sold shares on March 23, 2006, and the plaintiffs purchased shares on January

13, 2006.  (Doc. 73, ¶¶ 156, 273)  Morean sold shares between March 30, 2006, and April 13, 2006, and the plaintiffs purchased shares on December 30, 2003, and April 20, 2006 (seven days later).  (Doc. 73, ¶ 156)  Murphy sold shares on an unspecified day, and the plaintiffs purchased shares on January 27 and 30, 2006.  (Doc. 73, ¶ 273) Raymund sold shares "immediately" after the March 22, 2006, earnings report, and the plaintiffs purchased shares on April 20, 2006 (nearly a month later).  (Doc. 73, ¶¶ 155, 273)  Sansone sold shares on March 27, 2006, and the plaintiffs purchased shares on November 23, 2005, and January 24, 2006.  (Doc. 73, ¶¶ 156, 273)

The complaint fails to state a claim against Main and Sansone because the plaintiffs allegedly purchased shares before but not after each defendant's sale.  The plaintiffs fail to state a claim against Lewis and Murphy because the plaintiffs fail to specify the day of each defendant's sale.  The plaintiffs fail to state a claim against Raymund because the purchases occurred too long (nearly a month) after the sale. The plaintiffs therefore fail to state a section 20A claim against any individual defendant.

## IV. Section 20(a)

The plaintiffs contend in count four that each defendant violated section 20(a) of the Exchange Act.  To assert a section 20(a) violation, a plaintiff must allege that the defendant controlled a person who violated any section of the Act.  15 U.S.C. § 78t(a). The regulations define control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person."  17 C.F.R. § 230.405.  In this circuit, a "controlling person" has "the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws" and

- 43 -

"the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."  Brown v. Enstar Group, Inc., 84 F.3d 393, 396 (11th Cir. 1996) (internal quotation marks omitted).  "[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs, including the content of public statements and financial statements disseminated by its company, are sufficient . . . ."  In re Hamilton Bankcorp., Inc. Sec. Litig., 194 F. Supp. 2d 1353, 1359-60 (S.D. Fla. 2002).  The "controlling person" will be liable for the acts of the violator "unless the controlling person acted in good faith and did not induce the act or acts constituting the violation or cause of action.  15 U.S.C. § 78t(a).

The plaintiffs fail to state a section 20(a) claim because they fail to adequately allege a predicate violation of the Exchange Act.  Moreover, while the complaint alleges that Jabil controlled its employees and the individual defendants (Doc. 73, ¶¶ 278-79), the complaint never alleges that Jabil had "the power to control the general affairs of the entity primarily liable."  See Brown, 84 F.3d at 396 (internal quotation marks omitted).  The plaintiffs' response to the motion to dismiss fails to cite a single case in which a corporation was held liable under section 20(a) for controlling its directors or officers.  (Doc. 79 at 47-48)  Although a corporation can be held liable for controlling an affiliate or subsidiary corporation, see Theoharous, 256 F.3d at 1227, that is not the case here.

Conclusion

The defendants' motion to dismiss (Doc. 75) is **GRANTED**.  Counts one, two, three, and four are **DISMISSED WITHOUT PREJUDICE**.  The lead plaintiffs may

- 44 -

amend the complaint on or before **Monday, May 12, 2008**.  The defendants' request

(Doc. 77) for oral argument is **DENIED AS MOOT**.

ORDERED in Tampa, Florida, on April 9, 2008.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE