**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

EDWARD J. GOODMAN LIFE INCOME :
TRUST, et al, On behalf Themselves and :
All Others Similarly Situated, :
 :
     Plaintiffs, :  Lead Case No.
vs. :  8:06-CV-1716-SDM-EAJ
 :
JABIL CIRCUIT, INC.,  et al :  CLASS ACTION
 :
 :
     Defendants. :


**DECLARATION OF KEVIN H. METZ IN SUPPORT OF KPMG LLP'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**


I, Kevin H. Metz, declare as follows:

(1) I am over 21 years of age and am otherwise competent to make this declaration.

(2) I am an attorney at Latham & Watkins LLP, am licensed to practice in the District of Columbia, and have been admitted to practice *pro hac vice* before this Court in the above-captioned matter on behalf of defendant KPMG, LLP.

(3) I swear to and submit this Declaration in support of Defendant KPMG LLP's Motion to Dismiss Plaintiffs' Third Amended Complaint.

(4) Attached hereto as Exhibit A is a true and correct copy of excerpts from Jabil Circuit 2006 Form 10-K filed May 15, 2007.

(5) Attached hereto as Exhibit B is a true and correct copy of the Complaint for *Gruber v. Brown*, 06-2917-CI-08 (Fla. Cir. Ct., April 26, 2006).

(6)    Attached hereto as Exhibit C is a true and correct copy of *Testimony Concerning Options Backdating Before the U.S. Senate Committee on Banking, Housing and Urban Affairs* (September 6, 2006).

(7)    Attached hereto as Exhibit D is a true and correct copy of the Complaint for *Barone v. Brown*, 06-3279-CI-11 (Fla. Cir. Ct. May 10, 2006).

(8)    Attached hereto as Exhibit E is a true and correct copy of excerpts from Jabil Circuit Schedule 14A Proxy Statement, filed December 7, 2001.

(9)    Attached hereto as Exhibit F is a true and correct copy of excerpts from Jabil Circuit Schedule 14A Proxy Statement, filed December 3, 2003.

(10)    Attached hereto as Exhibit G is a true and correct copy of excerpts from Jabil Circuit Schedule 14A Proxy Statement, filed December 14, 2004.

(11)    Attached hereto as Exhibit H is a true and correct copy of excerpts from Jabil Circuit Schedule 14A Proxy Statement, filed December 16, 2005.

(12)    Attached hereto as Exhibit I is a true and correct copy of excerpts from S. Rep. No. 104-98 (1995).

(13)    Attached hereto as Exhibit J is a true and correct copy of excerpts from H. R. Conf. Rep. No. 104-369 (1995).

(14)    Attached hereto as Exhibit K is a true and correct copy of excerpts from Codification of Statements on Auditing Standards §§ 110.01, 110.03.

(15)    Attached hereto as Exhibit L is a true and correct copy of *In re Witness Systems, Inc. Sec. Litig.*, Civ. No. 06-1894-CC, Slip Op. (N.D. Ga. March 31, 2008).

(16)    Attached hereto as Exhibit M is a true and correct copy of excerpts from Jabil 2006 SEC Form 10-K, Jabil 2001 SEC Form 10-K and Jabil 2000 SEC Form 10-K.

(17)     Attached hereto as Exhibit N is a true and correct copy of excerpts from

Jabil Circuit's 2003 Form 10-K filed November 12. 2003.

(18)     Attached hereto as Exhibit O is a true and correct copy of excerpts from

Jabil Circuit's 2004 Form 10-K filed November 5, 2004.

(19)     Attached hereto as Exhibit P is a true and correct copy of excerpts from

Jabil Circuit's 2005 Form 10-K filed October 28, 2005.

(20)     Attached hereto as Exhibit Q is a true and correct copy of excerpts from

Codification of Statements on Auditing Standards § 326.

I declare under penalty of perjury that the foregoing is true and correct.  Executed

on this 6th day of August, 2008, in Washington, D.C.

<div style="margin-left:40%">

s/ Kevin H. Metz
Kevin H. Metz
Admitted *Pro Hac Vice*
District of Columbia Bar No. 494087

Michele E. Rose
Admitted *Pro Hac Vice*
District of Columbia Bar No. 474044

LATHAM & WATKINS, LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, DC  20004
(202) 637.1008 / (202) 637.2201 Facsimile

And

David T. Knight
Florida Bar No. 0181830

Brian L. Josias
Florida Bar No 893811

HILL, WARD & HENDERSON, P.A.
Post Office Box 2231
Tampa, Florida  33601-2231
(813) 221-3900 / (813) 221-2900 Facsimile

Attorneys for Defendant KPMG, LLP

</div>

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT A**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# 10-K

**FORM 10-K**
**Filed on 05/15/2007 – Period: 08/31/2006**
File Number 001-14063



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

(Mark one)

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended August 31, 2006

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number: 001-14063

# JABIL CIRCUIT, INC.
### (Exact Name of Registrant as Specified in Its Charter)

| Delaware | 38-1886260 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**10560 Dr. Martin Luther King, Jr. Street North, St. Petersburg, Florida 33716**
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: (727) 577-9749

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.001 par value per share | New York Stock Exchange |
| Series A Preferred Stock Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter periods that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the voting common stock held by non-affiliates of the Registrant based on the closing sale price of the Common Stock as reported on the New York Stock Exchange on February 28, 2007 was approximately $4.9 billion. For purposes of this determination, shares of Common Stock held by each officer and director and by each person who owns 10% or more of the outstanding Common Stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. The number of outstanding shares of the Registrant's Common Stock as of the close of business on April 20, 2007, was 205,981,056. The Registrant does not have any non-voting stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

None.

Table of Contents

| | Consolidated Statements of Earnings | | | |
|---|---|---|---|---|
| | Fiscal Year Ended August 31, 2006 | Fiscal Year Ended August 31, 2005 | | |
| | As Currently Reported | As Previously Reported | Adjustments | As Restated |
| | | (In thousands, except for per share data) | | |
| **Consolidated Statement of Earnings Data:** | | | | |
| Net revenue | $10,265,447 | $7,524,386 | — | $7,524,386 |
| Cost of revenue | 9,500,547 | 6,895,880 | — | 6,895,880 |
| Gross profit | 764,900 | 628,506 | — | 628,506 |
| Selling, general and administrative | 382,210 | 278,866 | 35,404 | 314,270(6) |
| Research and development | 34,975 | 22,507 | — | 22,507 |
| Amortization of intangibles | 24,323 | 39,762 | — | 39,762 |
| Acquisition−related charges | — | — | — | — |
| Restructuring and impairment charges | 81,585(1) | — | — | — |
| Operating income | 241,807 | 287,371 | (35,404) | 251,967 |
| Other loss | 11,918(1) | 4,106 | — | 4,106(2) |
| Interest income | (18,734) | (13,774) | — | (13,774) |
| Interest expense | 23,507 | 20,667 | — | 20,667 |
| Income before income taxes | 225,116 | 276,372 | (35,404) | 240,968 |
| Income tax expense | 60,598(1) | 44,525 | (7,432) | 37,093(6) |
| Net income | $   164,518 | $ 231,847 | $  (27,972) | $ 203,875 |
| Earnings per share: | | | | |
| Basic | $      0.79 | $     1.14 | $   (0.13) | $    1.01 |
| Diluted | $      0.77 | $     1.12 | $   (0.14) | $    0.98 |
| Common shares used in the calculations of earnings per share: | | | | |
| Basic | 207,413 | 202,501 | — | 202,501 |
| Diluted | 212,540 | 207,526 | 180 | 207,706 |
| **Consolidated Balance Sheet Data:** | | | | |
| Working capital | $   977,631 | $1,117,806 | $    — | $1,117,806 |
| Total assets | $ 5,411,730 | $4,077,262 | $  10,724 | $4,087,986 |
| Current installments of notes payable, long−term debt and long−term lease obligations | $    63,813 | $      674 | $    — | $      674 |
| Notes payable, long−term debt and long−term lease obligations, less current installments | $   329,520 | $ 326,580 | $    — | $ 326,580 |
| Total stockholders' equity | $ 2,294,481 | $2,135,217 | $  10,724 | $2,145,941 |
| Cash dividends declared, per share | $      0.14 | $      — | $    — | $      — |

40

Table of Contents

Consolidated Statements of Earnings

| | Fiscal Year Ended August 31, 2004 | | | Fiscal Year Ended August 31, 2003 | | |
|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| | | | (In thousands, except for per share data) | | | |
| **Consolidated Statement of Earnings Data:** | | | | | | |
| Net revenue | $6,252,897 | $ — | $6,252,897 | $4,729,482 | — | $4,729,482 |
| Cost of revenue | 5,714,517 | — | 5,714,517 | 4,294,016 | — | 4,294,016 |
| Gross profit | 538,380 | — | 538,380 | 435,466 | — | 435,466 |
| Selling, general and administrative | 263,504 | (5,756) | 257,748(6) | 243,663 | 16,150 | 259,813(6) |
| Research and development | 13,813 | — | 13,813 | 9,906 | — | 9,906 |
| Amortization of intangibles | 43,709 | — | 43,709 | 36,870 | — | 36,870 |
| Acquisition–related charges | 1,339 | — | 1,339(3) | 15,266 | — | 15,266(4) |
| Restructuring and impairment charges | — | — | — | 85,308 | — | 85,308(4) |
| Operating income | 216,015 | 5,756 | 221,771 | 44,453 | (16,150) | 28,303 |
| Other loss (income) | 7,193 | — | 7,193(3) | (2,600) | — | (2,600)(4) |
| Interest income | (7,237) | — | (7,237) | (6,920) | — | (6,920) |
| Interest expense | 18,546 | — | 18,546 | 17,019 | — | 17,019 |
| Income before income taxes | 197,513 | 5,756 | 203,269 | 36,954 | (16,150) | 20,804 |
| Income tax expense (benefit) | 30,613 | (1,074) | 29,539(6) | (6,053) | (1,713) | (7,766)(6) |
| Net income | $ 166,900 | $ 6,830 | $ 173,730 | $ 43,007 | $ (14,437) | $ 28,570 |
| Earnings per share: | | | | | | |
| Basic | $ 0.83 | $ 0.04 | $ 0.87 | $ 0.22 | $ (0.08) | $ 0.14 |
| Diluted | $ 0.81 | $ 0.04 | $ 0.85 | $ 0.21 | $ (0.07) | $ 0.14 |
| Common shares used in the calculations of earnings per share: | | | | | | |
| Basic | 200,430 | — | 200,430 | 198,495 | — | 198,495 |
| Diluted | 205,849 | (290) | 205,559 | 202,103 | (432) | 201,671 |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Working capital | $1,023,591 | $ — | $1,023,591 | $ 830,729 | $ — | $ 830,729 |
| Total assets | $3,329,356 | $ 4,683 | $3,334,039 | $3,244,745 | $ — | $3,244,745 |
| Current installments of notes payable, long–term debt and long–term lease obligations | $ 4,412 | $ — | $ 4,412 | $ 347,237 | $ — | $ 347,237 |
| Notes payable, long–term debt and long–term lease obligations, less current installments | $ 305,194 | $ — | $ 305,194 | $ 297,018 | $ — | $ 297,018 |
| Total stockholders' equity | $1,819,340 | $ 4,683 | $1,824,023 | $1,588,476 | $ 4,193 | $1,592,669 |
| Cash dividends declared, per share | $ — | $ — | $ — | $ — | $ — | $ — |

41

**Table of Contents**

| | Consolidated Statements of Earnings Fiscal Year Ended August 31, 2002 | | |
| | As Previously Reported | Adjustments | As Restated |
| --- | --- | --- | --- |
| | (In thousands, except for per share information) | | |
| **Consolidated Statement of Earnings Data:** | | | |
| Net revenue | $ 3,545,466 | — | $3,545,466 |
| Cost of revenue | 3,210,875 | (6,000) | 3,204,875(6) |
| Gross profit | 334,591 | 6,000 | 340,591 |
| Selling, general and administrative | 203,845 | 643 | 204,488(6) |
| Research and development | 7,864 | — | 7,864 |
| Amortization of intangibles | 15,113 | — | 15,113 |
| Acquisition-related charges | 7,576 | — | 7,576(5) |
| Restructuring and impairment charges | 52,143 | — | 52,143(5) |
| Operating income | 48,050 | 5,357 | 53,407 |
| Other loss | — | — | — |
| Interest income | (9,761) | — | (9,761) |
| Interest expense | 13,055 | — | 13,055 |
| Income before income taxes | 44,756 | 5,357 | 50,113 |
| Income tax expense | 10,041 | (1,341) | 11,382(6) |
| Net income | $ 34,715 | $ 4,016 | $ 38,731 |
| **Earnings per share:** | | | |
| Basic | $ 0.18 | $ 0.02 | $ 0.20 |
| Diluted | $ 0.17 | $ 0.02 | $ 0.19 |
| **Common shares used in the calculations of earnings per share:** | | | |
| Basic | 197,396 | — | 197,396 |
| Diluted | 200,782 | (247) | 200,535 |
| **Consolidated Balance Sheet Data:** | | | |
| Working capital | $ 994,962 | $ — | $ 994,962 |
| Total assets | $ 2,547,906 | $ — | $2,547,906 |
| Current installments of notes payable, long-term debt and long-term lease obligations | $ 8,692 | $ — | $ 8,692 |
| Notes payable, long-term debt and long-term lease obligations, less current installments | $ 354,668 | $ — | $ 354,668 |
| Total stockholders' equity | $ 1,506,966 | $ 2,684 | $1,509,650 |
| Cash dividends declared, per share | $ — | $ — | $ — |

42

Table of Contents
customer industry sector. The provision represents management's estimate of probable liabilities, calculated as a function of sales volume and historical repair experience, for each product under warranty. The estimate is reevaluated periodically for accuracy. The balance of the warranty provision was insignificant for all periods presented.

### q. Derivative Instruments

On September 1, 2000, the Company adopted Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Certain Hedging Activities*, ("SFAS 133"), as amended by Statement of Financial Accounting Standards No. 138, *Accounting for Certain Derivative Instruments and Certain Hedging Activity, an Amendment of SFAS 133*, ("SFAS 138") and Statement of Financial Accounting Standards No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*, ("SFAS 149"). In accordance with these standards, all derivative instruments are recorded on the balance sheet at their respective fair values. Generally, if a derivative instrument is designated as a cash flow hedge, the change in the fair value of the derivative is recorded in other comprehensive income to the extent the derivative is effective, and recognized in the statement of operations when the hedged item affects earnings. If a derivative instrument is designated as a fair value hedge, the change in fair value of the derivative and of the hedged item attributable to the hedged risk are recognized in earnings in the current period.

### r. Intellectual Property Guarantees

The Company's turnkey solutions products may compete against the products of original design manufacturers and those of electronic product companies, many of whom may own the intellectual property rights underlying those products. As a result, the Company could become subject to claims of intellectual property infringement. Additionally, customers for the Company's turnkey solutions services typically require that we indemnify them against the risk of intellectual property infringement. The Company has no liabilities recorded at August 31, 2006 related to intellectual property infringement claims.

## 2. Stock Option Litigation and Restatements

On April 26, 2006, a shareholder derivative lawsuit was filed in State Circuit Court in Pinellas County, Florida on behalf of Mary Lou Gruber, a purported shareholder of the Company, naming the Company as a nominal defendant, and naming certain of the Company's officers, Scott D. Brown, Executive Vice President, Mark T. Mondello, Chief Operating Officer, and Timothy L. Main, Chief Executive Officer, President and a Board member, as well as certain of the Company's Directors, Mel S. Lavitt, William D. Morean, Frank A. Newman, Steven A. Raymund and Thomas A. Sansone, as defendants (the "Initial Action"). Mr. Morean and Mr. Sansone were the Company's previous Chief Executive Officer and President, respectively (such two individuals, with the defendant officers, collectively, the "Officer Defendants"). The Initial Action alleged that the named defendant officers and directors breached certain of their fiduciary duties to the Company in connection with certain stock option grants between August 1998 and October 2004. Specifically, it alleged that the defendant directors (other than Mr. Morean and Mr. Main), in their capacity as members of the Board of Director Audit or Compensation Committee, at the behest of the Officer Defendants, backdated stock option grants to make it appear they were granted on a prior date when the Company's stock price was lower. The Initial Action alleged that such alleged backdated options unduly benefited the Officer Defendants, resulted in us issuing materially inaccurate and misleading financial statements and caused millions of dollars of damages to the Company. The Initial Action also sought to have the Officer Defendants disgorge certain options they received, including the proceeds of options exercised, as well as certain equitable relief and attorneys' fees and costs.

On May 2, 2006, the Company was notified by the Staff of the Securities and Exchange Commission (the "SEC") of an informal inquiry concerning its stock option grants. On May 3, 2006, the Company's Board of Directors had a meeting, which had been arranged prior to the SEC contacting the Company, to discuss the Initial Action. At that meeting, the Company's Board of Directors appointed the Special Committee to review the

114

Table of Contents
allegations in the Initial Action. On May 10, 2006, the law firms representing the plaintiff in the Initial Action, along with two additional law firms, representing a purported shareholder of the Company, Robert Barone, filed a lawsuit in State Circuit Court in Pinellas County, Florida that was nearly identical to the Initial Action (with the Initial Action, collectively, the "State Derivative Actions"). On May 17, 2006, the Company received a subpoena from the U.S. Attorney's office for the Southern District of New York requesting certain stock option related material. On July 12, 2006, the parties to the State Derivative Actions filed a stipulation and proposed order of consolidation, which also appointed co-lead counsel. The Court signed the order on July 17, 2006, consolidated the cases under the caption *In re Jabil Derivative Litigation*, No. 06−2917−CI−08 (the "Consolidated State Derivative Action"), and ordered that the complaint filed in the Initial Action would become the operative complaint. The Company has entered into a stipulation extending the time for us to respond to the Consolidated State Derivative Action until June 29, 2007.

Two Federal derivative suits were also filed in the United States District Court for the Middle District of Florida, Tampa Division, on July 10, 2006 and December 6, 2006 respectively (collectively, the "Federal Derivative Actions"). The complaints assert virtually identical factual allegations and claims as in the State Derivative Actions. On January 26, 2007, the District Court consolidated the two Federal Derivative Actions under the caption *In re Jabil Circuit Options Backdating Litigation*, 8:06−cv−01257 (the "Consolidated Federal Derivative Action") and appointed co-lead counsel. The Company has entered into a stipulation extending its time to respond to the Consolidated Federal Derivative Action until June 29, 2007.

On September 18, 2006, a putative shareholder class action was filed in the United States District Court for the Middle District of Florida, Tampa Division encaptioned *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., et al.*, No. 8:06−cv−01716 against the Company and various present and former officers and directors, including Forbes I.J. Alexander, Scott D. Brown, Laurence S. Grafstein, Mel S. Lavitt, Chris Lewis, Timothy Main, Mark T. Mondello, William D. Morean, Lawrence J. Murphy, Frank A. Newman, Steven A. Raymund, Thomas A. Sansone and Kathleen Walters on behalf of a proposed class of plaintiffs comprised of persons that purchased shares of the Company between September 19, 2001 and June 21, 2006. The complaint asserted claims under Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b−5 promulgated thereunder, as well as under Section 20(a) of that Act. The complaint alleged that the defendants had engaged in a scheme to fraudulently backdate the grant dates of options for various senior officers and directors, causing the Company's financial statements to understate management compensation and overstate net earnings, thereby inflating the Company's stock price. In addition, the complaint alleged that the Company's proxy statements falsely stated that the Company had adhered to its option grant policy of granting options at the closing price of its shares on the trading date immediately prior to the date of the grant. A second putative class action, containing virtually identical legal claims and allegations of fact, encaptioned *Steven M. Noe v. Jabil Circuit, Inc., et al.*, No., 8:06−cv−01883, was filed on October 12, 2006. The two actions were consolidated into a single proceeding (the "Consolidated Class Action") and on January 18, 2007, the Court appointed The Laborers Pension Trust Fund for Northern California and Pension Trust Fund for Operating Engineers as lead plaintiffs in the action. On March 5, 2007, the lead plaintiffs filed a consolidated class action complaint (the "Consolidated Class Action Complaint"). The Consolidated Class Action Complaint is purported to be brought on behalf of all persons who purchased the Company's publicly traded securities between September 19, 2001 and December 21, 2006, and named the Company and certain of its current and former officers, including Forbes I.J. Alexander, Scott D. Brown, Wesley B. Edwards, Chris A. Lewis, Mark T. Mondello, Robert L. Paver and Ronald J. Rapp, as well as certain of the Company's Directors, Mel S. Lavitt, William D. Morean, Frank A. Newman, Laurence S. Grafstein, Steven A. Raymund, Lawrence J. Murphy, Kathleen A. Walters and Thomas A. Sansone, as defendants. The Consolidated Class Action Complaint alleges violations of Sections 10(b), 20(a), and 14(a) of the Securities and Exchange Act and the rules promulgated thereunder. It contained allegations of fact and legal claims similar to the original putative class actions and, in addition, alleged that the defendants failed to timely disclose the facts and circumstances that led it, on June 12, 2006, to announce that it was lowering its prior guidance for net earnings for the third quarter of fiscal year 2006. On April 30, 2007, Plaintiffs filed a First Amended Consolidated Class Action Complaint asserting claims substantially similar to the Consolidated Class Action Complaint it replaced but adding additional allegations relating to the restatement of earnings previously

115

Table of Contents
announced in connection with the correction of errors in the calculation of compensation expense for certain stock option grants. The Company has until sixty days following the filing of the First Amended Consolidated Class Action Complaint to file its response and will vigorously defend the action.

The Special Committee has conducted its review and analysis of the claims asserted in the derivative actions and has concluded that the evidence does not support a finding of intentional manipulation of stock option grant pricing by any member of management. The Company's internal review, similarly, did not find evidence of backdating. However, both the Special Committee review and the Company's internal review identified certain errors in the ways in which it accounted for certain option grants. These errors, which are described more fully below, generally fall into one of three categories. First, there were situations in which the Company incorrectly identified the "measurement date" used to establish the exercise price for the options grant. These situations, for the most part, occurred because the Company believed that a grant was "final" when the Board Committee approved the options when, in fact, the identities of grant recipients or the number of options they were to receive had not yet been established with certainty. Under the applicable accounting literature, the Company should not have identified a measurement date until the grant recipients and number of awards were established with certainty.

Second, there was one situation in which a grant to a large number of non-executive employees was finalized but, before the options could be distributed, the price of the underlying stock fell significantly. Because the Company did not wish to issue these employees "underwater" options, it cancelled those options and issued new ones. Under the applicable accounting literature, the Company should have treated the subsequent grant as a repricing of the first grant, and applied variable accounting for the life of these grants.

Third, the Company retained as a consultant an individual who served on the Board of Directors, and awarded him options as compensation for his performance of those consulting services. The applicable accounting literature required that the Company account for options granted to a consultant differently from the way that it accounted for options granted to an employee, which it failed to do.

The Special Committee concluded that it is not in the Company's best interests to pursue the derivative actions and will assert that position on the Company's behalf in each of the pending derivative lawsuits. The Company continues to cooperate fully with the Special Committee, the SEC and the U.S. Attorney's office. The Company cannot predict what effect such reviews may have.

116

<u>**Table of Contents**</u>

The Company's restated Consolidated Financial Statements contained in this Form 10–K incorporate additional stock–based compensation expense, including the income tax impacts related to the restatement adjustments. The total restatement impact, net of tax, for the years ended August 31, 1996 through August 31, 2003, of $20.0 million, has been reflected as an adjustment to retained earnings as of September 1, 2003 and the impact on previously reported net income for fiscal years 2005 and 2004 is presented below.

|  | Net Income For the Fiscal Year Year Ended August 31, | | Retained Earnings As of Sept. 1, |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | | (in thousands) | |
| As previously reported | $231,847 | $166,900 | $  623,053 |
| Adjustments: | | | |
| Stock compensation expense | (35,404) | 5,756 | (24,618) |
| Income tax benefit (provision) | 7,432 | 1,074 | 4,627 |
| Total adjustments | (27,972) | 6,830 | (19,991) |
| As adjusted | $203,875 | $173,730 | $  603,062 |

The table below presents the impact of the individual restatement adjustments, and are explained in further detail following the table (in thousands):

|  | 2005 | 2004 | Total Adjust-ments to Retained Earnings | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STOCK–BASED COMPENSATION (EXPENSE):** | | | | | | | | | | | |
| Incorrect identification of measurement dates | $(24,338) | $(4,426) | $ (8,566) | $ (4,150) | $(2,291) | $ (791) | $ (779) | $ (246) | $(123) | $(123) | $ (63) |
| Subsequent change to a finalized grant | (11,076) | 10,043 | $(12,189) | (12,023) | 1,762 | (1,928) | — | — | — | — | — |
| Stock option grants to a director in his capacity as a consultant | 10 | 139 | $ (3,863) | 23 | (114) | 265 | (2,974) | (941) | (122) | — | — |
| Total stock–based compensation | $(35,404) | $ 5,756 | $ (24,618) | $(16,150) | $ (643) | $(2,454) | $(3,753) | $(1,187) | $(245) | $(123) | $ (63) |
| **INCOME TAX BENEFIT:** | | | | | | | | | | | |
| Total income tax benefit (expense) | $  7,432 | $ 1,074 | $   4,627 | $  1,713 | $  669 | $  259 | $ 1,402 | $  440 | $  86 | $  39 | $  19 |
| Total increase (decrease) to consolidated net income | $(27,972) | $ 6,830 | $ (19,991) | $(14,437) | $   26 | $(2,195) | $(2,351) | $  (747) | $(159) | $ (84) | $ (44) |

*Stock–based compensation*

The Company has made the adjustments reflected above that relate to stock–based compensation because it decided that it had made certain errors in accounting for certain options grants. The Company reached this conclusion in consultation with accounting experts and legal counsel and in consideration of the findings of the Special Committee and its internal review.

The accounting literature in effect during the relevant period was primarily Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"). This guidance focused on the establishment of a "measurement date" for purposes of determining compensation cost relating to option awards. Under APB 25, "measurement date" is defined as the first date on which both of the following are known: (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any. This accounting guidance provided that companies would not have to record compensation expense in connection with options granted to employees, officers and directors if the quoted market price of the stock at the

117

Table of Contents
measurement date of the option award was equal to the amount the employee was required to pay. In contrast, companies would have to record compensation expense to the extent that the quoted market price of the stock at the measurement date exceeded the amount the employee is required to pay. Generally, the Company, as did other companies, historically set the exercise price for its option grants by reference to the closing price of the Company's stock on the day before the date of the grant. We refer to this as the "measurement date" for the grant.

With this background, the errors that the Company made can be categorized as follows:

(a) *Incorrect identification of measurement dates.* As a general proposition, the Company identified the grant date, which it used to establish the measurement date, as the date that the Compensation Committee (or some other decision–maker, as permitted) met or otherwise acted to grant options. However, in some situations, the grant may not have been "final," on that date, as defined in the accounting literature, because it may still have been subject to the exercise of discretion as to the individuals who were to receive the options or the amounts they were to receive. To identify these situations, the Company reviewed documentary and other evidence to determine the dates on which the Compensation Committee (or other decision–maker) decided the terms of the grants. In those situations where the Company determined that the grant had not been finalized until some date after the grant date that the Company previously had used to establish the measurement date for purposes of calculating compensation expense, the Company used the newly–identified grant date to establish the appropriate measurement date, and recalculated compensation expense based on that date. More specifically, the methodology that the Company used to identify new or to confirm previously identified grant dates, and to recalculate compensation expense, identified the point in time at which the exercise of discretion no longer applied to the grant. Many changes to lists of grant recipients after the originally identified measurement date were administrative in nature, such as changes to an individual's name or employment status. The Company did not consider such administrative changes to represent the exercise of discretion. The Company did, however, consider other changes to grant lists to represent the exercise of discretion and recalculated compensation expense accordingly. The types of situations that the Company considered to be within this latter category included: (i) situations in which there were grants to groups of individuals, but subsequent changes to the grants to some members of those groups, with the continued use of the initial measurement date; (ii) situations in which there was a final grant to certain individuals and a subsequent grant to other individuals, with the use of the same measurement date as the initial grant; (iii) situations in which there was a final grant to individuals and a subsequent decision to grant additional options to some of the same individuals, with the use of the same measurement date as the initial grant; and (iv) a situation in which grants to certain officers and a small group of highly–valued non–officers were believed to be final when, in fact, they were subject to further discretionary adjustments, yet the Company continued to use the originally identified grant date for purposes of establishing the measurement date. Additionally, there was a situation in which a member of the administrative staff mistakenly believed that a grand had occurred on a particular date, and so identified a measurement date based on that date when the grant, in fact, had occurred on a different date. Other than as described below, the number of employees and grants affected by the errors was minimal.

In the Company's fiscal years 2002 and 2003, grants to certain sub–groups of non–executive employees totaling 187 and 1,563 individuals, respectively, continued to change after the previously identified grant dates. Accordingly, the Company calculated the compensation expense associated with those grants based on the date on which the grants to any particular list of employees became final. The 187 individuals impacted in fiscal year 2002 represented a small portion of the total grants issued and the 1,563 individuals impacted in fiscal year 2003 represented substantially all non–executive employees receiving a grant.

Beginning in our fiscal year 2004, the Company changed our process for determining option awards to non–executive employees. In that year, the Company began to use a job function classification, rather than a salary–based formula, to determine these awards. Beginning in the Company's fiscal year 2004, management, acting with the Compensation Committee's approval, retained limited discretion to adjust awards within groups of employees. Following these discretionary adjustments (as well as adjustments to reflect administrative changes),

118

Table of Contents

management compiled the various lists of employees into a final list and distributed the options. In recognition of this change in process, the Company has adjusted our methodology for determining the date the list associated with grants to non–officer employees issued in those years was final. Accordingly, in determining the measurement date the Company has treated lists of grants to 2,180 and 2,262 non–executive employees issued in our fiscal years 2004 and 2005, respectively, as not final until they were complied by management as final, regardless of whether any particular list, in fact, changed.

Due to the methodology used in fiscal years 2002 through 2005, changes to the measurement date of a few employees could cause the measurement date for a large number of employees to change.

