UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | |
|---|---|
| EDWARD J. GOODMAN LIFE INCOME TRUST, et al., On Behalf of Themselves and All Others Similarly Situated, )))))))))))) | Lead Case No. 8:06-cv-01716-SDM-EAJ |
| Plaintiffs, | <u>CLASS ACTION</u> |
| vs. | |
| JABIL CIRCUIT, INC., et al., | |
| Defendants. | |

OPPOSITION TO DEFENDANT KPMG LLP'S MOTION TO DISMISS PLAINTIFFS'
THIRD AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND FACTUAL OVERVIEW ...........................................................1

II.  ARGUMENT ...................................................................................................................5

    A.   Standard ...................................................................................................................5

    B.   Plaintiffs Have Alleged with Particularity the Falsity of KPMG's
        Statements Concerning Its Audits Over Jabil's Financial Statements....................6

        1.   KPMG Falsely Stated that Audits of Jabil Financial Statements
              Were Conducted in Conformity with GAAS and PCAOB
              Standards ....................................................................................................6

    C.   The TAC Particularly Alleges that KPMG Knew or Was Severely
        Reckless in Not Knowing that Its Statements Concerning Jabil's
        Audits and Financial Statements Were Materially False and
        Misleading.............................................................................................................12

        1.   The Magnitude and Breadth of the Accounting Misstatements
              Support a Strong Inference of Scienter ......................................................14

        2.   The Accounting Rules Which KPMG Ignored Were Simple
              and Easily Identifiable Further Evidences KPMG's Culpable
              State of Mind...............................................................................................16

        3.   The PCAOB Report Admonishing KPMG Confirms that
              KPMG Was Not Performing Audits Consistent with Its
              Standard .....................................................................................................18

        4.   KPMG Earned Skyrocketing Audit Fees from Jabil Supporting
              a Strong Inference of Scienter....................................................................21

        5.   KPMG's Close Relationship with Defendants – 24 Years of
              Audit and Tax Services – Supports a Strong Inference of
              Scienter ......................................................................................................22

        6.   KPMG's Failure to Issue an Adverse Report or Qualified
              Opinion Subsequent to the March 18, 2006 *The Wall Street
              Journal* Article Supports a Strong Inference of Scienter...........................24

                                                                                                  **Page**

        7.    KPMG Knew but Disregarded that Defendants' Incentive
              Bonus Structure Rewarded Defendants Based upon Meeting
              Earnings Targets .................................................................................27

   D.   KPMG Ignored Numerous Red Flags Sufficient to Place a Reasonable
        Auditor on Notice that Jabil Was Committing Wrongful Acts to the
        Detriment of Investors ........................................................................28

        1.    Jabil Ignored Substantially Delayed Forms 4 Filings Disclosing
              Stock Option Grants – a Red Flag for Backdating ....................29

        2.    KPMG Failed to Detect Clear Internal Control Weaknesses and
              Obvious Theft by a Key Accounting Executive Who Wrote
              Hundreds of Checks to Himself ................................................30

        3.    The Violation of Jabil's Own Internal Stock Option Plan
              Constitutes a Red Flag Supporting KPMG's Scienter ..............32

   E.   Plaintiffs' Claims Against KPMG Are Timely.....................................33

        1.    KPMG Misstates the Legal Standard in the Eleventh Circuit .................34

        2.    Plaintiffs Were Not on Inquiry Notice Until After November
              2006.........................................................................................35

        3.    None of the Disclosures Cited by KPMG Could Have Put
              Plaintiffs on Inquiry Notice with Respect to KPMG ................37

        4.    The Running of the Statute of Limitations Cannot Be Decided
              on a Motion to Dismiss, and Must Be Decided by the Trier of
              Fact..........................................................................................40

              a.    Jabil's False Denials of Wrongdoing and Words of
                    Comfort Preclude a Finding of Inquiry Notice as a
                    Matter of Law ..............................................................41

              b.    KPMG's July 2006 Unqualified Audit Opinion
                    Precludes a Finding of Inquiry Notice as a Matter of
                    Law ..............................................................................43

III.   CONCLUSION..................................................................................44

## I.     INTRODUCTION AND FACTUAL OVERVIEW

KPMG LLP ("KPMG") has no answer to the detailed and powerful allegations that it knowingly failed to conduct audit reviews in the manner which it had assured Jabil Circuit, Inc.'s ("Jabil" or the "Company") investors.  The allegations are particularized and strong, exceeding the Private Securities Litigation Reform Act of 1995's ("PSLRA") strict standards applied to securities cases, even those involving outside auditors.  The Third Amended Class Action Complaint for Violations of the Federal Securities Laws ("TAC") details facts demonstrating that, rather than performing its duties of corporate watchdog, KPMG simply sat on the sidelines and approved at least a decade of self-dealing which has cost Jabil's investors hundreds of millions of dollars.  Jabil has now admitted to facts which show that had KPMG, as it represented, conducted audits consistent with Generally Accepted Accounting Standards ("GAAS") and Public Company Accounting Oversight Board ("PCAOB") standards,[1] KPMG would have and should have discovered, reported, and stopped Jabil's fraud.  Indeed, Jabil has admitted to: (1) years of backdated stock options; (2) defendants and Board of Directors ("Board") committee members backdating stock options to executives and to rank and file employees; (3) documents evidencing stock option grants were falsified to appear as though stock options were granted earlier than they truthfully were, when the stock price was lower; (4) quarterly and annual financial statements for years were materially false and have been restated to the tune of *$54 million*; and (5) executive stock option recipients did not report stock option

---

[1]       The PCAOB is a private sector, non-profit corporation created by the Sarbanes-Oxley Act of 2002 ("SOX") to oversee the auditors of public companies in order to protect the interests of investors and further the public interest in the preparation of informative, fair and independent audit reports.

grants on Forms 4 to the Securities and Exchange Commission ("SEC") for weeks, months and, at times, more than a year after the stock options were granted – a tell-tale sign of backdating. *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986 (N.D. Cal. 2007).

At the same time, however, defendants, including those exclusively in charge of issuing options, pocketed millions of dollars.  ¶¶58, 88-89, 93-98, 109-116.[2]  Together, defendants exercised and sold backdated stock options, and unloaded hundreds of thousands of shares (all totaling $464 million), while the Company's stock price and overall financial condition were materially and artificially inflated.  ¶¶29, 58.  Defendants also pocketed millions in bonuses (based on targeted earnings results), which topped $1 million for defendant Timothy L. Main ("Main") alone in 2005 – a year in which reported earnings were overstated by $46 million, or 14.5%.  ¶¶55, 66, 231.  The TAC alleges that KPMG ignored the obvious evidence of these facts and Class Period (September 19, 2001 through December 21, 2006) reporting of ever-increasing earnings, which often beat Wall Street analysts' estimates by pennies per share on razor-thin margins, and was a suspicious red flag that should have put KPMG on notice.  ¶22.

It did not end there.  KPMG, while claiming to be a thorough and independent outside auditor and purporting to comply with the post-SOX rigors of the PCAOB, intentionally concealed or failed to detect not only the backdating of stock options and violations of simple Generally Accepted Accounting Principles ("GAAP") provisions, but perhaps the simplest of frauds, a basic and easily detectable financial crime.  Defendant Patrick Henry Stewart ("Stewart"), a former controller of Jabil Global Services, stole $1.8 million from the Company

---

[2]      All paragraph ("¶") and exhibit references are to the TAC, unless otherwise noted.

by writing over 100 checks to himself and others in order to pay his personal debts, upgrade his car, and purchase property, gold bars and rare coins.  ¶174.  All this occurred while KPMG falsely assured investors the following:

- audits were conducted in accordance with GAAS (¶¶141, 260-264);

- audits of the Company's financial statements and internal controls were conducted in accordance with PCAOB standards, including the ***examination of evidence supporting*** the disclosures in the financial statements (¶¶150, 166, 260-264); and

- audit opinions of Jabil's financial statements were fairly presented in conformity with GAAP and that the audits provided had a reasonable basis for KPMG's opinion (¶¶141, 150, 260-264).

The TAC alleges that each of these statements was knowingly false.  KPMG either ignored or never even obtained the requisite "evidential material" required by GAAS.  *See* ¶¶276, 278, 282 (obtain sufficient competent evidential matter through inspection).  This is a simple form of testing, which was required to show whether the Company was actually complying with Accounting Principles Board Opinion No. 25 (herein "APB 25").  The Company admitted that based upon objective evidence, including multiple grant lists, available and in existence at the time the false financial statements were issued, it discovered numerous violations of APB 25, including:

- situations in which there were grants to groups of individuals, but ***subsequent changes*** to the grants to some members of those groups, with the ***continued use of the initial measurement date***;

- situations in which there was a final grant to certain individuals and a subsequent grant to other individuals, with the use of the same measurement date as the initial grant;

- situations in which there was a final grant to individuals and a ***subsequent decision to grant additional stock options*** to some of the same individuals, with the ***use of the same measurement date as the initial grant***; and

- 3 -

- • a situation in which grants to certain officers and a small group of highly valued non-officers were believed to be final when, in fact, they were subject to further discretionary adjustments, yet the Company **continued to use the originally identified grant date** for purposes of establishing **the measurement date**.

¶15, 54, 229(a), 286.   KPMG's motion to dismiss endeavors to convince the Court that these particularized allegations are inadequate, suggesting that auditors are specially protected from answering to even particularly alleged frauds, such as alleged here.   *See* KPMG Mem.[3] at 37-43. Predictably, like the evidence of backdating, self-dealing, and the abundance of red flags KPMG intentionally overlooked or ignored, KPMG simply ignores the specific allegations of the TAC or relegates its weak defenses to footnotes.   *See id.* at 26 n.15, 33 n.21.   But these allegations, including the fact that KPMG has been Jabil's outside auditor for 24 years and thus wholly familiar with Jabil's accounting processes (another red flag), are plainly sufficient to state a claim.   Where plaintiffs' allegations of  "dereliction of responsibility is accompanied by other 'red flags' which the auditor chooses to ignore, there may be enough to establish scienter."   *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002).[4]

The facts alleged further show that KPMG was highly motivated to turn a blind eye to plainly obvious violations of GAAP and Jabil's failure to take known compensation expenses for backdated stock options.   KPMG profited handsomely, scoring a whopping **$25 million** in so-called audit fees during the Class Period, each year's fees growing exponentially from the

---

[3]      "KPMG Mem." refers to Defendant KPMG LLP's Motion to Dismiss Plaintiffs' Third Amended Class Action Complaint.  KPMG's motion to dismiss violates Civil L.R. 1.05(a) by using smaller margin widths than permitted under the local rules.  *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1423 n.2 (M.D. Fla. 1997).

