UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EDWARD J. GOODMAN LIFE INCOME TRUST,
on behalf of itself and others similarly situated,

     Plaintiffs,

v.                                  CASE NO: 8:06-cv-01716-T-23EAJ

JABIL CIRCUIT, INC., et al.,

     Defendants.

_____/

## ORDER

The plaintiffs assert claims against Jabil Circuit, Inc., ("Jabil"), KPMG, LLP,

("KPMG") and sixteen individual defendants (collectively, the "defendants") pursuant to

Sections 10(b), 14(a), 20(a), and 20A of the Securities Exchange Act of 1934 (the

"Exchange Act"), and Securities and Exchange Commission ("SEC") Rules 10b-5 and

14a-9. An April 9, 2008, order (Doc. 95) dismisses the amended complaint with leave to

amend. On July 23, 2008, the plaintiffs amended the complaint (Doc. 114). The

defendants move (Docs. 117, 121) to dismiss the third amended complaint (the

"complaint") for failure to state a claim pursuant to Rule 12(b)(6), Federal Rules of Civil

Procedure, and failure to satisfy the pleading requirements of Rule 9(b), Federal Rules

of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

The plaintiffs respond (Docs. 124, 127) in opposition, and the defendants reply

(Docs. 128, 129). With leave of court, the plaintiffs file a sur-reply (Doc. 132) in

opposition to the Jabil defendants' motion to dismiss.

**FACTUAL BACKGROUND**

The complaint contains the following factual allegations, assumed true for the sole purpose of deciding a motion under Rule 12(b)(6).[1]

I. The Parties

A. The Plaintiffs

Appointed the lead plaintiffs in a January 18, 2007, order (Doc. 57), Laborers Pension Trust Fund for Northern California ("Laborers") and Pension Trust Fund for Operating Engineers ("Pension") sue on behalf of themselves and a putative class of other persons and entities (collectively the "plaintiffs") who purchased Jabil publicly traded securities from September 19, 2001, through December 21, 2006, (the "class period"). (Doc. 114, ¶ 1, 62) The plaintiffs allegedly suffered financial loss as a result of the defendants' Exchange Act violations.

B. The Defendants

A Delaware corporation headquartered in St. Petersburg, Florida, Jabil provides "design, production and product management services" to electronics and technology companies. (Doc. 114, ¶ 63). Each individual defendant held a directorship or officership at Jabil for all or part of the class period. (Doc. 114, ¶ 1) Timothy L. Main ("Main") served as the company's chief executive officer and president and as a

---

[1] Despite spanning fifty additional pages, the third amended complaint re-alleges (without improvement) the same factual allegations as the first complaint. Accordingly, to avoid incorporating by reference large sections of the April 9, 2008, order dismissing the first amended complaint, this order repeats large sections of the earlier order.

director.  (Doc. 114, ¶ 66)  Forbes I.J. Alexander ("Alexander") served as treasurer from November, 1996, through August, 2004, and was promoted to chief financial officer in September, 2004.  (Doc. 114, ¶ 75)  Mark T. Mondello ("Mondello") was appointed chief operating officer in 2002.  (Doc. 114, ¶ 67)  Ronald J. Rapp ("Rapp") served as chief operating officer from 2000 through 2002.  (Doc. 114, ¶ 77)  Chris A. Lewis ("Lewis") acted as chief financial officer from August, 1999, through September, 2004.  (Doc. 114, ¶ 76)  Scott D. Brown ("Brown") was appointed executive vice-president in November, 2002.  (Doc. 114, ¶ 68)  Wesley B. Edwards ("Edwards") served as a senior vice-president (Doc. 114, ¶ 78), and Robert L. Paver ("Paver") as general counsel.  (Doc. 114, ¶ 79)  William D. Morean ("Morean") served as chairman of the board of directors.  (Doc. 114, ¶ 64).  The other directors include Laurence S. Grafstein ("Grafstein") (beginning in April, 2002), Mel S. Lavitt ("Lavitt"), Lawrence J. Murphy ("Murphy"), Frank A. Newman ("Newman"), Steven A. Raymund ("Raymund"), Thomas A. Sansone ("Sansone"), and Kathleen A. Walters ("Walters") (beginning in July, 2005).  (Doc. 114, ¶¶ 65, 69-74)  Finally, the plaintiffs sue KPMG, who has audited Jabil's financial statements since 1984. (Doc. 114, ¶ 80)

II. Stock Option Plan

During the class period and as part of its compensation program, Jabil granted stock options to its directors, officers, and employees.  (Doc. 114, ¶ 13, 132)  Jabil was required to issue the options in accord with the company's 1992 Stock Option Plan and 2002 Stock Incentive Plan (collectively the "1992 and 2002 Plans").  (Doc. 114, ¶ 133)

A stock option grants the recipient an option to purchase shares at a specified price, called the "exercise price." (Doc. 114, ex. 37)  The 1992 and 2002 Plans require the exercise price "to be at least equal to the fair market value[2] of shares of common stock on the date of the grant." (Doc. 114, ¶¶ 122, 140)  Thus, when exercising an option, the recipient purchases shares at the market price on the day of the grant, rather than the price on the day of purchase. (Doc. 114, ex. 37)

The plaintiffs allege that the defendants violated the 1992 and 2002 Plans by approving "backdated" stock option grants to directors and officers during the class period. (Doc. 114, ¶ 4)  "'Backdating' is a practice whereby a public company issues options on a particular date while falsely reporting that the options were issued on an earlier date when the company's stock was trading at a lower price." (Doc. 114, ¶ 5)  The exercise price of a backdated option is lower than the fair market value of a common share on the day of the grant, resulting in an "instant paper gain." (Doc. 114, ¶¶ 6-7)

Although not unlawful per se, backdating requires attention to Generally Accepted Accounting Principles ("GAAP").  Accounting Principles Board Opinion No. 25 ("APB 25"),[3] entitled "Accounting for Stock Issued to Employees," requires the recording of the

---

[2] The 2002 Plan defines fair market value as "the closing sales price for such stock (or the closing bid, if no sales were reported)." (Doc. 114, ¶ 130 n.21)

[3] Statement of Financial Accounting Standards No. 123 ("SFAS 123") has superseded APB 25. (Doc. 114, ¶ 212 n.30)  Under SFAS 123, a corporation accounting for a stock option grant is required to use the fair market value method rather than the intrinsic value method. (Doc. 114, ¶ 212 n.30)  The fair market value method requires a corporation to expense an employee stock option when granted. (Doc. 114, ¶ 212 n.30)

"intrinsic value" of a fixed stock option on the "measurement date."[4]  (Doc. 114, ¶ 212)

 A backdated option has intrinsic value on the measurement date, and the difference

between the option's "exercise price and the quoted market price must be recorded as

compensation expense to be recognized over the vesting period of the option."

(Doc. 114, ¶ 238)  A stock option that is not backdated has no intrinsic value on the

measurement date and creates neither contemporaneous employee compensation nor

a requirement to recognize and report compensation expense.  (Doc. 114, ¶ 238)  In

documents filed during the class period, Jabil reported that "[t]he Company applies APB

Opinion No. 25 in accounting for its stock options, and accordingly, no compensation

cost has been recognized for its stock options in the consolidated financial statements."

(Doc. 114, ¶¶ 10, 122, 141)


### III. Article and Aftermath

On March 18, 2006, The Wall Street Journal published an article, "The Perfect

Payday – Some CEOs reap millions by landing stock options when they are most

valuable; Luck – or something else?"  (Doc. 114, ¶ 20)  The article questions the timing

of options granted to executives of several technology companies.  (Doc. 114, ex. 38)

The article identifies six stock option grants to Jabil's chief executive officer, Main, at

"suspicious" times between 1998 and 2001.  (Doc. 114, ¶ 20)  A statistical analysis

---

[4] "The measurement date for determining compensation cost in stock option, purchase, and award plans is the first date on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase prices, if any.  That date for many or most plans is the date an option or purchase right is granted or stock is awarded to an individual employee."  In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1168 n.7 (S.D. Fla. 2004).

performed by the newspaper calculates the supposed probability of Main's six grants occurring randomly as "one in one million." (Doc. 114, ¶ 20) In the days and weeks following publication, Main and other Jabil executives denied that Jabil had engaged in backdating. (Doc. 114, ¶¶ 194-99)

Allegedly "diverting investors' focus from backdating allegations," Jabil issued on March 22, 2006, a press release announcing favorable financial results for the second quarter of fiscal year 2006, as well as an improved forecast for both the third quarter and the fiscal year. (Doc. 114, ¶¶ 22, 176) Main attributed Jabil's success to "burning on fire demand." (Doc. 114, ¶ 22) In response to the positive news, Jabil's shares reached the class period high of $43.31 per share on March 27, 2007. (Doc. 114, ¶ 303) However, as backdating concerns rose, Jabil's share price "began to decline precipitously" between April 6 and May 1, 2006. (Doc. 114, ¶¶ 187, 304) Notwithstanding the decline, in April and early May, 2006, analysts at several prominent institutions expressed confidence in Jabil. (Doc. 114, ¶¶ 188-91)

On May 3, 2006, Jabil disclosed that the SEC had initiated an informal inquiry into Jabil's stock option practice.[5] (Doc. 73, ¶¶ 192, 305) Jabil also disclosed that

---

[5] In a November 24, 2008, Form 8-K (Doc. 134-2), Jabil publicly announces receipt of a letter from the SEC Division of Enforcement stating that the Division has completed the investigation of Jabil's stock option grants and recommending no further SEC action. Objecting to consideration of the letter, the plaintiffs state (Doc. 135) that Jabil's notice "improperly tries to suggest to this Court that the SEC's decision not to recommend an enforcement action against Jabil somehow supports the Jabil Defendants' Motion to Dismiss." (Doc. 135 at 1) To the extent the plaintiffs' "Response to Jabil Defendants' November 26, 2008, Notice of Recent Filing" seeks affirmative relief, the relief is **DENIED**. Although the SEC's declining an enforcement action is inconsequential to this action, the plaintiffs' about-face on this issue is telling. Throughout the complaint, the plaintiffs attempt to taint Jabil by allegations of law enforcement inquiry into Jabil's stock option grants. (Doc. 114, ¶¶ 31, 33, 41, 192, 195, 198, 199, 204, 208, 213, 305) The plaintiffs' vehement objection to removal of this taint confirms the irrelevant and impertinent nature of the plaintiffs' original allegations and reveals an unbecoming excess of pleading zeal.

shareholders had initiated a derivative action in state court against Jabil executives and directors who allegedly had breached their fiduciary duty to Jabil in connection with the stock option grants. (Doc. 114, ¶ 192) Jabil's board of directors formed a Special Review Committee to review the allegations. (Doc. 114, ¶ 192) The next day at the company's headquarters, Jabil hosted an analyst day during which Main rejected the backdating allegations and called The Wall Street Journal's article a "witch hunt." (Doc. 114, ¶¶ 197) Main's statements failed to halt the decline of Jabil's share price. Between May 3 and 10, 2008, Jabil shares fell from $40.78 to $38.21 per share. (Doc. 114, ¶ 193)

On June 12, 2006, Jabil announced a failure to meet the earnings forecast for the third quarter of fiscal year 2006. (Doc. 114, ¶ 201) During a conference call with analysts and investors, Main attributed the shortfall to (1) mechanical tooling operation loss, (2) failure to fulfill contracts, and (3) higher cost in the warranty and repair division. (Doc. 114, ¶ 202) On June 21, 2006, the United States Attorney for the Southern District of New York issued Jabil a subpoena that requested material concerning stock options. (Doc. 114, ¶ 208)

IV. Jabil Restates Earnings

After completion of an internal review, Jabil concluded on November 7, 2006, that its 2005 financial statement and disclosure "should no longer be relied upon" and that Jabil "will need to restate" the information. (Doc. 114, ¶ 215) Jabil stated that "[t]he issues under review principally reflect changes in the Company's understanding of the

requirements for identifying appropriate measurement dates for option grants as defined in relevant accounting guidance or errors in interpreting such guidance, and administrative and logistical errors made in effecting the options program." (Doc. 114, ¶ 215) On December 8, 2006, Jabil announced the Special Review Committee's conclusion that "there is no merit to the allegations in the State Court derivative complaints that Jabil's officers issued themselves backdated stock options or attempted to cause others to issue them." (Doc. 114, ¶ 217) On March 21, 2007, Jabil stated that the 2003 financial statement and disclosure "should not be relied upon." (Doc. 114, ¶ 225)

On March 28, 2007, after the plaintiffs instituted the present action, Jabil announced in a Form 8-K that Jabil "will record approximately $54.3 million of aggregate incremental non-cash stock-related compensation charges for the fiscal years 1996 through August 31, 2005." (Doc. 114, ¶ 225) Jabil attributed the restatement to three categories of accounting error. (Doc. 114, ¶ 229) First, Jabil incorrectly identified the measurement date for some grants. Jabil typically identified the grant date of options as "the date that the Compensation Committee (or some other decision-maker, as permitted) met or otherwise acted to grant options." (Doc. 114, ¶ 78). However, some of the grants were not final—within the meaning of APB 25—because Jabil retained some discretion concerning the amount or recipient of the option. Jabil identified four situations in which this type of error occurred:

> (i) situations in which there were grants to groups of individuals, but subsequent changes to the grants to some members of those groups, with the continued use of the initial measurement date; (ii) situations in which there was a final grant to certain individuals and a subsequent grant to

> other individuals, with the use of the same measurement date as the initial grant; (iii) situations in which there was a final grant to individuals and a subsequent decision to grant additional options to some of the same individuals, with the use of the same measurement date as the initial grant; and (iv) a situation in which grants to certain officers and a small group of highly-valued non-officers were believed to be final when, in fact, they were subject to further discretionary adjustments, yet [Jabil] continued to use the originally identified grant date for purposes of establishing the measurement date.