As a result of the aforementioned, our historical financial statements have been restated to increase stock-based compensation expense by a total of $37.3 million recognized over the applicable vesting periods through fiscal year 2005. The adjustments have been recorded to selling, general and administrative expense in the Consolidated Statement of Earnings.

*(b) Subsequent change to a finalized grant.* After the Company decided on October 12, 2000 to grant stock options to approximately 1,510 non–executive, representing employees, the price of the Company's stock declined. Rather than issue "underwater" options, the Company decided on December 22, 2000 to issue new grants. The Company did not do that with respect to officer grants approved at the same time. The Company has decided that it should have characterized this as a cancellation and re–pricing of the October 12, 2000 grant for non–executive employees. Under APB 25, as interpreted by FASB Interpretation No. 44, *Accounting for Certain Transactions Involving Stock Compensation (an interpretation of APB No. 25)*, and other related interpretations, such a repricing requires variable accounting for the awards until that award is exercised, is forfeited, or expires unexercised. This was not identified in the Company's original financial reporting processes and, therefore, it was not properly accounted for in the financial statements as a variable award, which requires re–measurement at each interim reporting period. As a result, the Company's historical financial statements have been restated to increase stock–based compensation expense by a total of $13.2 million which has been recognized beginning as of December 22, 2000, the date of modification, and over each interim reporting period thereafter through fiscal year 2005. The adjustments have been recorded to selling, general and administrative expense in the Consolidated Statement of Earnings.

*(c) Stock option grants to a director in his capacity as a consultant.* The Company has determined that from fiscal years 1998 through 2002, it did not properly account for stock option awards that were granted to a non–employee director who it retained to provide consulting services. These awards were not properly accounted for in accordance with Emerging Issues Task Force No. 96–18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services*, and related interpretations. As a result, the Company's historical financial statements have been restated to increase stock–based compensation expense by a total of $3.7 million which has been recognized through fiscal year 2005. The adjustments have been recorded to selling, general and administrative expense in the Consolidated Statement of Earnings.

*Income tax benefit*

The Company has evaluated the impact of the restatements on the Company's global tax provision. The Company has to file tax returns in multiple tax jurisdictions around the world. In certain jurisdictions, including, but not limited to, the United States and the United Kingdom, the Company is able to claim a tax deduction relative to stock options. In those jurisdictions, where a tax deduction is claimed, the Company has recorded deferred tax benefits, totaling $13.1 million at August 31, 2005, to reflect future tax deductions to the extent that the Company believes such assets to be recoverable.

Because virtually all holders of stock options for which remeasurement was required were not involved in or aware of the circumstances that lead to remeasurement, the Company has taken and intends to take certain actions to deal with the adverse tax consequences that may be incurred by the holders of stock options for which

119

Table of Contents
remeasurement was required, including amending certain stock option agreements. Such adverse tax consequences relate to the portions of stock options for which remeasurement was required and that vest after December 31, 2004 ("Section 409A Affected Options") and subject the option holder to a penalty tax under Internal Revenue Code Section 409A ("Section 409A") (and, as applicable, similar penalty taxes under California and other state tax laws). Under Internal Revenue Service ("IRS") regulations, these option amendments had to be completed by December 31, 2006 for anyone who was an executive officer when he or she received Section 409A Affected Options. The amendments for non-executive officers cannot be offered until after this Form 10-K for the fiscal year ended August 31, 2006 is filed and such amendments need to be completed by December 31, 2007. The Company is investigating the alternatives available to amend these affected options.

The Company intends to compensate certain option holders who have already exercised Section 409A Affected Options for the penalties they incur under Section 409A (and, as applicable, similar state tax laws). The Company has notified the IRS of its' intent to participate in the IRS Compliance Resolution Program ("program") for employees other than corporate insiders for additional 2006 taxes arising under Section 409A due to the exercise of stock rights. This program allows the Company to calculate and remit to the IRS, on behalf of the affected employees, the penalty for calendar year 2006 due to the application of Section 409A to certain options exercised during 2006. The Company's current estimate for such a penalty is expected to be less than $4.0 million and is expected to be recorded in the Consolidated Statement of Earnings in the third quarter of fiscal year 2007. There is one executive officer impacted by the 2006 exercise of Section 409A Affected Options. The Compensation Committee of the Board of Directors has approved the payment of a bonus of approximately $150.0 thousand to cover the penalty for this executive officer as he is prohibited from participation in the program. This bonus was approved as the executive officer was not an officer at the time of the grant and was not involved or aware of the options impact.

Two of the Company's executive option holders were subject to the December 31, 2006 deadline described above. Accordingly, in December 2006, the Company offered to amend the Section 409A Affected Options held by the executive officers to increase the exercise price so that these options will not subject the option holder to a penalty tax under Section 409A. Both individuals accepted the Company's offer. In addition, the Company has agreed to pay each of the individuals a cash bonus of $2.0 thousand each in fiscal year 2007 equal to the aggregate increase in the exercise prices for the amended options. The Company plans to take remedial actions with respect to the outstanding Section 409A Affected Options granted to non-officers and are currently assessing this transaction.

120

**Table of Contents**
The following table reconciles the previously filed Consolidated Statements of Earnings to the restated Consolidated Statements of Earnings, for the fiscal years specified below.

| | Consolidated Statements of Earnings | | | | | |
|---|---|---|---|---|---|---|
| | Fiscal Year Ended August 31, 2005 | | | Fiscal Year Ended August 31, 2004 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| | (in thousands, except per share data) | | | | | |
| **Consolidated Statement of Earnings Data:** | | | | | | |
| Net revenue | $ 7,524,386 | $ — | $7,524,386 | $ 6,252,897 | — | $6,252,897 |
| Cost of revenue | 6,895,880 | — | 6,895,880 | 5,714,517 | — | 5,714,517 |
| Gross profit | 628,506 | — | 628,506 | 538,380 | — | 538,380 |
| Selling, general and administrative | 278,866 | 35,404 | 314,270 | 263,504 | (5,756) | 257,748 |
| Research and development | 22,507 | — | 22,507 | 13,813 | — | 13,813 |
| Amortization of intangibles | 39,762 | — | 39,762 | 43,709 | — | 43,709 |
| Acquisition-related charges | — | — | — | 1,339 | — | 1,339 |
| Restructuring and impairment charges | — | — | — | — | — | — |
| Operating income | 287,371 | (35,404) | 251,967 | 216,015 | 5,756 | 221,771 |
| Other loss | 4,106 | — | 4,106 | 7,193 | — | 7,193 |
| Interest income | (13,774) | — | (13,774) | (7,237) | — | (7,237) |
| Interest expense | 20,667 | — | 20,667 | 18,546 | — | 18,546 |
| Income before income taxes | 276,372 | (35,404) | 240,968 | 197,513 | 5,756 | 203,269 |
| Income tax expense | 44,525 | (7,432) | 37,093 | 30,613 | (1,074) | 29,539 |
| Net income | $ 231,847 | (27,972) | $ 203,875 | $ 166,900 | 6,830 | $ 173,730 |
| Earnings per share: | | | | | | |
| Basic | $ 1.14 | $ (0.13) | $ 1.01 | $ 0.83 | .04 | $ 0.87 |
| Diluted | $ 1.12 | $ (0.14) | $ 0.98 | $ 0.81 | .04 | $ 0.85 |
| Common shares used in the calculations of earnings per share: | | | | | | |
| Basic | 202,501 | — | 202,501 | 200,430 | — | 200,430 |
| Diluted | 207,526 | 180 | 207,706 | 205,849 | (290) | 205,559 |

121

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT B**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT OF THE STATE OF
FLORIDA, IN AND FOR PINELLAS COUNTY
CIVIL DIVISION

MARY LOU GRUBER, Derivatively on          )       No. 06-3917-CI-08
Behalf of Nominal Defendant JABIL         )
CIRCUIT, INC.,                            )
                                          )       UCN:52XXXGCA002917 XX CICI
                Plaintiff,                )
                                          )
        v.                                )
                                          )
SCOTT D. BROWN, MEL S. LAVITT,            )
TIMOTHY L. MAIN, MARK T.                  )
MONDELLO, WILLIAM D. MOREAN,              )
FRANK A. NEWMAN, STEVEN A.                )
RAYMUND, and THOMAS A. SANSONE,)
                                          )
                Defendants,               )
                                          )
        and                               )       JURY TRIAL DEMANDED
                                          )
JABIL CIRCUIT, INC.,                      )
                                          )
                Nominal Defendant.        )

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff, by her attorneys, submits this Verified Derivative Complaint (the "Complaint")

against the defendants named herein.

## NATURE OF THE ACTION

1.   This is a shareholder's derivative action brought for the benefit of nominal

defendant Jabil Circuit, Inc. ("Jabil" or the "Company") against certain current members of its

Board of Directors (the "Board") and certain of its executive officers seeking redress for

defendants' breaches of fiduciary duties and unjust enrichment.

1

## PARTIES

2.      Plaintiff Mary Lou Gruber is, and was at all relevant times, a shareholder of nominal defendant Jabil.

3.      Nominal defendant Jabil is a Delaware corporation with its principal executive offices located at 10560 Dr. Martin Luther King, Jr. Street North, St. Petersburg, Florida 33716. According to its public filings, Jabil is a provider of worldwide electronic manufacturing services and solutions.

4.      Defendant William D. Morean ("Morean") has served as a director of Jabil since 1978 and currently serves as Chairman of the Board.   Morean previously served as Chief Executive Officer of the Company from 1988 to 2000.

5.      Defendant Thomas A. Sansone ("Sansone") has served as a director of Jabil since 1983 and currently serves as Vice Chairman of the Board.   Sansone previously served as President of the Company from 1988 to 1999.

6.      Defendant Timothy L. Main ("Main") has served as a director of Jabil and as President of the Company since 1999 and as Chief Executive Officer of the Company since 2000.   Main previously served as Jabil's Senior Vice President, Business Development, from 1996 to 1999.

7.      Defendant Mark T. Mondello ("Mondello") has served as Chief Operating Officer of the Company since 2002, and previously served as Jabil's Senior Vice President, Business Development from 1999 to 2002.

2

8.      Defendant Scott D. Brown ("Brown") has served as Executive Vice President of the Company at all times relevant hereto.

9.      Collectively, defendants Morean, Sansone, Main, Mondello, and Brown are referred to herein as the "Officer Defendants."

10.     Defendant Mel S. Lavitt ("Lavitt") has served as a director of Jabil since 1991. Lavitt served as a member of the Stock Option Committee of the Board (the "Stock Option Committee") from 2002 to 2003 and has served as a member of both the Compensation Committee of the Board (the "Compensation Committee") and the Audit Committee of the Board (the "Audit Committee") at all times relevant hereto.

11.     Defendant Steven A. Raymund ("Raymund") has served as a director of Jabil since 1996. Raymund served as a member of the Stock Option Committee from 1998 to 2003, and has served as a member of both the Compensation Committee and the Audit Committee at all times relevant hereto.

12.     Defendant Frank A. Newman ("Newman") has served as a director of Jabil since 1998. Newman served as a member of the Stock Option Committee from 1998 to 2003. Newman has served as a member of the Compensation Committee at all times relevant hereto and as a member of the Audit Committee since 2000.

13.     Collectively, defendants Lavitt, Raymund, and Newman are referred to herein as the "Committee Defendants."

14.     Collectively, the Officer Defendants and Committee Defendants are referred to herein as the "Individual Defendants."

3

## DUTIES OF THE INDIVIDUAL DEFENDANTS

15.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

16.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

17.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

4

b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

d.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

18.    The Individual Defendants, particularly the Officer Defendants and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)    transactions are executed in accordance with management's general or specific authorization;

5

> (b)    transactions are recorded as necessary to permit
> preparation of financial statements in conformity with
> [GAAP].

19.    Jabil's Audit Committee Charter provides that the Audit Committee shall be

responsible for, among other things,

> a.    Review of financial statements and any financial reports or other
> financial information submitted to the public with management and
> the independent auditor. It is anticipated that these discussions may
> include quality of earnings, discussions of significant items subject
> to estimate, consideration of the suitability of accounting
> principles, audit adjustments (whether or not recorded), and such
> other inquiries as may be deemed appropriate by the audit
> committee;
>
> b.    Periodic discussion with management and the auditors regarding
> the quality and adequacy of the Company's internal controls; and
>
> c.    Review with financial management and the independent
> accountants all major financial reports in advance of filing or
> distribution.

## FACTUAL ALLEGATIONS

20.    From 1998 to 2002, the Stock Option Committee administered the Company's

stock option plans and granted stock options to Company employees, including the Officer

Defendants. Since 2003 the Compensation Committee has administered the Company's stock

option plans and granted stock options to the Officer Defendants.

21.    From 1998 to 2004, the Stock Option Committee and Compensation Committee

granted certain Jabil stock options to certain of the Officer Defendants, as follows:[1]

| Officer | Purported Date of Grant | Exercise Price | Number of Options |
| --- | --- | --- | --- |

---

[1]    Exercise prices and numbers of options are not adjusted for the Company's 2-for-1 stock splits
effective February 18, 1999 and March 31, 2000.

6

| | | | |
|---|---|---|---|
| Morean | 9/1/98 | $11.75 | 63,000 |
| Sansone | 9/1/98 | $11.75 | 50,800 |
| Main | 9/1/98 | $11.75 | 32,000 |
| | 11/17/98 | $24.41 | 120,000 |
| | 2/8/99 | $31.50 | 100,000 |
| | 10/20/99 | $23.0938 | 141,600 |
| | 10/12/00 | $42.75 | 141,900 |
| | 9/21/01 | $15.00 | 248,900 |
| | 10/17/02 | $12.95 | 115,600 |
| | 10/2/03 | $26.14 | 105,000 |
| | 12/16/03 | $26.75 | 65,000 |
| | 10/20/04 | $24.02 | 105,000 |
| Mondello | 10/20/99 | $23.0938 | 30,000 |
| | 10/12/00 | $42.75 | 28,300 |
| | 9/21/01 | $15.00 | 101,600 |
| | 10/17/02 | $12.95 | 80,500 |
| | 10/2/03 | $26.14 | 75,000 |
| | 12/16/03 | $26.75 | 50,000 |
| | 10/20/04 | $24.02 | 120,000 |
| Brown | 9/21/01 | $15.00 | 97,300 |
| | 10/17/02 | $12.95 | 80,500 |
| | 10/2/03 | $26.14 | 65,000 |
| | 12/16/03 | $26.75 | 50,000 |
| | 10/20/04 | $24.02 | 65,000 |

22.    Pursuant to the terms of the Company's stock option plans, the exercise price of options must be no less than the closing price of Jabil stock on the date immediately preceding the grant.

23.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the exercise price of an option exceeds its market price on the date of grant, the company must recognize the difference as an expense.

7

24.    In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just before a substantial rise in Jabil's stock price, as demonstrated in the following chart:

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days After Grant | % Rise in Stock Price |
|---|---|---|---|
| 9/1/98 | $11.75 | $16.8125 | 43.1% |
| 11/17/98 | $24.41 | $30.2175 | 23.8% |
| 2/8/99 | $31.50 | $33.00 | 4.8% |
| 10/20/99 | $23.0938 | $26.594 | 15.2% |
| 10/12/00 | $42.75 | $53.875 | 26.0% |
| 9/21/01 | $15.00 | $20.05 | 33.7% |
| 10/17/02 | $12.95 | $15.40 | 18.9% |
| 10/2/03 | $26.14 | $28.07 | 7.4% |
| 12/16/03 | $26.75 | $28.30 | 5.8% |
| 10/20/04 | $24.02 | $25.04 | 4.2% |

25.    The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, at the behest of the Officer Defendants, the Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Jabil stock was lower than the market price on the actual grant dates.  This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and improperly reduced the amounts the Officer Defendants had to pay the Company upon exercise of the options.

8

26.     The Company, with the knowledge and approval of the Committee Defendants, violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted.

27.     On March 18, 2006, *The Wall Street Journal* published an article analyzing the timing of stock option grants made to a number of chief executive officers, including Main,. from 1995 to 2002. According to the *Journal*'s analysis, there is only a one in one million chance that the favorable timing of Main's option grants was the result of chance. In fact, the reason for the extraordinary pattern described by *The Wall Street Journal* was that the Officer Defendants' stock options were improperly backdated as alleged herein.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

28.     The Committee Defendants' improper backdating of stock option grants was not, and could not have been, an exercise of good faith business judgment. On the contrary, these defendants exercised no business judgment whatsoever, and merely "rubber-stamped" the Officer Defendants' improper requests for backdated stock option grants, which were intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

29.     The Committee Defendants further breached their fiduciary duties by knowingly approving the Company's violations of GAAP, which resulted in materially inaccurate and misleading financial statements.

30.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses the Company was required to incur and loss of funds paid to the Company upon exercise of options.

9

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

31.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

32.    Plaintiff is an owner of Jabil common stock and was an owner of Jabil common stock at all times relevant hereto.

33.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

34.    As a result of the facts set forth herein, plaintiff has not made any demand on the Jabil Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

35.    The Board currently consists of nine directors: defendants Morean, Sansone, Main, Lavitt, Raymund, and Newman, and directors Laurence F. Grafstein, Lawrence J. Murphy, and Kathleen Walters.  The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.    Morean, Sansone, and Main, because they are directly interested in the improperly backdated stock option grants complained of herein;

b.    Lavitt, Raymund, and Newman, because as members of the Stock Option Committee and/or Compensation Committee they are substantially likely to be held liable for breaching their fiduciary duties by improperly backdating stock option grants, as alleged herein;

c.    Lavitt, Raymund, and Newman, because as members of the Audit Committee they are substantially likely to be held liable for breaching their fiduciary duties by knowingly approving the Company's violations of GAAP, as alleged herein.

10

36.   Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

37.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

38.   As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

39.   As alleged in detail herein, the Officer Defendants breached their fiduciary duties by improperly requesting backdated stock option grants, which were intended to, and did, unduly benefit the Officer Defendants at the expense of the Company; and the Committee Defendants breached their fiduciary duties by rubber-stamping the Officer Defendants' improper requests and improperly backdating the stock option grants, as alleged herein.

40.   The Committee Defendants further breached their fiduciary duties by knowingly approving the Company's violations of GAAP, as alleged herein.

41.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT II

### AGAINST THE OFFICER DEFENDANTS
### FOR UNJUST ENRICHMENT

11

42.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

43.     The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

44.     To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.     Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

12

Dated: April 26, 2006

Respectfully submitted,

BARKER, RODEMS & COOK, P.A.

Chris A. Barker
FL BAR # 885568
SPN # 02253262
400 North Ashley Drive, Suite 2100
Tampa, Florida 33602
Telephone: (813) 489-1001
Fax: (813) 489-1008

SCHIFFRIN & BARROWAY, LLP
Eric L. Zagar
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*

13

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT C**



Home | Previous Page

## U.S. Securities and Exchange Commission

## Testimony Concerning Options Backdating

**by Christopher Cox**
*Chairman, U.S. Securities and Exchange Commission*

**Before the U.S. Senate Committee on Banking, Housing and Urban Affairs**

**September 6, 2006**

Chairman Shelby, Ranking Member Sarbanes, and Members of the Committee:

Thank you for inviting me to testify today about options backdating. This issue is one of intense public interest because it strikes at the heart of the relationship among a public company's management, its directors, and its shareholders. I appreciate the opportunity to explain the Commission's initiatives to deal with abuses involving the backdating of options.

I am especially pleased to testify together with Chairman Mark Olson of the Public Company Accounting Oversight Board. I will let Chairman Olson speak to the steps the PCAOB is taking to address these issues from the auditing regulator's perspective, but I'd like to assure the Committee, and the public, that the Commission is working in close cooperation with the PCAOB in this important area.

There are many variations on the backdating theme. But here is a typical example of what some companies did: They granted an "in-the-money" option-that is, an option with an exercise price lower than that day's market price. They did this by misrepresenting the date of the option grant, to make it appear that the grant was made on an earlier date when the market value was lower. That, of course, is what is meant by abusive "backdating" in today's parlance.

The purpose of disguising an in-the-money option through backdating is to allow the person who gets the option grant to realize larger potential gains-without the company having to show it as compensation on the financial statements.

Rather obviously, this fact pattern results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws.

The SEC has been after the problem of abusive options backdating for several years. As a preliminary step in explaining the Commission's response to the problem of fraudulent options backdating, it would be useful to put the whole topic of options compensation into some

perspective.

As you know, during the last year the Commission has been intensely focused on the quality of disclosure of executive compensation. Very recently, we enacted new rules that will require, beginning with the next proxy season, the full disclosure of all aspects of executive and director pay and benefits. A key component of that disclosure will be compensation in the form of stock options, which has been a fast growing portion of executive pay since the early 1990s.

Under the new SEC rules, all of an executive's compensation will now be totaled into one number, so that it can be compared easily from person to person, company to company, and industry to industry. The new rules also require detailed disclosure of compensation in the form of stock options, which will show whether a company has backdated options, and if so, why. The purpose of the new executive compensation rules is to make the CEO's pay understandable to the shareholders who own the company.

Of course, no new SEC rules would be necessary to make executive pay transparent, if executives were all paid in the form of salary. But beyond the obvious fact that the income tax code discriminates in favor of non-salary compensation that can be taxed as capital gains, one of the most significant reasons that non-salary forms of compensation have ballooned since the early 1990s is the $1 million legislative cap on salaries for certain top public company executives that was added to the Internal Revenue Code in 1993.

As a Member of Congress at the time, I well remember that the stated purpose was to control the rate of growth in CEO pay. With complete hindsight, we can now all agree that this purpose was not achieved. Indeed, this tax law change deserves pride of place in the Museum of Unintended Consequences.

There are other accounting and tax reasons, as well, that stock options over the years were increasingly included in the compensation packages of executives and non-executives.

Beginning in 1972, the accounting rule was that employee stock options wouldn't have to be shown as an expense on the income statement-so long as the terms were fixed when the option was granted, and so long as the exercise price was equal to the market price on that day. Indeed, no expense would ever need to be recorded in the financial statements for fixed options that weren't granted in-the-money.

In addition to this favorable accounting treatment, there was a tax benefit. The million-dollar cap on the tax deductibility of executive compensation, which I mentioned earlier, doesn't apply to options granted at fair market value. So for companies that wanted or needed to pay compensation in excess of $1 million per year, the tax code outlawed deducting it if it was paid in a straightforward way through salary, but permitted a deduction if the compensation was paid through at-the-money options.

And of course there were other reasons, many of them good ones with solid economic rationales, that companies wanted to use options as a form of

compensation. For example, a properly-structured option plan can be useful in more closely aligning the incentives of shareholders and managers. And for growth companies, the use of stock options as compensation offers a way to conserve resources while attracting top-flight talent in highly competitive markets.

All of these factors have contributed to the now-widespread use of stock options as compensation. But just as option compensation increased, so did the potential for abuse. And Congress deserves credit for taking preemptive action that we now know was critical to stopping the spread of the backdating contagion.

Four years ago, in 2002, the Sarbanes-Oxley Act very presciently tightened up on the reporting of stock option grants. Before Sarbanes-Oxley, officers and directors didn't have to disclose their receipt of stock option grants until after the end of the fiscal year in which the transaction took place. So a grant in January might not have to be disclosed until more than a year later. SOX changed that, by requiring real-time disclosure of option grants. And in August 2002, shortly after the law was signed, the SEC issued rules requiring that officers and directors disclose any option grants within two business days.

Not only must option grants now be reported within two business days, but this information was among the first required to be filed electronically using interactive data. Thanks to this new data-tagging technology, the public now has almost instant access to information about stock option grants.

The following year, in 2003, the SEC took another important step that has helped increase the transparency of public company options plans. The Commission approved changes to the listing standards of the New York Stock Exchange and the Nasdaq Stock Market that for the first time required shareholder approval of almost all equity compensation plans. Companies have to publicly disclose the material terms of their stock option plans in order to obtain shareholder approval.

Very importantly, the required disclosures include the terms on which options will be granted. And companies must tell their shareholders whether the plan permits options to be granted with an exercise price that's less than the market value on the date of grant.

Then, in December 2004, the FASB issued Statement of Financial Accounting Standard 123R, which effectively eliminated the accounting advantage that had previously been given to stock options issued at-the-money. Since this new accounting rule took effect, all stock options granted to employees have to be recorded as an expense in the financial statements, whether or not the exercise price is at fair market value. This rule is nearly fully phased in.

Most recently, in January of this year, the SEC proposed that public companies be required to more thoroughly disclose their awards of in-the-money options to certain executives. The Commission also proposed that companies be required to disclose the fair value of the option on the grant date, as determined under the new accounting rules. The Commission adopted final rules on these subjects on July 26, 2006. As a result, in the next proxy season beginning in the spring, all public companies will now

report this information in clear, easy to understand tabular presentations.

The tables will include:

- The grant date fair value under FAS 123R (which is aggregated in the total compensation amount that is shown for each named executive officer);

- The FAS 123R grant date;

- The closing market price on the grant date if it is greater than the exercise price of the option; and

- The date the compensation committee or full board of directors took action to grant the option, if that date is different than the grant date.

Because the dates and numbers often don't tell the whole story, companies will also be required to discuss the policies and goals of their compensation programs-in plain English. The reports to investors will describe whether, and if so how, a company has engaged (or might engage in the future) in backdating or any of the many variations on that theme concerning the timing and pricing of options. For example, if a company has a plan to issue option grants in coordination with the release of material non-public information, that will now be clearly described.

The Commission will continue to avail itself of every opportunity to clarify the rules and procedures for options issuance going forward. To that end, you can expect that the Office of the Chief Accountant will soon issue further public guidance on the accounting issues surrounding backdating.

So, to recap, here is what has been done by way of prophylactic rules to eliminate the opportunities for abusive backdating. First, Sarbanes-Oxley has closed the disclosure loophole that permitted months and sometimes more than a year to elapse before option grants had to be reported. Second, a new accounting rule-FAS 123R-has eliminated the accounting benefit of granting at-the-money options. And third, the SEC's brand new executive compensation rules now require a complete quantitative and narrative disclosure of a company's executive compensation plans and goals. That enhanced disclosure will make it clear whenever options are being backdated, and it will require an explanation of the reasons. These new rules will soon be complemented by additional accounting guidance on these subjects.

Each of these steps by itself is an important contribution to preventing backdating abuse. In combination, they have effectively slammed the door shut on the easy opportunities to get away with secretive options grants. That's why almost all of the stock option abuses our Enforcement Division has uncovered started in periods prior to these reforms.

But while these accounting and disclosure rules changes have made it easier to detect and punish backdating abuses going forward, uncovering the problems from prior years has been quite a challenge.

A few years ago, the SEC began working with academics to decipher

market data that provided the first clues something fishy was going on. One of the academics with whom the SEC worked was Erik Lie of the University of Iowa, who subsequently published a paper in 2005 that showed compelling circumstantial evidence of backdating.

Dr. Lie's data showed that before 2003, a surprising number of companies seemed to have had an uncanny ability to choose grant dates that coincided with low stock prices. (In a follow-up paper this year, co-authored with Dr. Randall Heron of Indiana University, Dr. Lie demonstrated that this problem has greatly diminished since 2002, when the Sarbanes-Oxley Act shortened the time for reporting option grants to two business days.)

With a fair amount of detective work, and with the aid of economic research conducted by the SEC's Office of Economic Analysis, the Commission succeeded in turning what had begun as mere evidentiary threads into solid leads. Eventually, some of the evidence we began turning up was so compelling that several U.S. Attorneys took a criminal interest. Over the past several years, our inventory of backdating and related investigations has grown substantially. And beginning three years ago, the SEC has brought several enforcement actions against companies and individuals for fraudulent option practices.

For example, in 2003, the Commission charged Peregrine Systems, Inc. with financial fraud for failing to record any expense for compensation when it issued incentive stock options. The SEC's complaint alleged that at each quarterly board meeting, the company's directors would approve a total number of options for employees. The company would then allocate the options to the employees during the quarter. But the options wouldn't be priced until the day after the next quarterly Board meeting. On that day, the company looked back at the market price of its stock between the two quarterly Board meetings, and picked the lowest price. That turned the options into in-the-money grants. But even though accounting rules required that they then be recorded as compensation expense, the company didn't do that. As a result, Peregrine understated its expenses by approximately $90 million.

The following year, in 2004, the SEC brought a case involving the manipulation not of option grants, but of exercise dates. Our complaint charged that Symbol Technologies, Inc. and its former general counsel fudged option exercise dates so that senior executives could profit unfairly at the company's expense. Rather than use the actual exercise date as defined by the company's option plans, the general counsel picked the most advantageous date from a 30-day "look-back" period in order to come up with a lower exercise price. This was done without board approval and public disclosure. The SEC charged that to create the false appearance that these exercises had actually occurred on the chosen dates, the company's general counsel had instructed his staff to backdate the relevant documents, and to substitute phony exercise dates on the forms the executives used to report their option exercises to the SEC and the public. The result, according to the complaint, was a serious misstatement of the company's stock option expenses.

When the company subsequently restated its improper accounting, the cumulative net increase in reported stock option expenses was $229 million. The amount would undoubtedly have been higher had it not been

for the passage of the Sarbanes-Oxley Act. Thanks to the Act's new two-day deadline for reporting options transactions by officers and its prohibition on company loans to officers and directors, the company and its general counsel had put a halt to the "look-backs" because the law had rendered the practice unfeasible.

While the alleged manipulations of option grants and exercises in these two cases were part of larger accounting fraud charges, two more recent cases have focused solely on option practices. These are the Brocade and Comverse actions that the SEC filed in July and August of this year. The executives charged in these cases are contesting the SEC's allegations.

In July, the SEC filed a civil fraud action against three former executives of Brocade Communications Systems, alleging that the former CEO and the former Vice President of Human Resources routinely backdated stock option grants to give employees favorably priced options without recording the necessary compensation expenses. Specifically, the SEC's complaint alleges that the CEO caused Brocade to grant in-the-money options to both new and current employees between 2000 and 2004, and then backdated documents to make it appear that the options were at-the-money when granted. This had the effect of concealing millions of dollars in expenses from investors.