[4]      All citations, internal quotations and footnotes are omitted and all emphasis is added unless otherwise noted.

previous year – yet another red flag.  *See* ¶¶16(h), 259 (detailing year-by-year fees).  Finally, a PCAOB Report, which discusses KPMG's auditing practices during the Class Period, faults KPMG for "fail[ing] to perform a procedure . . . even if [KPMG] claim[ed] to have performed the procedure" in violation of PCAOB Auditing Standard No. 3, *Audit Documentation*.  Ex. 82 at 3.  More specifically, with respect to APB 25, the PCAOB found that KPMG "fail[ed] to identify and appropriately address this departure from GAAP" and a "modification that [an] issuer had made to certain vested stock options."  Ex. 82 at 6.  KPMG cannot deny that these facts provide further evidence of KPMG's deficient audit procedures throughout the Class Period.  ¶¶171-172.[5]  KPMG's motion to dismiss must be denied.

## II.    ARGUMENT

### A.    Standard

"To state a claim under section 10(b) or Rule 10b-5, a plaintiff must allege '(1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiff's loss.'"  Order[6] at 10 (citing *Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir. 2001)); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the allegations of the complaint must be accepted as true and construed favorably to the plaintiffs.  *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007).

---

[5]      When plaintiffs initially brought their allegations against KPMG, it quickly demanded plaintiffs' voluntary and immediate withdrawal of the claims or face the consequences of sanctions by way of Fed. R. Civ. P. 11.  *See* Dkt. No. 107.  That was nonsense, as plaintiffs' claims are particularly pled and suggest a strong inference of knowledge on the part of KPMG.

[6]      "Order" refers to this Court's April 9, 2008 Order.

**B.     Plaintiffs Have Alleged with Particularity the Falsity of KPMG's Statements Concerning Its Audits Over Jabil's Financial Statements**

In order to plead a claim for securities fraud under Rule 10b of the Securities and Exchange Act of 1934 ("Exchange Act") and the PSLRA, plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1).  Rule 9(b) is satisfied where circumstances of fraud are pled in detail. *Garfield v. NDC Health Corp*., 466 F.3d 1255, 1262 (11th Cir. 2006).  The TAC adequately alleges in detail the false and misleading statements and omissions (*e.g.*, ¶¶141, 150, 261-263); where and when each statement was made (*e.g.*, *id.*); and the reasons why each statement was false and misleading (*e.g.*, ¶¶169-175, 258-300).

**1.     KPMG Falsely Stated that Audits of Jabil Financial Statements Were Conducted in Conformity with GAAS and PCAOB Standards**

In the Eleventh Circuit, where an auditor gives an unqualified opinion approving false financial statements, and the plaintiff alleges specific GAAP and GAAS violations, the auditor has made false and misleading statements that could subject the auditor to liability.  *See Sunterra*, 199 F. Supp. 2d 1308; *Holmes v. Baker*, 166 F. Supp. 2d 1362 (S.D. Fla. 2001). Violations of GAAP and GAAS can constitute false or misleading statements of material fact in violation of Rule 10b-5(b) of the Exchange Act.  *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324, 1335 (N.D. Ga. 1998).

Further, a restatement admits that previously filed financial statements were materially false when issued.[7] *Barrie v. InterVoice-Brite, Inc.*, 397 F.3d 249, 258 (5th Cir. 2005). A restatement, by definition, means that facts ***existed and were known*** to a company ***at the time the financial statements were issued*** that rendered their financial statement false.[8] *Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 658 (W.D. Tex. 2006) ("announcement of the need to restate its earnings constitutes an admission that its public filings are false"). GAAP rules are specific on this point. Pursuant to APB 20, a restatement is an admission that financial statements were materially false at the time they were made. *See also* SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1) (financial statements not prepared in accordance with GAAP are materially false).

Here, plaintiffs particularly allege that KPMG falsely represented that its audits of Jabil's financial statements, particularly for FY03-FY05, had been performed in accordance with GAAS and PCAOB standards. ¶¶141, 150, 166, 260-264. Each of the financial statements was given a clean audit opinion and each has now been restated. ¶¶225-231. In fact, Jabil's FY03 earnings were overstated by ***46.7%***. ¶¶55, 139, 231. Yet, in FY03, KPMG falsely stated that it (1) audited Jabil's financial in accordance with GAAS, (2) obtained evidence during its audit, and (3) had "searched for [such] evidential matter" which provided a reasonable basis for its

---

[7]    Where a company does not record and report a compensation expense arising from stock option backdating, as required by GAAP, any subsequently issued financial statement is misleading. *See* 6 Alan R. Bromberg & Lewis D. Lowenfels on Securities Fraud and Commodities Fraud §17:1 (2d ed. 2007).

[8]    Both courts and the SEC confirm that restatements are not proper for a "change in ***estimate***" or other restated adjustment based upon subsequent information that did not and could not have existed at the time of the original financial statements were prepared. *In re Commtouch Software Ltd. Sec. Litig.*, No. C 01-00719 WHA, 2002 U.S. Dist. LEXIS 13742, at *22 (N.D. Cal. July 24, 2002) (emphasis in original); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 577 (W.D. Pa. 2006).

conclusions that the Company's financial statements were presented fairly in accordance with GAAP.  ¶¶141, 261, 276-277; Ex. 12.  These statements were materially false and misleading because KPMG had not: (i) conducted its audit of Jabil in accordance with GAAS, and specifically APB 25; (ii) nor had KPMG collected or obtained the relevant evidence pursuant to GAAS and Certification of Statements on Auditing Standards ("AU") §326, *i.e.*, grant lists identifying the recipient and grant date of stock options; and (iii) because KPMG failed to review the relevant stock option grant lists, KPMG did not apply the relevant accounting principles, such as AU §326, and did not have a reasonable basis for its audit opinions.  *See Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1176 (10th Cir. 2006) (plaintiff must specify the reasons why an auditor's opinion was false or misleading in relation to the audits it performed).   Accordingly, with respect to stock option accounting, KPMG conducted no audit at all.  *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1372 (M.D. Fla. 2008).

The TAC particularly alleges that in FY05, KPMG falsely stated that it (1) audited Jabil's financial statements and internal controls in accordance with GAAS and PCAOB standards, and (2) obtained an adequate understanding of Jabil's internal control over financial reporting. Specifically, KPMG falsely claimed:

1) *"We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement."*

With respect to Jabil's internal controls, KPMG stated:

2) "We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial

Reporting, that Jabil Circuit, Inc., maintained effective internal control over financial reporting as of August 31, 2005, based on criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."

3)    "Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment testing and evaluating the design and operating effectiveness of internal control. . . ."

4)    "***We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Jabil Circuit and subsidiaries as of August 31, 2005 and 2004***, and the related consolidated statements of earnings, stockholders equity, comprehensive income, and cash flows for each of the years in the three-year period ended August 31, 2005 and the related schedule, and our report dated October 25, 2005 expressed an unqualified opinion on those consolidated financial statements.

¶¶150, 154, 166, 262-263; Ex. 35.[9]

KPMG does not seriously dispute that plaintiffs particularly allege falsity under the PSLRA standards.  Indeed the who, what, when and where are particularly identified.  *See Garfield*, 466 F.3d at 1262.  Instead, KPMG contends that the alleged false statements are just nit-picking.  KPMG Mem. at 38-39.  This contention is absurd as the TAC alleges specific violations of GAAS and PCAOB AU §326.  ¶¶266-300.  KPMG relies on the Tenth Circuit

---

[9]    The SEC has stressed the importance of meaningful audits being performed by independent accountants:

[T]he capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.

*Relationships Between Registrants and Independent Accountants*, Securities Act Release No. 6341, Exchange Act Release No. 18,044, Public Utility Holding Company Act Release No. 22,167, Investment Company Act Release No. 11,912, Accounting Series Release No. 296, 1981 SEC LEXIS 858, at *8-*9 (Aug. 20, 1981); ¶264.

opinion in *Deephaven* to support its contention that plaintiffs' allegations of falsity must fail because KPMG's statements are statements of "opinion."  KPMG Mem. at 38.  However, KPMG agrees statements claiming that they had conducted their audits of Jabil's financials in compliance with GAAS and PCAOB are not "opinions" at all, but false statements of historical fact.  *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003) ("a statement of opinion is not the same as a statement of historical fact"), *aff'd*, 133 Fed. Appx. 994 (6th Cir. 2005); KPMG Mem. at 38.

Moreover, plaintiffs also particularly allege that KPMG had no reasonable basis for its "opinions" because it failed to obtain and examine basic evidentiary material, such as stock option grant lists, which would have evidenced obvious failures to correctly apply APB 25.  ¶276; *Deephaven*, 454 F.3d at 1175.  With respect to pleading violations of GAAS, the TAC complies with the standard set forth in *Conaway*, 284 F. Supp. 2d at 740-41.  Specifically, the TAC particularly alleges the documents and final stock option recipient lists, which KPMG ignored or recklessly disregarded.  ¶¶276, 278, 283-84.  The existence of such lists is undisputed as Jabil's own internal investigation utilized these precise documents and materials in determining that routine violations of APB 25 had indeed occurred at the Company.  ¶¶228-231.  Further, the TAC specifically identifies the relevant GAAS and PCAOB standards KPMG violated in conducting audits of Jabil's financials throughout the Class Period.  ¶¶276-277, 290-292.  This included violations of AU §§326, 110.01, 150.02 and PCAOB Audit Standard No. 2.  Because the TAC adequately alleges specific facts supporting a strong inference that specific factual assertions contained in KPMG's 2003-2005 audit opinions were issued "'without a genuine belief or reasonable basis,'" and because the TAC sufficiently specifies "'the reason or

reasons why'" the subject audit opinions were allegedly false or misleading as required by the PSLRA, the TAC against KPMG should be upheld. *See Conaway*, 284 F. Supp. 2d at 741. Based upon the documents and grant lists now identified by the Company, KPMG either had no reasonable basis for its statements, or had done no audit at all.