(Doc. 114, ¶ 229)   These errors occurred in grants to a large number of non-executive employees.  Thus, a change to "the measurement date of a few employees could cause the measurement date for a large number of employees to change." (Doc. 114, ¶ 229) These errors caused Jabil to increase compensation expense by $37.3 million through fiscal year 2005.

Jabil's second category of accounting error stems from a grant in fiscal year 2000. On October 12, 2000, Jabil decided to grant options to 1,510 non-executive employees. Afterward the price of Jabil's shares decreased.  "Rather than issue 'underwater' options, [Jabil] decided on December 22, 2000, to issue new grants." (Doc. 114, ¶ 229) Because the grants issued at fair market value on December 22, 2000, Jabil recognized no compensation expense.  However, APB 25 requires Jabil to account the transaction as a re-pricing of the October 12, 2000, grant.  This error required Jabil to increase stock-based compensation expense by $13.2 million.  Although Jabil also issued options to several officers on October 12, 2000, no officer enjoyed a re-pricing of the options granted on this date.  (Doc. 114, ¶ 229)

Third, Jabil improperly accounted stock option grants to a non-employee director who provided consulting services. As a result, Jabil increased stock-based compensation expense by $3.7 million.

Of the $54.3 million restatement for the eleven-year period, $48.9 million results from increased compensation expense to non-executive employees, $1.7 million results from misdated options to executive officers, and $3.7 million relates to consultation by a single director. The following table lists the stock-based compensation expense included in the restated financial statements and the effect of the restatement on reporting earnings (net of tax benefits).[6]

**Table 1: Effect of Restatement on Reporting Earnings**
**(dollar values in thousands)**

| Year | Reported Earnings (Original) | Restated Stock-Based Compensation Income (Expense) | Restated Stock-Based Compensation Income (Expense) (net of tax) | Reported Earnings (Restated) | Percentage Overstated (Understated) |
|---|---|---|---|---|---|
| 2005 | $231,847 | $(35,404) | $(27,972) | $203,875 | 13.7% |
| 2004 | $166,900 | 5,756 | $6,830 | $173,730 | (3.9%) |
| 2003 | $43,007 | $(16,150) | $(14,437) | $28,570 | 50.5% |
| 2002 | $34,715 | $(643) | $26 | $34,741 | (0.1%) |
| 2001 | $118,517 | $(2,454) | $(2,195) | $116,322 | 1.9% |
| 2000 | $145,648 | $(3,753) | $(2,351) | $143,297 | 1.6% |
| 1999 | $84,819 | $(1,187) | $(747) | $84,072 | 0.9% |
| 1998 | $57,469 | $(245) | $(159) | $57,310 | 0.3% |
| 1997 | $59,313 | $(123) | $(84) | $59,229 | 0.1% |
| 1996 | $30,383 | $(63) | $(34) | $30,349 | 0.1% |
| | | | | | |
| Total | $972,618 | (54,266) | $(41,123) | $931,495 | 4.4% |

---

[6] "In certain jurisdictions, including, but not limited to, the United States and the United Kingdom, [Jabil] is able to claim a tax deduction relative to stock options." (Doc. 114, ex. 78)

IV. Dismissal of the Amended Complaint

An April 9, 2008, order (Doc. 95) dismisses each of the plaintiffs' claims under Section 10(b) because the plaintiffs fail to plead backdating with particularity and because the amended complaint fails to create a strong inference that any defendant acted with scienter. (Doc. 95 at 8-37). The order also finds that the PSLRA's "safe harbor" protects the defendants' forward-looking statements concerning Jabil's third quarter performance. (Doc. 95 at 20-22) By failing to adequately plead backdating, the amended complaint also fails to plead loss causation. Because the amended complaint fails to plead a violation of Section 10(b), the April 9, 2008, order dismisses the remaining claims under Sections 14(a), 20A, and 20(a). With leave of court, the plaintiffs amended the complaint on July 23, 2008.

The third amended complaint (Doc. 114) adds forty-eight pages of new allegations. The complaint adds insider-trading claims against the individual defendants and asserts Section 10(b) claims against Jabil's auditor, KPMG. However, the third amended complaint fails to rectify the many pleading deficiencies identified in the April 9, 2008, order.

**MOTION TO DISMISS STANDARD**

During resolution of a motion to dismiss, allegations in the complaint are accepted as true and construed favorably to the plaintiff. Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1282 (11th Cir. 2007). The allegations "must 'possess enough heft' to set forth 'a plausible entitlement to relief.'" Fin. Sec. Assur., 500 F.3d at 1282 (quoting

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1966-67 (2007)).  The pendency of a

securities fraud case permits judicial notice of a required public filing with the SEC, but

only to determine the content of the document.  Bryant v. Avado Brands, Inc., 187 F.3d

1271, 1278 (11th Cir. 1999).


## DISCUSSION

The complaint asserts five claims for relief.  First, the plaintiffs allege that each

defendant issued false statements and employed a scheme to defraud investors in

violation of Section 10(b) and Rule 10b-5.  Second, the plaintiffs allege that the

defendants Alexander, Brown, Edwards, Main, Morean, Lewis, Murphy, Raymund, and

Sansone violated Section 10(b) and Rule 10b-5 by selling Jabil securities without

disclosing material confidential information concerning Jabil's financial condition.  Third,

the plaintiffs allege that defendants Grafstein, Lavitt, Lewis, Main, Morean, Murphy,

Newman, Raymund, Sansone, and Walters violated Section 14(a) and Rule 14a-9 by

signing a proxy statement containing a false or misleading statement of material fact.

Fourth, the plaintiffs allege that the "insider selling defendants" violated Section 20A by

violating Section 10(b) and selling Jabil securities contemporaneously with the plaintiffs'

buying Jabil securities.  Finally, the plaintiffs allege that each defendant except KPMG

violated Section 20(a) by acting as a "control person" who supervised the other

securities violations alleged.

I. False and Misleading Statements by the Jabil Defendants
in Violation of Section 10(b) and Rule 10b-5

Section 10(b), 15 U.S.C. § 78j(b), proscribes the "use or employ[ment], in connection with the purchase or sale of a security . . ., [of] any manipulative or deceptive device or contrivance in contravention" of SEC rules.  Promulgated under Section 10(b), SEC Rule 10b-5 prohibits any person's using an instrumentality of interstate commerce:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim under Section 10(b) or Rule 10b-5, a plaintiff must allege "(1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiff's loss." Theoharous v. Fong, 256 F.3d 1219, 1224 (11th Cir. 2001).  A plaintiff must also satisfy the pleading requirements of Rule 9(b), Federal Rules of Civil Procedure, and the PSLRA.

To satisfy Rule 9(b)'s particularity requirement for fraud, a plaintiff must set forth "(1) precisely what documents or oral representations were made, . . . (2) the time and place of each such statement and [where possible] the person responsible for making (or, in the case of omissions, not making) same, . . . (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." In re Recoton Corp. Sec. Litig., 358 F. Supp. 2d 1130,

1138 (M.D. Fla. 2005) (quoting <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001).

To satisfy the PSLRA, a plaintiff must "'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 127 S. Ct. 2499, 2508 (2007) (<u>quoting</u> 15 U.S.C. § 78u-4(b)(1)).  "[W]here the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers."  <u>Phillips v. Scientific-Atlanta, Inc.</u>, 374 F.3d 1015, 1019 (11th Cir. 2004); <u>see also</u> <u>In re AFC Enters., Inc., Sec. Litig.</u>, 348 F. Supp. 2d 1363, 1370 (N.D. Ga. 2004).  "A sufficient level of factual support for a [Section 10(b)] claim may be found where the circumstances of the fraud are [pleaded] in detail.  This means the who, what, when, where, and how: the first paragraph of any newspaper story."  <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks omitted).  "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  <u>Garfield</u>, 466 F.3d at 1262 (quoting 15 U.S.C. § 78u-4(b)(1)).

## A. Fraud

Like the previous iterations, the third amended complaint alleges that the defendants violated the Exchange Act by knowingly, falsely, and misleadingly stating Jabil's stock option practice, accounting practice, and earnings forecast. (Doc. 114 at 61-121) The complaint alleges that KPMG violated the Exchange Act by falsely certifying that KPMG audited Jabil's financial statements in conformity with Generally Accepted Auditing Standards ("GAAS"). (Doc. 114, ¶¶ 141, 150, 260-65) The April 9, 2008, order dismisses the amended complaint because the plaintiffs pleaded neither fraud nor scienter with particularity. (Doc. 95 at 11-37) Although the order finds insufficient facts to show fraud and scienter, the plaintiffs' newest complaint adds no new relevant detail. Instead, the complaint relies on the specious argument that Jabil's financial restatement constitutes an admission of fraud.

### 1. Stock Option Practice

The complaint alleges that during the class period the defendants stated that "[t]he exercise price of all incentive stock options granted under the plans is to be at least equal to the fair market value of shares of common stock on the date of the grant" (the "policy representation"). (Doc. 114, ¶ 10) The plaintiffs allege that the policy representation is false and misleading because the defendants priced stock options lower than the fair market value of common shares on the day of the grant. (Doc. 114, ¶ 124) The complaint contains the following specific allegations concerning the timing of the representation, the individual defendants who approved the representation, and the reasons the representation is false and misleading.

On November 28, 2001, Jabil included the policy representation in the fiscal year 2001, Form 10-K, signed by Lavitt, Lewis, Main, Morean, Murphy, Newman, Raymund, and Sansone.  (Doc. 114, ¶¶ 121, 122)  However, Alexander, Brown, Edwards, Lavitt, Lewis, Main, Mondello, Morean, Murphy, Newman, Paver,  Raymund, and Rapp received stock options dated October 12, 2000, at $42.75 per share, "the second lowest trading price of the month."  (Doc. 73, ¶ 100)

On November 25, 2002, Jabil included the policy representation in the fiscal year 2002, Form 10-K, signed by Grafstein, Lavitt, Lewis, Main, Morean, Murphy, Newman, and Raymund.  (Doc. 114, ¶¶ 129, 130)  However, Alexander, Murphy, Morean, Sansone, Raymund, Main, Rapp, Brown, Mondello, Lavitt, Newman, Paver, and Lewis received stock options dated September 20, 2001, "the second lowest closing price of the month and the year."  (Doc. 114, ¶ 116)

On November 12, 2003, Jabil included the policy representation in the fiscal year 2003, Form 10-K, signed by Grafstein, Lavitt, Lewis, Main, Morean, Murphy, Newman, Raymund, and Sansone.  (Doc. 114, ¶ 139, 140)  Pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), the 2003 Form 10-K also contains certifications[7] by Main and Lewis containing the policy representation.  (Doc. 114, ¶ 140)  However, Alexander, Brown, Edwards, Grafstein, Lavitt, Lewis, Main,  Mondello, Morean, Murphy, Newman, Paver, Raymund, and Sansone received stock options dated October 17, 2002, at $12.95 per share, "the seventh lowest closing price of the year."  (Doc. 114, ¶ 126)

_____

[7] See Public Company Accounting and Investor Protection Act of 2002 ("Sarbanes Oxley Act of 2002"), Pub. L. No. 107-204, § 302, 116 Stat. 777 (codified in part at 15 U.S.C. § 7241(a)) (requiring the principal officers of a public company to certify quarterly and annual reports).