The complaint alleges that the CEO repeatedly used hindsight to select a date with a lower stock price from the recent past as the purported option grant date, and that, to facilitate the scheme, the Human Resources executive created, or directed others to create, false paperwork making it appear that the options had been granted on the earlier date. The complaint alleged that, in some instances, employment offer letters and compensation committee minutes were falsified to suggest that options had been granted to employees before they had even been hired by the company.

The SEC's complaint also charged Brocade's former CFO, alleging that he learned of the backdating after joining the company but took no action to correct or halt the practice and instead signed Brocade's SEC filings. When these stock option practices surfaced, Brocade was required to restate and revise its financial statements for six fiscal years, from 1999 through 2004. The scheme resulted in the inflation of Brocade's net income by as much as $1 billion in the year 2000 alone. Simultaneously with the filing of the SEC's complaint, the U.S. Attorney's Office for the Northern District of California separately filed criminal charges against the former CEO and the former Vice President of Human Resources for the same misconduct.

In the second recent case, the Commission filed a civil fraud complaint last month against three former senior executives of Comverse Technology, Inc., alleging that they engaged in a decade-long fraudulent scheme to grant undisclosed, in-the-money options to themselves and to others by backdating stock option grants to coincide with historically low closing prices of Comverse common stock.

The complaint alleges that from 1991 to 2002, Comverse's founder and former Chairman and CEO repeatedly used hindsight to select a date when the closing price of Comverse's common stock was at or near a quarterly or annual low. According to the complaint, the CEO then communicated this

date and closing price to Comverse's former general counsel who, with the CEO's knowledge, created company records that falsely indicated that a committee of Comverse's board of directors had actually approved the option grant on the date the CEO had picked.

The complaint also alleges that Comverse's former CFO joined the scheme no later than 1998, and assisted in selecting backdated grant dates. It is alleged that each of the three defendants realized actual illicit gains from the backdating when they sold stock they acquired from exercises of backdated options, including at least $6 million by the CEO alone. In addition, the complaint alleges that the former CEO and CFO created a slush fund of backdated options between 1999 and 2002 by causing options to be granted to fictitious employees and, later, used these options to recruit and retain key personnel.

Comverse has publicly announced that it expects to restate historical financial results for multiple years in order to record material charges for option-related compensation expenses. Simultaneously with the filing of the SEC's complaint, the U.S Attorney's Office for the Eastern District of New York unsealed a criminal complaint charging these three executives with conspiracy to violate the antifraud provisions of the federal securities laws, wire fraud, and mail fraud by engaging in the same scheme.

These cases demonstrate some of the variations on the basic theme of fraudulent backdating that the Commission has uncovered. They involve backdated option grants that are more profitable to recipients; backdated option exercises that reduce recipients' taxes at the expense of shareholders; options granted to top executives; and options granted to rank and file employees. They involve actual personal gain to wrongdoers, and real harm to companies that failed to properly account for the options practices.

Unfortunately, these cases that I've used as illustrations are not the only matters the SEC has under investigation. The SEC's Division of Enforcement is currently investigating over 100 companies concerning possible fraudulent reporting of stock option grants. The companies are located throughout the country, and include Fortune 500 companies as well as smaller cap issuers. They span multiple industry sectors.

You should not expect that all of these investigations will result in enforcement proceedings. At the same time, we have to expect other enforcement actions will be forthcoming in the future.

The SEC's Enforcement staff is sharing information related to its investigations with other law enforcement and regulatory authorities as warranted and appropriate, including the Department of Justice, the President's Corporate Fraud Task Force, U.S. Attorney's offices around the country, the Federal Bureau of Investigation, and the Internal Revenue Service.

In our rulemaking, our provision of accounting and final regulatory guidance, and our enforcement programs, the SEC has been and will remain vigilant in the battle against fraudulent options backdating. The agency is grateful for the opportunity to provide you with this update on a very important subject. I am happy to take any questions you may have.

*http://www.sec.gov/news/testimony/ts090606cc.htm*

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT D**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT OF THE STATE OF
FLORIDA, IN AND FOR PINELLAS COUNTY
CIVIL DIVISION

ROBERT BARONE, Derivatively on )   No. _06 - 3279 -CI - 11_
Behalf of Nominal Defendant JABIL )
CIRCUIT, INC., )
 )   UCN:52200 _4CA00 3279 XX CICI_
                    Plaintiff, )
 )
       v. )
 )
SCOTT D. BROWN, MEL S. LAVITT, )
TIMOTHY L. MAIN, MARK T. )
MONDELLO, WILLIAM D. MOREAN, )
FRANK A. NEWMAN, STEVEN A. )
RAYMUND, and THOMAS A. SANSONE, )
 )
                    Defendants, )
 )
       and )
 )   **JURY TRIAL DEMANDED**
JABIL CIRCUIT, INC., )
 )
                    Nominal Defendant. )
_____ )

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Derivative Complaint (the "Complaint")
against the defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of nominal
defendant Jabil Circuit, Inc. ("Jabil" or the "Company") against certain current members of its
Board of Directors (the "Board") and certain of its executive officers seeking to remedy
defendants' breaches of fiduciary duties and unjust enrichment.

1

## PARTIES

2.      Plaintiff Robert Barone is, and was at all relevant times, a shareholder of nominal defendant Jabil.

3.      Nominal defendant Jabil is a Delaware corporation with its principal executive offices located at 10560 Dr. Martin Luther King, Jr. Street North, St. Petersburg, Florida 33716. According to its public filings, Jabil is a provider of worldwide electronic manufacturing services and solutions.

4.      Defendant William D. Morean ("Morean") has served as a director of Jabil since 1978 and currently serves as Chairman of the Board.   Morean previously served as Chief Executive Officer of the Company from 1988 to 2000.

5.      Defendant Thomas A. Sansone ("Sansone") has served as a director of Jabil since 1983 and currently serves as Vice Chairman of the Board.   Sansone previously served as President of the Company from 1988 to 1999.

6.      Defendant Timothy L. Main ("Main") has served as a director of Jabil and as President of the Company since 1999 and as Chief Executive Officer of the Company since 2000.   Main previously served as Jabil's Senior Vice President, Business Development, from 1996 to 1999.

7.      Defendant Mark T. Mondello ("Mondello") has served as Chief Operating Officer of the Company since 2002, and previously served as Jabil's Senior Vice President, Business Development from 1999 to 2002.

2

8.     Defendant Scott D. Brown ("Brown") has served as Executive Vice President of the Company at all times relevant hereto.

9.     Collectively, defendants Morean, Sansone, Main, Mondello, and Brown are referred to herein as the "Officer Defendants."

10.    Defendant Mel S. Lavitt ("Lavitt") has served as a director of Jabil since 1991. Lavitt served as a member of the Stock Option Committee of the Board (the "Stock Option Committee") from 2002 to 2003 and has served as a member of both the Compensation Committee of the Board (the "Compensation Committee") and the Audit Committee of the Board (the "Audit Committee") at all times relevant hereto.

11.    Defendant Steven A. Raymund ("Raymund") has served as a director of Jabil since 1996. Raymund served as a member of the Stock Option Committee from 1998 to 2003, and has served as a member of both the Compensation Committee and the Audit Committee at all times relevant hereto.

12.    Defendant Frank A. Newman ("Newman") has served as a director of Jabil since 1998. Newman served as a member of the Stock Option Committee from 1998 to 2003. Newman has served as a member of the Compensation Committee at all times relevant hereto and as a member of the Audit Committee since 2000.

13.    Collectively, defendants Lavitt, Raymund, and Newman are referred to herein as the "Committee Defendants."

14.    Collectively, the Officer Defendants and Committee Defendants are referred to herein as the "Individual Defendants."

3

## DUTIES OF THE INDIVIDUAL DEFENDANTS

15.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

16.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

17.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

4

b.   exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.   exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

d.   exercise good faith in ensuring that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

e.   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

18.   The Individual Defendants, particularly the Officer Defendants and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)   transactions are executed in accordance with management's general or specific authorization;

5

        (b)      transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

19.     Jabil's Audit Committee Charter provides that the Audit Committee shall be responsible for, among other things,

        a.      Review of financial statements and any financial reports or other financial information submitted to the public with management and the independent auditor. It is anticipated that these discussions may include quality of earnings, discussions of significant items subject to estimate, consideration of the suitability of accounting principles, audit adjustments (whether or not recorded), and such other inquiries as may be deemed appropriate by the audit committee;

        b.      Periodic discussion with management and the auditors regarding the quality and adequacy of the Company's internal controls; and

        c.      Review with financial management and the independent accountants all major financial reports in advance of filing or distribution.

## FACTUAL ALLEGATIONS

20.     From 1998 to 2002, the Stock Option Committee administered the Company's stock option plans and granted stock options to Company employees, including the Officer Defendants. Since 2003 the Compensation Committee has administered the Company's stock option plans and granted stock options to the Officer Defendants.

21.     From 1998 to 2004, the Stock Option Committee and Compensation Committee granted certain Jabil stock options to certain of the Officer Defendants, as follows:[1]

---

[1] Exercise prices and number of options are not adjusted for the Company's 2-for-1 stock splits effective February 18, 1999 and March 31, 2000.

6

| Officer | Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|---|
| Morean | 9/1/98 | $11.75 | 63,000 |
| Sansone | 9/1/98 | $11.75 | 50,800 |
| Main | 9/1/98 | $11.75 | 32,000 |
|  | 11/17/98 | $24.41 | 120,000 |
|  | 2/8/99 | $31.50 | 100,000 |
|  | 10/20/99 | $23.0938 | 141,600 |
|  | 10/12/00 | $42.75 | 141,900 |
|  | 9/21/01 | $15.00 | 248,900 |
|  | 10/17/02 | $12.95 | 115,600 |
|  | 10/2/03 | $26.14 | 105,000 |
|  | 12/16/03 | $26.75 | 65,000 |
|  | 10/20/04 | $24.02 | 105,000 |
| Mondello | 10/20/99 | $23.0938 | 30,000 |
|  | 10/12/00 | $42.75 | 28,300 |
|  | 9/21/01 | $15.00 | 101,600 |
|  | 10/17/02 | $12.95 | 80,500 |
|  | 10/2/03 | $26.14 | 75,000 |
|  | 12/16/03 | $26.75 | 50,000 |
|  | 10/20/04 | $24.02 | 120,000 |
| Brown | 9/21/01 | $15.00 | 97,300 |
|  | 10/17/02 | $12.95 | 80,500 |
|  | 10/2/03 | $26.14 | 65,000 |
|  | 12/16/03 | $26.75 | 50,000 |
|  | 10/20/04 | $24.02 | 65,000 |

22.     Pursuant to the terms of the Company's stock option plans, the exercise price of options must be no less than the closing price of Jabil stock on the date immediately preceding the grant.

23.     Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the exercise price of an option exceeds its market price on the date of grant, the company must recognize the difference as an expense.

7

24.     In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just before a substantial rise in Jabil's stock price, as demonstrated in the following chart:

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days After Grant | % Rise in Stock Price |
|---|---|---|---|
| 9/1/98 | $11.75 | $16.8125 | 43.1% |
| 11/17/98 | $24.41 | $30.2175 | 23.8% |
| 2/8/99 | $31.50 | $33.00 | 4.8% |
| 10/20/99 | $23.0938 | $26.594 | 15.2% |
| 10/12/00 | $42.75 | $53.875 | 26.0% |
| 9/21/01 | $15.00 | $20.05 | 33.7% |
| 10/17/02 | $12.95 | $15.40 | 18.9% |
| 10/2/03 | $26.14 | $28.07 | 7.4% |
| 12/16/03 | $26.75 | $28.30 | 5.8% |
| 10/20/04 | $24.02 | $25.04 | 4.2% |

25.     The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, at the behest of the Officer Defendants, the Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Jabil stock was lower than the market price on the actual grant dates.  This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and improperly reduced the amounts the Officer Defendants had to pay the Company upon exercise of the options.

8

26.     The Company, with the knowledge and approval of the Committee Defendants,

violated GAAP by failing to recognize compensation expenses incurred when the improperly

backdated options were granted.

27.     On March 18, 2006, *The Wall Street Journal* published an article analyzing the

timing of stock option grants made to a number of chief executive officers, including Main,

from 1995 to 2002.   According to the *Journal*'s analysis, there is only a one in one million

chance that the favorable timing of Main's option grants was the result of chance.   In fact, the

reason for the extraordinary pattern described by *The Wall Street Journal* was that the Officer

Defendants' stock options were improperly backdated as alleged herein.

### THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

28.     The Committee Defendants' improper backdating of stock option grants was not,

and could not have been, an exercise of good faith business judgment.   On the contrary, these

defendants exercised no business judgment whatsoever, and merely "rubber-stamped" the

Officer Defendants' improper requests for backdated stock option grants, which were intended

to, and did, unduly benefit the Officer Defendants at the expense of the Company.

29.     The Committee Defendants further breached their fiduciary duties by knowingly

approving the Company's violations of GAAP, which resulted in materially inaccurate and

misleading financial statements.

30.     As a direct and proximate result of the Individual Defendants' foregoing breaches

of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not

limited to, the additional compensation expenses the Company was required to incur and loss of

funds paid to the Company upon exercise of options.

9

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

31.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

32.     Plaintiff is an owner of Jabil common stock and was an owner of Jabil common stock at all times relevant hereto.

33.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

34.     As a result of the facts set forth herein, plaintiff has not made any demand on the Jabil Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

35.     The Board currently consists of nine directors: defendants Morean, Sansone, Main, Lavitt, Raymund, and Newman, and directors Laurence F. Grafstein, Lawrence J. Murphy, and Kathleen Walters.   The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

 a.     Morean, Sansone, and Main, because they are directly interested in the improperly backdated stock option grants complained of herein;

 b.     Lavitt, Raymund, and Newman, because as members of the Stock Option Committee and/or Compensation Committee they are substantially likely to be held liable for breaching their fiduciary duties by improperly backdating stock option grants, as alleged herein;

 c.     Lavitt, Raymund, and Newman, because as members of the Audit Committee they are substantially likely to be held liable for breaching their fiduciary duties by knowingly approving the Company's violations of GAAP, as alleged herein.

10

36. Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

37. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

38. As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

39. As alleged in detail herein, the Officer Defendants breached their fiduciary duties by improperly requesting backdated stock option grants, which were intended to, and did, unduly benefit the Officer Defendants at the expense of the Company; and the Committee Defendants breached their fiduciary duties by rubber-stamping the Officer Defendants' improper requests and improperly backdating the stock option grants, as alleged herein.

40. The Committee Defendants further breached their fiduciary duties by knowingly approving the Company's violations of GAAP, as alleged herein.

41. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT II

### AGAINST THE OFFICER DEFENDANTS
### FOR UNJUST ENRICHMENT

11

42.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

43.    The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

44.    To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.    Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

12

Dated: May 2, 2006

Respectfully submitted,

BARKER, RODEMS & COOK, P.A.

Chris A. Barker
FL BAR # 885568
SPN # 02253262
400 North Ashley Drive, Suite 2100
Tampa, Florida 33602
Telephone: (813) 489-1001
Fax: (813) 489-1008

MURRAY FRANK & SAILER, LLP
Eric J. Belfi
275 Madison Avenue
New York, NY 10016
Telephone: (212) 682-1818
Fax: (212) 682-1892

JAMES M. ORMAN, ESQUIRE
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
Telephone: (215) 523-7800
Fax: (215) 523-9290

SCHIFFRIN & BARROWAY, LLP
Eric L. Zagar
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*

13

**VERIFICATION**

I, Robert M. Barnes, hereby verify that I have reviewed the Complaint and authorized its filing and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: 4/29/06

_____
Robert Barnes

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT E**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# DEF 14A

**JABIL CIRCUIT, INC.**
**Filed on 12/07/2001 − Period: 01/24/2002**
File Number 001−14063



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

APPENDIX C

JABIL CIRCUIT, INC.

2002 STOCK INCENTIVE PLAN

1. Purposes of the Plan.  The purposes of this Stock Incentive Plan are to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees and Consultants, and to promote the success of the Company's business. Awards granted under the Plan may be Incentive Stock Options, Nonstatutory Stock Options, Stock Awards, Performance Units, Performance Shares or Stock Appreciation Rights.

2. Definitions.  As used herein, the following definitions shall apply:

(a) "Administrator" means the Board or any Committee or person as shall be administering the Plan, in accordance with Section 4 of the Plan.

(b) "Applicable Law" means the legal requirements relating to the administration of the Plan under applicable federal, state, local and foreign corporate, tax and securities laws, and the rules and requirements of any stock exchange or quotation system on which the Common Stock is listed or quoted.

(c) "Award" means an Option, Stock Appreciation Right, Stock Award, Performance Unit or Performance Share granted under the Plan.

(d) "Award Agreement" means a written agreement by which an Award is evidenced.

(e) "Board" means the Board of Directors of the Company.

(f) "Change in Control" means the happening of any of the following:

(i) When any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, a Subsidiary or a Company employee benefit plan, including any trustee of such plan acting as trustee) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities; or

(ii) The occurrence of a transaction requiring stockholder approval, and involving the sale of all or substantially all of the assets of the Company or the merger of the Company with or into another corporation.

(g) "Change in Control Price" means, as determined by the Board,

(i) the highest Fair Market Value of a Share within the 60 day period immediately preceding the date of determination of the Change in Control Price by the Board (the "60-Day Period"), or

(ii) the highest price paid or offered per Share, as determined by the Board, in any bona fide transaction or bona fide offer related to the Change in Control of the Company, at any time within the 60-Day Period, or

(iii) some lower price as the Board, in its discretion, determines to be a reasonable estimate of the fair market value of a Share.

(h) "Code" means the Internal Revenue Code of 1986, as amended.

(i) "Committee" means a Committee appointed by the Board in accordance with Section 4 of the Plan.

(j) "Common Stock" means the Common Stock, $.001 par value, of the Company.

(k) "Company" means Jabil Circuit, Inc., a Delaware corporation.

C-1

(l) "Consultant" means any person, including an advisor, engaged by the Company or a Parent or Subsidiary to render services and who is compensated for such services, including without limitation non-Employee Directors who are paid only a director's fee by the Company or who are compensated by the Company for their services as non-Employee Directors. In addition, as used herein, "consulting relationship" shall be deemed to include service by a non-Employee Director as such.

(m) "Continuous Status as an Employee or Consultant" means that the employment or consulting relationship is not interrupted or terminated by the Company, any Parent or Subsidiary. Continuous Status as an Employee or Consultant shall not be considered interrupted in the case of (i) any leave of absence approved in writing by the Board, an Officer, or a person designated in writing by the Board or an Officer as authorized to approve a leave of absence, including sick leave, military leave, or any other personal leave; provided, however, that for purposes of Incentive Stock Options, any such leave may not exceed 90 days, unless reemployment upon the expiration of such leave is guaranteed by contract (including certain Company policies) or statute, or (ii) transfers between locations of the Company or between the Company, a Parent, a Subsidiary or successor of the Company; or (iii) a change in the status of the Grantee from Employee to Consultant or from Consultant to Employee.

(n) "Covered Stock" means the Common Stock subject to an Award.

(o) "Date of Grant" means the date on which the Administrator makes the determination granting the Award, or such other later date as is determined by the Administrator. Notice of the determination shall be provided to each Grantee within a reasonable time after the Date of Grant.

(p) "Date of Termination" means the date on which a Grantee's Continuous Status as an Employee or Consultant terminates.

(q) "Director" means a member of the Board.

(r) "Disability" means total and permanent disability as defined in Section 22(e)(3) of the Code.

(s) "Employee" means any person, including Officers and Directors, employed by the Company or any Parent or Subsidiary of the Company. Neither service as a Director nor payment of a director's fee by the Company shall be sufficient to constitute "employment" by the Company.

(t) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(u) "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the National Market System of the National Association of Securities Dealers, Inc. Automated Quotation ("NASDAQ") System, the Fair Market Value of a Share of Common Stock shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such system or exchange (or the exchange with the greatest volume of trading in Common Stock) on the last market trading day prior to the day of determination, as reported in The Wall Street Journal or such other source as the Administrator deems reliable;

(ii) If the Common Stock is quoted on the NASDAQ System (but not on the National Market System thereof) or is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid and low asked prices for the Common Stock on the last market trading day prior to the day of determination, as reported in The Wall Street Journal or such other source as the Administrator deems reliable;

(iii) In the absence of an established market for the Common Stock, the Fair Market Value shall be determined in good faith by the Administrator.

(v) "Grantee" means an individual who has been granted an Award.

(w) "Incentive Stock Option" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

(x) "Mature Shares" means Shares for which the holder thereof has good title, free and clear of all liens and encumbrances, and that such holder either (i) has held for at least six months or (ii) has purchased on the open market.

(y) "Nonstatutory Stock Option" means an Option not intended to qualify as an Incentive Stock Option.

(z) "Officer" means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(aa) "Option" means a stock option granted under the Plan.

(bb) "Parent" means a corporation, whether now or hereafter existing, in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company holds at least 50 percent of the voting shares of one of the other corporations in such chain.

(cc) "Performance Period" means the time period during which the performance goals established by the Administrator with respect to a Performance Unit or Performance Share, pursuant to Section 9 of the Plan, must be met.

(dd) "Performance Share" has the meaning set forth in Section 9 of the Plan.

(ee) "Performance Unit" has the meaning set forth in Section 9 of the Plan.

(ff) "Plan" means this 2002 Stock Incentive Plan.

(gg) "Rule 16b-3" means Rule 16b-3 promulgated under the Exchange Act or any successor to Rule 16b-3, as in effect when discretion is being exercised with respect to the Plan.

(hh) "Share" means a share of the Common Stock, as adjusted in accordance with Section 11 of the Plan.

(ii) "Stock Appreciation Right" or "SAR" has the meaning set forth in Section 7 of the Plan.

(jj) "Stock Grant" means Shares that are awarded to a Grantee pursuant to Section 8 of the Plan.

(kk) "Subsidiary" means a corporation, domestic or foreign, of which not less than 50 percent of the voting shares are held by the Company or a Subsidiary, whether or not such corporation now exists or is hereafter organized or acquired by the Company or a Subsidiary.

3. Stock Subject to the Plan.  Subject to the provisions of Section 11 of the Plan and except as otherwise provided in this Section 3, the maximum aggregate number of Shares that may be subject to Awards under the Plan is 7,000,000 Shares. The Shares may be authorized, but unissued, or reacquired Common Stock.

If an Award expires or becomes unexercisable without having been exercised in full the remaining Shares that were subject to the Award shall become available for future Awards under the Plan (unless the Plan has been terminated). If any Shares (whether subject to or received pursuant to an Award granted hereunder, purchased on the open market, or otherwise obtained, and including Shares that are deemed (by attestation or otherwise) to have been delivered to the Company as payment for all or any portion of the exercise price of an Award) are withheld or applied as payment by the Company in connection with the exercise of an Award or the withholding of taxes related thereto, such Shares, to the extent of any such withholding or payment, shall again be available for future Awards under the Plan. Any Shares that are authorized to be optioned and sold under the Jabil Circuit, Inc. 1992 Stock Option Plan (the "1992 Plan") and that are not subject to options granted under the 1992 Plan and outstanding as of the date of termination of the 1992 Plan shall be available or shall increase the number of Shares available, as applicable, for Awards under the Plan. The Board may from time to time determine the appropriate methodology for calculating the number of Shares issued pursuant to the Plan.

4. Administration of the Plan.

(a) Procedure.

(i) Multiple Administrative Bodies.  The Plan may be administered by different bodies with respect to different groups of Employees and Consultants. Except as provided below, the Plan shall be administered by (A) the Board or (B) a committee designated by the Board and constituted to satisfy Applicable Law.

(ii) Rule 16b-3.  To the extent the Board considers it desirable for transactions relating to Awards to be eligible to qualify for an exemption under Rule 16b-3, the transactions contemplated under the Plan shall be structured to satisfy the requirements for exemption under Rule 16b-3.

(iii) Section 162(m) of the Code.  To the extent the Board considers it desirable for compensation delivered pursuant to Awards to be eligible to qualify for an exemption from the limit on tax deductibility of compensation under Section 162(m) of the Code, the transactions contemplated under the Plan shall be structured to satisfy the requirements for exemption under Section 162(m) of the Code.

(iv) Authorization of Officers to Grant Options.  In accordance with Applicable Law, the Board may, by a resolution adopted by the Board, authorize one or more Officers to designate Officers and Employees (excluding the Officer so authorized) to be Grantees of Options and determine the number of Options to be granted to such Officers and Employees; provided, however, that the resolution adopted by the Board so authorizing such Officer or Officers shall specify the total number and the terms (including the exercise price, which may include a formula by which such price may be determined) of Options such Officer or Officers may so grant.

(b) Powers of the Administrator.  Subject to the provisions of the Plan, and in the case of a Committee or an Officer, subject to the specific duties delegated by the Board to such Committee or Committee, the Administrator shall have the authority, in its sole and absolute discretion:

(i) to determine the Fair Market Value of the Common Stock, in accordance with Section 2(u) of the Plan;

(ii) to select the Consultants and Employees to whom Awards will be granted under the Plan;

(iii) to determine whether, when, to what extent and in what types and amounts Awards are granted under the Plan;

(iv) to determine the number of shares of Common Stock to be covered by each Award granted under the Plan;

(v) to determine the forms of Award Agreements, which need not be the same for each grant or for each Grantee, for use under the Plan;

(vi) to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted under the Plan. Such terms and conditions, which need not be the same for each grant or for each Grantee, include, but are not limited to, the exercise price, the time or times when Options and SARs may be exercised (which may be based on performance criteria), the extent to which vesting is suspended during a leave of absence, any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the shares of Common Stock relating thereto, based in each case on such factors as the Administrator shall determine;

(vii) to construe and interpret the terms of the Plan and Awards;

(viii) to prescribe, amend and rescind rules and regulations relating to the Plan, including, without limiting the generality of the foregoing, rules and regulations relating to the operation and administration of the Plan to accommodate the specific requirements of local and foreign laws and procedures;

C-4

(ix) to modify or amend each Award (subject to Section 13 of the Plan);

(x) to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(xi) to determine the terms and restrictions applicable to Awards;

(xii) to make such adjustments or modifications to Awards granted to Grantees who are Employees of foreign Subsidiaries as are advisable to fulfill the purposes of the Plan or to comply with Applicable Law;

(xiii) to delegate its duties and responsibilities under the Plan with respect to sub-plans applicable to foreign Subsidiaries, except its duties and responsibilities with respect to Employees who are also Officers or Directors subject to Section 16(b) of the Exchange Act; and

(xiv) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) Effect of Administrator's Decision.  The Administrator's decisions, determinations and interpretations shall be final and binding on all Grantees and any other holders of Awards.

5. Eligibility and General Conditions of Awards.

(a) Eligibility.  Awards other than Incentive Stock Options may be granted to Employees and Consultants. Incentive Stock Options may be granted only to Employees. If otherwise eligible, an Employee or Consultant who has been granted an Award may be granted additional Awards.

(b) Maximum Term.  Subject to the following provision, the term during which an Award may be outstanding shall not extend more than ten years after the Date of Grant, and shall be subject to earlier termination as specified elsewhere in the Plan or Award Agreement; provided, however, that any deferral of a cash payment or of the delivery of Shares that is permitted or required by the Administrator pursuant to Section 10 of the Plan may, if so permitted or required by the Administrator, extend more than ten years after the Date of Grant of the Award to which the deferral relates.

(c) Award Agreement.  To the extend not set forth in the Plan, the terms and conditions of each Award, which need not be the same for each grant or for each Grantee, shall be set forth in an Award Agreement.

(d) Termination of Employment or Consulting Relationship.  In the event that a Grantee's Continuous Status as an Employee or Consultant terminates (other than upon the Grantee's death or Disability), then, unless otherwise provided by the Award Agreement, and subject to Section 11 of the Plan:

(i) the Grantee may exercise his or her unexercised Option or SAR, but only within such period of time as is determined by the Administrator, and only to the extent that the Grantee was entitled to exercise it at the Date of Termination (but in no event later than the expiration of the term of such Option or SAR as set forth in the Award Agreement). In the case of an Incentive Stock Option, the Administrator shall determine such period of time (in no event to exceed three months from the Date of Termination) when the Option is granted. If, at the Date of Termination, the Grantee is not entitled to exercise his or her entire Option or SAR, the Shares covered by the unexercisable portion of the Option or SAR shall revert to the Plan. If, after the Date of Termination, the Grantee does not exercise his or her Option or SAR within the time specified by the Administrator, the Option or SAR shall terminate, and the Shares covered by such Option or SAR shall revert to the Plan. An Award Agreement may also provide that if the exercise of an Option following the Date of Termination would be prohibited at any time because the issuance of Shares would violate Company policy regarding compliance with Applicable Law, then the exercise period shall terminate on the earlier of (A) the expiration of the term of the Option set forth in Section 6(b) of the Plan or (B) the expiration of a period of 10 days after the Date of Termination during which the exercise of the Option would not be in violation of such requirements;

C-5

(ii) the Grantee's Stock Awards, to the extent forfeitable immediately before the Date of Termination, shall thereupon automatically be forfeited;

(iii) the Grantee's Stock Awards that were not forfeitable immediately before the Date of Termination shall promptly be settled by delivery to the Grantee of a number of unrestricted Shares equal to the aggregate number of the Grantee's vested Stock Awards;

(iv) any Performance Shares or Performance Units with respect to which the Performance Period has not ended as of the Date of Termination shall terminate immediately upon the Date of Termination.

(e) Disability of Grantee.  In the event that a Grantee's Continuous Status as an Employee or Consultant terminates as a result of the Grantee's Disability, then, unless otherwise provided by the Award Agreement:

(i) the Grantee may exercise his or her unexercised Option or SAR at any time within 12 months from the Date of Termination, but only to the extent that the Grantee was entitled to exercise the Option or SAR at the Date of Termination (but in no event later than the expiration of the term of the Option or SAR as set forth in the Award Agreement). If, at the Date of Termination, the Grantee is not entitled to exercise his or her entire Option or SAR, the Shares covered by the unexercisable portion of the Option or SAR shall revert to the Plan. If, after the Date of Termination, the Grantee does not exercise his or her Option or SAR within the time specified herein, the Option or SAR shall terminate, and the Shares covered by such Option or SAR shall revert to the Plan.