Plaintiffs also allege that from 1996-2006, KPMG should have but did not obtain, search for, or review grant lists evidencing stock option grants during each audit of Jabil financial statements. *See* ¶276 (citing AU §326). The stock option grant lists were clearly available at the time KPMG purportedly conducted its audits, and had KPMG reviewed such materials it could not have reasonably concluded that Jabil had complied with GAAP. ¶¶262-264. As Jabil now admits, the grant lists reviewed by the Company during its investigation evidenced that stock options were issued with hindsight, using measurement dates in the past.[10] ¶229. However, the relevant audits standards that KPMG assured investors that it complied with required them to:

- obtain sufficient competent evidential matter through inspection;

- be thorough in the search for evidential matter and unbiased in its evaluation;

- design audit procedures to obtain competent evidential matter; and

- consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the client's financial statements.

*See* ¶276; AU §326.

Plaintiffs allege that KPMG would have discovered material discrepancies or falsification of information on the grant lists including backdated stock option grants and admitted evidence

---

[10]     There is no evidence that these grant lists were hidden from or not disclosed to KPMG.  Of course, such contentions by KPMG would implicate its co-defendant Jabil and its knowledge of backdating.

of grants that were changed after selection of the original measurement date.  ¶¶225-230, 278. KPMG's assertion that the TAC fails to adequately plead the specific information contained in "final stock lists" or other "backdating documentation" is incorrect.  KPMG Mem. at 40-41.  As Jabil's own admissions, contained in its May 15, 2007 Form 10-K, explain, to identify these situations of backdating Jabil  reviewed ***documentary*** and other ***evidence***, including grant lists (¶229) to determine the dates on which the Compensation Committee (or other decision-maker) decided the terms of the grants.

      **C.**    **The TAC Particularly Alleges that KPMG Knew or Was Severely Reckless in Not Knowing that Its Statements Concerning Jabil's Audits and Financial Statements Were Materially False and Misleading**

A complaint alleging violations of Rule 10(b) must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  Accordingly, in the Eleventh Circuit, a plaintiff must plead facts showing that the alleged misrepresentation was made with actual intent or "'severe recklessness.'"  *Garfield*, 466 F.3d at 1264.

The Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007), sets out three prescriptions of the scienter analysis.  First, that courts must "accept all factual allegations in the complaint as true."  *Id.*  Second, that "courts must consider the complaint in its entirety" and consider "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter," in isolation.  *Id.* (emphasis in original).  And third, that a court "must take into account plausible opposing inferences" in determining whether a strong inference of scienter exists.  *Id*.  The inference of scienter "need not be irrefutable" or a "'smoking –gun'" or even the "'most plausible of competing inferences.'"  *Id*. at 2510.  Rather, a

- 12 -

strong inference exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. With respect to an auditor, allegations of GAAP and GAAS violations alone are insufficient. However, allegations of dereliction of responsibility accompanied by red flags putting the auditor on notice, may be enough to establish scienter. *Sunterra*, 199 F. Supp. 2d at 1333 ("'A complaint will usually survive a motion to dismiss if plaintiffs have alleged the existence of red flags sufficiently attention-grabbing to have alerted a reasonable auditor . . . .'").

To sufficiently plead that an auditor acted with severe recklessness with respect to its audit opinion, and approved misstatements of facts, "[p]laintiff must offer specific factual allegations that are sufficient to support the 'strong inference that the audit was so deficient that it amounted to no audit at all.'" *Grand Lodge*, 550 F. Supp. 2d at 1372; *see also In re Faro Techs. Sec. Litig.*, No. 6:05-cv-1810-Orl-22DAB, 2007 WL 430731, at *19 (M.D. Fla. Feb. 3, 2007) (citing *Sunterra*, 199 F. Supp. 2d at 1337). Plaintiffs may satisfy this burden by showing that the accounting practices were "'so deficient that [the audit] amounted to no audit at all,'" or an egregious refusal to see the obvious, or to investigate the doubtful. *Faro*, 2007 WL 430731, at *20.

KPMG maintains that its failure to obtain relevant stock option lists and other supporting documentation in conducting its audits of Jabil's compliance with APB 25 were not in violation of AU §326 because the specific tests required to ensure such compliance is left "to the judgment of the auditor." KPMG Mem. at 41-42. Plaintiffs, however, do not allege that KPMG simply exercised poor judgment in its audits of Jabil. Rather, the TAC demonstrates that KPMG exercised no judgment at all. *See Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374

- 13 -

(RPP), 1999 U.S. Dist. LEXIS 2102, at \*40-\*41 (S.D.N.Y. Mar. 1, 1999) (holding that AU §326 was violated regardless of contention that audit was performed in the exercise of the auditor's professional judgment because auditor did not attempt to study carefully or properly investigate the evidence, materials or circumstances to date, or had changed or withdrawn any of its audit opinions). Nor has KPMG issued a qualified or adverse report concerning Jabil's historical fraudulent stock option backdating practices, even in light of Jabil's post-Class Period admissions. *See* ¶¶15, 294.

The TAC more than alleges that KPMG failed to adhere to GAAS in its audits of Jabil's compensation expenses. The TAC places this failure in a broader context with allegations that, taken together, paint a portrait of an audit so reckless that the most cogent inference is the intent to defraud. ¶¶171-172, 274-300.

### 1. The Magnitude and Breadth of the Accounting Misstatements Support a Strong Inference of Scienter

While simple misapplication of accounting rules alone does not create a strong inference of scienter, the nature or timing of GAAP violations or a significant restatement may shift the balance strongly in favor of scienter. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 651-52 (E.D. Va. 2000) (violations of relatively straightforward accounting principles that occurred over the entire class period and resulted in large restatement are probative of scienter). Order at 35-36. "[W]here the 'number, size, timing, nature, frequency, and context of the [GAAP violations] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.'" *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) (second alteration in original). Additionally, the more widespread the GAAP violation (in this case, ten years), "the more likely

it might be that such a violation could not be accomplished without either the auditor consciously disregarding the results of its audit or a failure on the auditor's part to conduct its audit in conformity with GAAS." *Deephaven*, 454 F.3d at 1176 n.9.

Here, Jabil has admitted to a decade of false financial statements resulting in a $54 million restatement. ¶225.  Plaintiffs allege a wholesale failure of the Company to record known compensation expense required for stock options issued at less than the fair market value. The backdating was accomplished through admitted intentional manipulation of stock option grant lists which falsely reflected that stock option were granted before they actually were.  ¶229. Further, such accounting irregularities affected options from top-level executives to non-executive employees.

KPMG wrongly contends that errors in Jabil's financial statements were neither "vast" nor "widespread."  KPMG Mem. at 26.  KPMG also asserts that "total expenses" during 2003 and 2005 were $4.7 billion and $7.3 billion and thus the overstatement of earnings related to stock options is insignificant.  *Id.*  This assertion, designed to obfuscate KPMG's wrongdoing, is demonstrably false.  First, because Jabil's financial statements have been restated, its financial statements were materially false.  *See* APB No. 20; *see also* SEC Regulation S-X, 17 C.F.R. §210, 4-0.1(a)(1) (financial statements not prepared in accordance with GAAP are materially false).  Moreover, in 2003, KPMG's failure to audit the Company's accounting for stock options resulted in a "drastic overstatement" of earnings, an amazing ***46.7%***.  ¶¶55, 139, 231; *see Carley Capital*, 27 F. Supp. 2d at 1339-1340 (combination of accounting violations with drastic overstatement plus red flags may be enough to adequately allege scienter).  Further, the accounting manipulations were widespread as to both the number of years and number of

- 15 -

individuals.   For instance, in 2003, grants to ***1,563 individuals were "change[d] after*** the previously identified grant dates."   ¶229.   KPMG is, however, correct that Jabil's restatement centered upon a single issue – backdated stock option-based compensation.  KPMG Mem. at 26. However, Jabil repeatedly stated that APB 25 was a "significant accounting polic[y]," and that if Jabil was required to recognize stock option compensation expenses, its operations could be affected in a materially adverse manner.   ¶¶279-280.   Thus, such errors were anything but insignificant.

> ### 2.   The Accounting Rules Which KPMG Ignored Were Simple and Easily Identifiable Which Further Evidences KPMG's Culpable State of Mind

Where stock options are required to be granted at 100% of the fair market value, as Jabil's were, APB 25 is a clear and simple rule, and its violation supports an inference of scienter.   *See United States v. Shanahan*, No. S1-4:07 CR 175 JCH DDN, 2008 U.S. Dist. LEXIS 29868, at *19-*20 (E.D. Mo. Mar. 31, 2008) (APB 25 is not ambiguous or vague). "[T]he less complex the rules violated, the greater the magnitude of the irregularities, and the more frequent the violations, the stronger the inference that "conscious fraud or recklessness is the explanation for the auditor's role in the violations." *MicroStrategy*, 115 F. Supp. 2d at 652; *In re Ravisent Techs., Inc.*, No. Civ.A. 00-CV-1014, 2004 WL 1563024, at *9 (E.D. Pa. July 13, 2004); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000).  The "inference of scienter becomes more probable as the violations become more obvious." *MicroStrategy*, 115 F. Supp. 2d at 638.