On November 5, 2004, Jabil included the policy representation in the fiscal year 2004, Form 10-K, signed by Alexander, Grafstein, Lavitt, Main, Morean, Murphy, Newman, Raymund, and Sansone. (Doc. 114, ¶¶ 146, 149) The 2004 Form 10-K also contained Sarbanes-Oxley certifications by Main and Alexander containing the policy representation. (Doc. 114, ¶ 148) However, Grafstein, Murphy, Newman, Sansone, Main, Mondello, Lewis, Brown, Alexander, Edwards, Lavitt, Morean, Paver, and Raymund received stock options dated October 2, 2003, at $26.14 per share, "the lowest closing price of the month and the second lowest trading price for the remainder of the calendar year." (Doc. 114, ¶ 135) Additionally, Grafstein, Murphy, Newman, Sansone, Main, Mondello, Lewis, Brown, Alexander, Edwards, Lavitt, Morean, Paver and Raymund received stock options dated December 16, 2003, at $26.75 per share, "the sixth lowest trading price of the month." (Doc. 114, ¶ 137)

On October 28, 2005, Jabil included the policy representation in the fiscal year 2005, Form 10-K, signed by Alexander, Grafstein, Lavitt, Main, Morean, Murphy, Newman, Raymund, Sansone, and Walters. (Doc. 114, ¶ 162,163) The complaint includes no allegation of the specific dates of suspiciously timed stock option grants in 2005. However, Alexander, Brown, Edwards, Grafstein, Lavitt, Main, Mondello, Morean, Murphy, Newman, Paver, Raymund, and Sansone received stock options dated October 20, 2004, at $24.02 per share. (Doc. 114, ¶ 144) Twenty days later, the share price rose to $25.09. (Doc. 114, ¶ 144)

The plaintiffs rely on the statement of one confidential witness ("CW"), CW5, to support their claim that Jabil backdated the "suspiciously timed" stock options. CW5

served as a treasury analyst in the St. Petersburg office from March, 1999, through August, 2005, and "was responsible for the administration of stock options, as well as cash management." (Doc. 114, ¶ 59)  CW5 "was also responsible for entering details of grant 'letters' that Kathryn Vetter[8] . . . forwarded to CW5 from Jabil's Legal Department regarding the granting and issuance of options into the Equity Edge information system."[9]  (Doc. 114, ¶ 59)  "CW5 was also responsible for handling the exercising and cancellation of options on behalf of the options recipients."  (Doc. 114, ¶ 59)  In 2001, numerous Jabil officers received stock options.  (Doc. 73, ¶ 105(a))  Following the events on September 11, 2001, the price of Jabil's shares declined below the exercise price of the options.  (Doc. 114, ¶ 118(a))  CW5 reports that Jabil issued the officers new stock options "in the same exact amounts as the options they received earlier in the year, but at a new, lower strike price."  (Doc. 114, ¶ 118(b))  CW5 states that Vetter informed CW5 that "these new options were a replacement for the options that the officers received earlier in 2001 because those options were now 'underwater.'" (Doc. 114, ¶ 118(b))  Although the grant date of the replacement options was September 21, 2001, the documentation for recording the options was provided to CW5 several months after September 2001 and possibly as late as March 2002.  (Doc. 114, ¶ 118(c))

The PSLRA imposes no requirement that a plaintiff name a confidential witness. Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir. 2000); In re PSS World Med., Inc. Sec.

---

[8] Vetter served as Paver's executive assistant.  (Doc. 114, ¶ 59)

[9] Equity Edge is a commercially available software program for administering an employee stock option plan.

Litig., 250 F. Supp. 2d 1335, 1350 (M.D. Fla. 2002). However, "the weight afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1240 (11th Cir. 2008). The PSLRA requires a plaintiff to describe "the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." Mizzaro, 544 F.3d at 1240; see also Novak, 216 F.3d at 313-14; In re PSS World Med., 250 F. Supp. 2d at 1350.

The defendants argue that the plaintiffs (1) fail to allege "that any specific grant of stock to any specific defendant was backdated"; (2) fail to allege "when, how, and by whom each (or, for that matter, any) option grant was backdated"; (3) fail to allege "the specific role each defendant played in the backdating scheme"; (4) fail to allege the number of backdated shares that "each defendant received and the specific benefit obtained"; and (5) fail to allege "the amount of compensation expense associated with each backdated option." (Doc. 117 at 12-14)

The complaint specifies the offending statement and identifies when and where the defendants issued the statement. The complaint alleges which individual defendant signed each Form 10-K and Sarbanes-Oxley certification. The deficiencies in the fraud allegations concern the falsity or misleading nature of the statement. The plaintiffs purport to allege repeated instances of backdating by pleading the dates of "suspiciously timed" option grants and the individual defendants who received the grants. (Doc. 114, ¶¶ 111-16, 126-28, 135-37, 144) However, the plaintiffs fail to allege that any specific

grant of options to any specific defendant was backdated. The issuance of a "suspiciously timed" option combined with a restatement of financial information fails to convert the policy representation into an actionably false and misleading statement.

To demonstrate falsity and misrepresentation, the plaintiffs also rely on the statement of CW5, who addresses only the options granted in 2001. Construing the allegations in the plaintiffs' favor, the complaint alleges sufficient facts to support the probability that CW5 is an actual person who possesses information about possible backdating. CW5 claims that several months after September 21, 2001, CW5 was asked to register in Equity Edge a number of replacement options with a September 21, 2001, grant date. This claim by CW5 may provide circumstantial evidence of backdating on this particular occasion. (Doc. 114, ¶ 118(b)) However, the plaintiffs fail to allege a connection between the options dated September 21, 2001, and the "suspiciously timed" options dated September 20, 2001. The plaintiffs also provide no factual detail supporting an inference that the option grants were not actually "finalized" on September 21, 2001. The CW5 allegations therefore fail to provide a sufficient basis for inferring that any statement is false and misleading.

Finally, the plaintiffs attempt to plead backdating by stating that Jabil "admitted unequivocally . . . that the Company had not been applying APB 25 and stock options had not been issued at 'fair market value on the date of the grant.'" (Doc. 114, ¶ 124, 133, 153, 169) Viewed favorably to the plaintiff, the restatement provides some evidence that the policy representation was false—Jabil admits misdating some option grants before and during the class period. But even considering the restatement, the

complaint still alleges neither any particular defendant's role in the backdating scheme nor when or how any particular stock option was backdated.  See In re Hanson Natural Corp., 527 F. Supp. 2d 1142, 1153 (C.D. Cal. 2007) ("[W]hile Plaintiff alleges the existence of an 'unlawful backdating scheme,' he does not set forth any of the factual allegations, including when option grants were backdated, how the option grants were backdated, who was involved in the backdating, and what compensation expense was associated with the backdating.")

### 2. Accounting Practice

During the class period, the defendants allegedly represented in public filings the company's policy of applying APB 25 and the company's compliance with APB 25 ("the APB 25 representation").  The defendants included the APB representation in each Form 10-K for fiscal years 2001 through 2005.  (Doc. 114, ¶¶ 122, 131, 140, 149, 162)  The plaintiffs allege that the APB 25 representation is false and misleading because the defendants failed to record the appropriate compensation expense for backdated options.  (Doc. 114, ¶¶ 124, 133, 139, 143, 153, 169)  The plaintiffs allege the materiality of the failure to record.  (Doc. 114, ¶¶ 241-44)

The plaintiffs allege that throughout the class period the defendants falsely and misleadingly stated in each Form 10-K Jabil's quarterly and annual earnings.  (Doc. 114, ¶¶ 121, 129, 139, 145, 146, 156, 157, 158, 159, 161)  The plaintiffs allege that each financial statement is false and misleading because Jabil "had not been applying APB 25 and stock options had not been issued at "fair market value on the date of the grant." (Doc. 114, ¶¶ 124, 133, 153, 169)  The plaintiffs allege that the granting of backdated

options required Jabil to record a compensation expense. (Doc. 114, ¶¶ 124, 133, 153, 169) Each false financial statement allegedly enabled Jabil to meet its earnings forecast and artificially inflated Jabil's share price, allowing the defendants to pocket more than "$1 billion in illegal insider trading proceeds." (Doc. 114, ¶ 351) The false financial results allowed the defendants to reap millions of dollars in incentive based bonuses for meeting and exceeding profitability goals." (Doc. 114, ¶¶ 56, 58, 66-78)

The complaint specifies each offending statement and identifies when and where each statement was issued. The complaint alleges which individual defendant signed each Form 10-K. The complaint generally alleges that each statement is false and misleading because Jabil failed to record the appropriate compensation expense for the backdated options. However, the complaint fails to allege an adequate basis for the claim that Jabil was required to record a compensation expense for the options. APB 25 would require the recording of a compensation expense only if Jabil had issued backdated options. As previously established, the complaint fails to adequately allege backdating.

### 3. Denial of Backdating

The plaintiffs allege that the defendants repeatedly denied that Jabil had granted backdated stock options. "Section 10(b) liability can be predicated on a defendant's false statement to securities analysts or to the financial or news media." In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1339 (S.D. Fla. 1999) (citing Basic v. Levinson, 485 U.S. 224, 228, n.4, 108 S. Ct. 978 (1988)). "A company may be held liable for statements made to analysts that reach the market, where the plaintiff alleges

entanglement between the Company's executives and the analysts." In re Sunbeam, 89

F. Supp. 2d at 1339 (citing Gross v. Medaphis Corp., 977 F. Supp. 1463, 1474 (N.D.

Ga. 1997). "A plaintiff must (1) identify specific forecasts and the company insider who

adopted them; (2) point to specific interactions between the insider and the analyst [or

journalist] which gave rise to the entanglement; and (3) state the dates when these

interactions occurred." Gross, 977 F. Supp. at 1474. In other words, a plaintiff must

allege who conveyed what specific information to which analyst or journalist and when

this occurred. Absent an allegation sufficient to characterize each statement as "group-

published information," it is unreasonable to presume each statement is the result of the

defendants' collective conduct. See Phillips, 374 F.3d at 1019; see also In re AFC

Enters., 348 F. Supp. 2d at 1370.

According to a MarketWatch article, at a May 4, 2006, analyst event at Jabil's

headquarters "Main said that there was 'absolutely no backdating' of stock options that

either he, or other Jabil executives, received between 1998 and 2001." (Doc. 114,

¶ 197) According to a St. Petersburg Times article, Main also stated that the timing of

the stock option grants was a matter of chance and that "[t]he math is right" but "[t]he

conclusions are wrong." (Doc. 114, ¶ 198) Although in this instance the plaintiffs

identify which defendant conveyed what specific information to which news outlet and

when, the plaintiffs fail to adequately allege backdating and, consequently, fail to allege

adequately the false and misleading nature of the statement.

According to a MarketWatch article, at the May 4, 2006, analyst event, Main

stated that he would be "shocked into another dimension if the probe found anything

improper," and called The Wall Street Journal's article a "witch hunt." (Doc. 114, ¶ 197) Main stated, "I want to give you an appreciation for basically how p----- off I am about this whole thing . . . . I guess this is part of being a successful, big company. People want to take shots at you." (Doc. 114, ¶ 198) Also at the analyst event, Raymund stated, "We've always done everything exactly according to procedure and with transparency, there's no reason to change. I think any aspersions cast in our direction are unfounded and Jabil is being penalized for extraordinary results for their stockholders." (Doc. 114, ¶ 196) The plaintiffs identify which defendant conveyed what specific information to which news outlet and when this occurred. However, the representations are vague statements of opinion, which present no actionable misrepresentation. See Commc'ns Workers of Am. Plan for Employees' Pensions and Death Benefits v. CSK, 525 F. Supp. 2d 1116, 1121 (D. Ariz. 2007); Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Vague statements of opinion are not actionable under the federal securities laws because they are considered immaterial and discounted by the market as mere 'puffing.'") Moreover, by failing to plead backdating, the plaintiffs fail to plead exactly why each statement is false and misleading.

In a June 21, 2006, conference call Jabil executives declined to comment further on the backdating issue because of the ongoing SEC investigation. (Doc. 114, ¶ 209) However, Walters stated, "[Y]ou can assume that everything we said historically still stands." (Doc. 114, ¶ 209) Main stated, "You can go back and look at press releases and what we said at the analyst day . . . ." (Doc. 114, ¶ 209) During a conference call

with analysts on September 26, 2006, Main declined to comment on the backdating allegations.  (Doc. 114, ¶ 214)  The plaintiffs fail to explain why each of these statements is false and misleading.

### 4. 3Q06 and 2006 Earnings Forecast

The plaintiffs allege that in a March 22, 2006, press release the defendants projected third quarter revenue "in a range of $2.5 to $2.6 billion and core earnings of $0.43 per diluted share, depending upon actual levels of production."  (Doc. 114, ¶¶ 177, 178)  The defendants updated their fiscal year 2006 forecast, projecting "revenue of $9.9 billion, $600 million higher than guidance the company provided in December, 2005."  (Doc. 114, ¶ 177)  The defendants expected "to grow full fiscal core earnings per share 33 percent to $1.70 per diluted share."  (Doc. 114, ¶ 177)

Without alleging any new fact regarding the earnings forecast, the plaintiffs again plead these supposedly false statements despite the April 9, 2008, order determining that the PLSRA's "safe harbor" protects the statements.  (Doc. 95, 20-22) Purporting to answer the earlier ruling, the complaint asserts mere legal conclusions.  (Doc. 114, ¶¶ 318-25) For the reasons stated in the April 2, 2008, order (Doc. 95, 20-22), these statements are not actionable.

### 5. Business Condition Omission

According to Business Outlook, on March 22, 2006, Main stated that "[d]emand for Jabil's outsourcing services continues to be broad-based across numerous markets." (Doc. 114, ¶ 177)  On the same day, Main and Alexander hosted a conference call in

which they repeated the projection announced in the press release and commented on

Jabil's business condition. (Doc. 114, ¶ 178)

> Consumer demand's done pretty darn well all year. And demand feels
> pretty stable. But for end market contribution overall, again looking at
> the full portfolio of businesses that we're in, I think that a 3 to 5% end
> market growth rate is appropriate. And again, it is this burning on fire
> demand for outsourcing services that is driving the growth. It is just
> extraordinary right now.