(ii) the Grantee's Stock Awards, to the extent forfeitable immediately before the Date of Termination, shall thereupon automatically be forfeited;

(iii) the Grantee's Stock Awards that were not forfeitable immediately before the Date of Termination shall promptly be settled by delivery to the Grantee of a number of unrestricted Shares equal to the aggregate number of the Grantee's vested Stock Awards;

(iv) any Performance Shares or Performance Units with respect to which the Performance Period has not ended as of the Date of Termination shall terminate immediately upon the Date of Termination.

(f) Death of Grantee.  In the event of the death of an Grantee, then, unless otherwise provided by the Award Agreement,

(i) the Grantee's unexercised Option or SAR may be exercised at any time within 12 months following the date of death (but in no event later than the expiration of the term of such Option or SAR as set forth in the Award Agreement), by the Grantee's estate or by a person who acquired the right to exercise the Option or SAR by bequest or inheritance, but only to the extent that the Grantee was entitled to exercise the Option or SAR at the date of death. If, at the time of death, the Grantee was not entitled to exercise his or her entire Option or SAR, the Shares covered by the unexercisable portion of the Option or SAR shall immediately revert to the Plan. If, after death, the Grantee's estate or a person who acquired the right to exercise the Option or SAR by bequest or inheritance does not exercise the Option or SAR within the time specified herein, the Option or SAR shall terminate, and the Shares covered by such Option or SAR shall revert to the Plan.

(ii) the Grantee's Stock Awards, to the extent forfeitable immediately before the date of death, shall thereupon automatically be forfeited;

(iii) the Grantee's Stock Awards that were not forfeitable immediately before the date of death shall promptly be settled by delivery to the Grantee's estate or a person who acquired the right to hold the Stock Grant by bequest or inheritance, of a number of unrestricted Shares equal to the aggregate number of the Grantee's vested Stock Awards;

C-6

(iv) any Performance Shares or Performance Units with respect to which the Performance Period has not ended as of the date of death shall terminate immediately upon the date of death.

(g) Buyout Provisions.  The Administrator may at any time offer to buy out, for a payment in cash or Shares, an Award previously granted, based on such terms and conditions as the Administrator shall establish and communicate to the Grantee at the time that such offer is made. Any such cash offer made to an Officer or Director shall comply with the provisions of Rule 16b-3 relating to cash settlement of stock appreciation rights. This provision is intended only to clarify the powers of the Administrator and shall not in any way be deemed to create any rights on the part of Grantees to buyout offers or payments.

(h) Nontransferability of Awards.

(i) Except as provided in Section 5(h)(iii) below, each Award, and each right under any Award, shall be exercisable only by the Grantee during the Grantee's lifetime, or, if permissible under Applicable Law, by the Grantee's guardian or legal representative.

(ii) Except as provided in Section 5(h)(iii) below, no Award (prior to the time, if applicable, Shares are issued in respect of such Award), and no right under any Award, may be assigned, alienated, pledged, attached, sold or otherwise transferred to encumbered by a Grantee otherwise than by will or by the laws of descent and distribution (or in the case of Stock Awards, to the Company) and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or any Subsidiary; provided, that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

(iii) To the extent and in the manner permitted by Applicable Law, and to the extent and in the manner permitted by the Administrator, and subject to such terms and conditions as may be prescribed by the Administrator, a Grantee may transfer an Award to:

(A) a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of the Grantee (including adoptive relationships);

(B) any person sharing the employee's household (other than a tenant or employee);

(C) a trust in which persons described in (A) and (B) have more than 50 percent of the beneficial interest;

(D) a foundation in which persons described in (A) or (B) or the Grantee control the management of assets; or

(E) any other entity in which the persons described in (A) or (B) or the Grantee own more than 50 percent of the voting interests;

provided such transfer is not for value. The following shall not be considered transfers for value: a transfer under a domestic relations order in settlement of marital property rights, and a transfer to an entity in which more than 50 percent of the voting interests are owned by persons described in (A) above or the Grantee, in exchange for an interest in such entity.

6. Stock Options.

(a) Limitations.

(i) Each Option shall be designated in the Award Agreement as either an Incentive Stock Option or a Nonstatutory Stock Option. Any Option designated as an Incentive Stock Option:

(A) shall not have an aggregate Fair Market Value (determined for each Incentive Stock Option at the Date of Grant) of Shares with respect to which Incentive Stock Options are exercisable for the first time by the Grantee during any calendar year (under the Plan and any other employee stock option plan of the Company or any Parent or Subsidiary ("Other

Plans")), determined in accordance with the provisions of Section 422 of the Code, that exceeds $100,000 (the "$100,000 Limit");

(B) shall, if the aggregate Fair Market Value of Shares (determined on the Date of Grant) with respect to the portion of such grant that is exercisable for the first time during any calendar year ("Current Grant") and all Incentive Stock Options previously granted under the Plan and any Other Plans that are exercisable for the first time during a calendar year ("Prior Grants") would exceed the $100,000 Limit, be exercisable as follows:

(1) The portion of the Current Grant that would, when added to any Prior Grants, be exercisable with respect to Shares that would have an aggregate Fair Market Value (determined as of the respective Date of Grant for such Options) in excess of the $100,000 Limit shall, notwithstanding the terms of the Current Grant, be exercisable for the first time by the Grantee in the first subsequent calendar year or years in which it could be exercisable for the first time by the Grantee when added to all Prior Grants without exceeding the $100,000 Limit; and

(2) If, viewed as of the date of the Current Grant, any portion of a Current Grant could not be exercised under the preceding provisions of this Section 6(a)(i)(B) during any calendar year commencing with the calendar year in which it is first exercisable through and including the last calendar year in which it may by its terms be exercised, such portion of the Current Grant shall not be an Incentive Stock Option, but shall be exercisable as a separate Option at such date or dates as are provided in the Current Grant.

(ii) No Employee shall be granted, in any fiscal year of the Company, Options to purchase more than 3,000,000 Shares. The limitation described in this Section 6(a)(ii) shall be adjusted proportionately in connection with any change in the Company's capitalization as described in Section 11 of the Plan. If an Option is canceled in the same fiscal year of the Company in which it was granted (other than in connection with a transaction described in Section 11 of the Plan), the canceled Option will be counted against the limitation described in this Section 6(a)(ii).

(b) Term of Option.  The term of each Option shall be stated in the Award Agreement; provided, however, that in the case of an Incentive Stock Option, the term shall be 10 years from the date of grant or such shorter term as may be provided in the Award Agreement. Moreover, in the case of an Incentive Stock Option granted to a Grantee who, at the time the Incentive Stock Option is granted, owns stock representing more than 10 percent of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option shall be five years from the date of grant or such shorter term as may be provided in the Award Agreement.

(c) Option Exercise Price and Consideration.

(i) Exercise Price.  The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator and, except as otherwise provided in this Section 6(c)(i), shall be no less than 100 percent of the Fair Market Value per Share on the Date of Grant.

(A) In the case of an Incentive Stock Option granted to an Employee who on the Date of Grant owns stock representing more than 10 percent of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110 percent of the Fair Market Value per Share on the Date of Grant.

(B) Any Option that is (1) granted to a Grantee in connection with the acquisition ("Acquisition"), however effected, by the Company of another corporation or entity ("Acquired Entity") or the assets thereof, (2) associated with an option to purchase shares of stock or other equity interest of the Acquired Entity or an affiliate thereof ("Acquired Entity Option") held by such Grantee immediately prior to such Acquisition, and (3) intended to preserve for the Grantee the economic value of all or a portion of such Acquired Entity Option,

C-8

may be granted with such exercise price as the Administrator determines to be necessary to achieve such preservation of economic value.

(C) Any Option that is granted to a Grantee not previously employed by the Company, or a Parent or Subsidiary, as a material inducement to the Grantee's commencing employment with the Company may be granted with such exercise price as the Administrator determines to be necessary to provide such material inducement.

(d) Waiting Period and Exercise Dates. At the time an Option is granted, the Administrator shall fix the period within which the Option may be exercised and shall determine any conditions that must be satisfied before the Option may be exercised. An Option shall be exercisable only to the extent that it is vested according to the terms of the Award Agreement.

(e) Form of Consideration. The Administrator shall determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator shall determine the acceptable form of consideration at the time of grant. The acceptable form of consideration may consist of any combination of cash, personal check, wire transfer or, subject to the approval of the Administrator:

(i) pursuant to rules and procedures approved by the Administrator, promissory note;

(ii) Mature Shares;

(iii) pursuant to procedures approved by the Committee, (A) through the sale of the Shares acquired on exercise of the Option through a broker-dealer to whom the Grantee has submitted an irrevocable notice of exercise and irrevocable instructions to deliver promptly to the Company the amount of sale or loan proceeds sufficient to pay the exercise price, together with, if requested by the Company, the amount of federal, state, local or foreign withholding taxes payable by the Grantee by reason of such exercise, or (B) through simultaneous sale through a broker of Shares acquired upon exercise; or

(iv) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Law.

(f) Exercise of Option.

(i) Procedure for Exercise; Rights as a Stockholder.

(A) Any Option granted hereunder shall be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Award Agreement.

(B) An Option may not be exercised for a fraction of a Share.

(C) An Option shall be deemed exercised when the Company receives:

(1) written notice of exercise (in accordance with the Award Agreement) from the person entitled to exercise the Option, and

(2) full payment for the Shares with respect to which the Option is exercised. Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Award Agreement and the Plan.

(3) Shares issued upon exercise of an Option shall be issued in the name of the Grantee or, if requested by the Grantee, in the name of the Grantee and his or her spouse. Until the stock certificate evidencing such Shares is issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option. The Company shall issue (or cause to be issued) such stock certificate promptly after the

C-9

Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 11 of the Plan.

(4) Exercising an Option in any manner shall decrease the number of Shares thereafter available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

7. Stock Appreciation Rights.

(a) Grant of SARs.  Subject to the terms and conditions of the Plan, the Administrator may grant SARs in tandem with an Option or alone and unrelated to an Option. Tandem SARs shall expire no later than the expiration of the underlying Option.

(b) Exercise of SARs.  SARs shall be exercised by the delivery of a written notice of exercise to the Company, setting forth the number of Shares over which the SAR is to be exercised. Tandem SARs may be exercised:

(i) with respect to all or part of the Shares subject to the related Option upon the surrender of the right to exercise the equivalent portion of the related Option;

(ii) only with respect to the Shares for which its related Option is then exercisable; and

(iii) only when the Fair Market Value of the Shares subject to the Option exceeds the exercise price of the Option.

The value of the payment with respect to the tandem SAR may be no more than 100 percent of the difference between the exercise price of the underlying Option and the Fair Market Value of the Shares subject to the underlying Option at the time the tandem SAR is exercised.

(c) Payment of SAR Benefit.  Upon exercise of an SAR, the Grantee shall be entitled to receive payment from the Company in an amount determined by multiplying:

(i) the excess of the Fair Market Value of a Share on the date of exercise over the SAR exercise price; by

(ii) the number of Shares with respect to which the SAR is exercised;

provided, that the Administrator may provide in the Award Agreement that the benefit payable on exercise of an SAR shall not exceed such percentage of the Fair Market Value of a Share on the Date of Grant as the Administrator shall specify. As determined by the Administrator, the payment upon exercise of an SAR may be in cash, in Shares that have an aggregate Fair Market Value (as of the date of exercise of the SAR) equal to the amount of the payment, or in some combination thereof, as set forth in the Award Agreement.

8. Stock Awards.  Subject to the terms of the Plan, the Administrator may grant Stock Awards to any Employee or Consultant, in such amount and upon such terms and conditions as shall be determined by the Administrator.

9. Performance Units and Performance Shares.

(a) Grant of Performance Units and Performance Shares.  Subject to the terms of the Plan, the Administrator may grant Performance Units or Performance Shares to any Employee or Consultant in such amounts and upon such terms as the Administrator shall determine.

(b) Value/Performance Goals.  Each Performance Unit shall have an initial value that is established by the Administrator on the Date of Grant. Each Performance Share shall have an initial value equal to the Fair Market Value of a Share on the Date of Grant. The Administrator shall set performance goals that, depending upon the extent to which they are met, will determine the number or value of Performance Units or Performance Shares that will be paid to the Grantee.

C-10

(c) Payment of Performance Units and Performance Shares.

(i) Subject to the terms of the Plan, after the applicable Performance Period has ended, the holder of Performance Units or Performance Shares shall be entitled to receive a payment based on the number and value of Performance Units or Performance Shares earned by the Grantee over the Performance Period, determined as a function of the extent to which the corresponding performance goals have been achieved.

(ii) If a Grantee is promoted, demoted or transferred to a different business unit of the Company during a Performance Period, then, to the extent the Administrator determines appropriate, the Administrator may adjust, change or eliminate the performance goals or the applicable Performance Period as it deems appropriate in order to make them appropriate and comparable to the initial performance goals or Performance Period.

(d) Form and Timing of Payment of Performance Units and Performance Shares. Payment of earned Performance Units or Performance Shares shall be made in a lump sum following the close of the applicable Performance Period. The Administrator may pay earned Performance Units or Performance Shares in cash or in Shares (or in a combination thereof) that have an aggregate Fair Market Value equal to the value of the earned Performance Units or Performance Shares at the close of the applicable Performance Period. Such Shares may be granted subject to any restrictions deemed appropriate by the Administrator. The form of payout of such Awards shall be set forth in the Award Agreement pertaining to the grant of the Award.

10. Deferral of Receipt of Payment. The Administrator may permit or require a Grantee to defer receipt of the payment of cash or the delivery of Shares that would otherwise be due by virtue of the exercise of an Option or SAR, the grant of or the lapse or waiver of restrictions with respect to Stock Awards or the satisfaction of any requirements or goals with respect to Performance Units or Performance Shares. If any such deferral is required or permitted, the Administrator shall establish such rules and procedures for such deferral.

11. Adjustments Upon Changes in Capitalization or Change of Control.

(a) Changes in Capitalization.  Subject to any required action by the stockholders of the Company, the number of Covered Shares, and the number of shares of Common Stock which have been authorized for issuance under the Plan but as to which no Awards have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Award, as well as the price per share of Covered Stock, shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Covered Stock.

(b) Change in Control.  In the event of a Change in Control, then the following provisions shall apply:

(i) Vesting.  Any Award outstanding on the date such Change in Control is determined to have occurred that are not yet exercisable and vested on such date:

(A) shall become fully exercisable and vested on the first anniversary of the date of such Change in Control (the "Change in Control Anniversary") if the Grantee's Continuous Status as an Employee or Consultant does not terminate prior to the Change in Control Anniversary;

C-11

(B) shall become fully exercisable and vested on the Date of Termination if the Grantee's Continuous Status as an Employee or Consultant terminates prior to the Change in Control Anniversary as a result of termination by the Company without Cause or resignation by the Grantee for Good Reason; or

(C) shall not become full exercisable and vested if the Grantee's Continuous Status as an Employee or Consultant terminates prior to the Change in Control Anniversary as a result of termination by the Company for Cause or resignation by the Grantee without Good Reason.

For purposes of this Section 11(b)(i), the following definitions shall apply:

(D) "Cause" means:

(1) A Grantee's conviction of a crime involving fraud or dishonesty; or

(2) A Grantee's continued willful or reckless material misconduct in the performance of the Grantee's duties after receipt of written notice from the Company concerning such misconduct;

provided, however, that for purposes of Section 11(b)(i)(D)(2), Cause shall not include any one or more of the following: bad judgment, negligence or any act or omission believed by the Grantee in good faith to have been in or not opposed to the interest of the Company (without intent of the Grantee to gain, directly or indirectly, a profit to which the Grantee was not legally entitled).

(E) "Good Reason" means:

(1) The assignment to the Grantee of any duties inconsistent in any respect with the Grantee's position (including status, titles and reporting requirement), authority, duties or responsibilities, or any other action by the Company that results in a diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action that is not taken in bad faith and that is remedied by the Company promptly after receipt of written notice thereof given by the Grantee within 30 days following the assignment or other action by the Company;

(2) Any reduction in compensation; or

(3) Change in location of office of more than 35 miles without prior consent of the Grantee.

(ii) Dissolution or Liquidation.  In the event of the proposed dissolution or liquidation of the Company, to the extent that an Award is outstanding, it will terminate immediately prior to the consummation of such proposed action. The Board may, in the exercise of its sole discretion in such instances, declare that any Option or SAR shall terminate as of a date fixed by the Board and give each Grantee the right to exercise his or her Option or SAR as to all or any part of the Covered Stock, including Shares as to which the Option or SAR would not otherwise be exercisable.

(iii) Merger or Asset Sale.  Except as otherwise determined by the Board, in its discretion, prior to the occurrence of a merger of the Company with or into another corporation, or the sale of substantially all of the assets of the Company, in the event of such a merger or sale each outstanding Option or SAR shall be assumed or an equivalent option or right shall be substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation or a Parent or Subsidiary of the successor corporation does not agree to assume the Option or SAR or to substitute an equivalent option or right, the Administrator shall, in lieu of such assumption or substitution, provide for the Grantee to have the right to exercise the Option or SAR as to all or a portion of the Covered Stock, including Shares as to which it would not otherwise be exercisable. If the Administrator makes an Option or SAR exercisable in lieu of assumption or substitution in the event of a merger or sale of assets, the Administrator shall notify the Grantee that the Option or SAR shall be fully exercisable for a period of 15 days from the date

C-12

of such notice, and the Option or SAR will terminate upon the expiration of such period. For the purposes of this paragraph, the Option or SAR shall be considered assumed if, following the merger or sale of assets, the option or right confers the right to purchase, for each Share of Covered Stock subject to the Option or SAR immediately prior to the merger or sale of assets, the consideration (whether stock, cash, or other securities or property) received in the merger or sale of assets by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the merger or sale of assets was not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation and the participant, provide for the consideration to be received upon the exercise of the Option or SAR, for each Share of Optioned Stock subject to the Option or SAR, to be solely common stock of the successor corporation or its Parent equal in Fair Market Value to the per Share consideration received by holders of Common Stock in the merger or sale of assets.

(iv) Except as otherwise determined by the Board, in its discretion, prior to the occurrence of a Change in Control other than the dissolution or liquidation of the Company, a merger of the Company with or into another corporation, or the sale of substantially all of the assets of the Company, in the event of such a Change in Control, all outstanding Options and SARs, to the extent they are exercisable and vested (including Options and SARs that shall become exercisable and vested pursuant to Section 11(b)(i) above), shall be terminated in exchange for a cash payment equal to the Change in Control Price (reduced by the exercise price applicable to such Options or SARs). These cash proceeds shall be paid to the Grantee or, in the event of death of an Grantee prior to payment, to the estate of the Grantee or to a person who acquired the right to exercise the Option or Stock Purchase Right by bequest or inheritance.

12. Term of Plan. The Plan shall become effective upon its approval by the stockholders of the Company within 12 months after the date the Plan is adopted by the Board. Such stockholder approval shall be obtained in the manner and to the degree required under applicable federal and state law. The Plan shall continue in effect until October 17, 2011, unless terminated earlier under Section 13 of the Plan.

13. Amendment and Termination of the Plan.

(a) Amendment and Termination. The Board may at any time amend, alter, suspend or terminate the Plan.

(b) Stockholder Approval. The Company shall obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply with Rule 16b-3 or with Section 422 of the Code (or any successor rule or statute or other applicable law, rule or regulation, including the requirements of any exchange or quotation system on which the Common Stock is listed or quoted). Such stockholder approval, if required, shall be obtained in such a manner and to such a degree as is required by the applicable law, rule or regulation.

(c) Effect of Amendment or Termination. No amendment, alteration, suspension or termination of the Plan shall impair the rights of any Grantee, unless mutually agreed otherwise between the Grantee and the Administrator, which agreement must be in writing and signed by the Grantee and the Company.

14. Conditions Upon Issuance of Shares.

(a) Legal Compliance. Shares shall not be issued pursuant to an Award unless the exercise, if applicable, of such Award and the issuance and delivery of such Shares shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, Applicable Law, and the requirements of any stock exchange or quotation system upon which the Shares may then be listed or quoted, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

C-13

(b) Investment Representations.  As a condition to the exercise of an Award, the Company may require the person exercising such Award to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

15. Liability of Company.

(a) Inability to Obtain Authority.  The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

(b) Grants Exceeding Allotted Shares.  If the Covered Stock covered by an Award exceeds, as of the date of grant, the number of Shares that may be issued under the Plan without additional stockholder approval, such Award shall be void with respect to such excess Covered Stock, unless stockholder approval of an amendment sufficiently increasing the number of Shares subject to the Plan is timely obtained in accordance with Section 13 of the Plan.

16. Reservation of Shares.  The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

17. Rights of Employees and Consultants.  Neither the Plan nor any Award shall confer upon an Grantee any right with respect to continuing the Grantee's employment or consulting relationship with the Company, nor shall they interfere in any way with the Grantee's right or the Company's right to terminate such employment or consulting relationship at any time, with or without cause.

18. Sub-plans for Foreign Subsidiaries.  The Board may adopt sub-plans applicable to particular foreign Subsidiaries. All Awards granted under such sub-plans shall be treated as grants under the Plan. The rules of such sub-plans may take precedence over other provisions of the Plan, with the exception of Section 3, but unless otherwise superseded by the terms of such sub-plan, the provisions of the Plan shall govern the operation of such sub-plan.

C-14

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT F**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# DEF 14A

**JABIL CIRCUIT, INC.**
**Filed on 12/03/2003 − Period: 01/13/2004**
File Number 001−14063



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

**SCHEDULE 14A**
**INFORMATION REQUIRED IN PROXY STATEMENT**

**SCHEDULE 14A INFORMATION**
**Proxy Statement Pursuant to Section 14(a) of the Securities**
**Exchange Act of 1934**

Filed by the Registrant  ☒

Filed by a Party other than the Registrant  ☐

Check the appropriate box:

| | | | |
|---|---|---|---|
| ☐ | Preliminary Proxy Statement | ☐ | Confidential, for Use of the Commission Only (as permitted by Rule 14a–6(e)(2)) |
| ☒ | Definitive Proxy Statement | | |
| ☐ | Definitive Additional Materials | | |
| ☐ | Soliciting Material Under Rule 14a–12 | | |

JABIL CIRCUIT, INC.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing proxy statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.

☐  Fee computed on table below per Exchange Act Rules 14a–6(i)(1) and 0–11.

   (1)  Title of each class of securities to which transaction applies:

   (2)  Aggregate number of securities to which transaction applies:

   (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)  Proposed maximum aggregate value of transaction:

   (5)  Total fee paid:

☐  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)  Amount Previously Paid:

   (2)  Form, Schedule or Registration Statement No.:

   (3)  Filing Party:

   (4)  Date Filed:

Table of Contents

the Record Date, and (v) 15,912 shares beneficially owned by Mr. Morean's spouse, over which Mr. Morean disclaims beneficial ownership.

(3) Mr. Morean is a Director of Jabil in addition to being a Principal Stockholder. Mr. Main is a Named Executive Officer in addition to being a Director.

(4) Includes (i) 3,284,671 shares held by Morean Limited Partnership, a North Carolina limited partnership, of which Morean–Petersen, Inc. is the sole general partner, as to which Ms. Petersen has shared voting and dispositive power; Ms. Petersen is the President of Morean–Petersen, Inc., (ii) 5,010 shares held by Audrey Petersen Revocable Trust, of which Ms. Petersen is trustee, as to which Ms. Petersen has sole voting and dispositive power, and (iii) 40,400 shares held by the Morean Petersen Foundation, Inc., a private charitable foundation of which Ms. Petersen is a director and with respect to which Ms. Petersen may be deemed to have shared voting and dispositive power.

(5) Includes (i) 4,281,600 shares held by TASAN Limited Partnership, a Nevada limited partnership, of which TAS Management, Inc. is the sole general partner, as to which Mr. Sansone has sole voting and dispositive power; Mr. Sansone is President of TAS Management, Inc., (ii) 620,250 shares held by Life's Requite, Inc., a private charitable foundation of which Mr. Sansone is a director and as to which Mr. Sansone may be deemed to have shared voting and dispositive power, and (iii) 203,174 shares subject to options held by Mr. Sansone that are exercisable within 60 days of the Record Date.

(6) Includes 896,056 shares subject to options held by Mr. Main that are exercisable within 60 days of the Record Date.

(7) Includes 167,780 shares subject to options held by Mr. Murphy that are exercisable within 60 days of the Record Date.

(8) Includes (i) 40,980 shares subject to options held by Mr. Lavitt that are exercisable within 60 days of the Record Date, and (ii) 60,000 shares beneficially owned by Mr. Lavitt's spouse, over which Mr. Lavitt disclaims beneficial ownership.

(9) Includes (i) 25,260 shares subject to options held by Mr. Raymund that are exercisable within 60 days of the Record Date, and (ii) 2,000 shares beneficially owned by Mr. Raymund's spouse.

(10) The 80,980 shares beneficially owned by Mr. Newman consists entirely of shares subject to options held by Mr. Newman that are exercisable within 60 days of the Record Date.

(11) Includes 4,760 shares subject to options held by Mr. Grafstein that are exercisable within 60 days of the Record Date.

(12) Includes 344,678 shares subject to options held by Mr. Mondello that are exercisable within 60 days of the Record Date.

(13) Includes 144,734 shares subject to options held by Mr. Lewis that are exercisable within 60 days of the Record Date.

(14) Includes (i) 89,496 shares held by Scott D. Brown Revocable Living Trust, of which Mr. Brown is trustee, as to which Mr. Brown has sole voting and dispositive power, and (ii) 154,320 shares subject to options held by Mr. Brown that are exercisable within 60 days of the Record Date.

(15) Includes 150,544 shares subject to options held by Mr. Peters that are exercisable within 60 days of the Record Date.

(16) Includes (i) 3,040,906 shares subject to options held by 10 executive officers, two employee directors and six non–employee directors that are exercisable within 60 days of the Record Date, (ii) 15,912 shares beneficially owned by Mr. Morean's spouse, over which Mr. Morean disclaims beneficial ownership, (iii) 60,000 shares beneficially owned by Mr. Lavitt's spouse, over which Mr. Lavitt disclaims beneficial ownership, and (iv) 2,000 shares beneficially owned by Mr. Raymund's spouse.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16 (a) of the Exchange Act requires Jabil's officers and directors, and persons who own more than ten percent of a registered class of Jabil's equity securities, to file initial reports of ownership on Form 3 and changes in ownership on Form 4 or Form 5 with the SEC. Such officers, directors and ten–percent stockholders are also required by SEC rules to furnish Jabil with copies of all such forms that they file.

19

Table of Contents

Based solely on its review of the copies of such forms received by Jabil from certain reporting persons, Jabil believes that, during the fiscal year ended August 31, 2003, all Section 16(a) filing requirements applicable to its officers, directors and ten percent stockholders were met with the exception of the acquisition of 2,000 shares of Jabil common stock by Mr. Raymund's spouse in one transaction in fiscal 2003, which was reported late on Form 4.

**Compensation Committee Interlocks and Insider Participation**

Jabil's Compensation Committee was formed in November 1992 and is currently composed of Messrs. Lavitt, Newman and Raymund. No member of the Compensation Committee is currently or was formerly an officer or an employee of Jabil or its subsidiaries. There are no compensation committee interlocks and no insider participation in compensation decisions that are required to be reported under the rules and regulations of the Securities Exchange Act of 1934, as amended.

## EXECUTIVE OFFICER COMPENSATION

**Summary Compensation Table**

The following table shows, as to (i) the Chief Executive Officer, and (ii) each of the four other most highly compensated executive officers (a) whose salary plus bonus exceeded $100,000 during the last fiscal year, and (b) who served as executive officers at fiscal year end (collectively the "Named Officers"), information concerning compensation paid for services to Jabil in all capacities during the three fiscal years ended August 31, 2003:

| Name and Principal Position | Fiscal Year | Annual Compensation(1) | | Long Term Compensation Awards | All Other Compensation($)(2) |
| | | Salary($) | Bonus($) | Securities Underlying Options(#) | |
| --- | --- | --- | --- | --- | --- |
| Timothy L. Main | 2003 | $736,923 | $222,000 | 115,600 | $ 17,837 |
| Chief Executive Officer, | 2002 | 700,000 | 210,000 | 248,900 | 22,317 |
| President and Director | 2001 | 656,154 | 70,000 | 141,900 | 38,519 |
| Mark T. Mondello | 2003 | $413,462 | $127,500 | 80,500 | $  9,765 |
| Chief Operating Officer | 2002 | 275,000 | 110,000 | 101,600 | 8,825 |
| | 2001 | 275,000 | 27,500 | 28,300 | 19,557 |
| Chris A. Lewis | 2003 | $367,692 | $112,500 | 85,500 | $  8,757 |
| Chief Financial Officer | 2002 | 280,000 | 112,000 | 96,800 | 8,988 |
| | 2001 | 275,616 | 28,000 | 23,500 | 17,382 |
| Scott D. Brown | 2003 | $367,308 | $112,500 | 80,500 | $  8,738 |
| Executive Vice President | 2002 | 275,000 | 110,000 | 97,300 | 8,825 |
| | 2001 | 261,114 | 27,500 | 25,000 | 13,634 |
| William E. Peters | 2003 | $298,077 | $ 90,000 | 80,500 | $  7,198 |
| Senior Vice President, | 2002 | 273,077 | 110,000 | 89,600 | 8,724 |
| Operations | 2001 | 247,308 | 25,000 | 19,000 | 13,842 |

(1)   Compensation deferred at the election of executive is included in the year earned.
(2)   Represents payments pursuant to Jabil's Profit Sharing Plan. The Board of Directors determines the aggregate amount of payments under the plan based on quarterly financial results. The actual amount paid to individual participants is based on the participant's salary and bonus actually paid (not necessarily earned) during such quarter.