Indeed, the accounting treatment under APB 25 is "quite simple" for stock options issued at the fair market value on the date of the grant.  *E.g.*, ¶169(f) (citing Michael S. Sirkin &

Lawrence K. Cagney, Executive Compensation §5.02 (American Lawyer Media, Inc. 2007));

*United States v. Reyes*, No. C 06-00556 CRB, 2007 U.S. Dist. LEXIS 41632 (N.D. Cal. May 30,

2007) (APB 25 is not ambiguous or unclear); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F.

Supp. 2d 1164, 1182 (C.D. Cal. 2007) (measurement dates for determining grant date are not

complex for sophisticated executives); *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d

688, 719-20 (S.D. Ohio 2006) (an inference of knowledge or recklessness may be drawn from

allegations of accounting violations that are so simple, basic and persuasive in nature that they

should have been obvious to the defendant).

KPMG does not contest the simplicity of the accounting application of APB 25.  KPMG

Mem. at 28.  APB 25 identifies a simple two-step analysis to accounting for stock options.  A

specific KPMG PowerPoint presentation outlining the simplicity of APB 25 is attached to the

TAC.  *See* ¶169(f); Ex. 4.  Nor does KPMG contend that the failure to apply these simple

accounting rules does not support a strong inference of scienter.  Instead, KPMG argues that

APB 25 is not "***necessarily*** [] simple in all ***circumstances***."  KPMG Mem. at 28.  Here, however,

where Jabil's stock option plans required options to be granted at 100% of the fair market value,

and where the Company and KPMG assured investors that stock options were issued at the fair

market value on the date of grant and thus, no compensation expense would be taken, APB 25 is

applied in its most basic and simple form.  *See Quest*, 527 F. Supp. 2d at 1182.

Furthermore, the GAAP violations in this case were obvious – a simple review of the

Jabil stock option grant lists in any year during the Class Period would have disclosed the

multiple situations where the Company manipulated the grant date of stock options, *i.e.*, ¶¶229,

291-298.  Specifically, a review of such lists would have identified:

- ***situations in which there was a final grant to certain individuals and a subsequent grant to other individuals, with the use of the same measurement date as the initial grant***; *and*

- ***situations in which there was a final grant to individuals and a subsequent decision to grant additional options to some of the same individuals, with the use of the same measurement date as the initial grant***.

¶¶15, 229(a), 286; Ex. 80.

The simplicity of accounting rules and their application (or lack thereof) to the circumstances here support a strong inference of knowledge. *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996).

> **3.     The PCAOB Report Admonishing KPMG Confirms that KPMG Was Not Performing Audits Consistent with Its Standard**

The 2006 PCAOB Inspection Report of KPMG stated that as late as 2005, KPMG had failed to perform audit procedures consistent with PCAOB standards and in particular, standards designed to test companies' compliance with APB 25.  ¶171.  The report is powerful corroborating evidence of KPMG's severe recklessness concerning its audits of Jabil.  *Id.*  For instance, the PCAOB found, as plaintiffs adequately allege, that KPMG "failed to perform a procedure based on the absence of documentation and the absence of persuasive other evidence," even where it claimed to have performed such procedures.  ¶171; Ex. 82.

> In some cases, the conclusion that the Firm [KPMG] failed to perform a procedure may be based on the absence of documentation and the absence of persuasive other evidence, even if the Firm claims to have performed the procedure.  PCAOB Auditing Standard No. 3, *Audit Documentation* ("AS No. 3").

*Id.*

The PCAOB findings were even more specific, with respect to APB 25, KPMG "failed to identify and appropriately address[] [a] departure from GAAP" and potential effects of modification to stock options that *were not* in accordance with APB 25:

> The Firm failed to identify and appropriately address this departure from GAAP. The Firm's *failure to identify the departure resulted from the Firm's failure to evaluate the potential effects of a modification that the issuer had made to certain vested stock options upon the termination of an executive of the issuer*.

*Id.*

Buried in a footnote, KPMG once again fails to dispute these damning allegations and claims that its failure to comply with PCAOB standards in the report described "another company" that KPMG audited.   KPMG Mem. at 33 n.21.   KPMG has failed to offer any evidence that Jabil is not the company referenced in the report.   Further, even if the PCAOB KPMG Report related to a company other than Jabil, the specific failures discovered by the PCAOB are still probative of KPMG's systematic procedural failures to properly audit stock options at Jabil.   For instance, with respect to the audit described in the PCAOB Report, KPMG falsely claimed to have conducted its audits in accordance with relevant GAAP and PCAOB standards even when the facts strongly suggest otherwise.   ¶171; Ex. 82.   The PCAOB's findings that KPMG failed to investigate and identify basic departures from GAAP and APB 25, including "modifications" to stock options and absence of other persuasive evidence is nearly identical to KPMG's failures at Jabil.   *See* ¶229(a) ("in some situations, the grant may not have been 'final,' on that date, as defined in the accounting literature, because it may still have been subject to the exercise of discretion as to the individuals who were to receive the options or the amounts they were to receive").   Here, the TAC alleges that KPMG knew of or was severely reckless in not knowing that its statements were false because it simply did not perform the

- 19 -

requisite procedures in accordance with PCAOB standards.  ¶¶266-300.  Had KPMG done so it would have easily uncovered the grant lists that demonstrated widespread evidence of backdating and failure to apply APB 25.  ¶¶15, 229(a), 286, 291, 296; Ex. 80.

KPMG claims to not understand what stock option grant lists plaintiffs are referring to, even though they are particularized in the TAC.  *See* KPMG Mem. at 40 (arguing that plaintiffs' allegations of final stock option lists are vague and fail to state what information in the stock option lists would have revealed).  Clearly, KPMG has not read the TAC or the Company's admissions – a fitting pattern of conduct when one considers that such conduct is similar to KPMG's failure to obtain the necessary evidential matter to support assertions contained in its own financial statements or in its motion to dismiss.  *Id.* at 40.  The TAC alleges and Jabil now admits that its own special committee investigation uncovered pervasive errors in accounting, based on the review of the very grant lists that KPMG reviewed or ignored:

- Repeated changes *to lists of grant recipients* subsequent to the originally identified measurement date.

- Other *changes to grant lists* to representing the exercise of discretion and recalculated compensation expense.

- In fiscal years 2002 and 2003 the Company recalculated the compensation expense associated with subsequent grants based on the date on which the grants to any particular *list of employees became final*.

- Following discretionary adjustments . . . management compiled *various lists* of employees into a *final list* and then distributed the options.

- In determining the measurement date Jabil treated *lists of grants to 2,180 and 2,262* non-executive employees issued in both fiscal years 2004 and 2005, respectively, as not final.

¶¶15, 225; Ex. 80.

- 20 -

The PCAOB Report and the Company's admission strongly corroborate plaintiffs' allegations of scienter.

### 4. KPMG Earned Skyrocketing Audit Fees from Jabil Supporting a Strong Inference of Scienter

KPMG earned profits from Jabil during the Class Period of approximately ***$25 million*** for so-called audit and tax services. ¶259. These allegations of KPMG's motive to commit or participate in fraud are significant and weigh heavily in favor of a finding of scienter. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

An auditor's desire to maintain a strong revenue stream from a client may motivate fraud by the auditor. *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1207-08 (D. Colo. 2004); *see also In re Tyco Int'l, Ltd. Multidistrict Litig.*, MDL Docket No. 02-1335-B, 2004 U.S. Dist. LEXIS 20733, at *39-*40 (D.N.H. Oct. 14, 2004) (finding fees paid to auditor, in addition to other scienter allegations, contributed to a strong inference of scienter); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 335 (S.D.N.Y. 2001) (same). As the First Circuit noted:

> The final allegation on which plaintiffs rely is [the auditor's] motivation to overlook [] concealment of losses in order to protect its own source of lucrative accounting and consulting fees. ***We do not doubt that such a profit motive could contribute to an auditor's decision to "turn[] a blind eye," to a corporation's misleading accounting***. Such allegations can thus strengthen an inference of scienter predicated on other facts, possibly adding sufficient strength to satisfy the strong-inference requirement . . . .

*In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 215 (1st Cir. 2005). Indeed, KPMG's overall "audit" fees increased ***284%*** during the Class Period alone, from $1.9 million in FY01 to $7.3 million in FY06. ¶259. KPMG attempts to dismiss plaintiffs' particularized motive allegations as nothing more than an allegation that KPMG received "millions earned in fees."

KPMG Mem. at 36.  However, considering the magnitude of fees earned over such a short period, the fees were "concrete benefits" received by KPMG and therefore, relevant to this scienter analysis.  *See In re Oxford Health Plans, Inc., Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999); *MicroStrategy*, 115 F. Supp. 2d at 655 (concrete benefits to an auditor weigh in favor of a strong inference of scienter).

For instance, in FY01, Jabil paid KPMG more than $1.9 million in audit and non-audit related services.  *Id.*  In FY02, Jabil's payments to KPMG increased to more than $2.5 million for audit and tax (including tax compliance) related services.  In FY03, Jabil's payments to KPMG increased to more than $2.9 million.  *Id.*  In FY04, Jabil's payments to KPMG increased to more than $4.5 million; in FY05 – $5.7 million in fees.  *Id.*  In FY06, Jabil's payments to KPMG again increased to more than $7.3 million.  *Id.*  These facts are undisputed and highly probative of scienter.  *Compare Sunterra*, 199 F. Supp. 2d at 1337 (in dismissing the complaint in part because the complaint contained no allegation of motive or benefit to Arthur Andersen LLP for ignoring fraud).  KPMG glibly dismisses these allegations by wholly disregarding the massive increase in audit fees while fraud and self dealing was afoot and rubber stamped by KPMG.