(Doc. 114, ¶ 178) In response to a question about the strength of demand from large

customers, Main stated, "If you look back at the 10-K, Phillips and Nokia were the two

biggest customers, and they were in the low teens. It would be tough to move the

needle a lot if we weren't doing well with the bigger customers." (Doc. 114, ¶ 182) The

defendants further stated during the conference call that "the instrumentation and

medical sector would increase by 10% in the third quarter, reflecting the ongoing growth

of assemblies within this sector across multiple customers." (Doc. 114, ¶ 183) The

plaintiffs do not argue that the statements are false. Instead, the plaintiffs argue that in

issuing the statement the defendants "knew, but failed to disclose, that current

'execution' problems occurring throughout the company were compromising Jabil's

ability to manufacture, build and ship products in a manner which would enable Jabil to

meet its new 3Q06 and fiscal '06 earnings forecast." (Doc. 114, ¶ 25)

The April 9, 2008, order states:

> The cautionary statement in the conference call and Form 10-K warns "of risks of a significance similar to that actually realized." <u>Harris</u>, 182 F.3d at 807.  Given the cautionary language, each defendant's state of mind is irrelevant, and no defendant bears liability for the forward-looking statement.  <u>Harris</u>, 182 F.3d at 803.

(Doc. 95 at 25)  Despite this ruling, the plaintiffs continue to argue that the statement is misleading because the defendants actually knew about conflicting information.  As stated before, because the statements were accompanied with meaningful cautionary language, each defendant's state of mind is irrelevant.

Furthermore, the plaintiffs' allegations are insufficient to support a strong inference that any defendant actually knew the statement was false.  The complaint relies on accounts of several confidential witnesses and insists that the defendants knew about Jabil's "execution" problems.  (Doc. 114, ¶¶ 181-86, 318-325)  However, the complaint lacks any particularized facts showing that any defendant knew about the execution problems described by the confidential witnesses.

B. Scienter

To maintain a Section 10(b) claim, a complaint must state with particularity facts creating a strong inference that each defendant acted with scienter in each act or omission alleged.  <u>Tellabs</u>, 127 S. Ct. at 2508 (citing 15 U.S.C. § 78u-4(b)(2)); <u>see also</u> <u>Druskin v. Answerthink, Inc.</u>, 299 F. Supp. 2d 1307, 1322 (S.D. Fla. 2004).  A complaint satisfies the pleading requirement for scienter by demonstrating "severe recklessness." <u>McDonald v. Alan Bush Brokerage Co.</u>, 863 F.2d 809, 814 (11th Cir. 1989).  The

Eleventh Circuit describes severe recklessness as "limited to those highly unreasonable omissions or misrepresentations" that are known to the defendant or so obvious that the defendant must have been aware and "that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers." McDonald, 863 F.2d at 814. A motive and opportunity to commit fraud provides circumstantial evidence of severe recklessness but cannot alone establish scienter. Bryant, 187 F.3d at 1285-86. Tellabs requires consideration of "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." 127 S. Ct. at 2510. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510. A complaint may aggregate facts to imply scienter as to each defendant but may not rely on group pleading. Phillips, 374 F.3d at 1017; Primavera Investors v. Liquidmetal Techs., Inc., 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005).

The April 9, 2008, order finds that the plaintiffs' scienter allegations fail to raise a strong inference that any defendant acted recklessly or with fraudulent intent. (Doc. 95 at 26-37) Rather than bolster the complaint with allegations particularizing each defendant's scienter, the plaintiffs pad the complaint with prolix descriptions of Jabil's 2005 financial restatement. (Doc. 114 ¶¶ 15-230) The plaintiffs contend that the restatement amounts to an admission of fraud. (Doc. 124, at 11-14)

The plaintiffs state that Jabil "admits that it 'misapplied' simple accounting rules (APB 25) as a result of 'administrative errors' and so-called 'other events' i.e., intentional misconduct." (Doc. 114 ¶ 347)  Although the plaintiffs speculate that the defendants engaged in intentional misconduct, the complaint lacks any factual detail supporting a strong inference of scienter.  See Rosenberg v. Gould, __ F.3d __, 2009 WL 50721, at *3 (11th Cir. Jan 9, 2009) (affirming dismissal of a backdating case resting solely "'on speculation and conclusory allegations.'" (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1265 (11th Cir. 2006)).  In their memorandum in opposition to Jabil's motion to dismiss, the plaintiffs state, "By definition, most backdating activities [include] creating false documentation specifically designed to deceive." (Doc. 124 at 12)  Notably absent from the complaint is a single factual allegation detailing an attempt by any defendant to falsify a document.

The plaintiffs cannot meet the pleading standard for scienter simply by reciting Jabil's "admission" of misdating stock options—especially when options granted to non-executive employees account for the majority of the restatement and option grants to officers and directors account for only $1.7 million of the $54.3 million restatement.  Given the absence of facts demonstrating scienter, the plaintiffs apparently "seek to hold [the defendants] accountable for nothing more than a Restatement of [the company's] financials." Ley v. Visteon Corp., 543 F.3d 801, 813 (6th Cir. 2008).

The restatement provides no inference of scienter, and certainly provides no cogent and compelling inference.  In the restatement, Jabil identified three errors, none of which supports the plaintiffs' claim of fraud or recklessness.  Jabil's first error resulted

from assigning the day the pertinent board committee approved the options as the grant date for the options. In some cases, APB 25 required Jabil to change the grant date for the whole grant after minor changes to the number of options granted to a small number of non-executive employees. The complaint fails to allege that the options were backdated—the restatement confirms that the grant date was fixed, and the accounting error resulted from subsequent administrative changes to the grants to non-executive employees.

Jabil's second accounting error resulted from a cancellation and re-issue of options after a decline in Jabil's share price. Because the decline in share price sent the options "underwater," Jabil issued replacement options to non-executive employees. Although some Jabil officers received "underwater" options at the same time, the officers received no replacement options.

Jabil's third error resulted from improperly accounting for options granted to a non-employee director between 1998 and 2002. The complaint fails to allege any fact showing that this third error supports an inference of intentional or reckless conduct by any defendant. Accordingly, none of the accounting errors identified by Jabil in the restatement supports a strong inference that any officer or director acted with scienter. See Rudolph v. UTStarcom, 560 F. Supp. 2d 880, 890 (N.D. Cal. 2008) (stating that an "admission" of backdating in a restatement does not create a cogent and compelling inference of scienter because the options could have been backdated through innocent bookkeeping error).

The plaintiffs attempt to bolster an inference of scienter from (1) the defendants'
knowledge of non-public information, (2) the defendants' financial benefit from
"suspiciously timed" options, (3) the "breadth and magnitude" of the defendants'
accounting violations, (4) the defendants' committee membership, (5) the critical
importance of Jabil's stock option incentive program, (6) the defendants' false
Sarbanes-Oxley certifications, and (7) the accounts of several confidential witnesses.
(Doc. 124 at 10-31)  The defendants argue that the allegations, considered alone or
together, permit no strong inference of scienter.  (Doc. 117 at 14-35)

### 1. Knowledge of Non-Public Information

The complaint alleges that each individual defendant, by virtue of his position,
"had access to the adverse undisclosed information . . . regarding the Company's
business operations, financial condition, loss reserves, products, markets, customer
relationships and present and future business prospects. The Individual Defendants
knew or recklessly disregarded that said adverse information had not been disclosed to
and was being concealed from, the investing public."  (Doc. 114, ¶ 81)  The complaint
alleges that each individual defendant "knew or should have known" that Jabil had
issued backdated stock options and had failed to properly account for the options.
(Doc. 114, ¶ 169)  The complaint alleges that in issuing each false statement each
individual defendant acted "knowingly" or "knowingly or with severe recklessness."
(Doc. 114, ¶¶ 16, 169, 301, 340)

"A pleading of scienter may not rest on the inference that defendants must have
been aware of the misstatement based on their positions within the company."

Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002).  A conclusory allegation that a defendant "knew," "knew or should have known," or acted "knowingly or with severe recklessness" fails to support an inference of scienter.  See In re Recoton Corp. Sec. Litig., 358 F. Supp. 2d 1130, 1147 (M.D. Fla. 2005) (holding that "would have known," "knew and ignored," or "recklessly failed to know" allegations fail to satisfy the scienter requirement); In re Sunterra, 199 F. Supp. 2d 1308, 1324 (M.D. Fla. 2002) (holding that allegations of "must have known" fail to demonstrate scienter).  The complaint's allegations of knowledge of non-public information fail to raise an inference of scienter with respect to any defendant.

### 2. Financial Benefit and Motivation

The complaint alleges that each individual defendant benefitted financially from the false and misleading statements through (1) insider trading, (2) the receipt of a backdated stock option, or (3) the receipt of an incentive-based bonus.

The complaint alleges that several individual defendants engaged in insider trading by selling Jabil shares "while in possession of material, adverse non-public information concerning the Company" despite each individual defendant's duty to refrain from such conduct.  (Doc. 114, ¶ 336)  On March 23, 2006, the day after the favorable earnings announcement, Brown, Main, and Sansone sold 244,800 shares of Jabil for $8.8 million of profit.  (Doc. 114, ¶ 29)  On March 27, 2006, Alexander and Sansone sold 98,664 shares for $3.9 million of profit.  (Doc. 114, ¶ 29)  On March 30, 2006, Brown sold 58,000 shares for $1.7 million of profit.  (Doc. 114, ¶ 29)  Between March 30

and April 24, 2006, Morean sold 1,250,000 shares for $52.2 million of profit. (Doc. 114, ¶ 29)

"While a showing of profitable stock trades is not a prerequisite to prove scienter, where it is alleged, plaintiffs 'bear the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing.'" Druskin, 299 F. Supp. 2d at 1335. A showing of unusualness requires an allegation of the "amount of trading that the insider conducted before or after the Class Period." Druskin, 299 F. Supp. 2d at 1336. "Whether insider trading will support an inference that defendants engaged in securities fraud 'turns upon (1) the percentage of holdings sold by a defendant, (2) the number of defendants who sold stock, and (3) the difference between stock sales during the relevant time period and prior activity.'" Druskin, 299 F. Supp. 2d at 1335; see also Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d. Cir. 1995) (no scienter inferred from the defendant's selling approximately eleven percent of holdings); Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (no scienter inferred from the defendant's selling approximately seventeen percent of holdings). "Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Ronconi, 253 F.3d at 435 (internal quotation marks and alteration omitted).

The complaint pleads the number of shares sold and the amount of profit received by certain individual defendants on certain dates following the issuance of the March 22, 2006, earnings report. The plaintiffs also allege the percentage of the defendants' total shares sold during the class period. However, despite explicit instructions in the April 9,

2008, order, the plaintiffs fail to compare the number of shares sold during the class period with the number of shares sold either before or after the class period. <u>See</u> <u>Druskin</u>, 299 F. Supp. 2d at 1335. The complaint's allegations of insider trading fail to support an inference of scienter as to any individual defendant.

The complaint alleges that certain individual defendants benefitted financially from the false and misleading statements because certain individual defendants received backdated stock options on specific occasions between 1997 and 2004. Like the previous iteration, the complaint characterizes the stock options as "suspiciously timed" because Jabil's committees priced the options at or near a low point in Jabil's share price during a particular period.[10] (Doc. 114, ¶¶ 116-20, 126-28, 135-37, 144-46)

Receipt of a stock option evidences scienter only if the option grant is unusual or suspicious. <u>See</u> <u>In re Linear Tech. Corp. Derivative Litig.</u>, No. C-06-3290, 2006 WL 3533024, at *3 (N.D. Cal. Dec. 7, 2006). A showing of unusualness or suspiciousness requires an allegation of the amount and timing of the stock options granted during the class period and the options granted before or after the class period. <u>See</u> <u>In re Linear Tech Corp.</u>, 2006 WL 3533024, at *3. Because the plaintiffs fail to include any such allegation, no unusual or suspicious pattern emerges. <u>See</u> <u>In re Linear Tech Corp.</u>, 2006 WL 3533024, at *3 ("Because plaintiffs provide no facts as to how often and at

---

[10] By selecting a different scale for the y-axis (representing share price) on each chart, the plaintiffs apparently attempt to "magnify" the depth of the "suspicious" fall and subsequent rise in the share price coinciding with option grants to the defendants. This convenient (but obvious) manipulation of scale—disguising the weakness of the plaintiffs' claims of suspicious timing—taints the plaintiffs' allegations.

what times the Committee Defendants have granted stock options in the past, no 'pattern,' let alone a 'striking' one is apparent.")

As stated in the April 9, 2008, order, the pattern alleged—a stock grant followed by a price increase—is susceptible to a plausible and innocent explanation:

> Jabil's committees could have decided "that it made sense to try to anticipate possible stock price increases when timing grants so that lower cash salaries can be paid to management." (Doc. 75 at 24) Moreover, as the defendants argue, "in many periods, Jabil's growth prompted its volatile stock price to increase, which would lead to increases after almost any date selected during such periods."

(Doc. 95 at 30) Indeed the complaint states, "From 2002 onward, after passage of Sarbanes-Oxley, Jabil's Section 16 officers usually filed Forms 4 within two days of the option grant." (Doc. 114, ¶ 120) This allegation completely undermines any suspicion otherwise attending any grant after 2001. Accordingly, the plaintiffs' allegations of receipt of stock options fail to support an inference of scienter as to any defendant.