During the last three fiscal years, Jabil has not provided to the Named Officers any compensation disclosable as "Other Annual Compensation" (except for perquisites that, for any Named Officer, were less than the lesser of $50,000 or 10% of such Named Officer's total salary and bonus), nor has it granted any restricted stock awards to Named Officers. Jabil does not have any long–term incentive plans within the meaning of SEC rules.

20

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT G**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# DEF 14A

**JABIL CIRCUIT, INC.**
**Filed on 12/14/2004 ~ Period: 01/20/2005**
File Number 001~14063



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

(3)     Mr. Morean is a Director of Jabil in addition to being a Principal Stockholder. Mr. Main is a Named Executive Officer in addition to being a Director.

(4)     Includes (i) 2,457,728 shares held by Morean Limited Partnership, a North Carolina limited partnership, of which Morean−Petersen, Inc. is the sole general partner, as to which Ms. Petersen has shared voting and dispositive power; Ms. Petersen is the President of Morean−Petersen, Inc., (ii) 5,010 shares held by Audrey Petersen Revocable Trust, of which Ms. Petersen is trustee, as to which Ms. Petersen has sole voting and dispositive power, (iii) 40,400 shares held by the Morean Petersen Foundation, Inc., a private charitable foundation of which Ms. Petersen is a director and with respect to which Ms. Petersen may be deemed to have shared voting and dispositive power, and (iv) 36,000 shares held by the Alfred D. Petersen Revocable Trust, of which Ms. Petersen's spouse is the trustee and has voting and dispositive power over the shares held by such trust.

(5)     Includes (i) 4,348,180 shares held by TASAN Limited Partnership, a Nevada limited partnership, of which TAS Management, Inc. is the sole general partner, as to which Mr. Sansone has sole voting and dispositive power; Mr. Sansone is President of TAS Management, Inc., (ii) 592,250 shares held by Life's Requite, Inc., a private charitable foundation of which Mr. Sansone is a director and as to which Mr. Sansone may be deemed to have shared voting and dispositive power, and (iii) 147,100 shares subject to options held by Mr. Sansone that are exercisable within 60 days of the Record Date.

(6)     Mr. Main is also Chief Executive Officer and President of Jabil. Includes 1,090,544 shares subject to options held by Mr. Main that are exercisable within 60 days of the Record Date and 50,000 shares of restricted stock, of which Mr. Main has voting power, but not dispositive power.

(7)     Includes 182,780 shares subject to options held by Mr. Murphy that are exercisable within 60 days of the Record Date.

(8)     Includes (i) 50,980 shares subject to options held by Mr. Lavitt that are exercisable within 60 days of the Record Date, and (ii) 60,000 shares beneficially owned by Mr. Lavitt's spouse, over which Mr. Lavitt disclaims beneficial ownership.

(9)     Includes (i) 35,260 shares subject to options held by Mr. Raymund that are exercisable within 60 days of the Record Date, and (ii) 2,000 shares beneficially owned by Mr. Raymund's spouse.

(10)    The 90,908 shares beneficially owned by Mr. Newman consists entirely of shares subject to options held by Mr. Newman that are exercisable within 60 days of the Record Date.

(11)    Includes 11,400 shares subject to options held by Mr. Grafstein that are exercisable within 60 days of the Record Date.

(12)    Includes 457,750 shares subject to options held by Mr. Mondello that are exercisable within 60 days of the Record Date and 25,000 shares of restricted stock, of which Mr. Mondello has voting power, but not dispositive power.

(13)    Includes 240,210 shares subject to options held by Mr. Lewis that are exercisable within 60 days of the Record Date and 10,000 shares of restricted stock, of which Mr. Lewis has voting power, but not dispositive power.

(14)    Includes (i) 89,496 shares held by Scott D. Brown Revocable Living Trust, of which Mr. Brown is trustee, as to which Mr. Brown has sole voting and dispositive power, and (ii) 262,548 shares subject to options held by Mr. Brown that are exercisable within 60 days of the Record Date, and (iii) 20,000 shares of restricted stock, of which Mr. Brown has voting power, but not dispositive power.

(15)    Includes 29,100 shares subject to options held by Mr. Charriau that are exercisable within 60 days of the Record Date and 20,000 shares of restricted stock, of which Mr. Charriau has voting power, but not dispositive power.

(16)    Includes (i) 3,988,070 shares subject to options held by 12 executive officers, two employee directors and six non−employee directors that are exercisable within 60 days of the Record Date, (ii) 15,912 shares beneficially owned by Mr. Morean's spouse, over which Mr. Morean disclaims beneficial ownership, (iii) 60,000 shares beneficially owned by Mr. Lavitt's spouse, over which Mr. Lavitt disclaims beneficial ownership, (iv) 2,000 shares beneficially owned by Mr. Raymund's spouse, and (v) 270,000 shares of restricted stock held by 12 executive officers and one employee director, of which the officers and director hold voting power, but not dispositive power. Does not include Chris A. Lewis, who is included as a "named executive officer" but who is no longer an executive officer.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires Jabil's officers and directors, and persons who own more than ten percent of a registered class of Jabil's equity securities, to file initial reports of ownership on

Table of Contents

Form 3 and changes in ownership on Form 4 or Form 5 with the SEC. Such officers, directors and ten-percent stockholders are also required by SEC rules to furnish Jabil with copies of all such forms that they file.

Based solely on its review of the copies of such forms received by Jabil from certain reporting persons, Jabil believes that, during the fiscal year ended August 31, 2004, all Section 16(a) filing requirements applicable to its officers, directors and ten percent stockholders were met, except that John Lovato failed to timely file a Form 4 relating to the exercise of a call option.

#### Compensation Committee Interlocks and Insider Participation

Jabil's Compensation Committee was formed in November 1992 and is currently composed of Messrs. Lavitt, Newman and Raymund. No member of the Compensation Committee is currently or was formerly an officer or an employee of Jabil or its subsidiaries. There are no compensation committee interlocks and no insider participation in compensation decisions that are required to be reported under the rules and regulations of the Securities Exchange Act of 1934, as amended.

### EXECUTIVE OFFICER COMPENSATION

#### Summary Compensation Table

The following table shows, as to (i) the Chief Executive Officer, and (ii) each of the four other most highly compensated executive officers (a) whose salary plus bonus exceeded $100,000 during the last fiscal year, and (b) who served as executive officers at fiscal year end (collectively the "Named Officers"), information concerning compensation paid for services to Jabil in all capacities during the three fiscal years ended August 31, 2004:

| Name and Principal Position | Fiscal Year | Annual Compensation(1) | | | Long Term Compensation Awards(2) | | All Other Compensation($)(3) |
|---|---|---|---|---|---|---|---|
| | | Salary($) | Bonus($) | Other Annual Compensation ($) | Restricted Stock Award(s) ($) | Securities Underlying Options(#) | |
| Timothy L. Main | 2004 | $778,462 | $944,371 | $ 101,971(4) | — | 170,000 | $ 21,326 |
| Chief Executive Officer, | 2003 | 736,923 | 222,000 | — | — | 115,600 | 17,837 |
| President and Director | 2002 | 700,000 | 210,000 | — | — | 248,900 | 22,317 |
| Mark T. Mondello | 2004 | $449,039 | $486,000 | — | — | 125,000 | $ 12,352 |
| Chief Operating Officer | 2003 | 413,462 | 127,500 | — | — | 80,500 | 9,765 |
| | 2002 | 275,000 | 110,000 | — | — | 101,600 | 8,825 |
| Chris A. Lewis(5) | 2004 | $399,039 | $432,000 | — | — | 125,000 | $ 11,115 |
| Chief Financial Officer | 2003 | 367,692 | 112,500 | — | — | 85,500 | 8,757 |
| | 2002 | 280,000 | 112,000 | — | — | 96,800 | 8,988 |
| Scott D. Brown | 2004 | $384,616 | $415,800 | — | — | 115,000 | $ 10,698 |
| Executive Vice | 2003 | 367,308 | 112,500 | — | — | 80,500 | 8,738 |
| President | 2002 | 275,000 | 110,000 | — | — | 97,300 | 8,825 |
| Michel Charriau | 2004 | $408,700 | $361,120 | — | — | 115,000 | $ 5,787 |
| European Chief Operating | 2003 | 261,422 | 70,041 | — | $ 214,500(6) | 20,000 | –0– |
| Officer | 2002 | –0– | –0– | — | — | — | –0– |

(1)   Compensation deferred at the election of executive is included in the year earned.

(2)   Jabil does not have any long-term incentive plans within the meaning of SEC rules.

(3)   Represents payments pursuant to Jabil's Profit Sharing Plan. The Board of Directors determines the aggregate amount of payments under the plan based on quarterly financial results. The actual amount paid to individual participants is based on the participant's salary and bonus actually paid (not necessarily earned) during such quarter.

(4)   Amount paid to Mr. Main to be used to pay a $75,000 deposit for a club membership and $26,971 for estimated taxes payable by Mr. Main on the deposit amount.

(5)   Mr. Lewis was the Chief Financial Officer until August 31, 2004.

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT H**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# DEF 14A

**JABIL CIRCUIT, INC.**
**Filed on 12/16/2005 − Period: 01/19/2006**
File Number 001−14063



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934 requires Jabil's officers and directors, and persons who own more than ten percent of a registered class of Jabil's equity securities, to file initial reports of ownership on Form 3 and changes in ownership on Form 4 or Form 5 with the SEC. Such officers, directors and ten-percent stockholders are also required by SEC rules to furnish Jabil with copies of all such forms that they file.

Based solely on its review of the copies of such forms received by Jabil from certain reporting persons, Jabil believes that, during the fiscal year ended August 31, 2005, all Section 16(a) filing requirements applicable to its officers, directors and ten percent stockholders were met, except that Wesley B. Edwards failed to timely file one Form 4 relating to one exercise of an employee stock option. In addition, subsequent to fiscal year end, William D. Morean filed, or amended, four Form 4s relating to previous fiscal years, three relating to three separate gifts of shares and one relating to sales of shares.

**Compensation Committee Interlocks and Insider Participation**

Jabil's Compensation Committee was formed in November 1992 and is currently composed of Messrs. Lavitt, Newman and Raymund. No member of the Compensation Committee is currently or was formerly an officer or an employee of Jabil or its subsidiaries. There are no compensation committee interlocks and no insider participation in compensation decisions that are required to be reported under the rules and regulations of the Securities Exchange Act of 1934, as amended.

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT I**

Westlaw.

S. REP. 104-98                                                                                                    Page 1
S. REP. 104-98, S. Rep. No. 98, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 679, 1995 WL 372783
(Leg.Hist.)
(Cite as: S. REP. 104-98, 1995 U.S.C.C.A.N. 679)

**679 P.L. 104-67, *1 PRIVATE SECURITIES LITIGATION REFORM ACT OF
1995

DATES OF CONSIDERATION AND PASSAGE

House: March 7, 8, December 5, 1995
Senate: June 22, 23, 26, 27, 28, December 5, 1995
Cong. Record Vol. 141 (1995)
Senate Report (Banking, Housing, and Urban Affairs Committee) No. 104-98,
June 19, 1995
(To accompany S. 240)
House Conference Report No. 104-369,
Nov. 28, 1995
(To accompany H.R. 1058)

SENATE REPORT NO. 104-98
June 19, 1995

Mr. D'Amato, from the Committee on Banking, Housing, and Urban Affairs,
submitted the following

REPORT

together with

ADDITIONAL VIEWS

[To accompany S. 240]

**680 The Committee on Banking, Housing and Urban Affairs, to which was referred the bill (S. 240), to amend the Se-
curities Exchange Act of 1934 to establish a filing deadline and to provide certain safeguards to ensure that the interests
of investors are well protected under the implied private action provisions of the Act, having considered the same, reports
favorably thereon with an amendment in the nature of a substitute, and recommends that the bill as amended do pass.

CONTENTS

                                                                                                               Page
History of the legislation ........................................... 1
Purpose and summary .................................................. 4
Purpose and scope of the legislation:
    Background ....................................................... 8
    Elimination of abusive practices in securities
        litigation .................................................. 10
    Removing the incentives to participate in abusive class

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

S. REP. 104-98                                                                                           Page 2
S. REP. 104-98, S. Rep. No. 98, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 679, 1995 WL 372783
(Leg.Hist.)
(Cite as: S. REP. 104-98, 1995 U.S.C.C.A.N. 679)

    action litigation ................................................. 10
    New rules relating to the settlement process ...................... 12
    Attorney Sanctions for pursuing meritless litigation .............. 13
    Stay of discovery ................................................. 14
    A strong pleading requirement ..................................... 15
    A safe harbor for forward-looking statements or
      projections ..................................................... 15
    Written interrogatories ........................................... 18
    Limiting civil RICO actions ....................................... 19
    A grant of authority to the SEC to prosecute certain aiding
      and abetting cases .............................................. 19
    Limitation on damages ............................................. 19
    Modification of joint and several liability ....................... 20
    Loss Causation requirement for section 12(2) of the
      1933 Act ........................................................ 23
Auditor disclosure of corporate fraud ................................ 23
Section-by-section analysis of S. 240 ................................ 24
    Title I-Reduction of Abusive Litigation:
        Section 101. Elimination of Certain Abusive Practices ......... 24
        Section 102. Securities Class Action Reform ................... 24
        Section 103. Sanctions for Abusive Litigation ................. 26
        Section 104. Requirements for Securities Fraud Actions ........ 26
        Section 105. Safe Harbor for Forward-Looking
          Statements ................................................... 26
        Section 106. Written Interrogatories .......................... 27
        Section 107. Amendment to Racketeer Influenced and Corrupt
          Organizations Act ............................................ 28
        Section 108. Authority of Commission to Prosecute Aiding
          and Abetting ................................................. 28
        Section 109. Limitation on Rescission ......................... 28
        Section 110. Applicability .................................... 28
    Title II-Reduction of Coercive Settlements:
        Section 201. Limitation on Damages ............................ 28
        Section 202. Proportionate Liability .......................... 29
        Section 203. Applicability .................................... 29
    Title III-Auditor Disclosure of Corporate Fraud:
        Section 301. Fraud Detection and Disclosure ................... 29
Regulatory impact statement .......................................... 30
Changes in existing law .............................................. 30
Cost of the legislation .............................................. 30
Additional views of Senators Gramm, Mack, Faircloth, Bennett,
  Grams, and Frist ................................................... 33
Additional views of Senators Sarbanes, Bryan, and Boxer .............. 36
Additional views of Senator Dodd ..................................... 51

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

S. REP. 104-98                                                                                    Page 3
S. REP. 104-98, S. Rep. No. 98, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 679, 1995 WL 372783
(Leg.Hist.)
**(Cite as: S. REP. 104-98, 1995 U.S.C.C.A.N. 679)**

HISTORY OF THE LEGISLATION

On January 18, 1995, Senators Domenici and Dodd introduced S. 240, the "Private Securities Litigation Reform Act of 1995." This legislation, which was cosponsored by Senators Hatch, Mikulski, Bennett, Moseley-Braun, Lott, Murray, Mack, Johnston, Faircloth, Conrad, Burns, Chafee, Gorton, Helms, Kyl, Thomas, Hutchinson, Santorum, and Pell, contains provisions identical to those contained in S. 1976, which was introduced in the 103d Congress. Legislation to reform private litigation under the Federal securities laws, S. 3181, also was introduced in the 102d Congress.

On June 17, 1993 and July 21, 1993, the Subcommittee on Securities held hearings on private securities litigation. Witnesses testifying on June 17 included Edward R. McCracken, President and **681 *2 CEO, Silicon Graphics, Inc.; John G. Adler, President and CEO, Asaptec, Inc.; Richard J. Egan, Chairman, EMC Corp.; Thomas Dunlap, Jr., General Counsel, Intel Corp.; William R. McLucas, Director of the Division of Enforcement, Securities and Exchange Commission ("SEC"); Mark J. Griffin, Director, Securities Division of the Department of Commerce of the State of Utah, who testified on behalf of the North American Securities Administrators Association, Inc.; Joel Seligman, Professor, University of Michigan Law School; Patricia Reilly, an investor; Vincent E. O'Brien, Law and Economics Consulting Group, Inc.; William S. Lerach, Partner, Milberg Weiss Bershad Hynes & Lerach; Gordon K. Billipp, an investor; Russell E. Ramser, Jr., an investor; and Edward J. Radetich, President, Heffler & Co.

Witnesses testifying on July 21 included Representative W.J. "Billy" Tauzin; Representative Ron Wyden; Jake L. Netterville, Managing Partner, Postlethwaite & Netterville, who testified on behalf of the American Institute of Certified Public Accountants; A.A. Sommer, Jr., Chairman, Public Oversight Board, American Institute of Certified Public Accountants; Ralph V. Whitworth, President, United Shareholders Association; Abraham J. Briloff, Professor, Baruch College, CUNY; Melvyn I. Weiss, Partner, Milberg Weiss Bershad Hynes & Lerach; Richard A. Bowman, Executive Vice President and CFO, ITT Corp., who testified on behalf of the Financial Executives Institute; Marc E. Lackritz, President, Securities Industry Association; Ralph Nader, Public Citizen; and Maryellen F. Andersen, Investor and Corporate Relations Director, Connecticut Retirement & Trust Funds and Treasurer of the Council of Institutional Investors. Additional material was supplied for the record by a large number of parties.

On March 24, 1994, Senators Dodd, Domenici, Mikulski, Johnston, and Faircloth introduced S. 1976, the "Private Securities Litigation Reform Act of 1994."

On May 12, 1994, the Subcommittee on Securities held a hearing on the Supreme Court's decision in Central Bank of Denver v. First Interstate Bank of Denver, [FN1] which held that private parties could not bring suit under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5 against alleged aiders and abettors of persons violating the Federal securities laws. Witnesses included Senator Howard Metzenbaum; Arthur Levitt, Chairman, SEC; Donald C. Langevoort, Professor, Vanderbilt Law School; Mark J. Griffin, Director, Securities Division of the Department of Commerce of the State of Utah, who testified on behalf of the North American Securities Administrators Association, Inc.; Stuart J. Kaswell, Senior Vice President and General Counsel, Securities Industry Association;  Harvey J. Goldschmid, Professor, Columbia University School of Law; Eugene I. Goldman, Partner, McDermott, Will & Emery; and David S. Ruder, former Chairman, SEC, and Professor, Northwestern University School of Law. Harvey I. Pitt, Partner, Fried, Frank, Harris, Shriver & Jacobson, and Joel Seligman, Professor, University of Michigan Law School supplied additional material for the record.

**682 *3 On May 17, 1994, the Subcommittee on Securities issued a 163 page Staff Report on private securities litigation.

On March 2 and 22, 1995, and April 6, 1995, the Subcommittee on Securities held hearings on securities litigation reform legislation. Witnesses testifying on March 2 included Senator Christopher J. Dodd; Senator Pete V. Domenici; Marc E. Lackritz, President, Securities Industry Association; J. Carter Beese, former Commissioner, SEC, and Chairman, Capital Markets Regulatory Reform Project of the Center for Strategic and International Studies; Nell Minow, Principal, LENS, Inc.; James F. Morgan, Founder and Chairman, Morgan, Holland Ventures, who testified on behalf of the Nation-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

S. REP. 104-98                                                                                           Page 4
S. REP. 104-98, S. Rep. No. 98, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 679, 1995 WL 372783
(Leg.Hist.)
**(Cite as: S. REP. 104-98, 1995 U.S.C.C.A.N. 679)**

al Venture Capital Association; Christopher J. Murphy III, President and CEO, 1st Source Corp., who testified on behalf
of the Association of Publicly Traded Companies; and George Sollman, CEO, Centigram Communications Corp., who
testified on behalf of the American Electronics Association.

Witnesses testifying on March 22 included Mark J. Griffin, Director, Securities Division of the Department of Commerce
of the State of Utah, who testified on behalf of the North American Securities Administrators Association, Inc.; Joan R.
Gallo, City Attorney, San Jose, California; Sheldon H. Elsen, who testified on behalf of The Association of the Bar of the
City of New York; David Guin, Partner, Ritchie and Rediker, who testified on behalf of the National Association of Se-
curities and Commercial Law Attorneys; and Bartlett Naylor, National Coordinator, Office of Corporate Affairs, Interna-
tional Brotherhood of Teamsters.

Witnesses testifying on April 6 included Senator Barbara Mikulski; The Honorable Arthur Levitt, Chairman, SEC;
Richard C. Breeden, former Chairman, SEC; and Charles Cox, former Commissioner and former Acting Chairman, SEC.
On May 25, 1995, the Committee met in Executive Session to consider S. 240 and adopted an amendment in the nature
of a substitute that was offered by Chairman Alfonse M. D'Amato and, by a vote of 11-4, ordered S. 240 favorably repor-
ted. Senators Shelby, Sarbanes, Bryan, and Boxer voted against this legislation. Senator Bond recused himself from vot-
ing. The Committee adopted by a voice vote an amendment offered by Senator Bennett to amend section 12(2) of the Se-
curities Act of 1933 (the "1933 Act"). The Committee did not adopt amendments offered by Senator Bryan to extend the
statute of limitations for private actions under the 1934 Act (6-9) (with Senators Shelby, Sarbanes, Dodd, Kerry, Bryan,
and Boxer voting in favor of the amendment); by Senator Sarbanes to delegate promulgation of a safe harbor provision
for forward looking statements to SEC rulemaking (5-10) (with Senators Sarbanes, Kerry, Bryan, Boxer and Murray vot-
ing in favor of the amendment); by Senator Sarbanes to revise the scienter language of the safe harbor provision adopted
by the Committee (4-11) (with Senators Sarbanes, Kerry, Bryan and Boxer voting in favor of the amendment); by Senat-
or Boxer to exempt from the statutory safe harbor retirement plans for senior citizens (4-11) (with Senators Sarbanes,
Kerry, Bryan, and Boxer voting in favor of the amendment); and by Senator Bryan to revise the proportionate liability
provision adopted by the Committee (5- 10) (with Senators Shelby, **683 *4 Sarbanes, Kerry, Bryan, and Boxer voting
in favor of the amendment).

The Committee withheld consideration of two amendments pending further review: (i) to increase the uncollectible share
provision for proportionate liability from 50% to 100%; and (ii) to provide for liability in private actions under Rule
10b-5 for aiders and abettors of primary securities law violators.

<div style="text-align:center">PURPOSE AND SUMMARY</div>

During the Great Depression, Congress enacted the 1933 and 1934 Acts to promote investor confidence in the United
States securities markets and thereby to encourage the investment necessary for capital formation, economic growth, and
job creation. The Committee heard substantial testimony that today certain lawyers file frivolous "strike" suits alleging
violations of the Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation.
These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on
nothing more than a company's announcement of bad news, not evidence of fraud. All too often, the same "professional"
plaintiffs appear as name plaintiffs in suit after suit.

S. 240, the "Private Securities Litigation Reform Act of 1995," is intended to lower the cost of raising capital by com-
batting these abuses, while maintaining the incentive for bringing meritorious actions. Specifically, S. 240 intends: (1) to
encourage the voluntary disclosure of information by corporate issuers; (2) to empower investors so that they-not their
lawyers-exercise primary control over private securities litigation; and (3) to encourage plaintiffs' lawyers to pursue valid
claims and defendants to fight abusive claims. Senator Pete Domenici, one of two original co-sponsors of this legislation,
expects that S. 240 "will return some fairness and common sense to our broken securities class action litigation system,
while continuing to provide the highest level of protection to investors in our capital markets." [FN2]

<div style="text-align:center">© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.</div>

The federal securities laws and SEC rules prohibit the making of false and misleading statements or omissions in connection with the purchase and sale of securities. Under these provisions, the SEC has broad regulatory and enforcement powers. In addition, investors may bring private actions for violations of the federal securities laws. These actions typically rest upon the so called "catchall" fraud provision in Section 10(b) of the 1934 Act and SEC Rule 10b-5.

Congress has never expressly provided for private rights of action when it enacted Section 10(b). Instead, courts have held that Congress impliedly authorized such actions. As a result, 10(b) litigation has evolved out of judicial decision-making, not specific legislative action. The lack of congressional involvement has left judges free to develop conflicting legal standards, thereby creating substantial uncertainties and opportunities for abuses of investors, issuers, professional firms and others.

**684 *5 The Committee has determined that now is the time for Congress to reassert its authority in this area. As Chairman D'Amato made clear: "There is broad agreement on the need for reform. Shareholders' groups, Corporate America, the SEC, and even lawyers all want to curb abusive practices. Lawyers who bring meritorious suits do not benefit when strike suit artists wreak havoc on the Nation's boardrooms and courthouses. Our economy does not benefit when the threat of litigation deters capital formation." [FN3] Senator Dodd similarly said: "The flaws in the current private securities litigation system are simply too obvious to deny. The record is replete with examples of how the system is being abused and misused." [FN4] SEC Chairman Arthur Levitt concurred: "[T]here is no denying that there are real problems in the current system-problems that need to be addressed not just because of abstract rights and responsibilities, but because investors and markets are being hurt by litigation excesses." [FN5]

The purposes of S. 240 are threefold.

1.-S. 240 is intended to encourage the voluntary disclosure of information by issuers. The hallmark of our securities laws is broad, timely disclosure to investors of information about the financial condition of publicly traded companies. The mere specter of 10b-5 liability, however, has become more than a deterrent to fraud. Private securities class actions under 10b-5 inhibit free and open communication among management, analysts, and investors. This has caused corporate management to refrain from providing shareholders forward-looking information about companies. According to the SEC: "the threat of mass shareholder litigation, whether real or perceived," has had adverse effects, especially in "chilling * * * disclosure of forward-looking information." [FN6] Public companies-particularly high-tech, bio-tech and other growth companies, which are sued disproportionately in 10b-5 litigation-fear that releasing such information makes them even more vulnerable to attack. As a result, investors often receive less, not more, information, which makes investing more risky and increases the cost of raising capital.

To reduce this chill on voluntary disclosures by issuers, S. 240 creates a carefully tailored safe harbor for forward-looking statements. This safe harbor applies only to projections or estimates that are identified as forward-looking statements and that refer "clearly" and "proximately" to "the risk that actual results may differ materially from" the projection or estimate. The safe harbor has several other important limitations. For example, the safe harbor would not apply to initial public offerings of securities. In addition, the SEC's enforcement authority would not be limited by the provisions in S. 240. To the contrary, S. 240 expands the SEC's enforcement*6 **685 authority with respect to forward-looking statements by authorizing the SEC to recover damages on behalf of investors injured by such statements.

2.-S. 240 is intended to empower investors so that they, not their lawyers, control securities litigation. Under the current system, the initiative for filing 10b-5 suits comes almost entirely from the lawyers, not from genuine investors. Lawyers typically rely on repeat, or "professional," plaintiffs who, because they own a token number of shares in many companies, regularly lend their names to lawsuits. Even worse, investors in the class usually have great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers can decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients.

Numerous studies show that investors recover only 7 to 14 cents for every dollar lost as a result of securities fraud. Indeed, a 1994 Securities Subcommittee Staff Report found "evidence * * * that plaintiffs' counsel in many instances litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT J**

| 104TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>104–369 |
|---|---|---|

## SECURITIES LITIGATION REFORM

NOVEMBER 28, 1995.—Ordered to be printed

Mr. BLILEY, from the committee of conference,
submitted the following

## CONFERENCE REPORT

[To accompany H.R. 1058]

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 1058), to reform Federal securities litigation, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate to the text of the bill and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

*SECTION 1. SHORT TITLE; TABLE OF CONTENTS.*

*(a) SHORT TITLE.—This Act may be cited as the "Private Securities Litigation Reform Act of 1995".*

*(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:*

Sec. 1.  Short title; table of contents.

#### TITLE I—REDUCTION OF ABUSIVE LITIGATION

Sec. 101.  Private securities litigation reform.
Sec. 102.  Safe harbor for forward-looking statements.
Sec. 103.  Elimination of certain abusive practices.
Sec. 104.  Authority of Commission to prosecute aiding and abetting.
Sec. 105.  Loss causation.
Sec. 106.  Study and report on protections for senior citizens and qualified retirement plans.
Sec. 107.  Amendment to Racketeer Influenced and Corrupt Organizations Act.
Sec. 108.  Applicability.

#### TITLE II—REDUCTION OF COERCIVE SETTLEMENTS

Sec. 201.  Proportionate liability.

29–006

JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF
CONFERENCE

The managers on the part of the House and the Senate at the
conference on the disagreeing votes of the two Houses on the
amendments of the Senate to the bill (H.R. 1058) to reform Federal
securities litigation, and for other purposes, submit the following
joint statement to the House and the Senate in explanation of the
effect of the action agreed upon by the managers and recommended
in the accompanying conference report:

STATEMENT OF MANAGERS—THE "PRIVATE SECURITIES LITIGATION
REFORM ACT OF 1995"

The overriding purpose of our Nation's securities laws is to
protect investors and to maintain confidence in the securities mar-
kets, so that our national savings, capital formation and invest-
ment may grow for the benefit of all Americans.

The private securities litigation system is too important to the
integrity of American capital markets to allow this system to be
undermined by those who seek to line their own pockets by bring-
ing abusive and meritless suits. Private securities litigation is an
indispensable tool with which defrauded investors can recover their
losses without having to rely upon government action. Such private
lawsuits promote public and global confidence in our capital mar-
kets and help to deter wrongdoing and to guarantee that corporate
officers, auditors, directors, lawyers and others properly perform
their jobs. This legislation seeks to return the securities litigation
system to that high standard.