### 5.   KPMG's Close Relationship with Defendants – 24 Years of Audit and Tax Services – Supports a Strong Inference of Scienter

KPMG was inextricably intertwined with Jabil's accounting practice.  Indeed, KPMG has been auditing Jabil for ***24 years*** and has gained a vast knowledge of Jabil's business and operations which, taken together, supports a strong inference of severe recklessness.  *See Jacobs*, 1999 U.S. Dist. LEXIS 2102, at *15 (defendant auditor's history and knowledge of its client's internal workings, taken together, support a claim that its failure to observe GAAS amounted to a

violation of §10(b)); *see also In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1346 (S.D. Fla. 1999) (defendant auditor had been auditing the company for six years and "must have been aware" of facts contributing to fraud).

KPMG began auditing Jabil's financial statements on August 31, 1984.  ¶¶16(h), 170; Ex. 36.  Numerous facts contained in the TAC support the conclusion that KPMG was intimately involved in Jabil's operations.  For instance, KPMG attended Jabil's annual meetings in order to field questions regarding the Company's statements.  ¶293; *see Carley Capital*, 27 F. Supp. 2d at 1329.  Moreover, defendant Chris A. Lewis ("Lewis"), Jabil's CFO during the Class Period, was a Certified Public Accountant, formerly with KPMG.  ¶76.

The combination of KPMG's familiarity with Jabil's business operations, employee stock option plans, internal auditing procedures, and the ease with which Jabil's Special Committee uncovered Jabil's decade long fraudulent backdating practices further support a strong inference of scienter.  ¶¶213, 217; *Ades v. Deloitte & Touche*, 799 F. Supp. 1493, 1500-01 (S.D.N.Y. 1992) (plaintiffs' allegations support the inference that auditor acted in blind disregard that there was a strong likelihood that its client was involved in an underlying fraud).  These allegations, taken collectively, support a claim that KPMG's failure to observe GAAS in each particular audit amounts to recklessness sufficient to support a claim under §10(b).  *Ades*, 799 F. Supp. at 1500-01.

6.    **KPMG's Failure to Issue an Adverse Report or Qualified Opinion Subsequent to the March 18, 2006** *The Wall Street Journal* **Article Supports a Strong Inference of Scienter**

KPMG's failure to issue an adverse or qualified opinion subsequent to the March 18, 2006 *Wall Street Journal* article[11] supports a strong inference of scienter.  In the event that an auditor suspects financial irregularities or GAAP violations at a client company, GAAS requires that the auditor notify an appropriate level of management that is at least one level above those involved.  *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1231 n.33 (S.D.N.Y. 1992); *Brown v. Benchmark Power Corp.*, No. 95-35578, 1996 U.S. App. LEXIS 20523, at *10 (9th Cir. Aug. 12, 1996) (duty to disclose the inadequacy or material misrepresentations of previous audit opinions arises upon the disclosure of some sort of public statement or other affirmative act by the auditor); *see also* Statement of Accounting Standards ("SAS") No. 1, AU §561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*.

If after subsequent discussions the auditor continues to believe irregularities may exist, the board of directors or its audit committee should be notified.  *Price Waterhouse*, 797 F. Supp. at 1231; AU §561.04.  In addition, the auditor's procedures should be extended in an effort to obtain evidentiary material that will aid in a determination of whether an irregularity exists. *Price Waterhouse*, 797 F. Supp. at 1231.  Moreover, "when the auditor's examination indicates the presence of errors or possible irregularities, and the auditor remains uncertain about whether [they] may materially affect the financial statements, ***he should qualify his opinion or disclaim***

---

[11]    The "*Wall Street Journal* article" refers to the March 18, 2006 *The Wall Street Journal* article, entitled "The Perfect Payday – Some CEOs Reap Millions by Landing Stock Options When They Are Most Valuable; Luck – or Something Else?"

***an opinion*** on the financial statements." *Id.* Such disclaimers or public statements usually take the form of a qualified audit opinion, but may take other forms as well. *Brown*, 1996 U.S. App. LEXIS 20523, at *10.

Subsequent to the March 18, 2006 *Wall Street Journal* article, KPMG knew or was severely reckless in permitting Jabil to represent that KPMG had issued an unqualified opinion on the adequacy of Jabil's internal controls as of August 31, 2005. *See* Jabil's April 17, 2006 Form 10-Q for the quarter ending on February 28, 2006 and its July 10, 2006 Form 10-Q for the quarter ending May 31, 2006.[12]  Indeed, KPMG knew of or was severely reckless not to know of the March 18, 2006 *Wall Street Journal* article, which identified Jabil as one of six companies that made stock option grants to executives on periodic lows in stock value or on various occasions just before a significant rise in stock price. *See Sunbeam*, 89 F. Supp. 2d at 1345; ¶20; Ex. 38. The article identified six "suspicious" stock option grants to defendant Main, Jabil's Chief Executive Officer ("CEO"), between 1998 and 2001, and stated that the odds that these grant dates were selected by chance were approximately one in one million, the very conduct that is at issue in this case.  ¶20.

KPMG makes unreasonable assertion that while the article should have placed a ***reasonable investor*** on inquiry notice, the article was nonetheless would not have placed a ***reasonable auditor*** on the notice of the possibility of fraud by its own client whom they had audited for the previous 24 years. *See* KPMG Mem. at 10-15.  KPMG thus, permitted Jabil to

[12]     Exhibit A and B to the Declaration of Shawn A. Williams in Support of Plaintiffs' Opposition to Defendant KPMG LLP's Motion to Dismiss Plaintiffs' Third Amended Class Action Complaint ("Williams Decl."), attached hereto.

repeatedly state that investors could continue to rely on KPMG's 2005 Report on Internal Controls. Specifically, this assertion was expressly reiterated in Jabil's subsequent April 17, 2006 Form 10-Q for the quarter ending on February 28, 2006 and its July 10, 2006 Form 10-Q for the quarter ending May 31, 2006.[13] By allowing Jabil to continue to represent that KPMG was comfortable with its previous unqualified opinion, KPMG failed to adhere to AU §561 in further violation of GAAS. *See* Williams, Decl., Exs. A & B.

In fact, it appears to date, KPMG has failed to issue an adverse report, qualified opinion, or give any indication to investors that it no longer stands behind its unqualified auditing opinions of Jabil's 2003 financials or its 2005 Report on Internal Controls. ¶294. Notwithstanding the Company's admissions, KPMG still suggests that no backdating occurred. KPMG Mem. at 41. In light of the tidal waves of accounting fraud alleged, this Court may determine that KPMG's refusal to recognize its client's fraud or correct its previous misstatements supports a strong inference of scienter. *See In re Leslie Fay Cos., Inc. Sec. Litig.*, 835 F. Supp. 167, 175 (S.D.N.Y. 1993).

---

[13]     Plaintiffs respectfully request that this Court take judicial notice of the contents of Jabil's April 17, 2006 Form 10-Q for the quarter ending on February 28, 2006 and its July 10, 2006 Form 10-Q for the quarter ending May 31, 2006. *See* Williams Decl., Ex. A-B. In the Eleventh Circuit, a district court is authorized at the motion to dismiss stage to take judicial notice of relevant public documents which "(1) are required to be filed with the SEC, and (2) are actually filed with the SEC." *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1320 (S.D. Fla. 2004) (citing *Bryan v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999) (district courts may take judicial notice of publicly filed documents in securities fraud cases upon a motion to dismiss)).

7.      **KPMG Knew but Disregarded that Defendants' Incentive Bonus Structure Rewarded Defendants Based upon Meeting Earnings Targets**

Plaintiffs allege that, during and throughout the Class Period, bonuses under Jabil's incentive plan were tied to exceeding earnings per share ("EPS") growth estimates and meeting or exceeding projected earnings. Plaintiffs allege that Jabil and the individual defendants were motivated to falsify the Company's financials in order to meet or beat Wall Street earnings forecasts and expectations. ¶¶56, 57; Ex. 36. These were not simply standard bonuses, but instead specifically tied to factors, including pre-tax profitability and EPS. ¶56-57; Ex. 36. Defendant Main earned an extraordinary bonus of $1,143,225 in FY05, which was based in part on Jabil's admittedly inflated net income. ¶¶66, 163 n.25. *See* Order at 11 (citing *AFC Enters.*, 348 F. Supp. 2d at 1374 (recognizing that extraordinary incentive bonuses may support an inference of scienter)). The Company has restated its 2005 net income which had been overstated by more than ***$29 million***, or ***14.5%***. ¶¶163 n.25; 231. EPS was overstated by $0.14. *Id.* Main, who the TAC alleges received numerous backdated stock option grants, took home bonuses totaling $2,589,596 during the Class Period when the Company's reported financial results, including operating and net income, was admittedly materially overstated. ¶169(h).

The TAC particularly alleges that KPMG wholly ignored the wildly inflated bonuses received by key individuals who either granted or received backdated stock options, yet another red flag that should have put KPMG on notice that the financial statements may be misrepresented. ¶¶16, 56; Ex. 36. These facts raise a red flag requiring KPMG, as the independent auditor, to investigate. *See In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472,

480-81 (S.D.N.Y. 2005) (auditor should plan audit procedures based on assessment of risk of fraud).

> **D.      KPMG Ignored Numerous Red Flags Sufficient to Place a Reasonable Auditor on Notice that Jabil Was Committing Wrongful Acts to the Detriment of Investors**

GAAP and GAAS violations, "coupled with allegations of ignoring 'red flags,' can be sufficient to state a claim of securities fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001). "Red flags" are those facts which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors. *Sunterra*, 199 F. Supp. 2d at 1333 (citing *Vand De Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 736 (D. Mass. 1995)).

The Eleventh Circuit considers a wide variety of alleged red flags, including lack of internal controls in the audited company, tip-offs from company employees, publications accusing the company of accounting fraud, knowledge that the company was under financial pressure, and the obvious or basic nature of the fraud. *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1362 (S.D. Fla. 2005); *see also Sunbeam*, 89 F. Supp. 2d at 1344-45. None of these factors, however, are required or dispositive, as each scienter analysis relies heavily on the overall context in which the alleged fraud occurred. *Spear*, 399 F. Supp. 2d at 1362-63. Plaintiffs have alleged specific obvious red flags that should have put KPMG on notice that the financial statements might be, and indeed were, false. *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 505, 514 (S.D. Ohio 2000) (the "clearest way a plaintiff can satisfy this burden [regarding scienter] is to identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored,

deliberately, recklessly, or by failing to follow generally accepted accounting and auditing principles").