The complaint alleges that each individual defendant benefitted financially from the false and misleading statements because each individual defendant received "incentive-based bonuses . . . in part for achieving earnings and revenue targets." (Doc. 114, ¶ 56) A report of the compensation committee provides that "[b]onuses are paid on an annual or quarterly basis and are based on qualitative and subjective factors, including the pre-tax profitability of the Company, business development, operational performance, and other measures of efficiency appropriate to the officer compensated." (Doc. 114, ¶ 56) The complaint alleges the bonus each individual defendant received each year. (Doc. 114, ¶¶ 66-78)

Receipt of a standard incentive-based bonus has limited probative value for scienter.  Kalnit v. Eichler, 264 F.3d 131, 139-40 (2d Cir. 2001); In re Metris Cos., Inc. Sec. Litig., 428 F. Supp. 2d 1004, 1013 (D. Minn. 2006) ("[I]t is well-established that a desire to get greater pay and bonuses attaches to executives in every company.  Such a desire is not probative of the question of the executives' motivation to defraud the market.")  An "extraordinary" incentive package provides circumstantial evidence of scienter.  In re AFC Enters., Inc. Sec. Litig., 348 F. Supp. 2d 1363, 1374 (N.D. Ga. 2004).  The complaint fails to allege facts demonstrating that any individual defendant received or had the potential to receive an extraordinary incentive package. The bonus allegations yield no inference of scienter as to any defendant.

4. GAAP Violation

The complaint alleges that the defendants' practice of backdating stock option grants and failing to properly account for the grants materially violates GAAP, particularly APB 25.  (Doc. 114, ¶ 236-38)  The plaintiffs allege each defendant "systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date." (Doc. 114, ¶ 237)  The plaintiffs allege that the failure to adhere to APB 25 caused the company to overstate earnings.  (Doc. 114, ¶ 236)  As in the previous complaint, the plaintiffs conclusorily allege violations of SEC regulations and Internal Revenue Service ("IRS") rules and regulations.  (Doc. 114, ¶¶ 247-57)

The complaint alleges that "the fact that Jabil revised and restated downward its net income is an admission that the financial statements originally issued were false

when they were reported and that the misstatements were material." (Doc. 114, ¶ 239) The complaint alleges a restatement of approximately $54.3 million in aggregate incremental non-cash stock-related compensation charges for fiscal years 1996 through August 31, 2005. (Doc. 114, ¶ 52) Of the $54.3 million expense, Jabil reported incurring approximately $35.0 million in 2005 and $16.2 million in 2003. (Doc. 114, ¶ 52) Approximately $48.9 million of the $54.3 million expense results from misdated option grants to employees who were neither directors nor officers at the time of the grants. (Doc. 114, ¶ 52) Approximately $3.7 million relates to options "granted to a director over a period of five years for his providing consulting services to the Company." (Doc. 114, ¶ 52) Approximately $1.7 million results from misdated options granted to officers. (Doc. 114, ¶ 52)

A GAAP violation alone cannot satisfy the PSLRA's scienter requirement. Ziemba, 256 F.3d at 1208. However, facts suggesting the "defendants recklessly disregarded the deviance from GAAP" may establish scienter. In re Friedman's, Inc. Sec. Litig., 385 F. Supp. 2d 1345, 1361 (N.D. Ga. 2005) (alteration and internal quotation marks omitted). A series of GAAP violations, "coupled with allegations of ignoring 'red flags,'" contributes to an inference of scienter. Ziemba, 256 F.3d at 1208; In re Smith-Gardner Sec. Litig., 214 F. Supp. 1291, 1302 (S.D. Fla. 2002). The fact that a company's GAAP errors violate an internal accounting policy or an obvious and simple accounting principle raises an inference of scienter. See Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996) (denying summary judgment on the scienter issue because the defendant allegedly violated GAAP and its own revenue recognition policy); In re

Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 21-22 (D.D.C. 2000); In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("[I]f the GAAP rules and MicroStrategy accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard."). Additionally, "significant overstatements of revenue 'tend to support the conclusion that defendants acted with scienter.'" In re MicroStrategy,, 115 F. Supp. 2d at 636 (internal quotation marks omitted). Thus, "[w]here the number, size, timing, nature, frequency, and context of the GAAP violations or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter." In re AFC Enters., 348 F. Supp. 2d at 1372.

The complaint's allegations of GAAP, SEC, and IRS violations fail to raise an inference of scienter because the complaint fails to adequately allege a basis for the claim of backdating. The majority of the restatement expense (approximately $48.9 million of the $54.3 million) results from misdated option grants to employees who were neither directors nor officers at the time of the grants. However, the complaint fails to include a single specific allegation of Jabil's granting a non-director or non-officer a backdated option. Approximately $3.7 million of the restatement expense results from an improper accounting of options "granted to a director over a period of five years for his providing consulting services to the Company." (Doc. 114, ¶ 52) The complaint fails to include any allegation concerning this director's receipt of a backdated option. Finally, approximately $1.7 million of the restatement expense results from misdated

option grants to officers.  (Doc. 114, ¶ 52)  The complaint fails to include sufficient allegations to demonstrate the significance of the $1.7 million expense.

The plaintiffs insist that these violations support a strong inference of scienter because "(i) APB 25 was a clear and simple accounting policy; (ii) the backdating of stock options violated Jabil's internal, 'significant' accounting policies; and (iii) Jabil understood how to correctly establish a grant date, but failed to do so."  (Doc. 124 at 18)  However, many public companies have restated their financial statements to correct for misapplications of APB 25, and these restatements prompted the SEC to issue guidance on how to apply APB 25 properly.  (Doc. 115, ex. 68)  The widespread misinterpretation of APB 25 belies the plaintiffs' characterization of APB 25 as "clear and simple."  The plaintiffs fail to plead any particularized facts showing that any defendant purposefully or recklessly violated Jabil's accounting policy.

Finally, the plaintiffs allege that Jabil understood how to identify the correct grant date but failed to do so.  The plaintiffs allege that Sansone practiced tax law prior to joining Jabil. (Doc. 114, ¶ 65).  The plaintiffs allege that Alexander is a fellow at the Chartered Institute of Management Accountants (Doc. 114, ¶ 75) and that Rapp and Lewis are Certified Public Accountants.  (Doc. 114, ¶¶ 76, 77)  The plaintiffs contend that this sophisticated accounting knowledge supports an inference of "at least deliberate recklessness" by each defendant.  (Doc. 114, ¶ 169(h))  Misapplication of APB 25 was widespread before the SEC's guidance, and the plaintiffs offer no facts other than generalized accounting knowledge to support the allegation that any defendant knew, before the restatement, that Jabil misapplied APB 25.

4. Committee Membership

The complaint alleges that between 1996 and 2006, several defendants served on committees directly responsible for both the granting or issuance of stock options and oversight of the Company's publicly issued financial statements and internal controls. (Doc. 114, at 42-46) The committees include the non-executive stock option committee, the generally empowered stock option committee, the audit committee, and the compensation committee.

The complaint includes the following specific allegations concerning the committees. During the class period, the non-executive stock option committee administered the 1992 and 2002 Plans with respect to employees who were neither directors nor officers. (Doc. 114, ¶¶ 94-95) The non-executive stock option committee allegedly "approved and/or recklessly disregarded the backdating of stock option grants to the Company's employees, causing the Company to make materially false and misleading statements to the public and investors regarding its true financial condition." (Doc. 114, ¶ 95) From the beginning of the class period through fiscal year 2002, the generally empowered stock option committee administered the 1992 and 2002 Plans with respect to everyone, including directors and officers. (Doc. 114, ¶ 96-97) During the class period, the audit committee oversaw Jabil's auditing, accounting, and financial reporting. (Doc. 114, ¶ 87-89) The members of the audit committee allegedly "knew or were severely reckless in not knowing that Jabil's financial statements issued during the Class Period were materially false in that the Company failed to properly account for stock options grants in accordance with APB 25 and that the Company's granting

policies were not properly adhered to."  (Doc. 114, ¶ 89)  During the class period, the compensation committee reviewed and established compensation plans, salaries, bonuses, and other officer benefits.  (Doc. 14, ¶¶ 90-103)  After fiscal year 2002, the compensation committee assumed the duties of the generally empowered stock option committee.  (Doc. 114, ¶ 97)  The complaint alleges which individual defendant served on which committee and at what time.

Membership in a committee responsible for approving a backdated option or for monitoring the exercise date of an option may contribute to an inference of scienter. See In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007) ("[T]he members of the compensation committee were charged with a specific 'duty to monitor' the exercise dates of the options granted.  Their failure to do so, as demonstrated by the facts alleged in the Complaint, gives rise to an inference of scienter.") (internal citation omitted); Ryan v. Gifford, 918 A.2d 341, 355 n.35 (Del. Ch. 2007) ("[A]ny grant of options had to have been approved by the committee, and that committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant.").

As previously established, the complaint fails to adequately allege backdating, and consequently, membership in a committee responsible for approving a stock option grant, monitoring the exercise date of an option grant, or overseeing accounting or financial reporting fails to raise an inference of scienter.  The complaint's allegations with respect to the generally empowered stock option committee, compensation committee, and audit committee therefore fail to raise an inference of scienter.

Membership in the non-executive stock option committee fails to support an inference of scienter because the complaint fails to include a single specific allegation of an employee receiving a backdated stock option.

### 5. Confidential Witnesses

The complaint relies on information provided by eight confidential witnesses ("CWs")[11] to support an inference that the defendants issued the March 22, 2006, earnings forecast with scienter. (Doc. 114, ¶ 59)  Because the statement issued on March 22, 2006, qualifies for protection under the PSLRA's "safe harbor," no scienter analysis is required.

### C. Loss Causation

The PSLRA requires a plaintiff to prove that a defendant's false or misleading statement "caused the loss for which the plaintiff seeks to recover." Dura Pharms., 544 U.S. at 346 (quoting 15 U.S.C. § 78u-4(b)(4)).  An "'artificially inflated purchase price' is not itself a relevant economic loss." Dura Pharms., 544 U.S. at 347.  Rather, a plaintiff must allege that a decline in share price occurred "after the truth became known." Dura Pharms., 544 U.S. at 347.  A plaintiff must also allege a "causal connection" between the false statement and a decline in share price. Dura Pharms., 544 U.S. at 347.  "A plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the

---

[11] Jabil employed each confidential witness for all or part of the class period. (Doc. 114, ¶ 59)

security." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (internal

quotations and citation omitted).  The PSLRA imposes no heightened pleading

requirement for causation or economic loss.  A plaintiff must comply with Rule 8(a)(2),

Federal Rules of Civil Procedure, which requires a "'short and plain statement of the

claim showing that the pleader is entitled to relief.'"  544 U.S. at 346.

The plaintiffs allege that the defendants' false and misleading statements "caused

Jabil's stock price to trade at artificially inflated prices throughout the Class Period" and

that "[l]ater, when the true state of the Company's financial condition . . . began to be

revealed to the market, Jabil's stock price began a continuous and precipitous decline."

(Doc. 114, ¶ 303)  The "initial disclosure[]" concerning Jabil's backdating of stock

options occurred in The Wall Street Journal's March 18, 2006, article.  (Doc. 114, ¶ 305)

Subsequent disclosures by Jabil occurring between May, 2006, and November 15,

2006, publicized, among other events, the SEC's initiation of an informal investigation

into Jabil's stock option grants and Jabil's (1) failure to meet earnings forecasts for fiscal

year 2006, and the third quarter of that year, (2) formation of the Special Review

Committee to investigate backdating allegations, and (3) receipt of a subpoena from the

Attorney Genearl for the Southern District of New York.  (Doc. 114, ¶¶ 33, 34, 35, 44)

These disclosures allegedly caused Jabil's share price to drop "from an adjusted close

of $30.30 on November 14, 2006 to $29.04 on November 15, 2006 and $28.67 by

November 17, 2006."  (Doc. 114, ¶ 47)  Jabil's December 8, 2006, disclosure—that it

would need to restate financial results for fiscal year 2005 and that "necessary

adjustments could require the Company to restate it[s] financial results as far back as

1996"—allegedly caused the share price to decline from $28.43 to $27.77.  (Doc. 114, ¶ 310)  Jabil's December 20, 2006, disclosure "that its restructuring would cost hundreds of millions of dollars" and require layoffs caused the share price to decline from $26.56 on December 20, 2006, to $24.12 on December 21, 2006.  (Doc. 114, ¶ 311)  Each remaining disclosure and subsequent decline in share price occurred after the class period.  (Doc. 114, ¶¶ 312-315)

The defendants argue that "not one of the Jabil disclosures or third-party statements that plaintiffs identify revealed any 'truth' to the market about options backdating at Jabil.  To the contrary, time and again, the Company denied that backdating occurred, and the investment community concurred that there was no evidence of such conduct."  (Doc. 117 at 35-36)

The plaintiffs allege that Jabil's shares declined in value after the defendants disclosed certain information.  However, the causation element requires an allegation of a causal connection between a false or misleading statement and a decline in share price.  Because the plaintiffs fail to adequately allege backdating, they fail to sufficiently plead loss causation.