Congress has been prompted by significant evidence of abuse
in private securities lawsuits to enact reforms to protect investors
and maintain confidence in our capital markets. The House and
Senate Committees heard evidence that abusive practices commit-
ted in private securities litigation include: (1) the routine filing of
lawsuits against issuers of securities and others whenever there is
a significant change in an issuer's stock price, without regard to
any underlying culpability of the issuer, and with only faint hope
that the discovery process might lead eventually to some plausible
cause of action; (2) the targeting of deep pocket defendants, includ-
ing accountants, underwriters, and individuals who may be covered
by insurance, without regard to their actual culpability; (3) the
abuse of the discovery process to impose costs so burdensome that
it is often economical for the victimized party to settle; and (4) the
manipulation by class action lawyers of the clients whom they pur-
portedly represent. These serious injuries to innocent parties are
compounded by the reluctance of many judges to impose sanctions
under Federal Rule of Civil Procedure 11, except in those cases in-
volving truly outrageous misconduct. At the same time, the invest-
ing public and the entire U.S. economy have been injured by the

(31)

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT K**

**.CCH**

a Wolters Kluwer business

**Accounting Research Manager ® - Audit Public**

AICPA - American Institute of Certified Public Accountants
 Auditing Standards (SAS)\Codification
  AU Section 100: Introduction
   AU Section 110: Responsibilities and Functions of the Independent Auditor

| Accounting Research Manager Interpretive Guidance: | Miller GAAS Practice Manual: AU Section 110 - Responsibilities and Functions of the Independent Auditor Ⓠ |
|---|---|

# AU Section 100: Statements on Auditing Standards — Introduction

*The following is a Codification of currently effective Statements on Auditing Standards (SASs) and related Auditing Interpretations. Statements on Auditing Standards are issued by the Auditing Standards Board (ASB), the senior technical body of the Institute designated to issue pronouncements on auditing matters. Rule 202 Ⓠ of the Institute's Code of Professional Conduct requires adherence to the applicable generally accepted auditing standards promulgated by the ASB. An auditor is required to comply with an unconditional requirement in all cases in which the circumstances exist to which the unconditional requirement applies. An auditor is also required to comply with a presumptively mandatory requirement in all cases in which the circumstances exist to which the presumptively mandatory requirement applies; however, in rare circumstances, an auditor may depart from a presumptively mandatory requirement provided the auditor documents his or her justification for the departure and how the alternative procedures performed in the circumstances were sufficient to achieve the objectives of the presumptively mandatory requirement.*

*Interpretations are issued under the authority of the Auditing Standards Board to provide recommendations on the application of Statements on Auditing Standards in specific circumstances, including engagements for entities in specialized industries. An auditor should be aware of and consider interpretations applicable to his or her audit. An interpretation is not as authoritative as a pronouncement of the ASB; however, if an auditor does not apply an auditing interpretation, the auditor should be prepared to explain how he or she complied with the SAS provisions addressed by such auditing interpretation. The specific terms used to define professional requirements in the SASs are not intended to apply to interpretations since interpretations are not auditing standards. It is the ASB's intention to make conforming changes to the interpretations over the next several years to remove any language that would imply a professional requirement where none exists.*

.. responsibilities and functions of independent auditor ... generally accepted auditing standards ... quality control standards ...

# AU Section 110: Responsibilities and Functions of the Independent Auditor

**Source: SAS No. 1, section 110 ⛶; SAS No. 78 ⛶; SAS No. 82.**

**Issue date, unless otherwise indicated: November, 1972.**

**.01** The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states whether his audit has been made in accordance with generally accepted auditing standards. These standards require him to state whether, in his opinion, the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period.

## Distinction Between Responsibilities of Auditor and Management

**.02** The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.[1] Because of the nature of audit evidence and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute, assurance that material misstatements are detected.[2] The auditor has no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by errors or fraud, that are not material to the financial statements are detected. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

> [1] See section 312, *Audit Risk and Materiality in Conducting an Audit* ⛶, and section 316, *Consideration of Fraud in a Financial Statement Audit*. The auditor's consideration of illegal acts and responsibility for detecting misstatements resulting from illegal acts is defined in section 317, *Illegal Acts by Clients* ⛶. For those illegal acts that are defined in that section as having a direct and material effect on the determination of financial statement amounts, the auditor's responsibility to detect misstatements resulting from such illegal acts is the same as that for error or fraud. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

> [2] See section 230, *Due Professional Care in the Performance of Work*, paragraphs .10 through .13 ⛶ [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.03** The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's

knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles[3] is an implicit and integral part of management's responsibility. The independent auditor may make suggestions about the form or content of the financial statements or draft them, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them. [Revised, April 1989, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards Nos. 53 through 62. As amended, effective for audits of financial statements for periods beginning on or after January 1, 1997, by Statement on Auditing Standards No. 78. Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997. Revised, April 2002, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 94 ◻. Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 106.]

[3] The responsibilities and functions of the independent auditor are also applicable to financial statements presented in conformity with a comprehensive basis of accounting other than generally accepted accounting principles; references in this section to financial statements presented in conformity with generally accepted accounting principles also include those presentations. [Footnote added, effective for audits of financial statements for periods beginning on or after January 1, 1997, by Statement on Auditing Standards No. 78. Footnote renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

## Professional Qualifications

.04 The professional qualifications required of the independent auditor are those of a person with the education and experience to practice as such. They do not include those of a person trained for or qualified to engage in another profession or occupation. For example, the independent auditor, in observing the taking of a physical inventory, does not purport to act as an appraiser, a valuer, or an expert in materials. Similarly, although the independent auditor is informed in a general manner about matters of commercial law, he does not purport to act in the capacity of a lawyer and may appropriately rely upon the advice of attorneys in all matters of law. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.05 In the observance of generally accepted auditing standards, the independent auditor must exercise his judgment in determining which auditing procedures are necessary in the circumstances to afford a reasonable basis for his opinion. His judgment is required to be the informed judgment of a qualified professional person. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

## Detection of Fraud

[.06–.09] [Superseded January 1977 by Statement on Auditing Standards No. 16, as superseded by Statement on Auditing Standards No. 53, as superseded by section 316. Paragraphs renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

## Responsibility to the Profession

.10 The independent auditor also has a responsibility to his profession, the responsibility to comply with the standards accepted by his fellow practitioners. In recognition of the importance of such

compliance, the American Institute of Certified Public Accountants has adopted, as part of its Code of Professional Conduct, rules which support the standards and provide a basis for their enforcement. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

⌐ Top

© 1998 American Institute of Certified Public Accountants, Inc.
© 2008 CCH.  All Rights Reserved.

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT L**

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

AUG 1 4 2006

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

|  |  |
|---|---|
| Ruth Rosenberg, Individually And On Behalf of All Others Similarly Situated, ) ) ) ) | |
| Plaintiff, ) ) | **CIVIL ACTION NO.** **1:06-CV-1894** **CC** |
| vs ) ) | **CLASS ACTION** |
| David B Gould, Nicholas Discombe, William Evans, Joel G Katz, Thomas J. Crotty, Loren Wimpfheimer and Witness Systems, Inc, ) ) ) ) ) ) ) | **COMPLAINT** **FOR VIOLATIONS OF** **FEDERAL SECURITIES** **LAWS** |
| Defendants ) ) | |

**JURY TRIAL DEMANDED**

## INTRODUCTION

This is a federal class action on behalf of purchasers of the common stock of

Witness Systems Inc ("Witness Systems" or the "Company") between April 23,

2004, and August 11, 2006, inclusive (the "Class Period"), seeking to pursue

remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As

alleged herein, defendants published a series of materially false and misleading

statements that defendants knew and/or with severe recklessness disregarded were

materially false and misleading at the time of such publication and/or that omitted

21    Defendant Witness Systems Inc. is a Delaware corporation with its principal place of business located at 300 Colonial Center Parkway, Roswell, Georgia 30076. According to the Company's profile, Witness Systems provides software and services that assist businesses capture customer intelligence and optimize their workforce performance.

22    Defendant David B Gould ("Gould") is, and during the Class Period was, Chairman, Chief Executive Officer, and a member of the Options Committee of the Board of Directors of the Company. During the Class Period, defendant Gould signed the Company's SEC filings, including but not limited to Witness Systems' Form(s) 10-Q , Form(s) 10-K, and Forms(s) Def-14.

23.    Defendant Nicholas Discombe ("Discombe") is, and during the Class Period was, Chief Operating Officer of the Company  During the Class Period, defendant Discombe signed the Company's SEC filings, including but not limited to Witness Systems' Form(s) 10-K

24.    Defendant William Evans ("Evans") is. and during the Class Period was, Chief Financial Officer, Executive Vice President, and Chief Administrative Officer of the Company. During the Class Period, defendant Evans signed the Company's SEC filings, including but not limited to Witness Systems' Form(s) 10-Q and Form(s) 10-K.

10

25      Defendant Joel G. Katz ("Katz") is, and during the Class Period was, a member of the Board of Directors and Chairman of the Audit Committee of the Company. During the Class Period, defendant Katz signed the Company's SEC filings, including but not limited to Witness Systems' Form(s) 10-K.

26      Defendant Thomas J. Crotty ("Crotty") is, and during the Class Period was, a member of the Board of Directors and Chairman of the Compensation Committee and a member of the Audit Committee of the Company. During the Class Period, defendant Crotty signed the Company's SEC filings, including but not limited to Witness Systems' Form(s) 10-K.

27      Defendant Loren Wimpfheimer ("Wimpfheimer") is, and during the Class Period was, Senior Vice President and General Counsel of the Company. During the Class Period, defendant Wimpfheimer signed the Company's SEC filings, including but not limited to Witness Systems' Forms(s) Def-14 as well as SEC Forms 4 as Attorney in Fact for defendant Gould.

28.     The defendants referenced above in ¶¶ 22-27 are referred to herein as the "Individual Defendants." The Individual Defendants other than defendants Crotty and Katz are referred to herein as the "Officer Defendants."

29      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business,

11

operations, products, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and/or *via* reports and other information provided to them in connection therewith.

30      It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above   Each of the above officers of Witness Systems, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein,

12

were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

31      As Officer Defendants or in the case of defendants Crotty and Katz members of the Compensation Committee, the Individual Defendants are controlling persons of a publicly-held company whose common stock was, and is. registered with the SEC pursuant to the Exchange Act, and was and is traded on the Nasdaq National Market Exchange (the "Nasdaq"), and was and is governed by the provisions of the federal securities laws. The Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and, present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations

32.      The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other

communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature   Because of their Board membership and/or executive and managerial positions with Witness Systems, each of the Individual Defendants had access to the adverse undisclosed information about Witness Systems' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Witness Systems and its business issued or adopted by the Company materially false and misleading.

33.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected   Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14

34    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Witness Systems common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Witness Systems between April 23, 2004 and August 11, 2006, inclusive (the "Class") and who were damaged thereby Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

36.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Witness Systems common shares were actively traded on the Nasdaq. As of April 30, 2006, the Company had over 33 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds

15

or thousands of members in the proposed Class Record owners and other members of the Class may be identified from records maintained by Witness Systems or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37      Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

38      Plaintiff- will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation

39      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Witness Systems; and

16

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT M**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# 10-K

**FORM 10-K**
**Filed on 05/15/2007 – Period: 08/31/2006**
File Number 001–14063



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**Table of Contents**

<div align="center">Consolidated Statements of Earnings</div>

| | Fiscal Year Ended August 31, 2006 | Fiscal Year Ended August 31, 2005 | | |
| --- | --- | --- | --- | --- |
| | As Currently Reported | As Previously Reported | Adjustments | As Restated |
| | | (In thousands, except for per share data) | | |
| **Consolidated Statement of Earnings Data:** | | | | |
| Net revenue | $10,265,447 | $7,524,386 | — | $7,524,386 |
| Cost of revenue | 9,500,547 | 6,895,880 | — | 6,895,880 |
| Gross profit | 764,900 | 628,506 | — | 628,506 |
| Selling, general and administrative | 382,210 | 278,866 | 35,404 | 314,270(6) |
| Research and development | 34,975 | 22,507 | — | 22,507 |
| Amortization of intangibles | 24,323 | 39,762 | — | 39,762 |
| Acquisition−related charges | — | | — | — |
| Restructuring and impairment charges | 81,585(1) | — | — | — |
| Operating income | 241,807 | 287,371 | (35,404) | 251,967 |
| Other loss | 11,918(1) | 4,106 | — | 4,106(2) |
| Interest income | (18,734) | (13,774) | — | (13,774) |
| Interest expense | 23,507 | 20,667 | — | 20,667 |
| Income before income taxes | 225,116 | 276,372 | (35,404) | 240,968 |
| Income tax expense | 60,598(1) | 44,525 | (7,432) | 37,093(6) |
| Net income | $    164,518 | $ 231,847 | $    (27,972) | $  203,875 |
| Earnings per share: | | | | |
| Basic | $       0.79 | $      1.14 | $      (0.13) | $      1.01 |
| Diluted | $       0.77 | $      1.12 | $      (0.14) | $      0.98 |
| Common shares used in the calculations of earnings per share: | | | | |
| Basic | 207,413 | 202,501 | — | 202,501 |
| Diluted | 212,540 | 207,526 | 180 | 207,706 |
| **Consolidated Balance Sheet Data:** | | | | |
| Working capital | $    977,631 | $1,117,806 | $      — | $1,117,806 |
| Total assets | $ 5,411,730 | $4,077,262 | $   10,724 | $4,087,986 |
| Current installments of notes payable, long−term debt and long−term lease obligations | $      63,813 | $        674 | $      — | $        674 |
| Notes payable, long−term debt and long−term lease obligations, less current installments | $    329,520 | $ 326,580 | $      — | $ 326,580 |
| Total stockholders' equity | $ 2,294,481 | $2,135,217 | $   10,724 | $2,145,941 |
| Cash dividends declared, per share | $  .   0.14 | $      — | $      — | $      — |

<div align="center">40</div>

Table of Contents

Consolidated Statements of Earnings

| | Fiscal Year Ended August 31, 2004 | | | Fiscal Year Ended August 31, 2003 | | |
|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| | (In thousands, except for per share data) | | | | | |
| **Consolidated Statement of Earnings Data:** | | | | | | |
| Net revenue | $6,252,897 | $ — | $6,252,897 | $4,729,482 | — | $4,729,482 |
| Cost of revenue | 5,714,517 | — | 5,714,517 | 4,294,016 | — | 4,294,016 |
| Gross profit | 538,380 | — | 538,380 | 435,466 | — | 435,466 |
| Selling, general and administrative | 263,504 | (5,756) | 257,748(6) | 243,663 | 16,150 | 259,813(6) |
| Research and development | 13,813 | — | 13,813 | 9,906 | — | 9,906 |
| Amortization of intangibles | 43,709 | — | 43,709 | 36,870 | — | 36,870 |
| Acquisition–related charges | 1,339 | — | 1,339(3) | 15,266 | — | 15,266(4) |
| Restructuring and impairment charges | — | — | — | 85,308 | — | 85,308(4) |
| Operating income | 216,015 | 5,756 | 221,771 | 44,453 | (16,150) | 28,303 |
| Other loss (income) | 7,193 | — | 7,193(3) | (2,600) | — | (2,600)(4) |
| Interest income | (7,237) | — | (7,237) | (6,920) | — | (6,920) |
| Interest expense | 18,546 | — | 18,546 | 17,019 | — | 17,019 |
| Income before income taxes | 197,513 | 5,756 | 203,269 | 36,954 | (16,150) | 20,804 |
| Income tax expense (benefit) | 30,613 | (1,074) | 29,539(6) | (6,053) | (1,713) | (7,766)(6) |
| Net income | $ 166,900 | $ 6,830 | $ 173,730 | $ 43,007 | $ (14,437) | $ 28,570 |
| Earnings per share: | | | | | | |
| Basic | $ 0.83 | $ 0.04 | $ 0.87 | $ 0.22 | $ (0.08) | $ 0.14 |
| Diluted | $ 0.81 | $ 0.04 | $ 0.85 | $ 0.21 | $ (0.07) | $ 0.14 |
| Common shares used in the calculations of earnings per share: | | | | | | |
| Basic | 200,430 | — | 200,430 | 198,495 | — | 198,495 |
| Diluted | 205,849 | (290) | 205,559 | 202,103 | (432) | 201,671 |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Working capital | $1,023,591 | $ — | $1,023,591 | $ 830,729 | $ — | $ 830,729 |
| Total assets | $3,329,356 | $ 4,683 | $3,334,039 | $3,244,745 | $ — | $3,244,745 |
| Current installments of notes payable, long–term debt and long–term lease obligations | $ 4,412 | $ — | $ 4,412 | $ 347,237 | $ — | $ 347,237 |
| Notes payable, long–term debt and long–term lease obligations, less current installments | $ 305,194 | $ — | $ 305,194 | $ 297,018 | $ — | $ 297,018 |
| Total stockholders' equity | $1,819,340 | $ 4,683 | $1,824,023 | $1,588,476 | $ 4,193 | $1,592,669 |
| Cash dividends declared, per share | $ — | $ — | $ — | $ — | $ — | $ — |

41

Table of Contents

|  | Consolidated Statements of Earnings Fiscal Year Ended August 31, 2002 | | |
|---|---|---|---|
|  | As Previously Reported | Adjustments | As Restated |
|  | (In thousands, except for per share information) | | |
| **Consolidated Statement of Earnings Data:** |  |  |  |
| Net revenue | $ 3,545,466 | — | $3,545,466 |
| Cost of revenue | 3,210,875 | (6,000) | 3,204,875(6) |
| Gross profit | 334,591 | 6,000 | 340,591 |
| Selling, general and administrative | 203,845 | 643 | 204,488(6) |
| Research and development | 7,864 | — | 7,864 |
| Amortization of intangibles | 15,113 | — | 15,113 |
| Acquisition-related charges | 7,576 | — | 7,576(5) |
| Restructuring and impairment charges | 52,143 | — | 52,143(5) |
| Operating income | 48,050 | 5,357 | 53,407 |
| Other loss | — | — | — |
| Interest income | (9,761) | — | (9,761) |
| Interest expense | 13,055 | — | 13,055 |
| Income before income taxes | 44,756 | 5,357 | 50,113 |
| Income tax expense | 10,041 | (1,341) | 11,382(6) |
| Net income | $ 34,715 | $ 4,016 | $ 38,731 |
| Earnings per share: |  |  |  |
| Basic | $ 0.18 | $ 0.02 | $ 0.20 |
| Diluted | $ 0.17 | $ 0.02 | $ 0.19 |
| Common shares used in the calculations of earnings per share: |  |  |  |
| Basic | 197,396 | — | 197,396 |
| Diluted | 200,782 | (247) | 200,535 |
| **Consolidated Balance Sheet Data:** |  |  |  |
| Working capital | $ 994,962 | $ — | $ 994,962 |
| Total assets | $ 2,547,906 | $ — | $2,547,906 |
| Current installments of notes payable, long-term debt and long-term lease obligations | $ 8,692 | $ — | $ 8,692 |
| Notes payable, long-term debt and long-term lease obligations, less current installments | $ 354,668 | $ — | $ 354,668 |
| Total stockholders' equity | $ 1,506,966 | $ 2,684 | $1,509,650 |
| Cash dividends declared, per share | $ — | $ — | $ — |

42



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# 10−K

**JABIL CIRCUIT, INC.**
**Filed on 11/28/2001 − Period: 08/31/2001**
File Number 001−14063



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

```
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
----------------------
FORM 10-K

(Mark One)

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
      OF THE SECURITIES EXCHANGE ACT OF 1934

[ ]   FOR THE FISCAL YEAR ENDED AUGUST 31, 2001
      TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
      OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM            TO

COMMISSION FILE NUMBER: 0-21308
---------------------
JABIL CIRCUIT, INC.
(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| DELAWARE | 38-1886260 |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |
| | |
| 10560 NINTH STREET NORTH, | 33716 |
| ST. PETERSBURG, FLORIDA | (Zip Code) |
| (Address of principal executive offices) | |

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE:
(727) 577-9749

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $0.001 par value per share | New York Stock Exchange |

SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:
NONE

Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter periods that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.  Yes [X]    No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of Registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K.  [ ]

The aggregate market value of the voting common stock held by
non-affiliates of the Registrant based on the closing sale price of the Common
Stock as reported on the New York Stock Exchange on November 16, 2001 was
approximately $4.1 billion. For purposes of this determination, shares of Common
Stock held by each officer and director and by each person who owns 5% or more
of the outstanding Common Stock have been excluded in that such persons may be
deemed to be affiliates. This determination of affiliate status is not
necessarily a conclusive determination for other purposes. The number of
outstanding shares of the Registrant's Common Stock as of the close of business
on November 16, 2001, was 197,144,750. The Registrant does not have any
non-voting stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

The Registrant's definitive Proxy Statement for the 2001 Annual Meeting of
Stockholders to be held on January 24, 2002 is incorporated by reference in Part
III of this Annual Report on Form 10-K to the extent stated herein.