       **1.**       **Jabil Ignored Substantially Delayed Forms 4 Filings Disclosing Stock Option Grants – a Red Flag for Backdating**

Jabil repeatedly filed late Forms 4 with the SEC, which disclosed stock option grants and exercise prices to the public. ¶¶110-116, 296. Specifically, from 1998 until the end of the Class Period, Jabil's officers and directors filed late Forms 4 on *30 occasions*, representing *68 separate transactions*. ¶296. Late filed Forms 4 have been found to be a red flag of backdating. *Zoran*, 511 F. Supp. 2d at 1006. In *Zoran*, Judge Alsup discussed how filing late Forms 4 allows a person to reach back in time and select a date where the stock price is trading low. *Id.* "In order to reach back to even earlier phony dates, the Form 4 filer must submit the form late. Therefore, a late-filed Form 4 is a red flag." *Id.* Late Form 4 filings are a tell tale, in fact, glaring, indicator of intentional backdating. *See In re Cirrus Logic, Inc.*, No. A-07-CA-212-55, 2008 U.S. Dist. LEXIS 71195 (W.D. Tex. Aug. 28, 2008) (allegations of discretionary stock option grants, substantially late filed Forms 4 and admissions, are enough to establish intentional backdating); *In re Finisar Corp.*, 542 F. Supp. 2d 980, 994 (N.D. Cal. 2008) (the delay in filing a Form 4 with the SEC reporting stock option grants may support an indication of backdating); *Winters v. Stemberg*, 529 F. Supp. 2d 237, 243 (D. Mass. 2008) (describing Forms 4 filings as a possible sign of stock option backdating).

In some instances, Jabil's executives did not file Forms 4 with the SEC for weeks or months after the purported grant date of stock options. *See, e.g.*, ¶112. On November 17, 1998, defendants Scott D. Brown ("Brown"), Wesley B. Edwards ("Edwards"), Lewis, Main, Mark T. Mondello ("Mondello"), Lawrence J. Murphy ("Murphy"), Robert L. Paver ("Paver"), and

Ronald J. Rapp ("Rapp") all received a stock option grant which was not reported to the SEC until almost a month later on December 10, 1998.  *Id.*  Other Forms 4 were even more egregiously late, and were filed with the SEC ***more than a year later***.  ¶115 (Paul Bittner's, Jabil's Vice President, stock option grant date of December 21, 2000 was not reported until almost a year later on October 5, 2001.).  On September 20, 2001, defendants Forbes I.J. Alexander, Morean, Murphy, Thomas A. Sansone ("Sansone"), Steven A. Raymund ("Raymund"), Main, Brown, Mondello, Edwards, Lavitt, Newman, Paver and Lewis all received stock options that were not reported to the SEC ***until a year later*** on October 15, 2002. ¶116.[14]

KPMG does not disagree, or contend, that these allegations are not sufficiently particularized.  Instead, KPMG states that late-filed Forms 4 do "not ***necessarily indicate***" backdating of stock option grants and therefore cannot support an inference of scienter.  KPMG Mem. at 32-33 (citing *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1156-57 (C.D. Cal. 2007)).  *Hansen*, however, is inapposite as that court analyzed the relevance of a Forms 4 "filed . . . within days" of the grant as required by SOX.  527 F. Supp. 2d at 1156.  Nowhere did the *Hansen* court state that Forms 4 filed a year after the grant date would not be relevant to scienter.  *See id.*

> ### 2.    KPMG Failed to Detect Clear Internal Control Weaknesses and Obvious Theft by a Key Accounting Executive Who Wrote Hundreds of Checks to Himself

KPMG's systemic failure to identify material weaknesses in the Company's internal controls is particularly alleged to have extended even beyond its failure to identify or address

---

[14]    On each of these occasions, plaintiffs allege a 20-day cumulative return and annualized returns which substantially outpaced returns for investors.  ¶¶110-116.

blatant violations of APB 25.  ¶¶293, 296-298.  The Company has admitted that its internal controls were inadequate and its Report on Internal Controls for 2005 was false and could not be relied on – ultimately restating the report.  ¶¶43-44, 225.  In addition to its failure to detect or report Jabil's obvious backdating and improper accounting for stock options, KPMG failed to detect other high level accounting fraud.  Jabil's Corporate Controller in the Repair and Warranty Unit had been writing checks to himself and other vendors, for personal use, for two years.  *See* ¶174 ("[M]ore than 10 percent of the company checks he wrote and used them to buy a Nissan 350Z convertible, install 350 feet of crown molding in his Hunter's Green home, and make $370,000 in payments to American Express . . . .  He even used a company check to pay his property tax bill.").

These irregularities were not uncovered by KPMG, but were reported by a whistleblower. *Id*.  KPMG again agrees that its so-called audits failed to detect and disclose the fraud, but asserts in a footnote that this dereliction is "unrelated."  KPMG Mem. at 26 n.15.  Not so. KPMG's failures here include violations of PCAOB AS No. 2.  Indeed, even after the embezzlement was discovered, Jabil did not demand accountability from its internal audit team or KPMG auditors.  Both remain on the payroll.  ¶¶174-175, 274.  *In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130 (M.D. Fla. 2005), is inapposite.  KPMG Mem. at 23 n.13.  In *Recoton*, the court found that a company's guilty plea to falsifying customs documents was unrelated to the alleged fraud.  358 F. Supp. 2d at 1148.  Here, the indicted Controller, Stewart, was in charge of the finances of one of the divisions (Repair and Warranty) which was admittedly responsible for the June 2006 earnings miss alleged in detail in the TAC.  ¶174. Confidential Witness ("CW") 7, a former Regional Controller with Jabil's Warranty and Repair

- 31 -

Division, on his/her first day of employment, learned that there was a lack of internal control in the organization which allowed his/her predecessor to embezzle millions of dollars. ¶¶59, 185. Jabil's 3Q06 earnings miss was driven in part by operational issues within the Company's electromechanical operations and with certain production and repair facilities in the America's region. ¶¶201, 203, 205, 222, 224; Exs. 60, 62, 64. These disclosures caused a stock price decline. ¶39. Thus, this auditing failure is indeed entirely related to the fraud alleged.

### 3. The Violation of Jabil's Own Internal Stock Option Plan Constitutes a Red Flag Supporting KPMG's Scienter

Plaintiffs' particularized allegations are substantially strengthened by the fact that, throughout the Class Period, Jabil admits that it violated its own internal accounting policies ("we apply APB 25") and its shareholder-approved stock option plans (requiring stock options to be issued at 100% of the fair market value). *E.g.*, ¶169; Order at 35; *MicroStrategy*, 115 F. Supp. 2d at 638; *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887 (N.D. Cal. Apr. 2, 2002). Jabil identified APB 25 as one of its "***significant accounting policies***" during and prior to the Class Period. ¶279. Towards the end of the Class Period, Jabil further emphasized the importance of compliance with APB 25, stating that its "results of operations could be adversely affected" if it was required to recognize stock-option expenses. ¶280. Jabil further stated that "the ability to grant options and other stock-based awards will be important to Jabil's future success by allowing it to remain competitive in attracting and retaining such key personnel." Ex. 17 at 8; *see also* ¶¶132, 151, 167, 346(b). Because of the significance of Jabil's stock option programs and its compliance with APB 25, KPMG's failure to identify routine violations of Jabil's significant internal accounting policy strongly support an inference of scienter. *MicroStrategy*, 115 F. Supp. 2d at 638.

- 32 -

Indeed, KPMG ignored enormous and basic failures of Jabil to comply with its internal accounting policies and APB 25. For example, on December 22, 2000, Jabil completed a re-pricing of grants to 1,510 non-executive Jabil employees, which had previously been granted on October 12, 2000. ¶¶229, 296. The relevant accounting guidance is clear that such a re-pricing must be accounted for using variable accounting, and thus Jabil would be required to take a charge for such re-pricing. ¶296. Pursuant to AU §326, KPMG was required to examine this transaction to ensure that it complied with APB 25. However, Jabil failed to apply variable accounting to this transaction and thus understated its compensation expenses by $13.2 million. Such a basic and fundamental failure to examine one of Jabil's largest stock option grants during a fiscal year cannot be the result of negligence, but rather supports an inference that with respect to stock option grants, KPMG's audit amounted to no audit at all.

### E.    Plaintiffs' Claims Against KPMG Are Timely

KPMG's primary contention in support of dismissal is that plaintiffs' claims against KPMG are untimely. KPMG Mem. at 9-10. In making these assertions, KPMG fundamentally misinterprets controlling Eleventh Circuit authority which is clear that statute of limitations questions are often "'inappropriate for resolution on a motion to dismiss,'" and that a plaintiff cannot be deemed to be on inquiry notice without "'the information needed to file suit.'" *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1283-84 (11th Cir. 2005); *Theoharous*, 256 F.3d at 1228. Further, KPMG ignores the repeated words of comfort from Jabil's management that falsely assured Jabil's shareholders that no fraud had occurred, and ignores its own unqualified audit opinion issued on July 10, 2006, which assured Jabil's shareholders of the adequacy of the Company's internal controls. Because defendants cannot meet their heavy burden to establish

- 33 -

that plaintiffs' claims were untimely, KPMG's statute of limitations contentions must be rejected.

### 1.      KPMG Misstates the Legal Standard in the Eleventh Circuit

KPMG states that plaintiffs' claims must be brought "within two years of the date they are first on 'inquiry notice' of possible claims against the defendant." KPMG Mem. at 9.  KPMG further contends that "[a]ctual knowledge of the fraud or its accounting ramifications is not required," but that merely the "'possibility of securities fraud'" is sufficient to trigger inquiry notice, and for the statute of limitations to begin to run.  *Id.* at 9-10.