The plaintiffs fail to plead a false statement with particularity, fail to plead facts showing a strong inference that any defendant acted with scienter, and fail to plead loss causation.  Accordingly, the Section 10(b) claim in count one against the Jabil defendants is **DISMISSED**.

## II. False and Misleading Statements by KPMG
### in Violation of Section 10(b) and Rule 10b-5

The plaintiffs allege that KPMG violated Section 10(b) of the Exchange Act by falsely representing that "Jabil's financial statements during the Class Period . . . were presented fairly in accordance with GAAP, and that KPMG's audits of Jabil's financial statements and internal controls had been performed in accordance with GAAS and [Public Company Accounting Oversight Board ("PCAOB")] Auditing Standards."[12] (Doc. 114, ¶ 260)  Moving to dismiss, KPMG argues that the plaintiffs' claims are untimely and that the complaint alleges neither a false or misleading statement by KPMG nor particularized facts supporting a strong inference that KPMG acted with scienter.  (Doc. 121)

### A. Statute of Limitations

A defendant may raise a limitation defense in a motion to dismiss for failure to state a claim "when the complaint shows on its face that the limitation period has run." See Avco Corp. v. Precision Air Parts, Inc., 676 F.2d 494, 495 (11th Cir. 1982).  Before the enactment of Sarbanes-Oxley,[13] a plaintiff was required to bring a Section 10(b) claim "within one year after the discovery of the facts constituting the violation and within

---

[12] The Sarbanes-Oxley act of 2002 creates the PCAOB "to oversee the audit of public companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports for companies the securities of which are sold to, and held by and for, public investors."  See 15 U.S.C. § 1711.

[13] The Public Company Accounting and Investor Protection Act of 2002 ("Sarbanes Oxley Act of 2002"), Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (codified in part at 28 U.S.C. § 1658(b)), has an effective date of July 30, 2002.

three years after such violation."  See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S. Ct. 2773, 2782 (1991).  Under Sarbanes-Oxley, a plaintiff must bring a Section 10(b) claim within two years after discovery of the facts evidencing securities fraud or within five years after the fraudulent conduct, whichever event first occurs.  See 28 U.S.C. § 1658; Berman v. Blount Parrish & Co., 525 F.3d 1057, 1058 (11th Cir. 2008).

Inquiry notice requires "'knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights [have] been infringed.'" Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001) (quoting Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 670 (7th Cir. 1998)) (internal quotation marks omitted).  A plaintiff "'need not . . . have fully discovered the nature and extent of the fraud before [he is] on notice that something may have been amiss.  Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.'"  Theoharous, 256 F.3d at 1228 (quoting Sterlin v. Biomune Sys., 154 F.3d 1191, 1203 (10th Cir. 1998)).

Although filing the original complaint on September 18, 2006, the plaintiffs failed to assert a claim against KPMG until May 12, 2008.  (Doc. 97)  KPMG argues that the claim is untimely because the March 18, 2006, Wall Street Journal article and the shareholder derivative actions filed against Jabil in April, 2006, notified the plaintiffs of the possibility of a claim against KPMG.  (Doc. 121 at 9-19)  The plaintiffs argue that they lacked inquiry notice until after November, 2006, when Jabil first disclosed the intention to restate Jabil's financial statements for fiscal year 2005.  (Doc. 127 at 35-37)

Alternatively, the plaintiffs argue that factual issues preclude a finding of inquiry notice on a motion to dismiss.  (Doc. 127 at 40-44)

The plaintiffs rely on The Wall Street Journal article to support their claims against the Jabil defendants and KPMG.  The plaintiffs' (largely unsupported) claims of widespread fraud at Jabil all stem from the alleged backdating of stock options.  The plaintiffs allege, "The scope of the evasion of basic accounting principles and the plain language of the Company's stock option plans was admittedly widespread across options issued to senior management, thousands of rank and file employees and consultants."  (Doc. 114, ¶ 268)  The plaintiffs repeat three times in the complaint The Wall Street Journal's one-in-one-million estimate of the probability that Main's options were not backdated. (Doc. 114, ¶¶ 16, 20, 104)  The plaintiffs also heavily rely on KPMG's ignoring "red flags" to support an inference of scienter.  Among the "red flags" is KPMG's failure to notice the persistent late filing of Forms 4 by senior management.  Of course, these Forms 4 are public records to which the plaintiffs had access upon filing.

With the publication of The Wall Street Journal article on March 18, 2006, the plaintiffs acquired "'knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights [have] been infringed.'"  See Theoharous, 256 F.3d at 1228.  The article specifically targets Main and suggests a breakdown of internal controls at Jabil—the basis for the plaintiffs' recently discovered claims against KPMG.  In fact, the plaintiffs sued the Jabil defendants only six months after the publication of the March 18, 2006, article in The Wall Street Journal.  Because the

plaintiffs knew of the "possibility of fraud" and were placed on inquiry notice on March 18, 2006, the plaintiffs' claim against KPMG is untimely.  See Theoharous, 256 F.3d at 1228.  However, even if the claim were timely, the complaint fails to raise a strong inference that KPMG acted with scienter.

## B. False Statements

The complaint alleges three categories of false statements by KPMG.  First, for fiscal years 2003, 2004, and 2005, KPMG falsely stated an unqualified opinion that Jabil's financial statements conformed to GAAP.  (Doc. 114, ¶¶ 141, 150, 166)  The plaintiffs allege that these statements were false because Jabil misapplied APB 25. (Doc. 114, ¶¶ 170, 172-73)  Second, for fiscal years 2003, 2004, and 2005, KPMG stated that KPMG audited Jabil's financial statements in conformance with GAAS and PCAOB auditing standards.  (Doc. 114, ¶¶ 141, 150, 166)  The complaint alleges that KPMG violated these auditing standards by failing to obtain sufficient "evidential material" to support the unqualified opinions.  (Doc. 114, ¶¶ 274-99)  Finally, for fiscal year 2005, KPMG falsely stated that "KPMG had obtained an understanding of the Company's systems of internal controls supporting its unqualified opinion" on Jabil's financial statements.[14]  (Doc. 114, ¶¶ 166, 263)

---

[14] Under the heading, "Reasons why KPMG Statements Were False and Misleading," the plaintiffs allege that "[t]he October 25, 2006, report on internal controls (reporting as of August 2005) was also false and misleading."  (Doc. 114, ¶ 267) This paragraph epitomizes the conclusory and disorganized nature of the plaintiffs' fifth attempt to plead a claim.

1. Unqualified Audit Opinions

"[A]n auditor's independent scrutiny plays a necessary role" in ensuring the preservation of the integrity of the securities markets.  <u>Deephaven Private Placement Trading, Ltd. V. Grant Thornton & Co.</u>, 454 F.3d 1168, 1174 (10th Cir. 2006).  However, an auditor does not "guarantee" or "insure" the accuracy of a company's financial statements.  <u>Deephaven</u>, 454 F.3d at 1175-76.  ("[A]n audit cannot be expected to completely eliminate the possibility that a material misstatement will exist in the financial statements.")  For 2003, 2004, and 2005, KPMG expressed the following "unqualified opinion" regarding Jabil's financials:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Jabil Circuit, Inc. and subsidiaries as of [the relevant date], and the results of their operations and their cash flows for each of the years in the three-year period ended [the relevant date], in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

(Doc. 114, ¶¶ 141, 150, 166)  "The opinion paragraph, as the term suggests, is stated as an opinion of [KPMG] rather than a statement of absolute fact or a guarantee."  <u>Deephaven</u>, 454 F.3d at 1175.  Thus, the plaintiffs may allege the false or misleading nature of the opinion paragraph only upon showing that (1) KPMG "did not actually form its opinion regarding the . . . financial statements based on its audits; or (2) [KPMG] did not have a reasonable basis for its opinion because it did not plan and perform its audits of the . . . financial statements in accordance with GAAS."  <u>Deephaven</u>, 454 F.3d at 1175-76.  Absent sufficient allegations of GAAS violations, the plaintiffs' claim against KPMG fails.

## 2. Conformance with GAAS

The complaint states that "KPMG did not obtain sufficient, competent, evidential matter to support Jabil's assertions regarding Jabil's accounting for stock options and specifically false assertions of compliance with APB 25. . . . KPMG should have, but did not, obtain final lists of stock option recipients.  If it did, it ignored them."  (Doc. 114, ¶ 278) The complaint states with particularity this alleged GAAS violation.  The complaint lists several other relevant accounting standards and conclusorily states that KPMG violated each accounting standard.  (Doc. 114, ¶¶ 291-99) However, the plaintiffs fail to allege any fact supporting the allegations of other GAAS violations.  See In re SmarTalk Teleservs. Sec., Inc. Litig., 124 F. Supp.2d 505, 518 (S.D. Ohio 2000) ("At most, Plaintiffs' allegations amount to a speculative attempt to connect generally stated GAAS violations with information discovered after the fact, in an attempt to create the appearance of recklessness. This attempt fails."); In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1427 (9th Cir. 1994) (finding insufficient the plaintiff's "self-righteous" allegation that an auditor conducted the audit in a manner different from the plaintiff's preferred method).

## 3. Understanding of Internal Controls

The complaint alleges that KPMG violated PCAOB Auditing Standard No. 2—"An Audit of Internal Control over Financial Reporting in Conjunction with an Audit of Financial Statements."  (Doc. 114, ¶¶ 290-92) The complaint states that the "vast internal control deficiencies, now admitted to by Jabil, evidences KPMG's conscious misbehavior or severe recklessness in the performance of its audits and issuance of its

2005 Report of Jabil's Internal Controls of its financial reporting." (Doc. 114, ¶ 290) The plaintiffs list the requirements of PCAOB Accounting Standard No. 2 without identifying a single fact particularizing the alleged violation.[15] The complaint fails to allege particularized facts showing that KPMG failed to obtain an understanding of Jabil's internal controls.

## C. Scienter

The complaint must state with particularity facts creating a strong inference that KPMG acted with scienter in each act or omission alleged. Tellabs, 127 S. Ct. at 2508 (citing 15 U.S.C. § 78u-4(b)(2)); see also Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1322 (S.D. Fla. 2004). A complaint satisfies the pleading requirement for scienter by demonstrating "severe recklessness." McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989). An auditor's mere error or negligent failure to discover information is insufficient to establish scienter. The plaintiff "must offer specific factual allegations that are sufficient to support the 'strong inference that the audit was so deficient that it amounted to no audit at all.'" Grand Lodge of Pa. v. Peters, 550 F. Supp. 2d 1363, 1372 (M.D. Fla. 2008) (quoting In re Faro Techs. Sec. Litig., No. 6:06-cv-8-Orl-22DAB, 2007 WL 430731, at *19 (M.D. Fla. Feb. 3, 2007)).

The plaintiffs allege that the following facts support a strong inference of scienter: (1) the magnitude and breadth of the accounting misstatements; (2) the simplicity of the

---

[15] Rather than plead facts showing a violation, the plaintiffs place two of the PCAOB requirements in bold type-face. (Doc. 114, ¶ 291) The use of bold and underlined type-faces to hide the absence of factual support for the allegations pervades the complaint.

accounting rules ignored by KPMG; (3) a PCAOB report admonishing KPMG for performing sub-standard audits; (4) KPMG's "skyrocketing" audit fees paid by Jabil; (5) KPMG's twenty-four-year tenure as Jabil's auditor; (6) KPMG's failure to issue an adverse opinion or qualified report after the March 18, 2006, Wall Street Journal article; (7) KPMG's "conscious disregard" of the fact that Jabil's incentive-based bonus structure rewarded the defendants for meeting earnings targets; and (8) KPMG's disregard of "numerous red flags." (Doc. 127 at 12-33)  None of these allegations, considered separately or in aggregate, supports a strong inference that KPMG intentionally or recklessly issued a false statement.

1. Magnitude and Breadth of Accounting Misstatements

The plaintiffs argue that the magnitude ($54.3 million restatement) and longevity (ten years) of Jabil's accounting misstatements supports a strong inference of scienter. (Doc. 114 at 14-16)  The plaintiffs argue that KPMG's failure to audit Jabil's 2003 compensation expenses resulted in "drastic overstatement of earnings, an amazing 46.7%." (Doc. 127  at 15)  Of course, the plaintiffs fail to mention that the restatement increased Jabil's earnings for 2004.  The table below compares the amount of restated compensation expense to total compensation expenses and total expenses.