```
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
```

ITEM 6.   SELECTED CONSOLIDATED FINANCIAL DATA

     The information set forth below is not necessarily indicative of the
results of future operations and should be read in conjunction with the
consolidated financial statements and notes thereto incorporated into Item 8 of
this report. The historical information set forth below has been restated to
reflect the September 1999 merger with GET Manufacturing, Inc. ("GET"), which
was accounted for as a pooling of interests.

| | YEARS ENDED AUGUST 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2001 | 2000 | 1999 | 1998 | 1997 |
| | (IN THOUSANDS, EXCEPT FOR PER SHARE AMOUNTS) | | | | |
| CONSOLIDATED STATEMENT OF EARNINGS DATA: | | | | | |
| Net revenue.............. | $4,330,655 | $3,558,321 | $2,238,391 | $1,484,245 | $1,178,644 |
| Cost of revenue........ | 3,936,589 | 3,199,972 | 1,992,803 | 1,307,692 | 1,040,214 |
| Gross profit............. | 394,066 | 358,349 | 245,588 | 176,553 | 138,430 |
| Selling, general and administrative...... | 184,112 | 132,717 | 92,015 | 60,116 | 45,086 |
| Research and development......... | 6,448 | 4,839 | 5,863 | 5,355 | 4,593 |
| Amortization of intangibles......... | 5,820 | 2,724 | 1,225 | -- | -- |
| Acquisition and merger-related charge...... | 6,558(1) | 5,153(2) | 7,030(3) | 20,825(4) | -- |
| Restructuring and other charges............. | 27,366(1) | -- | -- | -- | -- |
| Goodwill write-off..... | -- | -- | 3,578(3) | 3,578(4) | -- |
| Operating income........ | 163,762(1) | 212,916(2) | 135,877(3) | 86,679(4) | 88,751 |
| Income from joint ventures........... | -- | -- | -- | -- | (1,287) |
| Interest income........ | (8,243) | (7,385) | (4,536) | (238) | (3,697) |
| Interest expense....... | 5,857 | 7,605 | 7,110 | 3,876 | 5,811 |
| Income before income taxes................. | $ 166,148 | $ 212,696 | 133,303 | 83,041 | 87,924 |
| Income taxes........... | 47,631 | 67,048 | 48,484 | 25,572 | 28,611 |
| Net income.............. | $ 118,517(1) | $ 145,648(2) | $ 84,819(3) | $ 57,469(4) | $ 59,313 |
| Earnings per share(5): | | | | | |
| Basic................. | $    0.62 | $    0.81 | $    0.51 | $    0.36 | $    0.38 |
| Diluted............... | $    0.59(1) | $    0.78(2) | $    0.49(3) | $    0.35(4) | $    0.36 |
| Common shares used in the calculations of earnings per share(5): | | | | | |
| Basic................. | 191,862 | 179,032 | 166,754 | 158,589 | 155,181 |
| Diluted............... | 202,223 | 187,448 | 174,334 | 164,934 | 163,890 |

12

1

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
--------------------
FORM 10-K
FOR ANNUAL AND TRANSITION REPORTS PURSUANT TO SECTION 13 OR
15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

(MARK ONE)
[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF
       THE SECURITIES EXCHANGE ACT OF 1934
       FOR THE FISCAL YEAR ENDED AUGUST 31, 2000
[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF
       THE SECURITIES EXCHANGE ACT OF 1934
       FOR THE TRANSITION PERIOD FROM _____ TO _____

COMMISSION FILE NUMBER: 0-21308
JABIL CIRCUIT, INC.
(Exact Name of Registrant as Specified in Its Charter)

DELAWARE                              38-1886260
(State or other jurisdiction of       (I.R.S. Employer
incorporation or organization)        Identification No.)

10560 NINTH STREET NORTH,
ST. PETERSBURG, FLORIDA               33716
(Address of Principal Executive       (Zip Code)
Offices)

Registrant's telephone number, including area code: (727) 577-9749

Securities registered pursuant to Section 12(b) of the Act:

Title of each class                   Name of each exchange on which registered
COMMON STOCK, $0.001 PAR VALUE PER SHARE    NEW YORK STOCK EXCHANGE

Securities registered pursuant to Section 12(g) of the Act:

NONE

Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter periods that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of Registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K. [ ]

The aggregate market value of the voting common stock held by
non-affiliates of the Registrant (based on the closing sale price of the Common
Stock as reported on the New York Stock Exchange on October 12, 2000) was
approximately $6.5 billion. For purposes of this determination, shares of Common
Stock held by each officer and director and by each person who owns 5% or more
of the outstanding Common Stock have been excluded in that such persons may be
deemed to be affiliates. This determination of affiliate status is not
necessarily a conclusive determination for other purposes. The number of
outstanding shares of the Registrant's Common Stock as of the close of business
on October 12, 2000, was 190,457,939. The Registrant does not have any
non-voting stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

The Registrant's definitive Proxy Statement for the 2000 Annual Meeting of
Stockholders to be held on January 18, 2001 is incorporated by reference in Part
III of this Annual Report on Form 10-K to the extent stated herein.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

stock splits in the form of a 100% stock dividend to stockholders that were paid on February 17, 1999 and March 30, 2000.

| | HIGH | LOW |
|---|---|---|
| YEAR ENDED AUGUST 31, 2000 | | |
| First Quarter (September 1, 1999 -- November 30, 1999)...... | $35.75 | $22.00 |
| Second Quarter (December 1, 1999 -- February 29, 2000)...... | 38.59 | 31.22 |
| Third Quarter (March 1, 2000 -- May 31, 2000)............... | 44.63 | 31.81 |
| Fourth Quarter (June 1, 2000 -- August 31, 2000)............ | 62.34 | 36.50 |
| YEAR ENDED AUGUST 31, 1999 | | |
| First Quarter (September 1, 1998 -- November 30, 1998)...... | 14.63 | 6.30 |
| Second Quarter (December 1, 1998 -- February 28, 1999)...... | 19.35 | 14.88 |
| Third Quarter (March 1, 1999 -- May 31, 1999)............... | 24.13 | 15.97 |
| Fourth Quarter (June 1, 1999 -- August 31, 1999)............ | 26.78 | 18.32 |

As of October 12, 2000, there were approximately 2,511 holders of record of our common stock.

We have never paid cash dividends on our capital stock and do not anticipate paying cash dividends in the foreseeable future.

ITEM 6. SELECTED CONSOLIDATED FINANCIAL DATA

The information set forth below is not necessarily indicative of the results of future operations and should be read in conjunction with the consolidated financial statements and notes thereto incorporated into Item 8 of this report. The historical information set forth below has been restated to reflect the September 1999 merger with GET which was accounted for as a pooling of interests.

| | YEARS ENDED AUGUST 31, | | | | |
|---|---|---|---|---|---|
| | 2000 | 1999 | 1998 | 1997 | 1996 |
| | (IN THOUSANDS, EXCEPT FOR PER SHARE AMOUNTS) | | | | |
| CONSOLIDATED STATEMENT OF EARNINGS DATA: | | | | | |
| Net revenue........................ | $3,558,321 | $2,238,391 | $1,484,245 | $1,178,644 | $1,050,624 |
| Cost of revenue.................. | 3,199,972 | 1,992,803 | 1,307,692 | 1,040,214 | 959,495 |
| Gross profit....................... | 358,349 | 245,588 | 176,553 | 138,430 | 91,129 |
| Selling, general and administrative................ | 132,717 | 92,015 | 60,116 | 45,086 | 34,404 |
| Research and development.......... | 4,839 | 5,863 | 5,355 | 4,593 | 4,205 |
| Amortization of intangibles....... | 2,724 | 1,225 | -- | -- | -- |
| Acquisition and merger-related charge......................... | 5,153(1) | 7,030(2) | 20,825(3) | -- | -- |
| Goodwill write-off............... | -- | 3,578(2) | 3,578(3) | -- | -- |
| Operating income.................. | 212,916(1) | 135,877(2) | 86,679(3) | 88,751 | 52,520 |
| Income from joint ventures........ | -- | -- | -- | (1,287) | (316) |
| Interest income.................. | (7,385) | (4,536) | (238) | (3,697) | (1,369) |
| Interest expense................. | 7,605 | 7,110 | 3,876 | 5,811 | 9,510 |
| Income before income taxes.......... | 212,696 | 133,303 | 83,041 | 87,924 | 44,695 |
| Income taxes..................... | 67,048 | 48,484 | 25,572 | 28,611 | 14,311 |
| Net income................ | $ 145,648(1) | $ 84,819(2) | $ 57,469(3) | $ 59,313 | $ 30,384 |
| Earnings per share(4): | | | | | |
| Basic............................ | $ 0.81 | $ 0.51 | $ 0.36 | $ 0.38 | $ 0.21 |
| Diluted.......................... | $ 0.78(1) | $ 0.49(2) | $ 0.35(3) | $ 0.36 | $ 0.20 |
| Common shares used in the calculations of earnings per share(4): | | | | | |
| Basic............................ | 179,032 | 166,754 | 158,589 | 155,181 | 147,815 |
| Diluted.......................... | 187,448 | 174,334 | 164,934 | 163,890 | 155,558 |

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT N**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# 10−K

**JABIL CIRCUIT, INC.**
**Filed on 11/12/2003 − Period: 08/31/2003**
File Number 001−14063



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# UNITED STATES

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

(Mark one)

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

      **For the fiscal year ended August 31, 2003**

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

      **For the transition period from     to**

**Commission file number: 0-21308**

# Jabil Circuit, Inc.

*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **38-1886260** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **10560 Dr. Martin Luther King, Jr. Street North, St. Petersburg, Florida** | **33716** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**

**(727) 577-9749**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.001 par value per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter periods that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).   Yes ☑     No ☐

The aggregate market value of the voting common stock held by non-affiliates of the Registrant based on the closing sale price of the Common Stock as reported on the New York Stock Exchange on February 28, 2003 was approximately $2.6 billion. For purposes of this determination, shares of Common Stock held by each officer and director and by each person who owns 10% or more of the outstanding Common Stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. The number of outstanding shares of the Registrant's Common Stock as of the close of business on October 22, 2003, was 199,743,897. The Registrant does not have any non-voting stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

The Registrant's definitive Proxy Statement for the 2003 Annual Meeting of Stockholders to be held on January 13, 2004 is incorporated by reference in Part III of this Annual Report on Form 10-K to the extent stated herein.

Table of Contents

## JABIL CIRCUIT, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.   Description of Business and Summary of Significant Accounting Policies**

Jabil Circuit, Inc. (together with its subsidiaries, herein referred to as the "Company") is an independent provider of electronic manufacturing services for electronic circuit board assemblies and systems to major original equipment manufacturers in the automotive, computing and storage, consumer products, instrumentation and medical, networking, peripherals and telecommunications industries. The Company's manufacturing services combine a high volume, highly automated continuous flow manufacturing approach with advanced electronic design and design for manufacturability technologies. The Company is headquartered in St. Petersburg, Florida and has manufacturing operations in the United States, Europe, Asia and Latin America.

Significant accounting policies followed by the Company are as follows:

**a.   Principles of Consolidation and Basis of Presentation**

The consolidated financial statements include the accounts and operations of Jabil Circuit, Inc. and its wholly-owned subsidiaries. All significant inter-company balances and transactions have been eliminated in preparing the consolidated financial statements.

Certain amounts in the prior years' financial statements have been reclassified to conform to current year presentation.

**b.   Use of Accounting Estimates**

Management is required to make estimates and assumptions during the preparation of the consolidated financial statements and accompanying notes in conformity with accounting principles generally accepted in the United States of America. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the dates of the consolidated financial statements. They also affect the reported amounts of net income. Actual results could differ materially from these estimates and assumptions.

**c.   Cash, Cash Equivalents and Other Financial Instruments**

The Company considers all highly liquid instruments with original maturities of 90 days or less to be cash equivalents for consolidated financial statement purposes. Cash equivalents consist of investments in money market funds, municipal bonds and commercial paper with original maturities of 90 days or less. At August 31, 2003 and 2002 cash equivalents totaled approximately $213.4 million and $237.1 million, respectively. Management considers the carrying value of cash and cash equivalents to be a reasonable approximation of market value given the short-term nature of these financial instruments.

**d.   Inventories**

Inventories are stated at the lower of cost (first in, first out (FIFO) method) or market.

53

## JABIL CIRCUIT, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

#### e.   *Property, Plant and Equipment*

Property, plant and equipment is capitalized at cost and depreciated using the straight–line depreciation method over the estimated useful lives of the respective assets. Estimated useful lives for major classes of depreciable assets are as follows:

| Asset Class | Estimated Useful Life |
|---|---|
| Machinery, equipment and computer software | 3 to 7 years |
| Furniture and fixtures | 5 years |
| Leasehold improvements | Shorter of lease term or useful life of the improvement |
| Buildings | 35 years |

Maintenance and repairs are expensed as incurred. The cost and related accumulated depreciation of assets sold or retired are removed from the accounts and any resulting gain or loss is reflected in the consolidated statement of earnings as a component of operating income.

#### f.   *Goodwill and Other Intangible Assets*

In June 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 141, *Business Combinations*("SFAS 141"), and Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets* ("SFAS 142"). SFAS 141 requires that all business combinations initiated after June 30, 2001 be accounted for using the purchase method of accounting and that certain intangible assets acquired in a business combination be recognized as assets apart from goodwill. SFAS 142 requires goodwill to be tested for impairment at least annually, more frequently under certain circumstances, and written down when impaired, rather than being amortized as previous standards required. Furthermore, SFAS 142 requires purchased intangible assets other than goodwill to be amortized over their useful lives unless these lives are determined to be indefinite. Purchased intangible assets are carried at cost less accumulated amortization. SFAS 142 was effective for fiscal years beginning after December 15, 2001. However, the Company elected to early–adopt the standard as of the beginning of fiscal year 2002.

Prior to the adoption of SFAS 142, goodwill was amortized on a straight–line basis over the expected periods to be benefited, generally 10 to 15 years. The Company assessed the recoverability of goodwill by determining whether the unamortized goodwill balance could be recovered through undiscounted future cash flows of the acquired operation. The amount of goodwill impairment, if any, was measured based on projected discounted future cash flows using a discount rate reflecting the Company's average cost of funds.

#### g.   *Impairment of Long–lived Assets*

In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for Impairment or Disposal of Long–lived Assets* ("SFAS 144"), long–lived assets, such as property and equipment, and purchased intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of the asset is measured by comparison of its carrying amount to undiscounted future net cash flows the asset is expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the asset exceeds its fair market value.

Table of Contents

JABIL CIRCUIT, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company assesses the recoverability of goodwill and intangible assets not subject to amortization under SFAS 142. See Note 1(f) — "Description of Business and Summary of Significant Accounting Policies — Goodwill and Intangible Assets."

Prior to the adoption of SFAS 144, the Company accounted for long-lived assets in accordance with Statement of Financial Accounting Standards No. 121, *Accounting for Impairment of Long-lived Assets and for Long-lived Assets to be Disposed of.*

### h. Revenue Recognition

The Company's net revenue is principally derived from the product sales of electronic equipment built to customer specifications. The Company also derives revenue to a lesser extent from repair services, design services and excess inventory sales. Revenue from product sales and excess inventory sales is recognized, net of estimated product return costs, when goods are shipped, title and risk of ownership have passed, the price to the buyer is fixed or determinable and recoverability is reasonably assured. Service related revenues are recognized upon completion of the services. The Company assumes no significant obligations after product shipment.

### i. Income Taxes

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in the tax rate is recognized in income in the period that includes the enactment date of the rate change.

### j. Earnings Per Share

The following table sets forth the calculation of basic and diluted earnings per share (in thousands, except per share data).

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | August 31, 2003 | August 31, 2002 | August 31, 2001 |
| Numerator: |  |  |  |
| Net Income | $ 43,007 | $ 34,715 | $118,517 |
| Interest expensed on convertible debt, net of tax | --- | — | 1,277 |
| Adjusted Net Income | $ 43,007 | $ 34,715 | $119,794 |
| Denominator: |  |  |  |
| Weighted average shares outstanding — basic | 198,495 | 197,396 | 191,862 |
| Stock options | 3,608 | 3,386 | 7,290 |
| Shares issuable upon conversion of convertible notes | — | ---- | 3,071 |
| Weighted average shares outstanding — diluted | 202,103 | 200,782 | 202,223 |
| Earnings per common share: |  |  |  |
| Basic | $    0.22 | $    0.18 | $    0.62 |
| Diluted | $    0.21 | $    0.17 | $    0.59 |

55

Table of Contents

## JABIL CIRCUIT, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

For the years ended August 31, 2003, 2002 and 2001, options to purchase 4,816,789, 3,105,467, and 580,313 shares of common stock were outstanding during the period but were not included in the computation of diluted earnings per share because the options' exercise prices were greater than the average market price of the common stock, and therefore, the effect would be anti-dilutive.

In addition, the computation of diluted earnings per share for the year ended August 31, 2003 and 2002 did not include 8,406,960 shares of common stock issuable upon the conversion of the $345.0 million, 20-year, 1.75% convertible subordinated notes ("Convertible Notes") as their effect would have been anti-dilutive. The computation for the years ended August 31, 2003 and 2002, also did not include the elimination of $3.8 million in interest expense on the Convertible Notes, which would have been extinguished had the conversion of the Convertible Notes occurred, as the effect of the conversion would have been anti-dilutive. However 3,071,000 weighted-average shares of common stock were included in the computation for the year ended August 31, 2001, as the effect of the conversion would have been dilutive.

For the years ended August 31, 2003, 2002 and 2001, interest expense on the Convertible Notes, net of tax, was $3.8 million, $3.8 million and $1.3 million, respectively.

#### k.    Foreign Currency Transactions

For the Company's foreign subsidiaries that use a currency other than the U.S. dollar as their functional currency, assets and liabilities are translated at exchange rates in effect at the balance sheet date, and revenues and expenses are translated at the weighted average exchange rate for the period. The effects of these translation adjustments are reported in other comprehensive income. Gains and losses arising from transactions denominated in a currency other than the functional currency of the entity involved and remeasurement adjustments for foreign operations where the U.S. dollar is the functional currency are included in operating income.

#### l.    Profit Sharing, 401(k) Plan and Defined Contribution Plans

The Company contributes to a profit sharing plan for all employees who have completed a 12-month period of service in which the employee has worked at least 1,000 hours. The Company provides retirement benefits to its domestic employees who have completed a 90-day period of service, through a 401(k) plan that provides a Company matching contribution. The Company also has defined contribution benefit plans for certain of its international employees primarily dictated by the custom of the regions in which it operates. Company contributions are at the discretion of the Company's Board of Directors. In relation to these plans, the Company contributed approximately $19.3 million, $18.0 million and $21.9 million for the years ended August 31, 2003, 2002 and 2001, respectively.

#### m.    Stock Based Compensation

Prior to September 1, 1996, the Company accounted for its stock option plan in accordance with the provisions of Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations. As such, compensation expense would be recorded on the date of granting of stock options only if the current market price of the underlying stock exceeded the exercise price. Effective September 1, 1996, the Company adopted Statement of Financial Accounting Standards No. 123, *Accounting for Stock Based Compensation* ("SFAS 123"), which permits entities to recognize as expense over the vesting period the fair value of all stock based awards on the date of the grant. Alternatively, SFAS 123 allows entities to continue to apply the provisions of APB Opinion No. 25 and provide pro forma net income and pro forma net income per share disclosures for employee stock options granted in fiscal year 1996 and subsequent years as if the fair value based method defined in SFAS 123 had been applied. The Company elected to continue to apply the provisions of APB Opinion No. 25.

56

**JABIL CIRCUIT, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

At August 31, 2003, the Company had four stock-based employee compensation plans that are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25. No stock-based employee compensation expense is reflected in net income, as all options granted under the plan had an exercise price at least equal to the market value of the underlying stock on the date of the grant. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition and measurement provisions of SFAS 123 to stock-based employee compensation (in thousands, except per share data):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | August 31, 2003 | August 31, 2002 | August 31, 2001 |
| Reported net income | $ 43,007 | $ 34,715 | $118,517 |
| Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | (34,181) | (32,961) | (26,386) |
| Pro forma net income | $ 8,826 | $ 1,754 | $ 92,131 |
| Earnings per common share: | | | |
| Reported net income per share — basic | $ 0.22 | $ 0.18 | $ 0.62 |
| Pro forma net income per share — basic | $ 0.04 | $ 0.01 | $ 0.48 |
| Reported net income per share — diluted | $ 0.21 | $ 0.17 | $ 0.59 |
| Pro forma net income per share — diluted | $ 0.04 | $ 0.01 | $ 0.46 |

The disclosure presented above represents only the estimated fair value of stock options granted in fiscal year 1996 and subsequent years. Such disclosure is not necessarily indicative of the fair value of stock options that could be granted by the Company in future fiscal years or of all options currently outstanding. See Note 8 — "Stockholders' Equity" for further discussion and assumptions used to calculate the above pro forma information.

**n.   Comprehensive Income**

The Company has adopted Statement of Financial Accounting Standards No. 130, *Reporting Comprehensive Income* ("SFAS 130"). SFAS 130 establishes standards for reporting comprehensive income. The Statement defines comprehensive income as the changes in equity of an enterprise except those resulting from stockholder transactions.

Accumulated other comprehensive income, net of tax if applicable, consists of the following (in thousands):

|  | August 31, | |
|---|---|---|
|  | 2003 | 2002 |
| Foreign currency translation adjustment | $27,238 | $ 377 |
| Accumulated derivative net losses | (865) | — |
| Minimum pension liability | (5,294) | — |
|  | $21,079 | $ 377 |

The minimum pension liability recorded to accumulated other comprehensive income during fiscal year 2003 is net of a $2.27 million tax benefit.

## JABIL CIRCUIT, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*o.  Warranty Provision*

The Company maintains a provision for limited warranty repair of shipped products, which is established under the terms of specific manufacturing contract agreements. The warranty period varies by product and customer sector. The provision represents management's estimate of probable liabilities, calculated as a function of sales volume and historical repair experience, for each product under warranty. The estimate is evaluated periodically for accuracy. The warranty provision was insignificant for all periods presented.

*p.  Derivative Instruments*

On September 1, 2000, the Company adopted Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Certain Hedging Activities* ("SFAS 133"), as amended by Statement of Financial Accounting Standards No. 138, *Accounting for Certain Derivative Instruments and Certain Hedging Activity, an Amendment of SFAS 133* ("SFAS 138") and Statement of Financial Accounting Standards No. 149, *Amendment on Statement 133 on Derivative Instruments and Hedging Activities* ("SFAS 149"). In accordance with these standards, all derivative instruments are recorded on the balance sheet at their respective fair values. If a derivative instrument is designated as a cash flow hedge, the effective portion of the change in the fair value of the derivative is recorded in other comprehensive income and recognized in the statement of operations when the hedged item affects earnings. If a derivative instrument is designated as a fair value hedge, the change in fair value of the derivative and of the hedged item attributable to the hedged risk are recognized in earnings in the current period.

**2.  Inventories**

Inventories consist of the following (in thousands):

|  | August 31, | |
|---|---|---|
|  | 2003 | 2002 |
| Raw materials | $347,627 | $284,318 |
| Work in process | 104,741 | 67,023 |
| Finished goods | 57,850 | 44,577 |
|  | $510,218 | $395,918 |

58

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**


**EXHIBIT O**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# 10−K

**JABIL CIRCUIT, INC.**
**Filed on 11/05/2004 − Period: 08/31/2004**
File Number 001−14063



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

(Mark one)

☑   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**

**OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended August 31, 2004

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number: 0-21308

# Jabil Circuit, Inc.

*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **38-1886260** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **10560 Dr. Martin Luther King, Jr. Street North, St. Petersburg, Florida** | **33716** |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code:

**(727) 577-9749**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.001 par value per share | New York Stock Exchange |
| Series A Preferred Stock Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

**None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter periods that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).   Yes ☑   No ☐

The aggregate market value of the voting common stock held by non-affiliates of the Registrant based on the closing sale price of the Common Stock as reported on the New York Stock Exchange on February 27, 2004 was approximately $4.6 billion. For purposes of this determination, shares of Common Stock held by each officer and director and by each person who owns 10% or more of the outstanding Common Stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. The number of outstanding shares of the Registrant's Common Stock as of the close of business on October 15, 2004, was 201,501,195. The Registrant does not have any non-voting stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

The Registrant's definitive Proxy Statement for the 2004 Annual Meeting of Stockholders to be held on January 20, 2005 is incorporated by reference in Part III of this Annual Report on Form 10-K to the extent stated herein.

Table of Contents

## JABIL CIRCUIT, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.    Description of Business and Summary of Significant Accounting Policies**

Jabil Circuit, Inc. (together with its subsidiaries, herein referred to as the "Company") is an independent provider of electronic manufacturing services ("EMS") for electronic circuit board assemblies and systems to major original equipment manufacturers ("OEMs") in the aerospace, automotive, computing, consumer, defense, instrumentation, medical, networking, peripherals, storage and telecommunications industries. The Company's manufacturing services combine a high volume, highly automated, continuous flow manufacturing approach with advanced electronic design and design for manufacturability technologies. The Company is headquartered in St. Petersburg, Florida and has manufacturing operations in the United States, Europe, Asia and Latin America.

Significant accounting policies followed by the Company are as follows:

### a. Principles of Consolidation and Basis of Presentation

The consolidated financial statements include the accounts and operations of Jabil Circuit, Inc. and its wholly-owned subsidiaries. All significant inter-company balances and transactions have been eliminated in preparing the consolidated financial statements.

Certain amounts in the prior years' financial statements have been reclassified to conform to current year presentation.

### b. Use of Accounting Estimates

Management is required to make estimates and assumptions during the preparation of the consolidated financial statements and accompanying notes in conformity with accounting principles generally accepted in the United States of America. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the dates of the consolidated financial statements. They also affect the reported amounts of net income. Actual results could differ materially from these estimates and assumptions.

### c. Cash and Cash Equivalents

The Company considers all highly liquid instruments with original maturities of 90 days or less to be cash equivalents for consolidated financial statement purposes. Cash equivalents consist of investments in money market funds, municipal bonds and commercial paper with original maturities of 90 days or less. At August 31, 2004 and 2003 cash equivalents totaled approximately $40.5 million and $213.4 million, respectively. Management considers the carrying value of cash and cash equivalents to be a reasonable approximation of market value given the short-term nature of these financial instruments.

### d. Inventories

Inventories are stated at the lower of cost (first in, first out (FIFO) method) or market.

58

JABIL CIRCUIT, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*e. Property, Plant and Equipment, net*

Property, plant and equipment is capitalized at cost and depreciated using the straight–line depreciation method over the estimated useful lives of the respective assets. Estimated useful lives for major classes of depreciable assets are as follows:

| Asset Class | Estimated Useful Life |
|---|---|
| Buildings | 35 years |
| Leasehold improvements | Shorter of lease term or useful life of the improvement |
| Machinery and equipment | 5 to 7 years |
| Furniture, fixtures and office equipment | 5 years |
| Computer hardware and software | 3 to 7 years |
| Transportation equipment | 3 years |

Maintenance and repairs are expensed as incurred. The cost and related accumulated depreciation of assets sold or retired are removed from the accounts and any resulting gain or loss is reflected in the consolidated statement of earnings as a component of operating income.

*f. Goodwill and Other Intangible Assets*

In June 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 141, *Business Combinations* ("SFAS 141"), and Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets* ("SFAS 142"). SFAS 141 requires that all business combinations initiated after June 30, 2001 be accounted for using the purchase method of accounting and that certain intangible assets acquired in a business combination be recognized as assets apart from goodwill. SFAS 142 requires goodwill to be tested for impairment at least annually, more frequently under certain circumstances, and written down when impaired, rather than being amortized as previous standards required. Furthermore, SFAS 142 requires purchased intangible assets other than goodwill to be amortized over their useful lives unless these lives are determined to be indefinite. Purchased intangible assets are carried at cost less accumulated amortization. SFAS 142 was effective for fiscal years beginning after December 15, 2001. However, the Company elected to early–adopt the standard as of the beginning of fiscal year 2002.

*g. Impairment of Long–Lived Assets*

In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for Impairment or Disposal of Long–lived Assets* ("SFAS 144"), long–lived assets, such as property and equipment, and purchased intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of the asset is measured by comparison of its carrying amount to undiscounted future net cash flows the asset is expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the asset exceeds its fair market value.

The Company assesses the recoverability of goodwill and intangible assets not subject to amortization under SFAS 142. See Note 1(f) — "Description of Business and Summary of Significant Accounting Policies — Goodwill and Intangible Assets."

59

JABIL CIRCUIT, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### h. Revenue Recognition

The Company's net revenue is principally derived from the product sales of electronic equipment built to customer specifications. The Company also derives revenue to a lesser extent from repair services, design services and excess inventory sales. Revenue from product sales and excess inventory sales is recognized, net of estimated product return costs, when goods are shipped; title and risk of ownership have passed; the price to the buyer is fixed or determinable; and recoverability is reasonably assured. Service related revenues are recognized upon completion of the services. The Company assumes no significant obligations after product shipment.

### i. Income Taxes

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in the tax rate is recognized in income in the period that includes the enactment date of the rate change.

### j. Earnings Per Share

The following table sets forth the calculation of basic and diluted earnings per share (in thousands, except per share data).

|  | Fiscal Year Ended | | |
|  | August 31, 2004 | August 31, 2003 | August 31, 2002 |
|---|---|---|---|
| Numerator: |  |  |  |
| Net Income | $166,900 | $ 43,007 | $ 34,715 |
| Denominator: |  |  |  |
| Weighted average shares outstanding — basic | 200,430 | 198,495 | 197,396 |
| Stock options | 5,419 | 3,608 | 3,386 |
| Weighted average shares outstanding — diluted | 205,849 | 202,103 | 200,782 |
| Earnings per common share: |  |  |  |
| Basic | $    0.83 | $    0.22 | $    0.18 |
| Diluted | $    0.81 | $    0.21 | $    0.17 |

For the years ended August 31, 2004, 2003 and 2002, options to purchase 662,053, 4,816,789, and 3,105,467 shares of common stock were outstanding during the period but were not included in the computation of diluted earnings per share because the options' exercise prices were greater than the average market price of the common stock, and therefore, the effect would be anti-dilutive.

In addition, the computation of diluted earnings per share for the year ended August 31, 2003 and 2002 did not include 8,406,960 shares of common stock issuable upon the conversion of the then outstanding $345.0 million, 20-year, 1.75% convertible subordinated notes ("Convertible Notes") as their effect would have been anti-dilutive. The computation for the years ended August 31, 2003 and 2002, also did not include the elimination of $3.8 million in interest expense on the Convertible Notes, which would have been extinguished had the conversion of the Convertible Notes occurred, as the effect of the

60

**JABIL CIRCUIT, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

conversion would have been anti–dilutive. The Convertible Notes were extinguished in May 2004 as discussed in Note 5 — "Notes Payable, Long–Term Debt and Long–Term Lease Obligations."

#### k. Foreign Currency Transactions

For the Company's foreign subsidiaries that use a currency other than the U.S. dollar as their functional currency, assets and liabilities are translated at exchange rates in effect at the balance sheet date, and revenues and expenses are translated at the average exchange rate for the period. The effects of these translation adjustments are reported in other comprehensive income. Gains and losses arising from transactions denominated in a currency other than the functional currency of the entity involved and remeasurement adjustments for foreign operations where the U.S. dollar is the functional currency are included in operating income.

#### l. Profit Sharing, 401(k) Plan and Defined Contribution Plans

The Company contributes to a profit sharing plan for all employees who have completed a 12–month period of service in which the employee has worked at least 1,000 hours. The Company provides retirement benefits to its domestic employees who have completed a 90–day period of service, through a 401(k) plan that provides a Company matching contribution. The Company also has defined contribution benefit plans for certain of its international employees primarily dictated by the custom of the regions in which it operates. Company contributions are at the discretion of the Company's Board of Directors. In relation to these plans, the Company contributed approximately $18.7 million, $19.3 million and $18.0 million for the years ended August 31, 2004, 2003 and 2002, respectively.

#### m. Stock Based Compensation

Prior to September 1, 1996, the Company accounted for its stock option plan in accordance with the provisions of Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations. As such, compensation expense would be recorded on the date of granting of stock options only if the current market price of the underlying stock exceeded the exercise price. Effective September 1, 1996, the Company adopted Statement of Financial Accounting Standards No. 123, *Accounting for Stock Based Compensation* ("SFAS 123"), as amended by Statement of Financial Accounting Standards No. 148, *Accounting for Stock–Based Compensation — Transition and Disclosure,* which permits entities to recognize as expense over the vesting period the fair value of all stock based awards on the date of the grant. Alternatively, SFAS 123 allows entities to continue to apply the provisions of APB Opinion No. 25 and provide pro forma net income and pro forma net income per share disclosures for employee stock options granted in fiscal year 1996 and subsequent years as if the fair value based method defined in SFAS 123 had been applied. The Company elected to continue to apply the provisions of APB Opinion No. 25.

61

## JABIL CIRCUIT, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

At August 31, 2004, the Company had four stock–based employee compensation plans that are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25. No stock–based employee compensation expense is reflected in net income, as all options granted under the plan had an exercise price at least equal to the market value of the underlying stock on the date of the grant. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition and measurement provisions of SFAS 123 to stock–based employee compensation (in thousands, except per share data):

| | Fiscal Year Ended | | |
| | August 31, 2004 | August 31, 2003 | August 31, 2002 |
|---|---|---|---|
| Reported net income | $166,900 | $ 43,007 | $ 34,715 |
| Total stock–based employee compensation expense determined under fair value based method for all awards, net of related tax effects | (45,531) | (34,181) | (32,961) |
| Pro forma net income | $121,369 | $ 8,826 | $ 1,754 |
| Earnings per common share: | | | |
| Reported net income per share — basic | $ 0.83 | $ 0.22 | $ 0.18 |
| Pro forma net income per share — basic | $ 0.61 | $ 0.04 | $ 0.01 |
| Reported net income per share — diluted | $ 0.81 | $ 0.21 | $ 0.17 |
| Pro forma net income per share — diluted | $ 0.59 | $ 0.04 | $ 0.01 |

The disclosure presented above represents only the estimated fair value of stock options granted in fiscal year 1996 and subsequent years. Such disclosure is not necessarily indicative of the fair value of stock options that could be granted by the Company in future fiscal years or of all options currently outstanding. See Note 8 — "Stockholders' Equity" for further discussion and assumptions used to calculate the above pro forma information.

### n. Comprehensive Income

The Company has adopted Statement of Financial Accounting Standards No. 130, *Reporting Comprehensive Income* ("SFAS 130"). SFAS 130 establishes standards for reporting comprehensive income. The Statement defines comprehensive income as the changes in equity of an enterprise except those resulting from stockholder transactions.

Accumulated other comprehensive income consists of the following (in thousands):

| | August 31, | |
| | 2004 | 2003 |
|---|---|---|
| Foreign currency translation adjustment | $52,824 | $27,238 |
| Accumulated derivative net losses, net of tax | 274 | (865) |
| Minimum pension liability, net of tax | (41) | (5,294) |
| | $53,057 | $21,079 |

The minimum pension liability recorded to accumulated other comprehensive income during the fiscal years ended August 31, 2004 and 2003 is net of a $23 thousand and $2.27 million tax benefit, respectively.

Table of Contents

### JABIL CIRCUIT, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

#### o. Warranty Provision

The Company maintains a provision for limited warranty repair of shipped products, which is established under the terms of specific manufacturing contract agreements. The warranty period varies by product and customer industry sector. The provision represents management's estimate of probable liabilities, calculated as a function of sales volume and historical repair experience, for each product under warranty. The estimate is reevaluated periodically for accuracy. The balance of the warranty provision was insignificant for all periods presented.

#### p. Derivative Instruments

On September 1, 2000, the Company adopted Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Certain Hedging Activities* ("SFAS 133"), as amended by Statement of Financial Accounting Standards No. 138, *Accounting for Certain Derivative Instruments and Certain Hedging Activity, an Amendment of SFAS 133* ("SFAS 138") and Statement of Financial Accounting Standards No. 149, *Amendment on Statement 133 on Derivative Instruments and Hedging Activities* ("SFAS 149"). In accordance with these standards, all derivative instruments are recorded on the balance sheet at their respective fair values. If a derivative instrument is designated as a cash flow hedge, the effective portion of the change in the fair value of the derivative is recorded in other comprehensive income and recognized in the statement of operations when the hedged item affects earnings. If a derivative instrument is designated as a fair value hedge, the change in fair value of the derivative and of the hedged item attributable to the hedged risk are recognized in earnings in the current period.