KPMG's truncated analysis of Eleventh Circuit law fails to acknowledge that the district court must in fact examine two separate questions in order to determine when the statute of limitations begins to run:  "(1) What established inquiry notice to the plaintiff class, and when did that occur?  (2) When did the plaintiff class have sufficient information to file suit?"  *Tello*, 410 F.3d at 1294; *accord Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 960 (11th Cir. 2007).  The second step of the analysis, which is wholly ignored by KPMG, is critical because "a plaintiff is not deemed to have been on inquiry notice 'unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit.'"  *Spiegel v. Siegel*, No. 06-61848-CIV, 2008 U.S. Dist. LEXIS 3185, at *10 (S.D. Fla. Jan. 15, 2008) (quoting *Tello*, 410 F.3d at 1284); *Tello*, 410 F.3d at 1285 ("'Delaying the accrual of the one-year limitations period until this time does, however, ensure that plaintiffs are given the opportunity to adequately develop the facts and determine whether those facts merit bringing suit, thus giving meaning to the term inquiry.'") (quoting *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1202 (10th Cir. 1998)).  Thus, in securities fraud cases especially,

where the stringent pleading standards required by the PSLRA require plaintiffs to allege scienter with particularly, inquiry notice cannot begin until plaintiff can plead a claim.  *Spiegel*, 2008 U.S. Dist. LEXIS 3185, at *10; *see also Sterlin*, 154 F.3d at 1202.[15]  Of course, had KPMG acknowledged the correct legal standard, the entirety of its statute of limitations assertions would be undercut, because KPMG elsewhere continues to maintain that plaintiffs still cannot plead a claim for securities fraud against KPMG.

### 2.    Plaintiffs Were Not on Inquiry Notice Until After November 2006

Regardless of when plaintiffs were on inquiry notice with respect to Jabil, plaintiffs were not on inquiry notice with respect to KPMG until they had sufficient facts to state a claim with respect to KPMG.  As the Second Circuit recognized in *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 102-03 (2d Cir. 2003), inquiry notice for asserting a claim against a secondary actor (such as an underwriter or auditor) may occur years after inquiry notice with respect to the underlying primary Company.  "It makes little sense from a policy perspective to require specific factual

---

[15]      The majority of other courts agree.  *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 39, 401 (3d Cir. 2006) ("Undergirding the inquiry notice analysis is the assumption that a plaintiff either was or should have been able, in the exercise of reasonable diligence, to file an adequately pled securities fraud complaint as of an earlier date."); *Fujisawa Pharm. Co. v. Kappoor*, 115 F.3d 1332, 1335 (7th Cir. 1997) ("The facts constituting [inquiry] notice must be sufficiently probative of fraud – sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated – not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit."); *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 217-18 (3d Cir. 2007) ("'[t]he level of particularity in pleading required by the PSLRA is such that inquiry notice can be established only where the triggering data "relates directly to the misrepresentations and omissions alleged."'") (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005)); *In re DaimlerChrysler AG Sec. Litig.*, No. 00-993/00-984/01-004-JJF, 2003 U.S. Dist. LEXIS 10850, at *24 n.5 (D. Del. June 10, 2003) ("[i]n light of the stringent pleading requirements under the PSLRA, I am not persuaded that the statute of limitations starts to run before the plaintiffs have notice that the defendants acted with the requisite scienter in making the false misrepresentation in a Rule 10b-5 case."); *Law v. Medco Research, Inc.*, 113 F.3d 781, 785-86 (7th Cir. 1997) ("[T]he plaintiff gets [two years] after he learned or should have learned the facts that he must know to know that he has a claim. . . .  In a fraud case, he needs to know . . . that the defendant has made a representation that was ***knowingly*** false.") (emphasis in original).

allegations, . . . and then to punish the pleader for waiting until the appropriate factual information can be gathered by dismissing the complaint as time barred." *Id.* at 104.

With respect to KPMG, plaintiffs did not begin to be put on inquiry notice until November 2006, at the earliest. On November 14, 2006, after months of denial, Jabil, for the first time, disclosed it would restate its financial results for a single year, FY05, and that the 2005 Management Report on Internal Control over Financial Reporting should no longer be relied upon. ¶43. However, Jabil's November 2006 disclosure still made no mention of KPMG or its role in the backdating at Jabil. ¶¶43-44, 215-217. Nor did the November 2006 disclosure provide a single detail regarding the grant list documents (later disclosed in May 2007) indicating that KPMG may have failed to audit the Company's financial statements in accordance with GAAP and PCAOB standards. *See* ¶227; Ex. 80 (May 2007 disclosures). In fact, notwithstanding the November 2006 disclosure, Jabil also remained recalcitrant, announcing thereafter that its Special Committee had found "***no merit***" to backdating allegations made in certain derivative actions filed in the Florida State Court (neither of which made allegations against KPMG). ¶27. In any event, November 2006 was the first date a reasonable investor ***might*** (notwithstanding Company denials) understand the ***possibility*** of KPMG's material participation and involvement in Jabil's fraudulent stock option backdating scheme.

On December 8, 2006, Jabil both filed a Form 8-K with the SEC and issued a press release stating that it was "cooperating with the Special Review Committee, the SEC and the U.S. Attorney's Office" in a review of its historical stock option granting practices. ¶48; Ex. 72. Based on this review, Jabil concluded that it would need to restate its "2005 financial statements and related disclosures," and that it could merit an adjustment of Jabil's historical financial

statements **all the way back to 1996**.  *Id.*  Accordingly, this was the first date a reasonable investor might suspect the possibility of KPMG's material participation and involvement in Jabil's fraudulent stock option backdating scheme and as a result were possibly responsible for making false and misleading statements to the market.

Indeed, it was not until March 28, 2007, that Jabil filed a Form 8-K with the SEC and issued a press release reiterating that its historical financial statement should no longer be relied upon and admitting that misdated stock options would require a $54.3 million charge for a ten-year (FY96-FY05) corrected stock-related compensation expense which had not been recorded due to the misapplication of accounting guidance, administrative errors and undefined "other events."  ¶50.  Then, the May 15, 2007 Form 10-K contained critical facts supporting an inference of scienter against KPMG, including the fact that documentation was available which demonstrated the grant date for backdated stock options, but that KPMG had apparently not properly considered such documentation.  ¶229.

Because the essential facts necessary to state a claim with respect to KPMG could not have been discovered until Jabil's November 2006, December 2006, and March 2008 disclosures, plaintiffs claims are clearly not time-barred.

### 3. None of the Disclosures Cited by KPMG Could Have Put Plaintiffs on Inquiry Notice with Respect to KPMG

While KPMG discusses a litany of disclosures regarding the possibility of backdating at Jabil, KPMG does not seriously assert that such disclosures prior to May 2006 were adequate to state a claim against KPMG.

First, neither the April 26, 2006 nor the May 10, 2006 derivative complaints against Jabil's Board even mentions KPMG. KPMG Mem. at 17-18.[16] KPMG's assertion that claims in the derivative complaint were sufficient to put plaintiffs on notice of KPMG's culpable participation in the alleged fraud is unsupportable. KPMG's reliance on *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007), is entirely misplaced. In *Openwave*, the court took particular notice of the fact that a ***§11 Securities Act of 1933*** claim requires less pleading specificity and particularity than a §10(b) Exchange Act claim. *Id.* The *Openwave* court was solely concerned with the issue of inquiry notice in the context of a non-fraud related ***§11*** claim, which does not require allegations of scienter. *See id.* at 246. There, the court affixed inquiry notice on the date the three separate derivative lawsuits were filed against the defendant company. *Id. Shah v. Stanley*, No. 03 Civ. 8761(RJH), 2004 WL 2346716 (S.D.N.Y. Oct. 19, 2004), is also inapposite. In *Shah*, the allegations in the initial complaint and the subsequent complaint were "strikingly similar," and the facts in both the complaints were "alleged with equal detail." *Id.* at *10.

Neither of the derivative suits was based on the same theory as this case – indeed, neither derivative action brought federal securities fraud claims against Jabil, let alone KPMG. *See* Declaration of Kevin H. Metz, Exs. B, D (derivative complaints). Both 12-page complaints are boilerplate, far short on detail and particularity, and only accuse the Jabil directors and officers of breaching their fiduciary duties to Jabil. *Id.* Neither was subjected to the PSLRA heightened

---

[16] Defendants did not seek judicial notice of the derivative complaints and they are not relied upon by the allegations of the complaint and therefore cannot be considered. Otherwise, the Court must convert the motion to one for summary judgment and allow discovery.

pleading standards and neither alleged KPMG's failure to audit and account for Jabil's stock based compensation pursuant to AU §326. The third derivative action identified by KPMG, filed against Jabil in federal court alleging violations of §10(b) of the Exchange Act, was not filed until July 10, 2006, and is thus irrelevant.

Additionally, the TAC includes facts not contained or even referenced in either derivative action. Specifically, the facts regarding imputed admissions, the failure of KPMG to follow relevant GAAS and PCAOB standards, or references to the 2006 PCAOB Audit Report concerning KPMG's 2005 APB 25 testing deficiencies are all facts and allegations which were not available or discoverable to plaintiffs until the fall of 2006 at the earliest. ¶¶225-230, 259, 261-264, 266-300. As a result, the legal claims and factual allegations against KPMG are separate and distinct from the claims and allegations asserted by the derivative plaintiffs on April 26, 2006 and May 10, 2006, respectively. ¶¶332-360. Therefore, defendants' contentions concerning an inquiry notice date of May 3, 2006 are without merit or authority. KPMG Mem. at 14.

Similarly, the March 18, 2006 *Wall Street Journal* article, while identifying six "suspicious" stock option grants to Main between 1998 and 2001, makes no mention whatsoever of KPMG. And again, the May 3, 2006 Form 8-K, announcing that the SEC had begun an inquiry into Jabil's stock option backdating practices, made no mention of KPMG. Thus, there were clearly not enough facts to enable plaintiffs to stake a claim against KPMG as of May 3, 2006.