**Table 2: Restated Expenses as a Percentage of Total Expenses**
**(Dollar Amounts in Thousands)**

| Year | Reported Total Expenses | Reported Selling, General, and Administrative Expenses | Restated Stock-Based Compensation Income (Expense) | Percentage of Total Expenses |
|---|---|---|---|---|
| 2005 | $7,272,419 | $278,866 | $(35,404) | 0.5% |
| 2004 | $6,031,126 | $263,504 | 5,756 | 0.1% |
| 2003 | $4,701,179 | $243,663 | $(16,150) | 0.3% |
| 2002 | $3,492,059 | $203,845 | $(643) | 0.0% |
| 2001 | $4,169,347 | $184,112 | $(2,454) | 0.1% |
| 2000 | $3,349,158 | $132,717 | $(3,753) | 0.1% |
| 1999 | $2,103,701 | $92,015 | $(1,187) | 0.1% |
| 1998 | $1,397,811 | $60,116 | $(245) | 0.0% |
| 1997 | $1,090,016 | $45,086 | $(123) | 0.0% |
| 1996 | $998,167 | $34,404 | $(63) | 0.0% |
|  |  |  |  |  |
| Total | $34,604,983 | $1,538,328 | (54,266) | 0.2% |

A mere failure to follow GAAP does not create a strong inference of scienter. "However, violations of GAAP, when coupled with other evidence of fraud, can create a strong inference of scienter."  In re AFC Enters. Inc. Sec. Litig., 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004).  The "number, size, timing, nature, frequency, and context" of GAAP violations or a restatement may contribute to an inference that an auditor acted with scienter.  In re AFC Enters., 348 F. Supp. 2d at 1372.  Deprived of context, the $54.3 million restatement appears magnitudinous; restored to the context of Jabil's aggregate operation, the restatement proves merely exiguous.  Of the $54.3 million

restatement, $35.4 million arises from option grants in 2003 and $16.1 million arises from option grants in 2005. By comparison, Jabil reports total expense of $7.3 billion in fiscal year 2005 and $4.7 billion in fiscal year 2003. The scale of Jabil's overall business operation dwarfs the amount of the restatement, and the amount of the restatement fails to strengthen any inference that KPMG acted with scienter. See In re AFC Enters., 348 F. Supp. 2d at 1373 n.3 (noting that accounting error resulting in 136% overstatement of net income supports no inference of scienter because the overstatement equates to a 0.8% difference in reported revenue and a 4.4% difference in expense).

Similarly, the GAAP violations are not, as the plaintiffs suggest, pervasive. The plaintiffs argue that the breadth of violations supports a strong inference of scienter because "the accounting manipulations were widespread as to both the number of years and number of individuals." (Doc. 127 at 15-16) Although the plaintiffs allege that Jabil restated ten years of financial statements, ninety-five percent of the restatement resulted from options granted in 2003 and 2005. The plaintiffs allege that the backdating scheme was widespread because "grants to 1,563 individuals were "change[d] after the previously identified grant dates." (Doc. 127 at 16) Rather than plead facts showing KPMG's scienter, the plaintiffs mischaracterize Jabil's restatement.

Jabil explains that most of the restatement results from an incorrect identification of the required measurement date for options granted to lower-level employees. Jabil used an improper grant date because Jabil changed the number of options granted to several employees (or granted options to several new employees). Even though the

change may have altered the grant to only a small number of employees, APB 25 requires Jabil to change the grant date for every employee receiving an option in the grant. This accounting error required Jabil to restate the compensation expense for 1,563 non-executive employees who received a grant in 2003. However, Jabil did not change the grants to all 1,563 individuals after the grant date. Neither the magnitude nor the breadth of the restatement supports a strong inference that KPMG acted with severe recklessness.

## 2. Simplicity of APB 25

The plaintiffs argue that "APB 25 is a clear and simple rule" and that KPMG's failure to notice Jabil's misapplication of simple accounting rules supports a strong inference of scienter. (Doc. 127 at 16-18, Doc. 114, ¶ 169(f)) The widespread misapplication of APB 25 belies this argument. Similarly, the SEC's decision to issue a guidance letter describing the proper identification of grant dates under APB 25—the error that caused Jabil to restate its financial statements—weakens any inference that KPMG acted with scienter by failing to identify simple accounting errors. See In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1168-69 (S.D. Fla. 2004) (finding that "interpretations of the measurement date criteria embodied in APB No. 25 are far from obvious").[16] Jabil's misapplication of APB 25 fails to support a strong inference that KPMG acted with scienter.

---

[16] To support their argument that APB 25 is simple, the plaintiffs rely on United States v. Shanahan, No. 4:07-cr-175-JCH-DDN, 2008 U.S. Dist. LEXIS 29868 (E.D. Mo. Mar. 31, 2008). A criminal case not subject to the heightened pleading standard of the PSLRA, Shanahan holds only that a superseding indictment relying on APB 25 is not unconstitutionally vague. In fact, Shanahan notes that defining the measurement date under APB 25 "may be unclear in some situations." Shanahan, 2008 U.S. Dist. LEXIS 29868, at *25.

### 3. PCAOB Report

Sarbanes-Oxley requires the PCAOB to annually inspect each registered public accounting firm that regularly audits more than a hundred issuers. (Doc. 115, ex. 82) The inspections are "designed to identify and address weaknesses and deficiencies related to how a firm conducts audits." (Doc. 115, ex. 82) In July, 2007, the PCAOB reported the results of an inspection between May, 2006, and December, 2006, of KPMG's audit practices. The PCAOB report found several of KPMG's audits deficient. (Doc. 114, ¶ 171-73) The plaintiffs argue that the report provides "powerful corroborating evidence of KPMG's severe recklessness concerning its audits of Jabil." (Doc. 127 at 18) Analyzing one of KPMG's audits during 2006, the report states KPMG failed "to obtain sufficient competent evidential matter to support its audit opinion." The report finds that KPMG failed to identify the issuer's improper accounting "for a modification made to certain vested stock options" in violation of APB 25. KPMG's "failure to identify the departure resulted from [KPMG's] failure to evaluate the potential effects of a modification that the issuer had made to certain vested stock options upon the termination of an executive of the issuer." (Doc. 115, ex. 82)

The PCAOB report fails to support a strong inference that KPMG acted with scienter. The report states that "any deficiency observed in a particular audit reflects information reported to the [PCAOB] by the inspection team and does not reflect any determination by the [PCAOB] as to whether [KPMG] has engaged in any conduct for which it could be sanctioned through the [PCAOB's] disciplinary process." (Doc. 115,

ex. 82)  Additionally, the plaintiffs allege no fact showing that Jabil is among the issuers

identified in the report.  See Fidel v. Farley, 392 F.3d 220, 233 (6th Cir. 2004)

(holding that evidence of an auditor's settlement of a securities fraud action arising from

an audit of one company fails to "create the strong inference required under the PSLRA

to show that [the auditor] acted with the required state of mind during its review of [a

different company's] financial records").

### 4. "Skyrocketing" Audit Fees

The plaintiffs allege that Jabil paid KPMG $25 million in auditing fees during the

class period.  (Doc. 114, ¶ 259)  The plaintiffs allege that KPMG's audit fees increased

from $1.9 million in fiscal year 2001 to $7.3 million in fiscal year 2006.  (Doc. 114, ¶ 259)

The plaintiffs argue that these fees show "KPMG's motive to commit or participate in

fraud . . . and weigh heavily in favor of a finding of scienter."  (Doc. 127 at 21)  The

allegations that an auditor "earned and wished to continue earning fees from a client do

not raise an inference that the auditor acted with the requisite scienter.  At best, they set

forth a motive for the auditor to have engaged in fraud. Bare allegations of motive are

insufficient to adequately plead scienter."  Fidel v. Farley, 392 F.3d 220, 232 (6th Cir.

2004); see also In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y.

2008) (finding that PricewaterhouseCoopers LLP's ("PwC") receipt of $6 million in audit

fees shows only that "PwC was Doral's auditor, a fact which is wholly insufficient to

show PwC's scienter").[17]

---

[17] The increase in KPMG's fees fails to support an inference of scienter for another reason.
The passage of Sarbanes-Oxley in 2002 increased outside auditors' obligations (and legal exposure)
causing auditors to charge higher fees.  See, e.g., Susan W. Eldridge & Burch T. Kealey, SOX Costs:
Auditor Attestation under Section 404, http://ssrn.com/abstract=743285 (June 13, 2005).

### 5. Twenty-Four Year Tenure as Jabil's Auditor

The plaintiffs allege that KPMG's twenty-four year tenure as Jabil's auditor provides strong evidence of KPMG's scienter.  (Doc. 114, ¶ 170)  Like the audit fees allegation, KPMG's tenure and intimate knowledge of Jabil's business proves only that KPMG is Jabil's auditor.  KPMG's twenty-four year tenure creates no inference of scienter.  See In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008).

### 6. Failure to Issue an Adverse Opinion

The plaintiffs argue that "KPMG's refusal to recognize its client's fraud or correct its previous misstatements support a strong inference of scienter."  (Doc. 127 at 26)  As described above, the plaintiffs fail to plead any fraudulent conduct by Jabil.  Accordingly, KPMG's failure to issue an adverse opinion does not support a strong inference of scienter.

### 7. Disregard of Jabil's Incentive Bonus Structure

The plaintiffs argue that KMPG's disregard of Jabil's bonus structure supports a strong inference that KPMG acted with scienter.  (Doc. 127 at 27)  As noted above and in the April 9, 2008, order (Doc. 95), Jabil's ordinary bonus compensation program yields no inference of scienter as to any defendant.

### 8. Disregard of "Red Flags"

A "red flag" is a fact that places "a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors."  In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1334 (M.D. Fla. 2002).  The purported "red

flags" may not, however, "simply re-hash the alleged GAAP violations." In re Spear & Jackson Sec. Litig., 399 F. Supp. 2d 1350, 1363 (S.D. Fla. 2005). The plaintiffs argue that KPMG's disregard of several "red flags" supports a strong inference of scienter. Specifically, the plaintiffs allege that KPMG ignored Jabil executives' late filing of Forms 4 and detected neither theft by a Jabil executive nor Jabil's persistent violation of its stock option plans. None of these supposed "red flags" supports a strong inference of scienter.

The plaintiffs allege that KPMG ignored the late filing of Forms 4 by Jabil executives. However, the plaintiffs also allege that "[f]rom 2002 onward, after the passage of Sarbanes-Oxley, Jabil's Section 16 officers usually filed Forms 4 within two days of the option grant." (Doc. 114, ¶ 60) The plaintiffs' claims against KPMG arise from KPMG's audits in 2003, 2004, and 2005. The plaintiffs may not rely on KPMG's conduct from more than five years ago to support their current claims. The timely filing of Forms 4 during 2003, 2004, and 2005 negates any inference of scienter. See In re CNET Networks, Inc., 483 F. Supp. 2d 947, 961 (N.D. Cal. 2007) ("It is highly unlikely that defendants could have gone back in time to change the date for this grant if it was on record with the SEC two days after the fact.")

The plaintiffs also allege that KPMG failed to detect theft by a Jabil executive. (Doc. 127 at 30-32, Doc. 114, ¶ 174) However, the plaintiffs fail to show how KPMG's purported knowledge of theft notified KPMG of Jabil's backdating scheme. See In re Faro Techs. Sec. Litig., No. 6:06-cv-8-Orl-22DAB, 2007 WL 430731, at *16 (M.D. Fla. Feb. 3, 2007) "Plaintiff fails to show how knowledge of a former official's embezzlement

should have put [the auditor] on notice" of alleged corporate wrongdoing unrelated to the embezzlement). Accordingly, the embezzlement by a former Jabil executive fails to create a strong inference that KPMG acted with scienter.

Finally, the plaintiffs allege that KPMG failed to discover Jabil's violations of its own stock option plan. A "re-hash" of the plaintiffs' allegations of Jabil's GAAP violations, this allegation fails to create a strong inference that KPMG acted with scienter.

In sum, the plaintiffs' conclusory allegations of reckless behavior by KPMG fail to meet the exacting pleading standard of the PSLRA. "Viewed individually and collectively, [the plaintiffs] assert[] no more than a collection of circumstances which, viewed in hindsight, might be sufficient to substantiate negligence on the part of the auditor." In re Faro Techs. Sec. Litig., No. 6:06-cv-8-Orl-22DAB, 2007 WL 430731, at *19 (M.D. Fla. Feb. 3, 2007). The plaintiffs allege no facts to support a strong inference that any of KPMG's audits amounted "'to no audit at all.'" In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1337 (M.D. Fla. 2002) (quoting Reiger v. Altris Software, Inc., No. 98-CV-528, 1999 WL 540893, at *8 (S.D. Cal. Apr. 30, 1999). The Section 10(b) claim in count one against KPMG is **DISMISSED**.


### III. Insider Trading in Violation of Section 10(b) and Rule 10b-5-1

In count two, the plaintiffs assert that defendants Alexander, Brown, Edwards, Lewis, Main, Morean, Murphy, Raymund, and Sansone violated Section 10(b) and Rule 10b-5-1 by selling Jabil shares while in possession of material, non-public information

about Jabil.  (Doc. 114, ¶ 343)  Trading based on material non-public information is a "scheme to defraud" proscribed by Rule 10b-5.  An insider with knowledge of material, non-public information about a company must either disclose the information or abstain from trading the securities of the company.  See SEC v. Adler, 137 F.3d 1325, 1333 (11th Cir. 1998).