#### q. Intellectual Property Guarantees

The Company's turnkey solutions products may compete against the products of original design manufacturers and those of OEMs, many of whom may own the intellectual property rights underlying those products. As a result, the Company could become subject to claims of intellectual property infringement. Additionally, customers for the Company's turnkey solutions services typically require that we indemnify them against the risk of intellectual property infringement. The Company has no liabilities recorded at August 31, 2004 related to intellectual property infringement claims.

### 2.   Inventories

Inventories consist of the following (in thousands):

|  | August 31, | |
|---|---|---|
|  | 2004 | 2003 |
| Raw materials | $441,968 | $347,627 |
| Work in process | 133,005 | 104,741 |
| Finished goods | 81,708 | 57,850 |
|  | $656,681 | $510,218 |

**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT P**



# JABIL CIRCUIT INC (JBL)

10560 NINTH ST NORTH
ST PETERSBURG, FL 33716
727. 577.9749
http://www.jabil.com/

# 10−K

JABIL CIRCUIT, INC.
Filed on 10/28/2005 − Period: 08/31/2005
File Number 001−14063



**GSI**

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

(Mark one)

☑      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

        **For the fiscal year ended August 31, 2005**

        or

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

        **For the transition period from**      **to**

Commission file number: 0-21308

# Jabil Circuit, Inc.
*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **38-1886260** |
| *(State or Other Jurisdiction of* | *(I.R.S. Employer* |
| *Incorporation or Organization)* | *Identification No.)* |
| **10560 Dr. Martin Luther King, Jr. Street North,** | **33716** |
| **St. Petersburg, Florida** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

Registrant's telephone number, including area code:
**(727) 577-9749**
Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.001 par value per share | New York Stock Exchange |
| Series A Preferred Stock Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
**None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter periods that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of the voting common stock held by non-affiliates of the Registrant based on the closing sale price of the Common Stock as reported on the New York Stock Exchange on February 28, 2005 was approximately $4.4 billion. For purposes of this determination, shares of Common Stock held by each officer and director and by person who owns 10% or more of the outstanding Common Stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. The number of outstanding shares of the Registrant's Common Stock as of the close of business on October 17, 2005, was 204,687,559. The Registrant does not have any non-voting stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The Registrant's definitive Proxy Statement for the 2005 Annual Meeting of Stockholders to be held on January 19, 2006 is incorporated by reference in Part III of this Annual Report on Form 10-K to the extent stated herein.

---

**JABIL CIRCUIT, INC.
2005 FORM 10-K ANNUAL REPORT
TABLE OF CONTENTS**

**Part I.**

| | | |
|---|---|---|
| Item 1. | Business | 2 |
| Item 2. | Properties | 14 |
| Item 3. | Legal Proceedings | 16 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 16 |

**Part II.**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 16 |
| Item 6. | Selected Financial Data | 17 |

Table of Contents

JABIL CIRCUIT, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.  **Description of Business and Summary of Significant Accounting Policies**

Jabil Circuit, Inc. (together with its subsidiaries, herein referred to as the "Company") is an independent provider of electronic manufacturing services and solutions. The Company provides comprehensive electronics design, production, product management and repair services to companies in the aerospace, automotive, computing, consumer, defense, industrial, instrumentation, medical, networking, peripherals, storage and telecommunications industries. The Company's services combine a highly automated, continuous flow manufacturing approach with advanced electronic design and design for manufacturability technologies. The Company is headquartered in St. Petersburg, Florida and has manufacturing operations in the Americas, Europe and Asia.

Significant accounting policies followed by the Company are as follows:

*a. Principles of Consolidation and Basis of Presentation*

The consolidated financial statements include the accounts and operations of Jabil Circuit, Inc. and its wholly-owned subsidiaries. All significant inter-company balances and transactions have been eliminated in preparing the consolidated financial statements.

*b. Use of Accounting Estimates*

Management is required to make estimates and assumptions during the preparation of the consolidated financial statements and accompanying notes in conformity with accounting principles generally accepted in the United States of America. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the dates of the consolidated financial statements. They also affect the reported amounts of net income. Actual results could differ materially from these estimates and assumptions.

*c. Cash and Cash Equivalents*

The Company considers all highly liquid instruments with original maturities of 90 days or less to be cash equivalents for consolidated financial statement purposes. Cash equivalents consist of investments in money market funds, municipal bonds and commercial paper with original maturities of 90 days or less. At August 31, 2005 and 2004 cash equivalents totaled approximately $10.3 million and $40.5 million respectively. Management considers the carrying value of cash and cash equivalents to be a reasonable approximation of market value given the short-term nature of these financial instruments.

*d. Inventories*

Inventories are stated at the lower of cost (first in, first out (FIFO) method) or market.

66

Table of Contents

JABIL CIRCUIT, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*e. Property, Plant and Equipment, net*

Property, plant and equipment is capitalized at cost and depreciated using the straight–line depreciation method over the estimated useful lives of the respective assets. Estimated useful lives for major classes of depreciable assets are as follows:

| Asset Class | Estimated Useful Life |
|---|---|
| Buildings | 35 years |
| Leasehold improvements | Shorter of lease term or useful life of the improvement |
| Machinery and equipment | 5 to 7 years |
| Furniture, fixtures and office equipment | 5 years |
| Computer hardware and software | 3 to 7 years |
| Transportation equipment | 3 years |

Maintenance and repairs are expensed as incurred. The cost and related accumulated depreciation of assets sold or retired are removed from the accounts and any resulting gain or loss is reflected in the consolidated statement of earnings as a component of operating income.

*f. Goodwill and Other Intangible Assets*

The Company accounts for goodwill and other intangible assets in accordance with Financial Statement of Financial Accounting Standards No. 141, *Business Combinations* ("SFAS 141"), and Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets* ("SFAS 142"). SFAS 141 requires that all business combinations initiated after June 30, 2001 be accounted for using the purchase method of accounting and that certain intangible assets acquired in a business combination be recognized as assets apart from goodwill. SFAS 142 requires goodwill to be tested for impairment at least annually, more frequently under certain circumstances, and written down when impaired, rather than being amortized as previous standards required. Furthermore, SFAS 142 requires purchased intangible assets other than goodwill to be amortized over their useful lives unless these lives are determined to be indefinite. Purchased intangible assets are carried at cost less accumulated amortization.

*g. Impairment of Long–lived Assets*

In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for Impairment or Disposal of Long–lived Assets* ("SFAS 144"), long–lived assets, such as property and equipment, and purchased intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of the asset is measured by comparison of its carrying amount to undiscounted future net cash flows the asset is expected to generate. If the carrying amount of an asset is not recoverable, we recognize an impairment loss based on the excess of the carrying amount of the long–lived asset over its respective fair value.

The Company assesses the recoverability of goodwill and intangible assets not subject to amortization under SFAS 142. See Note 1(f) — "Description of Business and Summary of Significant Accounting Policies — Goodwill and Other Intangible Assets."

*h. Revenue Recognition*

The Company's net revenue is principally derived from the product sales of electronic equipment built to customer specifications. The Company also derives revenue to a lesser extent from repair services, design services and excess inventory sales. Revenue from product sales and excess inventory sales is

67

**JABIL CIRCUIT, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

generally recognized, net of estimated product return costs, when goods are shipped; title and risk of ownership have passed; the price to the buyer is fixed or determinable; and recoverability is reasonably assured. Service related revenues are recognized upon completion of the services. The Company assumes no significant obligations after product shipment.

### i. Income Taxes

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in the tax rate is recognized in income in the period that includes the enactment date of the rate change.

### j. Earnings Per Share

The following table sets forth the calculation of basic and diluted earnings per share (in thousands, except per share data).

| | Fiscal Year Ended August 31, | | |
| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Numerator:** | | | |
| Net income | $ 231,847 | $ 166,900 | $ 43,007 |
| **Denominator:** | | | |
| Weighted-average common shares outstanding — basic | 202,501 | 200,430 | 198,495 |
| Dilutive common shares issuable upon exercise of stock options | 4,590 | 5,419 | 3,608 |
| Dilutive unvested common shares associated with restricted stock awards | 435 | — | — |
| Weighted average shares outstanding — diluted | 207,526 | 205,849 | 202,103 |
| **Earnings per common share:** | | | |
| Basic | $ 1.14 | $ 0.83 | $ 0.22 |
| Diluted | $ 1.12 | $ 0.81 | $ 0.21 |

For the years ended August 31, 2005, 2004 and 2003, options to purchase 1,279,325; 662,053; and 4,816,789 shares of common stock were outstanding during the period but were not included in the computation of diluted earnings per share because the options' exercise prices were greater than the average market price of the common stock, and therefore, the effect would be anti-dilutive.

In addition, the computation of diluted earnings per share for the year ended August 31, 2003 did not include 8,406,960 shares of common stock issuable upon the conversion of the then outstanding $345.0 million, 20-year, 1.75% convertible subordinated notes ("Convertible Notes") as their effect would have been anti-dilutive. The computation for the years ended August 31, 2003 also did not include the elimination of $3.8 million in interest expense on the Convertible Notes, which would have been extinguished had the conversion of the Convertible Notes occurred, as the effect of the conversion would have been anti-dilutive. The Convertible Notes were extinguished in May 2004 as discussed in Note 5 — "Notes Payable, Long-Term Debt and Long-Term Lease Obligations."

68

JABIL CIRCUIT, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*k. Foreign Currency Transactions*

For the Company's foreign subsidiaries that use a currency other than the U.S. dollar as their functional currency, assets and liabilities are translated at exchange rates in effect at the balance sheet date, and revenues and expenses are translated at the average exchange rate for the period. The effects of these translation adjustments are reported in other comprehensive income. Gains and losses arising from transactions denominated in a currency other than the functional currency of the entity involved and remeasurement adjustments for foreign operations where the U.S. dollar is the functional currency are included in operating income.

*l. Profit Sharing, 401(k) Plan and Defined Contribution Plans*

The Company contributes to a profit sharing plan for all employees who have completed a 12–month period of service in which the employee has worked at least 1,000 hours. The Company provides retirement benefits to its domestic employees who have completed a 90–day period of service, through a 401(k) plan that provides a Company matching contribution. The Company also has defined contribution benefit plans for certain of its international employees primarily dictated by the custom of the regions in which it operates. Company contributions are at the discretion of the Company's Board of Directors. In relation to these plans, the Company contributed approximately $23.6 million, $18.7 million and $19.3 million for the years ended August 31, 2005, 2004 and 2003, respectively.

*m. Stock–Based Compensation*

Prior to September 1, 1996, the Company accounted for its stock option plan in accordance with the provisions of Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations. As such, compensation expense would be recorded on the date of granting of stock options only if the current market price of the underlying stock exceeded the exercise price. Effective September 1, 1996, the Company adopted Statement of Financial Accounting Standards No. 123, *Accounting for Stock–Based Compensation* ("SFAS 123"), as amended by Statement of Financial Accounting Standards No. 148, *Accounting for Stock–Based Compensation — Transition and Disclosure*, which permits entities to recognize as expense over the vesting period the fair value of all stock–based awards on the date of the grant. Alternatively, SFAS 123 allows entities to continue to apply the provisions of APB Opinion No. 25 and provide pro forma net income and pro forma net income per share disclosures for employee stock options granted in fiscal year 1996 and subsequent years as if the fair value based method defined in SFAS 123 had been applied. The Company elected to continue to apply the provisions of APB Opinion No. 25.

At August 31, 2005, the Company had four stock–based employee compensation plans that are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25 ("APB 25"). These plans provide for the grant of incentive stock options and restricted stock awards to eligible employees; and for employee purchase of common stock pursuant to the stock purchase plan. Following the guidance of APB 25, no stock–based employee compensation expense is reflected in net income for employee stock options granted under the plans to date, as all options granted under the plan had an exercise price at least equal to the fair market value of the underlying common stock on the date of the grant. Approximately $1.8 million in compensation expense related to the restricted stock awards granted during the current year was recognized in the Consolidated Statement of Earnings during the fiscal year ended August 31, 2005.

The Financial Accounting Standards Board recently published Statement of Financial Accounting Standards No. 123 (Revised 2004), *Share–Based Payment* ("SFAS 123R"). SFAS 123R, which is effective from the first annual period that begins after June 15, 2005, will require that compensation cost related to share–based payment transactions, including stock options, be recognized in the Consolidated

69

JABIL CIRCUIT, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Statement of Earnings. Accordingly, the Company will implement the revised standard in the first quarter of fiscal year 2006. See Note 15 — "New Accounting Pronouncements."

On January 28, 2005, in response to the issuance of SFAS 123R, the Company's Compensation Committee of the Board of Directors approved accelerating the vesting of most out-of-the-money, unvested stock options held by current employees, including executive officers, and directors. An option was considered out-of-the-money if the stated option exercise price was greater than the closing price, $23.31, of the Company's common stock on the day before the Compensation Committee approved the acceleration. Unvested options to purchase approximately 7.3 million shares became exercisable as a result of the vesting acceleration. The Compensation Committee did not approve the accelerated vesting of out-of-the-money unvested performance accelerated vesting options held by certain officers of the Company as it believed that, notwithstanding the potential additional compensation expense that could be avoided by accelerating such options, the existing stated financial performance criteria should be met before any of such options are accelerated. The accelerated vesting was effective as of January 28, 2005. However, holders of incentive stock options (within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended) to purchase 186,964 shares of common stock had the opportunity to decline the accelerated vesting in order to prevent changing the status of the incentive stock option for federal income tax purposes to a non-qualified stock option; holders of options to purchase 16,173 shares elected to decline the accelerated vesting. Additionally, holders of certain tax-qualified stock options issued to certain foreign employees to purchase 101,440 shares of common stock had the opportunity to decline the accelerated vesting in order to prevent the restriction of the availability of favorable tax treatment under applicable foreign law; holders of options to purchase 42,400 shares elected to decline the accelerated vesting.

The decision to accelerate vesting of these options was made primarily to avoid recognizing compensation cost in the statement of earnings in future financial statements upon the effectiveness of SFAS 123R. It is estimated that the maximum future compensation expense that will be avoided, based on Jabil's implementation date for FAS 123R of September 1, 2005, will be approximately $96.0 million, of which approximately $22.7 million is related to options held by executive officers and directors of the Company. The vesting acceleration did not result in the recognition of compensation expense in net income for the fiscal year ended August 31, 2005. The pro-forma results presented in the table below include approximately $110.6 million ($79.6 million, net of tax) of compensation expense for the fiscal year ended August 31, 2005 resulting from the vesting acceleration.

70

JABIL CIRCUIT, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition and measurement provisions of SFAS 123 to stock–based employee compensation (in thousands, except per share data):

|  | Fiscal Year Ended August 31, | | | | | |
|  | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| Reported net income | $ | 231,847 | $ | 166,900 | $ | 43,007 |
| Total stock–based employee compensation expense included in the determination of reported net income, net of related tax effects |  | 1,354 |  | — |  | — |
| Total stock–based employee compensation expense determined under fair value based method for all awards, net of related tax effects |  | (99,936) |  | (45,531) |  | (34,181) |
| Pro forma net income for calculation of diluted earnings per share | $ | 133,265 | $ | 121,369 | $ | 8,826 |
| Earnings per common share: |  |  |  |  |  |  |
| Reported net income per share — basic | $ | 1.14 | $ | 0.83 | $ | 0.22 |
| Pro forma net income per share — basic | $ | 0.66 | $ | 0.61 | $ | 0.04 |
| Reported net income per share — diluted | $ | 1.12 | $ | 0.81 | $ | 0.21 |
| Pro forma net income per share — diluted | $ | 0.64 | $ | 0.59 | $ | 0.04 |

The disclosure presented above represents only the estimated fair value of stock options granted in fiscal year 1996 and subsequent years. Such disclosure is not necessarily indicative of the fair value of stock options that could be granted by the Company in future fiscal years or of all options currently outstanding. See Note 8 — "Stockholders' Equity" for further discussion and assumptions used to calculate the above pro forma information.

**n. Comprehensive Income**

The Company has adopted Statement of Financial Accounting Standards No. 130, *Reporting Comprehensive Income* ("SFAS 130"). SFAS 130 establishes standards for reporting comprehensive income. The Statement defines comprehensive income as the changes in equity of an enterprise except those resulting from stockholder transactions.

Accumulated other comprehensive income consists of the following (in thousands):

|  | August 31, | | | |
|  | 2005 | | 2004 | |
|---|---|---|---|---|
| Foreign currency translation adjustment | $ | 90,201 | $ | 52,824 |
| Accumulated derivative net losses, net of tax |  | — |  | 274 |
| Minimum pension liability, net of tax |  | (10,098) |  | (41) |
|  | $ | 80,103 | $ | 53,057 |

The minimum pension liability recorded to accumulated other comprehensive income during the fiscal years ended August 31, 2005 and 2004 is net of a $4.3 million and $23.0 thousand tax benefit, respectively.

71

Table of Contents

JABIL CIRCUIT, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*o. Warranty Provision*

The Company maintains a provision for limited warranty repair of shipped products, which is established under the terms of specific manufacturing contract agreements. The warranty period varies by product and customer industry sector. The provision represents management's estimate of probable liabilities, calculated as a function of sales volume and historical repair experience, for each product under warranty. The estimate is reevaluated periodically for accuracy. The balance of the warranty provision was insignificant for all periods presented.

*p. Derivative Instruments*

On September 1, 2000, the Company adopted Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Certain Hedging Activities* ("SFAS 133"), as amended by Statement of Financial Accounting Standards No. 138, *Accounting for Certain Derivative Instruments and Certain Hedging Activity, an Amendment of SFAS 133* ("SFAS 138") and Statement of Financial Accounting Standards No. 149, *Amendment on Statement 133 on Derivative Instruments and Hedging Activities* ("SFAS 149"). In accordance with these standards, all derivative instruments are recorded on the balance sheet at their respective fair values. Generally, if a derivative instrument is designated as a cash flow hedge, the change in the fair value of the derivative is recorded in other comprehensive income to the extent the derivative is effective, and recognized in the statement of operations when the hedged item affects earnings. If a derivative instrument is designated as a fair value hedge, the change in fair value of the derivative and of the hedged item attributable to the hedged risk are recognized in earnings in the current period.

*q. Intellectual Property Guarantees*

The Company's turnkey solutions products may compete against the products of original design manufacturers and those of electronic product companies, many of whom may own the intellectual property rights underlying those products. As a result, the Company could become subject to claims of intellectual property infringement. Additionally, customers for the Company's turnkey solutions services typically require that we indemnify them against the risk of intellectual property infringement. The Company has no liabilities recorded at August 31, 2005 related to intellectual property infringement claims.

2.   **Inventories**

Inventories consist of the following (in thousands):

|  | August 31, | | | |
|---|---|---|---|---|
|  | 2005 | | 2004 | |
| Raw materials | $ | 573,756 | $ | 441,968 |
| Work in process |  | 148,455 |  | 133,005 |
| Finished goods |  | 96,224 |  | 81,708 |
|  | $ | 818,435 | $ | 656,681 |

72



**DECLARATION OF KEVIN METZ IN SUPPORT OF KPMG'S MOTION TO DISMISS**

**EXHIBIT Q**

# AU Section 326

# *Evidential Matter*

(Supersedes section 330, "Evidential Matter")

Source: SAS No. 31; SAS No. 48; SAS No. 80.

See section 9326 for interpretations of this section.

Issue date, unless otherwise indicated: August, 1980

.01 The third standard of field work is:

Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

.02 Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter[1] concerning the assertions in such financial statements. The measure of the validity of such evidence for audit purposes lies in the judgment of the auditor; in this respect audit evidence differs from legal evidence, which is circumscribed by rigid rules. Evidential matter varies substantially in its influence on the auditor as he or she develops an opinion with respect to financial statements under audit. The pertinence of the evidence, its objectivity, its timeliness, and the existence of other evidential matter corroborating the conclusions to which it leads all bear on its competence.

## Nature of Assertions

.03 Assertions are representations by management that are embodied in financial statement components. They can be either explicit or implicit and can be classified according to the following broad categories:

- Existence or occurrence
- Completeness
- Rights and obligations
- Valuation or allocation
- Presentation and disclosure

.04 Assertions about existence or occurrence address whether assets or liabilities of the entity exist at a given date and whether recorded transactions have occurred during a given period. For example, management asserts that finished goods inventories in the balance sheet are available for sale. Similarly, management asserts that sales in the income statement represent the exchange of goods or services with customers for cash or other consideration.

---

[1] See section 319, *Consideration of Internal Control in a Financial Statement Audit*, paragraphs .90 through .104, for further guidance on evidential matter. [Footnote added, May 1994, to cross-reference guidance on evidential matter to section 319. Footnote revised, May 2001, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 94.]

**AU §326.04**

.05  Assertions about completeness address whether all transactions and accounts that should be presented in the financial statements are so included. For example, management asserts that all purchases of goods and services are recorded and are included in the financial statements. Similarly, management asserts that notes payable in the balance sheet include all such obligations of the entity.

.06  Assertions about rights and obligations address whether assets are the rights of the entity and liabilities are the obligations of the entity at a given date. For example, management asserts that amounts capitalized for leases in the balance sheet represent the cost of the entity's rights to leased property and that the corresponding lease liability represents an obligation of the entity.

.07  Assertions about valuation or allocation address whether asset, liability, equity, revenue, and expense components have been included in the financial statements at appropriate amounts. For example, management asserts that property is recorded at historical cost and that such cost is systematically allocated to appropriate accounting periods. Similarly, management asserts that trade accounts receivable included in the balance sheet are stated at net realizable value. [As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

.08  Assertions about presentation and disclosure address whether particular components of the financial statements are properly classified, described, and disclosed. For example, management asserts that obligations classified as long-term liabilities in the balance sheet will not mature within one year. Similarly, management asserts that amounts presented as extraordinary items in the income statement are properly classified and described.

## Use of Assertions in Developing Audit Objectives and Designing Substantive Tests

.09  In obtaining evidential matter in support of financial statement assertions, the auditor develops specific audit objectives in the light of those assertions. In developing the audit objectives of a particular engagement, the auditor should consider the specific circumstances of the entity, including the nature of its economic activity and the accounting practices unique to its industry. For example, one audit objective related to the assertion about completeness that an auditor might develop for inventory balances is that inventory quantities include all products, materials, and supplies on hand.

.10  There is not necessarily a one-to-one relationship between audit objectives and procedures. Some auditing procedures may relate to more than one objective. On the other hand, a combination of auditing procedures may be needed to achieve a single objective. Paragraph .26 provides illustrative audit objectives for inventories of a manufacturing company for each of the broad categories of assertions listed in paragraph .03 and examples of substantive tests that may achieve those audit objectives.

.11  In selecting particular substantive tests to achieve the audit objectives he or she has developed, an auditor considers, among other things, the risk of material misstatement of the financial statements, including the assessed levels of control risk, and the expected effectiveness and efficiency of such tests. These considerations include the nature and materiality of the items being tested, the kinds and competence of available evidential matter, and the nature of the audit objective to be achieved. For example, in designing

substantive tests to achieve an objective related to the assertion of existence or occurrence, the auditor selects from items contained in a financial statement amount and searches for relevant evidential matter. On the other hand, in designing procedures to achieve an objective related to the assertion of completeness, the auditor selects from evidential matter indicating that an item should be included in the relevant financial statement amount and investigates whether that item is so included.

.12 The auditor's specific audit objectives do not change whether information is processed manually or electronically. However, the methods of applying audit procedures to gather evidence may be influenced by the method of processing. The auditor may use either manual auditing procedures, information technology-assisted audit techniques, or a combination of both to obtain sufficient competent evidential matter. Because of the growth in the use of computers and other information technology, many entities process significant information electronically. Accordingly, it may be difficult or impossible for the auditor to access certain information for inspection, inquiry, or confirmation without using information technology. [Paragraph added, effective for periods beginning after August 31, 1984, by Statement on Auditing Standards No. 48. As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

.13 The nature, timing, and extent of the procedures to be applied on a particular engagement are a matter of professional judgment to be determined by the auditor, based on the specific circumstances. However, the procedures adopted should be adequate to achieve the auditor's specific objectives and reduce detection risk to a level acceptable to the auditor. The evidential matter obtained should be sufficient for the auditor to form conclusions concerning the validity of the individual assertions embodied in the components of financial statements. The evidential matter provided by the combination of the auditor's assessment of inherent risk and control risk and on substantive tests should provide a reasonable basis for his or her opinion (see section 319, *Consideration of Internal Control in a Financial Statement Audit*, paragraphs .105 through .108). [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80. Revised, May 2001, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 94.]

.14 In entities where significant information is transmitted, processed, maintained, or accessed electronically, the auditor may determine that it is not practical or possible to reduce detection risk to an acceptable level by performing only substantive tests for one or more financial statement assertions. For example, the potential for improper initiation or alteration of information to occur and not be detected may be greater if information is produced, maintained, or accessed only in electronic form. In such circumstances, the auditor should perform tests of controls to gather evidential matter to use in assessing control risk,[2] or consider the effect on his or her report (see paragraph .25 of this section). [Paragraph added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

---

[2] Section 319.107 states that ordinarily the assessed level of control risk cannot be sufficiently low to eliminate the need to perform any substantive tests for significant account balances and transaction classes and, consequently, the auditor should perform substantive tests for such balances and classes regardless of the assessed level of control risk. [Footnote added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80. Footnote revised, May 2001, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 94.]

## Nature of Evidential Matter

**.15** Evidential matter supporting the financial statements consists of the underlying accounting data and all corroborating information available to the auditor. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

**.16** The books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of the financial statements. These accounting data are often in electronic form. Accounting data alone cannot be considered sufficient support for financial statements; on the other hand, without adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

**.17** Corroborating evidential matter includes both written and electronic information such as checks; records of electronic fund transfers; invoices; contracts; minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him or her to reach conclusions through valid reasoning. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

**.18** In certain entities, some of the accounting data and corroborating evidential matter are available only in electronic form. Source documents such as purchase orders, bills of lading, invoices, and checks are replaced with electronic messages. For example, entities may use Electronic Data Interchange (EDI) or image processing systems. In EDI, the entity and its customers or suppliers use communication links to transact business electronically. Purchase, shipping, billing, cash receipt, and cash disbursement transactions are often consummated entirely by the exchange of electronic messages between the parties. In image processing systems, documents are scanned and converted into electronic images to facilitate storage and reference, and the source documents may not be retained after conversion. Certain electronic evidence may exist at a certain point in time. However, such evidence may not be retrievable after a specified period of time if files are changed and if backup files do not exist. Therefore, the auditor should consider the time during which information exists or is available in determining the nature, timing, and extent of his or her substantive tests, and, if applicable, tests of controls. [Paragraph added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

**.19** The auditor tests underlying accounting data by (a) analysis and review, (b) retracing the procedural steps followed in the accounting process and in developing the allocations involved, (c) recalculation, and (d) reconciling related types and applications of the same information. Through the performance of such procedures, the auditor may determine that the accounting

records are internally consistent. Such internal consistency ordinarily provides evidence about the fairness of presentation of the financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

.20   The pertinent accounting data and corroborating evidential matter to support entries in the accounts and assertions in the financial statements ordinarily are available from the entity's files and accessible to the auditor for examination at certain points or periods in time. Both within the entity's organization and outside it are knowledgeable people to whom the auditor can direct inquiries. Assets having physical existence are available to the auditor for his or her inspection. Activities of the entity's personnel can be observed. Based on observations of these or other conditions or circumstances, the auditor may reach conclusions about the validity of various assertions in the financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

## Competence of Evidential Matter

.21   To be competent, evidence, regardless of its form, must be both valid and relevant. The validity of evidential matter is so dependent on the circumstances under which it is obtained that generalizations about the reliability of various kinds of evidence are subject to important exceptions. If the possibility of important exceptions is recognized, however, the following presumptions, which are not mutually exclusive, about the validity of evidential matter in auditing have some usefulness:

a.   When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.

b.   The more effective the internal control, the more assurance it provides about the reliability of the accounting data and financial statements.

c.   The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

## Sufficiency of Evidential Matter

.22   The independent auditor's objective is to obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion. The amount and kinds of evidential matter required to support an informed opinion are matters for the auditor to determine in the exercise of his or her professional judgment after a careful study of the circumstances in the particular case. However, in the great majority of cases, the auditor has to rely

on evidence that is persuasive rather than convincing. Both the individual assertions in financial statements and the *overall proposition that the financial statements as a whole are fairly presented* are of such a nature that even an experienced auditor is seldom convinced beyond all doubt with respect to all aspects of the statements being audited. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

.23  An auditor typically works within economic limits; the auditor's opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost. The auditor must decide, again exercising professional judgment, whether the evidential matter available to him or her within the limits of time and cost is sufficient to justify expression of an opinion. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

.24  As a guiding rule, there should be a rational relationship between the *cost of obtaining* evidence and the usefulness of the information obtained. The matter of difficulty and expense involved in testing a particular item is not in itself a valid basis for omitting the test. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

# Evaluation of Evidential Matter

.25  In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved. The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles.[3] In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.[4] [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

---

[3]  The term *comprehensive basis of accounting other than generally accepted accounting principles* is defined in section 623, *Special Reports*, paragraph .04. [Footnote added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

[4]  See section 508, *Reports on Audited Financial Statements*, paragraphs .20 through .34 and .61 through .63, for further guidance on expression of a qualified opinion or a disclaimer of opinion. [Footnote added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

**AU §326.23**

.26

# Appendix

## Financial Statement Assertions, Illustrative Audit Objectives, and Examples of Substantive Tests

### Illustrations for Inventories of a Manufacturing Company

This appendix illustrates the use of assertions in developing audit objectives and designing substantive tests. The following examples of substantive tests are not intended to be all-inclusive nor is it expected that all of the procedures would be applied in an audit.

| *Illustrative Audit Objectives* | *Examples of Substantive Tests* |
|---|---|
| *Existence or Occurrence* | |
| Inventories included in the balance sheet physically exist | • Observing physical inventory counts |
| | • Obtaining confirmation of inventories at locations outside the entity. |
| | • Testing of inventory transactions between a preliminary physical inventory date and the balance sheet date. |
| Inventories represent items held for sale or use in the normal course of business. | • Reviewing perpetual inventory records, production records, and purchasing records for indications of current activity. |
| | • Comparing inventories with a current sales catalog and subsequent sales and delivery reports. |
| | • Using the work of specialists to corroborate the nature of specialized products. |
| *Completeness* | |
| Inventory quantities include all products, materials, and supplies on hand | • Observing physical inventory counts |
| | • Analytically comparing the relationship of inventory balances to recent purchasing, production, and sales activities. |
| | • Testing shipping and receiving cutoff procedures. |
| Inventory quantities include all products, materials, and supplies owned by the company that are in transit or stored at outside locations. | • Obtaining confirmation of inventories at locations outside the entity. |
| | • Analytically comparing the relationship of inventory balances to recent purchasing, production, and sales activities. |
| | • Testing shipping and receiving cutoff procedures. |

**AU §326.26**

| *Illustrative Audit Objectives* | *Examples of Substantive Tests* |
|---|---|
| Inventory listings are accurately compiled and the totals are properly included in the inventory accounts. | <ul><li>Tracing test counts recorded during the physical inventory observation to the inventory listing.</li><li>Accounting for all inventory tags and count sheets used in recording the physical inventory counts.</li><li>Testing the clerical accuracy of inventory listings.</li><li>Reconciling physical counts to perpetual records and general ledger balances and investigating significant fluctuations.</li></ul> |

<div align="center">

*Rights and Obligations*

</div>

| | |
|---|---|
| The entity has legal title or similar rights of ownership to the inventories. | <ul><li>Observing physical inventory counts.</li><li>Obtaining confirmation of inventories at locations outside the entity.</li><li>Examining paid vendors' invoices, consignment agreements, and contracts.</li></ul> |
| Inventories exclude items billed to customers or owned by others. | <ul><li>Examining paid vendors' invoices, consignment agreements, and contracts.</li><li>Testing shipping and receiving cutoff procedures.</li></ul> |

<div align="center">

*Valuation or Allocation*

</div>

| | |
|---|---|
| Inventories are properly stated at cost (except when market is lower). | <ul><li>Examining paid vendors' invoices.</li><li>Reviewing direct labor rates.</li><li>Testing the computation of standard overhead rates.</li><li>Examining analyses of purchasing and manufacturing standard cost variances.</li></ul> |
| Slow-moving, excess, defective, and obsolete items included in inventories are properly identified. | <ul><li>Examining an analysis of inventory turnover.</li><li>Reviewing industry experience and trends.</li><li>Analytically comparing the relationship of inventory balances to anticipated sales volume.</li><li>Touring the plant.</li><li>Inquiring of production and sales personnel concerning possible excess or obsolete inventory items.</li></ul> |
| Inventories are reduced, when appropriate, to replacement cost or net realizable value. | <ul><li>Obtaining current market value quotations.</li><li>Reviewing current production costs.</li></ul> |

| *Illustrative Audit Objectives* | *Examples of Substantive Tests* |
|---|---|
| | • Examining sales after year-end and open purchase order commitments. |

### *Presentation and Disclosure*

| | |
|---|---|
| Inventories are properly classified in the balance sheet as current assets. | • Reviewing drafts of the financial statements. |
| The major categories of inventories and their bases of valuation are adequately disclosed in the financial statements. | • Reviewing drafts of the financial statements.<br>• Comparing the disclosures made in the financial statements to the requirements of generally accepted accounting principles. |
| The pledge or assignment of any inventories is appropriately disclosed. | • Obtaining confirmation of inventories pledged under loan agreements. |

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

———————————

**AU §326.26**