**4.    The Running of the Statute of Limitations Cannot Be Decided on a Motion to Dismiss, and Must Be Decided by the Trier of Fact**

Even if the evidence was not clear that plaintiffs' claims are timely, which, as established above, they are, dismissal would nonetheless be inappropriate because whether plaintiffs had sufficient facts to place them on inquiry notice of a claim for securities fraud "is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." *Cordova v. Lehman Bros., Inc.*, 526 F. Supp. 2d 1305, 1323-24 (S.D. Fla. 2007) (internal citation omitted);[17] *Tello*, 494 F.3d at 970 ("[D]etermination of inquiry notice is done on a case-by-case basis . . . ."); *see also Lentell*, 396 F.3d at 171.  Dismissal on a motion to dismiss is only warranted where "***uncontroverted*** evidence irrefutably demonstrates [that the] plaintiff discovered or should have discovered the fraudulent conduct" more than two years prior to the filing of their suit.  *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 194-95 (2d Cir. 2003) (citing *Nivram Corp. v. Hardcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 252 (S.D.N.Y. 1993)).  Here, however, where both Jabil and KPMG continued to falsely assert that nothing untoward had occurred for months after the May 2006 cut-off date, there is clearly, at best, a question of fact which cannot be decided on a motion to dismiss.

---

[17]    *See also Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 368-69 (7th Cir. 1997) (the trier of fact should determine when and under what circumstances such relations would be sufficiently adversarial to trigger the running the statute of limitations); *Vassilatos v. Cream Tech Int'l*, No. 92 Civ. 4574 (PKL), 1993 U.S. Dist. LEXIS 6620, at *14 (S.D.N.Y. May 19, 1993) ("After discovery is complete, the parties and the Court will be in a better position to ascertain the point of plaintiffs' discovery of the fraud for statute of limitations purposes."); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) (deferring consideration of the statute of limitations until complete factual record developed).

a.   **Jabil's False Denials of Wrongdoing and Words of Comfort Preclude a Finding of Inquiry Notice as a Matter of Law**

"[C]ourts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements." *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999). Jabil repeatedly and sternly denied that any backdating of stock options or any wrongdoing occurred at the Company. ¶¶32, 197, 221. Jabil's denials were in the strongest possible words. *See* ¶¶194-199, 221. Whether such reassuring statements justify reasonable reliance that apparent storm warnings have dissipated depends in large part on "how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial [the] 'reassuring' steps announced to avoid their recurrence [are]." *LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003).[18]

Here, Jabil's management denials continued throughout the Summer and into the Fall of 2006. ¶¶196-199. For example, on May 3, 2006, the Company told investors that "Jabil . . . [has] not backdated options for any of its officers or directors." *See* ¶31; Ex. 48 On May 4, 2006, Main stated he would be ***"shocked into another dimension"*** if the investigation found anything improper. ¶197, Ex. 49. Defendant Raymund said: "We've always done everything

---

[18]     Defendants' reliance on *LC Capital*, to suggest that management did not provide words of comfort is misplaced. In *LC Capital*, the "reassuring" statements by management were "mere expressions of hope" because, during the same period the statements were made, the company took "three substantial reserve charges were taken within four years, indicating the likelihood of either a fundamental defect in the company's reserve methodology or the company's refusal to face reality." *Id.* 155-56. Here, in contrast, management's reassurances in May 2006 were followed by third quarter financial statements and a subsequent announcement on September 26, 2006 implying that no determination had been made as to whether the investigation would result in any impact on the Company's financial statements, thus giving substantial support to management's assurances.

*exactly* according to procedure . . . any aspersions cast in our direction" were "unfounded and Jabil is being penalized for extraordinary results for their stockholders." ¶196; Ex. 51. On May 5, 2006, Main said: "I guess this is part of being a successful, big company. People want to take shots at you . . . . There was no backdating." ¶¶198-199. Main concluded that Jabil was simply the victim of a "***witch hunt***," which was being led by *The Wall Street Journal*. ¶198; Ex. 54.

Jabil's denials preclude KPMG from asserting a statute of limitations defense at this stage of the litigation as a matter of law. Management rejected out of hand that there was any backdating at the Company, much less any wrongdoing by KPMG. *LC Capital*, 318 F.3d at 155. In fact, Jabil remains defiant. Its motion to dismiss states "time and again, the Company denied that backdating occurred, and the investment community concurred that there was no evidence of such conduct." Defs' Mem. at 35-36;[19] *In re WorldCom Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 445 (S.D.N.Y. 2003) (inquiry notice was not triggered because defendants statements and conduct affirmatively denied the basis of plaintiffs' claims); *In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 518 (D. Del. 2003) ("[The defendants] assured [p]laintiffs and the public that the partly cloudy skies and mild winds were not the precursors of any storm. Rather, the clouds would surely break and the wind would surely die down, giving way to an overall calm and sunny day . . . . Given this forecast, I cannot fault [p]laintiffs for being caught without their umbrellas.").

---

[19]    "Defs' Mem." refers to Jabil Defendants' Motion to Dismiss Plaintiffs' Third Amended Class Action Complaint.

**b.      KPMG's July 2006 Unqualified Audit Opinion
Precludes a Finding of Inquiry Notice as a Matter of
Law**

Even if Jabil's management had not repeatedly falsely assured shareholders that no

disconduct had occurred, KPMG itself continued to certify Jabil's financial statements and

internal controls.  On July 10, 2006, the Company filed its Form 10-Q for the period ending

May 31, 2006.  Williams Decl., Ex. B.  The Form 10-Q reiterated that KPMG had issued an

unqualified opinion regarding the Company's fiscal 2005 report on internal controls:

> In addition, the independent registered public accounting firm auditing
> the company's financial statements must attest to, and report on, management's
> assessment of the effectiveness of the company's internal control over financial
> reporting.  ***The independent registered public accounting firm KPMG LLP
> issued an unqualified opinion on the adequacy of our internal control over
> financial reporting as of August 31, 2005***. . . .  [I]f our independent auditors are
> not satisfied with our internal control over financial reporting or with the level at
> which it is documented, operated or reviewed, they may decline to attest to
> management's assessment or issue a qualified report.

Williams Decl., Ex. B.  Thus, as late as July 10, 2006, KPMG continued to stand behind Jabil's

false 2005 internal controls which, as was later revealed, were wholly inadequate to prevent the

massive and systematic backdating of stock options and falsification of financial statements.

KPMG's unqualified opinion in the Company's July 10, 2006 Form 10-Q constitutes specific

words of comfort with respect to KPMG, which prohibits the Court from finding as a matter of

law that plaintiffs' claims are untimely.  *See Milman*, 72 F. Supp. 2d at 229.

- 43 -

## III.    CONCLUSION

Based on the foregoing reasons, plaintiffs respectfully request that the Court deny KPMG's motion to dismiss.  If the Court grants KPMG's motion in any respect, plaintiffs respectfully request leave to amend.

DATED:  October 6, 2008                    Respectfully submitted,

                                           COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           SHAWN A. WILLIAMS
                                           CHRISTOPHER M. WOOD


                                           _____
                                                   s/ Shawn A. Williams
                                                 SHAWN A. WILLIAMS

                                           100 Pine Street, Suite 2600
                                           San Francisco, CA  94111
                                           Telephone:  415/288-4545
                                           415/288-4534 (fax)

                                           COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           PAUL J. GELLER
                                           Florida Bar No. 984795
                                           DAVID J. GEORGE
                                           Florida Bar No. 0898570
                                           120 East Palmetto Park Road, Suite 500
                                           Boca Raton, FL  33432
                                           Telephone:  561/750-3000
                                           561/750-3364 (fax)

                                           Lead Counsel for Plaintiffs

S:\CasesSD\Jabil Circuit\OMD00053747 KPMG.doc

- 44 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 6, 2008.

s/ Shawn A. Williams
SHAWN A. WILLIAMS

COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:swilliams@csgrr.com

# Mailing Information for a Case 8:06-cv-01716-SDM-EAJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jonathan L Alpert**
  JONALPERT@AOL.COM

- **Patrick B. Calcutt**
  calcuttlaw@tampabay.rr.com,calcuttadoptgena@tampabay.rr.com

- **Michael L. Chapman**
  michael.chapman@hklaw.com,kristen.labbate@hklaw.com

- **William K. Dodds**
  william.dodds@dechert.com

- **Donald J. Enright**
  denright@finkelsteinthompson.com

- **Paul J. Geller**
  pgeller@csgrr.com,e_file_fl@csgrr.com

- **David J. George**
  dgeorge@csgrr.com,e_file_fl@csgrr.com

- **William E. Hoese**
  whoese@kohnswift.com

- **Brian L. Josias**
  bjosias@hwhlaw.com,dalani@hwhlaw.com

- **David Thomas Knight**
  dknight@hwhlaw.com,lcampbell@hwhlaw.com

- **Matthew J. Lang**
  matthew.lang@dechert.com,bryan.block@dechert.com,luis.lopez@dechert.com

- **Theodore J. Leopold**
  tleopold@leopoldkuvin.com,lcuomo@leopoldkuvin.com

- **Myles H. Malman**
  myles@malman.com

- **Kevin H. Metz**
  kevin.metz@lw.com

- **Tracy A. Nichols**
  tracy.nichols@hklaw.com,brenda.scott@hklaw.com

- **Michele E. Rose**
  michele.rose@lw.com

- **Jonathan H. Rosenthal**
  jrosenthal@bellsouth.net

- **Denis F. Sheils**
  dsheils@kohnswift.com

- **Steamship Trade Association/International etc Pension Fund**
  Jonalpert@aol.com

- **Shawn A. Williams**
  shawnw@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com

- **Christopher M. Wood**
  cwood@csgrr.com,gdarwish@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Joseph C. Kohn
Kohn, Swift & Graf, P.C.
1 S. Broad St., Suite 2100
Philadelphia, PA 19107

Andrei V. Rado
Labation Sucharow & Rudoff LLP
100 Park Ave.
New York, NY 10017
```