To state an insider trading claim under Rule 10b-5, a plaintiff must allege (1) that the defendant traded on the basis of material, non-public information, (2) that the defendant knew the information was material and non-public (scienter), and (3) that the plaintiff traded contemporaneously with the defendant.  Like any other claim under Rule 10b-5, the plaintiffs must plead the insider trading claim with the particularity required by Rule 9(b) and the PLSRA.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417-18 (3d Cir. 1997).  Nevertheless, the plaintiffs conclusorily allege that "Defendants alleged herein while in possession of material non-public information about the Company's true financial condition sold millions of dollars worth of Jabil stock at artificially inflated prices."  (Doc. 114, ¶ 343)

A. Trades on the Basis of Material, Non-public Information

The plaintiffs must allege that the insider traded "on the basis of" material, non-public information.  An insider trades "on the basis of" material, non-public information if the insider "was aware of the material, non-public information when the person made the purchase or sale."[18]  17 C.F.R. § 240.10b-5-1.  The plaintiffs allege generally that

_____

[18] Rule 10b-5-1(c) creates several affirmative defenses to the claim that an insider traded on the basis of material, non-public information, including trades pursuant to a binding contract or stock-trading plan.  See 17 C.F.R. § 240.10b-5-1(c).

the insider trading defendants knew the true financial condition of the company; however, the plaintiffs fail to state which defendant knew what information and why the information was material.  The plaintiffs' general allegations about Jabil's financial condition and committee membership wholly fail to meet the pleading standard for a fraud claim under Rule 10b-5.  As described above, the plaintiffs fail to plead the defendants' "backdating scheme" with particularity.  The plaintiffs' allegations concerning Jabil's "execution problems" (putatively corroborated in part by confidential witnesses) ascribe knowledge only to defendant Main.  The plaintiffs fail to allege any other material, non-public information known by any other trading defendant.

## B. Scienter

A plaintiff typically alleges scienter by showing an unusual trading pattern by the defendant.  "[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir.1989)).  Determining the suspiciousness of an insider trade requires consideration of (1) the magnitude of the insider trading, (2) the timing of the trades, and (3) the differences between the suspicious trades and the defendant's prior trades.  In re Silicon Graphics, 183 F.3d at 986.

The plaintiffs allege the number of shares sold by each defendant during the class period, each defendant's proceeds from the sales, and each defendant's "percentage sold."  (Doc. 114, ¶ 58)  Other than these conclusory facts, the plaintiffs allege no fact

showing the unusual magnitude of any defendant's trades during the class period. The plaintiffs allege that defendants Alexander, Brown, Main, Morean, and Sansone sold shares within several weeks after Jabil released a positive earnings forecast for the third quarter of 2006. (Doc. 114, ¶ 186) However, the plaintiffs fail to allege why these sales are suspicious. An insider's selling shares after an increase in the share price is not inherently suspicious. Furthermore, with the possible exception of Main, the plaintiffs fail to allege that any defendant knew any information that conflicted with Jabil's increased earnings forecast. Finally, the plaintiffs allege no fact comparing a "suspicious" trade by a defendant with the defendant's prior trading pattern. Accordingly, the plaintiffs fail to allege facts supporting a strong inference that any defendant traded with scienter.

### C. Contemporaneous Trades

The plaintiff must also allege that the defendant sold a security "contemporaneously" with the plaintiff's purchase or sale of a security. See Colby v. Hologic, Inc., 817 F. Supp. 204, 215 (D. Mass. 1993). Neither the Act nor the rules or regulations define "contemporaneously." A strict interpretation of "contemporaneously" includes only trades on the same day. In re AST Research Sec. Litig., 887 F. Supp. 231, 233-34 (C.D. Cal. 1995). A more lenient interpretation defines "contemporaneously" to include trades within several days of each other. In re Oxford Health Plans, Inc., 187 F.R.D. 133, 144 (S.D.N.Y. 1999) (purchase within five days sufficient); In re Cypress Semiconductor Sec. Litig., 836 F. Supp. 711, 714 (N.D. Cal. 1993) (same); but see In re Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746, 761

(N.D. Cal. 1997) ("Given that stock trades settle within three days, and allowing for the possibility of an intervening three-day weekend, only purchases within six days of insider sales are truly contemporaneous."); Colby v. Hologic, Inc., 817 F. Supp. 204, 215 (D. Mass. 1993) (eight days insufficient). The more heavily traded a company's shares, the shorter the period of contemporaneousness. See Kreindler v. Sambo's Restaurant, Inc., No. 79-cv-4538(WK), 1981 WL 1684, at *5 (S.D.N.Y. Sept. 23, 1981) ("In light of the fact that over 940,000 shares of Sambo's common stock exchanged hands on the New York Stock Exchange in those seven trading days, it does not seem to us that even these trades were sufficiently contemporaneous to confer standing to sue . . . ."); see also William K.S. Wang, The "Contemporaneous" Traders Who Can Sue an Inside Trader, 38 Hastings L.J. 1175, 1182 (1987). Regardless of the time between trades, a plaintiff's purchase cannot precede the defendant's sale. In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 663-64 (E.D. Va. 2000); In re Verifone Sec. Litig., 784 F. Supp. 1471, 1489 (N.D. Ca. 1992) ("No liability can attach for trades made by plaintiffs before the insider engages in trading activity.").

The plaintiffs' allegedly contemporaneous trades appear in the table below.

**Table 3: Contemporaneous Trades**

| Defendant | Dates Defendant Sold Jabil Shares | Dates Plaintiffs Purchased Shares | Purchasing Plaintiff |
|---|---|---|---|
| Alexander | 3/27/2006 | 3/31/2006 | Laborers |
| Brown | 3/23/2006 3/30/2006 | 3/31/2006 | Laborers |
| Edwards | n/a | n/a | |
| Lewis | 6/30/2004 | 7/2/2004 | Laborers |
| Main | 1/11/2006 3/23/2006 | 1/13/2006 | Laborers |
| Morean | 12/30/2003 | 12/30/2003 | Laborers |
| | 1/23/2006 | 1/24/2006 | Laborers |
| | 1/24/2006 | 1/24/2006 | Laborers |
| | | 1/25/2006 | Pension |
| | 2/6 - 2/8/2006 | 2/7/2006 | Pension |
| | | 2/8/2006 | Pension |
| | 3/30/2006 | 3/31/2006 | Laborers |
| | 4/20/2006 | 4/20/2006 | Laborers |
| | 4/24/2006 | 4/25/2006 | Pension |
| Murphy | 1/26/2006 | 1/27/2006 | Laborers |
| | | 1/30/2006 | Pension |
| Raymund | 4/18/2006 | 4/20/2006 | Laborers |
| Sansone | 11/23/2005 | 11/23/2005 | Laborers |
| | | 11/25/2005 | Laborers |
| | 1/24/2006 | 1/24/2006 | Laborers |

The plaintiffs allege trades within four days of sales by defendants Alexander, Brown (on March 30, 2006), Lewis, Main (on January 11, 2004), Morean, Murphy, Raymund, and Sansone. The plaintiffs fail to allege contemporaneous trades for Brown's and Main's March 23, 2006, trades, and fail to allege a single trade by

Edwards.  However, the plaintiffs fail to allege a contemporaneous trade with a defendant who knew inside information at the time of the trade.

## D. Summary

Although the complaint is heavily laden with hyperbole and conclusory allegations, the plaintiffs fail to state a claim against any defendant.  The plaintiffs fail to plead that any defendant (with the possible exception of Main) knew any specific and material non-public information.  Although the plaintiffs possibly allege (through confidential witnesses) that Main knew material, non-public information in March, 2006, the plaintiffs allege a contemporaneous trade by Main only in January, 2006.  Finally, the plaintiffs fail to plead scienter because the complaint fails either to address any defendant's historic trading pattern or to allege that any individual defendant's trades were unusual in magnitude or timing.  Accordingly, count two of the complaint is **DISMISSED**.

## IV. Violation of Section 14(a) of the Exchange Act

In count three, the plaintiffs assert that Grafstein, Lavitt, Lewis, Main, Morean, Newman, Murphy, Raymund, Sansone, and Walters (the "Section 14(a) defendants") violated Section 14(a) of the Exchange Act and Rule 14a-9.  (Doc. 114, ¶¶ 344-49)  To state a claim under Section 14(a) of the Exchange Act and Rule 14a-9, a plaintiff must allege that the defendant prepared a proxy statement containing a material misstatement or omission that caused the plaintiff's injury.  See Shaev v. Saper, 320 F.3d 373, 379 (3d Cir. 2003).  The plaintiff must allege that "the proxy solicitation itself,

rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." See Shaev, 320 F.3d at 379 (internal quotation marks omitted). Although not requiring scienter, a Section 14(a) claim requires an allegation that the defendant negligently drafted the proxy statement. Wilson v. Great Am. Inds., 855 F.2d 987, 995 (2d Cir. 1988).

The plaintiffs allege that the Section 14(a) defendants prepared proxy statements containing material misstatements or omissions. (Doc. 114, ¶¶ 346) Specifically, the proxy statements stated that Jabil granted stock options with an exercise price at fair market value (Doc. 114, ¶ 346) The plaintiffs allege that Jabil admits that the proxy statements were false and misleading. (Doc. 114, ¶ 347) The plaintiffs allege that each proxy statement was "an essential link in the accomplishment of the continuation of defendants' unlawful issuance of stock options and the concealment of the Company's true financial condition." (Doc. 114, ¶ 347) Finally, the plaintiffs allege that each Section 14(a) defendant knew or was severely reckless in not knowing that each proxy statement was materially false and misleading. (Doc. 114, ¶ 348) As previously established, the plaintiffs fail to adequately allege backdating. The plaintiffs therefore fail to plead that each proxy statement contained a material misstatement or omission. The plaintiffs fail to state a claim under Section 14(a) of the Exchange Act and Rule 14a-9 against any Section 14(a) defendant, and count three is **DISMISSED**.

## V. Violation of Section 20A

In count four, the plaintiffs assert that each individual defendant violated Section 20A of the Exchange Act. (Doc. 114, ¶¶ 350-55) To claim a violation of Section 20A, a plaintiff must plead a predicate violation of the Act or an implementing rule or regulation. See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir. 1994). The plaintiff must also allege that the defendant, while in the possession of "material, non-public information," purchased or sold a security "contemporaneously" with the plaintiff's purchase or sale of a security. See 15 U.S.C. § 78t-1(a).

Because the complaint asserts a Section 20A claim against the "Insider Selling Defendants" but fails to identify each defendant in the group, a reasonable construction of the complaint includes each individual defendant identified in count two (the Section 10(b) claim for insider trading). The complaint fails to adequately allege a violation of Section 10(b) or 14(a) of the Act; therefore the complaint fails to state a Section 20A claim against any individual defendant. Accordingly, count four is **DISMISSED**.

## VI. Violation of Section 20(a)

In count five, the plaintiffs contend that each defendant violated Section 20(a) of the Exchange Act. (Doc. 114, ¶¶ 356-60) To assert a Section 20(a) violation, a plaintiff must allege that the defendant controlled a person who violated any section of the Act. 15 U.S.C. § 78t(a). The regulations define control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person." 17 C.F.R. § 230.405. In this circuit, a "controlling person" has "the power to control the general affairs of the entity primarily liable at the time the entity violated the

securities laws" and "the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." <u>Brown v. Enstar Group, Inc.</u>, 84 F.3d 393, 396 (11th Cir. 1996) (internal quotation marks omitted). "[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs, including the content of public statements and financial statements disseminated by its company, are sufficient . . . ." <u>In re Hamilton Bankcorp., Inc. Sec. Litig.</u>, 194 F. Supp. 2d 1353, 1359-60 (S.D. Fla. 2002). The "controlling person" will be liable for the acts of the violator "unless the controlling person acted in good faith and did not induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). The plaintiffs fail to state a Section 20(a) claim because they fail to adequately allege a predicate violation of the Exchange Act. <u>See</u> <u>Rosenberg v. Gould</u>, __ F.3d __, 2009 WL 50721, at *4 (11th Cir. Jan. 9, 2009). Accordingly, count five is **DISMISSED**.


## CONCLUSION

The defendants' motions to dismiss (Docs. 117,121) are **GRANTED**. The defendants' requests (Docs. 122, 123) for oral argument are **DENIED AS MOOT**. The plaintiffs request leave to amend but identify no new facts that would establish a violation of the securities laws. <u>See</u> <u>Rosenberg v. Gould</u>, __ F.3d __, 2009 WL 50721, at *4 (11th Cir. Jan. 9, 2009) ("'Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.'" (quoting <u>Posner v. Essex Ins. Co.</u>, 178 F.3d 1209, 1222 (11th Cir. 1999)). Because the plaintiffs fail to plead a claim after four attempts, further leave to amend is

futile. <u>See</u> <u>In re Parmalat Sec. Litig.</u>, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) ("The requirement of pleading fraud with particularity does not justify a complaint longer than some of the greatest works of literature. A complaint of this length, indeed, is an undue imposition on all who are obliged to read it.")   The third amended complaint (Doc. 114) is **DISMISSED WITH PREJUDICE**.  The Clerk is directed to (1) enter judgment of dismissal in favor of each defendant and against the plaintiffs, (2) terminate any pending motion, and (3) close the case.

ORDERED in Tampa, Florida, on January 26, 2009.

**STEVEN D. MERRYDAY**
**UNITED STATES DISTRICT JUDGE**